**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION**

| | |
|---|---|
| ANTHONY J. ZANGHI, KENNETH J. SOWERS, DOMINIC MCCUCH, JAMES HOHMAN, DARRELL SHETLER on behalf of themselves and others similarly situated, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC, <br><br> Plaintiffs, <br> v. <br><br> FREIGHTCAR AMERICA, INC., JOHNSTOWN AMERICA CORPORATION, and JOHNSTOWN AMERICA CORPORATION USWA HEALTH & WELFARE PLAN, <br><br> Defendants. | Civil Action No.: 13-146 <br><br> Class Action <br><br> Jury Trial Demanded <br><br> Electronically Filed <br><br> Judge Gibson |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

**Introductory Statement**

Plaintiffs submit this Statement of Undisputed Facts in support of their Motion for

Partial Summary Judgment as to Liability.  Plaintiffs first present undisputed facts that were

available and presented to this Court in connection with the parties' pre-discovery cross-motions

for summary judgment in the first of the three underlying class actions, United Steelworkers of

America, AFL-CIO-CLC, Geraldine Deemer, and Darrell Shetler v. Johnstown America

Corporation, No. 02-CV-806 (W.D.Pa.) ("Deemer").

Plaintiffs next set forth material portions of the Court's summary judgment ruling, the

July 14, 2003 Memorandum Opinion and Order in Deemer ("Deemer SJ Ruling") (Cindrich, J.)

(Dkt. #40-2) (included in Plaintiffs' Summary Judgment Appendix as Ex. 1 to the Declaration of Pamina Ewing ("Ewing Decl. Ex. 1").  Based on contractual language that the <u>Deemer</u> Defendants conceded was controlling, the Court first concluded that the subject retiree health and life insurance benefits were vested, "except as the company and union may agree otherwise."  <u>Id.</u> at 2.  The Court continued that it was the Defendants' burden, in overcoming this vested right to retiree benefits, to show that the company and union "agreed otherwise," and observed that "[t]here is substantial evidence in the record to support plaintiffs' position that no such agreement was reached."  <u>Id.</u> at 3-4.  After the Court scheduled a hearing on the pending motions, the parties advised that they needed discovery, and the Court denied the cross-motions without prejudice to allow that discovery to proceed.  Thereafter, the parties engaged in discovery before agreeing to settle that case as well as the other two underlying class actions.

Following the description of the Court's summary judgment ruling, Plaintiffs herein set forth the additional undisputed facts that were adduced during discovery.  Finally, Plaintiffs provide the subsequent pertinent procedural history.

**<u>Introductory Facts and the Parties</u>**

1.      This Court has previously summarized the ten years of litigation involving this employer, in <u>Zanghi v. FreightCar America, Inc.</u>, 2014 WL 130985, at *1 (W.D.Pa. Jan. 14, 2014) ("<u>Zanghi</u> Dismissal Ruling").

2.      Plaintiffs Anthony J. Zanghi, Kenneth J. Sowers, Dominic McCuch, James Hohman, and Darrell Shetler ("Class Representatives") retired from a Johnstown railcar facility ("Johnstown Facility") formerly operated by Defendant FreightCar America, Inc.

("FreightCar").[1]  Complaint (Dkt. #1) ¶¶ 1-2; FreightCar's July 8, 2013 Complaint in FreightCar America, Inc. v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO/CLC, (No. 13-4889 in N.D.Ill., now transferred here) ("FreightCar Complaint") (Dkt. #10-2 here) (Ewing Decl. Ex. 2) ¶ 13.

3.     The Class Representatives proceed on behalf of themselves and a proposed class of retirees of the Johnstown Facility, together with the surviving spouses of these retirees (collectively, "Retirees").  Complaint ¶¶ 1-2.

4.     Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("Union" or "USW") was the collective bargaining representative for hourly employees at the Johnstown Facility and negotiated the collective bargaining agreements with FreightCar relating to the retiree health and life insurance benefits at issue in this case.  FreightCar Complaint ¶ 2, 14.

5.     Plaintiffs filed this class action on July 9, 2013 to protect Retirees' rights to their collectively bargained health and life insurance benefits.  Complaint ¶¶ 82-87.

6.     Defendant FreightCar manufactures railcars at fabrication facilities in Alabama, Illinois, and Virginia.  August 5, 2013 Declaration of Thomas McCarthy proffered by FreightCar ("McCarthy Decl.") (Dkt. #18-2) (Ewing Decl. Ex. 3) ¶ 3.

7.     Defendant Johnstown America Corporation USWA Health & Welfare Plan ("Plan")[2] "provides that FreightCar will make contributions toward life and health insurance

---

[1] References herein to "FreightCar" include the prior corporate entities Johnstown America Industries, Inc. and Johnstown America Corporation ("JAC").
[2] References herein to "Plan" include all pertinent iterations of the Johnstown America Corporation USWA Health & Welfare Plan.

benefits for FreightCar's union retirees that worked at its former Johnstown, Pennsylvania fabrication facility."  McCarthy Decl. ¶ 5.

8.     This case arises from three underlying class actions in this Court:  <u>United Steelworkers of America, AFL-CIO-CLC, Geraldine Deemer, and Darrell Shetler v. Johnstown America Corporation,</u> No. 02-CV-806 (W.D.Pa.) ("<u>Deemer</u>"); <u>United Steelworkers of America AFL-CIO-CLC, Reggie Britt, et al. v. Johnstown America Corporation</u>, No. 03-CV-1298 (W.D.Pa.) ("<u>Britt</u>"); and <u>Sowers v. FreightCar America. Inc.,</u> No. 07-CV-201 (W.D.Pa.) ("<u>Sowers</u>") (collectively, "Underlying Litigation").  FreightCar Complaint ¶ 15.

9.     Before November 1, 2013, Retirees received retiree health and life insurance benefits as a result of settlement of the Underlying Litigation.  FreightCar Complaint ¶¶ 37, 39.

10.    Effective November 1, 2013, FreightCar terminated all of its contributions for health and life insurance benefits for Retirees.  Dkt. #65 (Consent Order providing that FreightCar would extend date for termination of benefit contributions to November 1, 2013).

**The Undisputed Facts Available at the Time of the Deemer Summary Judgment Ruling**

11.    The Johnstown Facility operated for many years as the Freight Car division of Bethlehem Steel Corporation ("Bethlehem").  August 7, 2002 Affidavit of Mark J. Duray proffered by FreightCar ("Duray Aff.") (Dkt. #60-2) (Ewing Decl. Ex. 4) ¶ 2.

12.    Bethlehem Steel sold the assets of the Freight Car division in 1991 to a new corporation which was called Johnstown America Corporation ("JAC").  FreightCar Summary Judgment Brief in <u>Deemer</u> ("FreightCar SJ Brief") (Dkt. #40-3 here) (Ewing Decl. Ex. 5) at 4; see also Duray Aff. ¶ 3.

13.    The 1991 purchase agreement, **to which the USW was not a party,** provided that Bethlehem was to reimburse FreightCar for retiree insurance costs for those FreightCar

employees who were 43 at the time of the October 28, 1991 sale and who subsequently retired with eligibility for retiree insurance benefits from FreightCar.  Duray Aff. ¶ 6; June 28, 2002 Affidavit of Andrew Palm ("Palm Aff.") (Dkt. #40-4) (Ewing Decl. Ex. 6) ¶ 17.

14.     In connection with the 1991 sale, JAC recognized the USW as the collective bargaining representative of the Johnstown Facility bargaining unit employees.  Duray Aff. ¶ 3.

15.     Also in connection with the 1991 sale, Bethlehem and FreightCar entered into a Letter Agreement dated October 18, 1991, referred to as the "Mirroring Agreement."  Duray Aff. ¶¶ 3-4.  The Mirroring Agreement appears in the record as Exhibit B to the Palm Aff. (part of Dkt. #40-4) (Ewing Decl. Ex. 7).[3]

16.     The Mirroring Agreement is also known as "Side Letter 22" and was one of 27 side letters to the 1991 CBA.  Duray Aff. ¶ 4.

17.     The Mirroring Agreement was incorporated in and made part of the 1991 CBA.  FreightCar's Answer in <u>Deemer</u> (Ewing Decl. Ex. 8) ¶ 44.

18.     As averred by Mr. Duray, pursuant to the Mirroring Agreement, "JAC was obligated to mirror the Bethlehem benefit plans."  Duray Aff. ¶ 6; see also FreightCar SJ Brief at 5 ("While JAC was obligated to mirror the Bethlehem benefit plans, the 1991 purchase agreement obligated Bethlehem to reimburse JAC for retiree insurance costs…").

19.     Under the Mirroring Agreement, FreightCar agreed to establish employee benefit plans in general for the members of the bargaining unit "that were identical in all material respects to the Bethlehem plans they replace."  Mirroring Agreement at 1; see also Duray Aff. ¶ 4.

---

[3] The Palm Affidavit was proffered in the <u>Deemer</u> litigation.  See caption thereof.

20.     In addition to requiring the establishment of an identical program of benefits

generally, the Mirroring Agreement provides as follows with respect to welfare benefit plans:

> **Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing** [of the sale].  The obligation to pay benefits to employees **or former employees** of Bethlehem/FCD under Johnstown America Corporation bargaining unit welfare benefit plans which arise from or are based on events which occurred prior to closing [of the sale] (whether or not claims for such benefits are submitted prior to closing) shall remain the responsibility of Bethlehem, whether or not the claiming employees are employed by Johnstown America Corporation. **Johnstown America shall be responsible for all benefits payable to its employees or its retirees which arise or are based on events which occurred after closing.**

Mirroring Agreement at 2 (emphasis added).

21.     Then-USW Director Andrew Palm participated in the labor negotiations in

connection with the 1991 sale.  Palm Aff. ¶¶ 4-5.

22.     Mr. Palm explained as follows with regard to the Mirroring Agreement:

> When we were negotiating for the Union's first contract with JAC in 1991, we considered it crucial that JAC agree to the same retiree medical benefits as Bethlehem Steel was providing at that time.  One feature of retiree medical benefits for Bethlehem Steel retirees (and generally for all basic steel retirees) is that they are to continue throughout retirement and beyond contract expiration (unless the Union affirmatively agrees otherwise).  The reason we considered it crucial in 1991 to have JAC agree on this issue was because we had a lot of people in our bargaining unit who had worked many years and would be retiring during the next ten years.  Many were even eligible for immediate retirement from Bethlehem in 1991.  We thought it would be totally unfair and inappropriate if these people lost their lifetime retiree medical benefits by virtue of the sale.  We stated repeatedly to JAC negotiators that this issue was a deal breaker, in that we needed to have these retiree medical benefits or there would be no agreement.  In the end, we achieved our goal.

September 9, 2002 Supplemental Declaration of Andrew Palm ("Supp. Palm Decl.") (Dkt. #40-

5) (Ewing Decl. Ex. 9) ¶ 3.

23.     "Among the plans to be mirrored," FreightCar has admitted, "was Bethlehem's

'Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of

6

Bethlehem Steel Corporation and Subsidiary Companies' ('the Bethlehem PHMB')."  FreightCar SJ Brief at 4.

24.     The Bethlehem PHMB was maintained pursuant to a collective bargaining agreement between Bethlehem and the Union.  FreightCar SJ Brief at 5.

25.     The Bethlehem PHMB appears in the record as Exhibit A to the Palm Aff. (part of Dkt. #40-4) (Ewing Decl. Ex. 10).

26.     The Bethlehem PHMB provided that the company would pay the entire cost of hospital and physician's coverage.  Bethlehem PHMB at 1.

27.     Consistent with the Supplemental Palm Declaration (Dkt. #40-5 at ¶ 3, quoted above), the Bethlehem PHMB states as follows with respect to health insurance in its "Continuation of Coverage" provision:

> **Continuation of Coverage**
>
> **Any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise.**

Bethlehem PHMB at 57 (emphasis added).

28.      FreightCar does not dispute that the "Continuation of Coverage" provision is controlling, and indeed has expressly stated that it relies on the language providing "except as the Company and the Union may agree otherwise."  FreightCar SJ Brief at 5 ("While Plaintiffs rely on the statement that coverage will not be terminated or reduced (First Amended Complaint at ¶¶ 2, 14), Defendants rely on the language immediately following: *'except as the Company and the Union may agree otherwise.'*") (emphasis in the original).

7

29.     The Bethlehem PHMB similarly provides with respect to retiree life insurance:

Life Insurance After Retirement

Any Pensioner entitled to life insurance pursuant to the provisions of the
insurance agreement and booklet applicable at the time of retirement shall not
have such life insurance terminated or reduced (except as provided in such
booklet) so long as he or she remains retired from the Company, notwithstanding
the expiration of such agreement or booklet or this Agreement, except as the
Company and the Union may agree otherwise.

Bethlehem PHMB at 57.

30.     Nowhere does the Bethlehem PHMB reserve for the employer a **unilateral** right

to reduce or terminate benefits.  See Bethlehem PHMB; see also Palm Decl. ¶ 7.

31.     FreightCar "admits that it fulfilled its obligation under the Mirroring Agreement to

create and provide welfare plans which mirrored Bethlehem's."  FreightCar's Answer ("FreightCar

Answer") (Dkt. #76) ¶ 47.

32.     In 1993, while the 1991 CBA was still in effect, FreightCar distributed a summary

plan description called "JAC's Employee Guide" ("1993 SPD").  See Ewing Decl. Exs. 11, 12,

and 13.[4]

33.     The 1993 SPD includes a May 1993 letter addressed to "Dear Employee" that

states that "this handbook serves as the summary plan description required by the Employee

Retirement Income Security Act of 1974, as amended."  1993 SPD (Ewing Decl. Ex. 11) (Dkt.

#60-5) at FCA000215.

34.     The 1993 SPD states as follows with reference to health benefits:

Note:  **This plan is subject to the rights and obligations of collective
bargaining.  The company may amend or terminate the plan only through**

---

[4] Plaintiffs proffer three exhibits which together make up the 1993 SPD.  FreightCar submitted
excerpts from the 1993 SPD (Ewing Decl. Ex. 11) (Dkt. #60-5) and a "Retiree Insert" thereto
(Ewing Decl. Ex. 12) (Dkt. #60-6).  Because certain crucial pages were omitted from
FreightCar's submission, Plaintiffs proffer those at Ewing Decl. Ex.13 (Dkt. #1-9).

**this process.**  This booklet is intended as a general summary of your benefits under the plan.  The specific details of this plan are in the actual plan document, which controls your benefits.

1993 SPD (Ewing Decl. Ex. 13) (Dkt. #1-9) at handwritten page number 6 (emphasis added).

35.    Another notice similarly provides:

This guide attempts to provide a simple explanation of the provisions of your benefit.  Complete technical information on the plans can be found in formal legal documents available in the human resources department.

**If there's any omission, if this guide is unclear, or if this guide and the plans differ, the plans as stated in the legal documents must take precedence.**

1993 SPD (Ewing Decl. Ex. 11) (Dkt. #60-5) at FCA 000437 (emphasis added).

36.    On the first page of the 1993 SPD, a letter dated May 1993 addressed to

"Employee" similarly states that the handbook contained only "summaries of the benefit plans;"

and that:

Each benefit plan has legal documents that may be referred to whenever a question concerning your coverage arises.  **In the event of a difference between the summary and the legal documents, the legal documents shall control.**

1993 SPD (Ewing Decl. Ex. 11) (Dkt. #60-5) at FCA000215 (emphasis added).

37.    The 1993 SPD provides:

If you retire under Johnstown America's pension plan for represented employees and have worked continuously at Johnstown America for 15 or more years, you and your eligible dependents will be enrolled for retiree medical coverage under the medical plan, unless you choose not to be. If you're the spouse of a former employee who's eligible to receive a surviving spouse's benefit under the pension plan, you'll also be eligible for our retiree medical coverage.

1993 SPD (Ewing Decl. Ex. 11) (Dkt. #60-5) at FCA000256.

38.    The 1993 SPD states as follows with respect to employee coverage:  "The

company pays the cost of medical coverage for you and your dependents."  1993 SPD (Ewing

Decl. Ex. 11) (Dkt. #60-5) at FCA000225.

39.     FreightCar relies in this litigation on the following:

*If Coverage Ends or Is Modified*

**Subject to collective bargaining**, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part.  This means the plans may be discontinued in part or in their entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented. If any changes are made, you'll be notified.

1993 SPD (Ewing Decl. Ex. 11) (Dkt. #60-5) at FCA000450 (emphasis added).

40.     Another 1993 SPD provision, similarly relied upon by FreightCar and similarly consistent with the "Note" from the 1993 SPD cited above states:

Situations That May Affect Your Benefits

You and your family's medical benefits could be lost or delayed if:
* * *
**Subject to the collective bargaining agreement**, the plan is modified to reduce or eliminate certain benefits or it ends.

1993 SPD (Ewing Decl. Ex. 11) (Dkt. #60-5) at FCA000257 (emphasis added).

41.     As construed by FreightCar, "the general provisions of JAC's Employee Guide expressly reserve to JAC the right to terminate any benefit, including company paid retiree benefits, **subject to collective bargaining**."  Duray Aff. ¶ 20 (emphasis added).

42.     FreightCar and the Union engaged in collective bargaining in 1994, resulting in the 1994 CBA.  Duray Aff. ¶ 7.

43.     There was no change in the 1994 CBA that is pertinent to this case. Duray Aff. ¶ 7.

44.     FreightCar admits that from 1991 until 1997, it was bound by the express language in the Bethlehem PHMB appearing under the heading "Continuation of Coverage," which, again, provided that retiree benefits continued so long as the individual remained retired or received a Surviving Spouse benefit, unless the company and Union were to "agree

otherwise."  See FreightCar SJ Brief at 2 (arguing that Mirroring Agreement was "abrogated"
only in 1997).

45.     FreightCar and the Union engaged in collective bargaining in 1997, resulting in
the 1997 CBA.  Duray Aff. ¶ 8.

46.     It is FreightCar's position in this litigation that during the 1997 negotiations, it set
out to eliminate from the 1997 CBA side letters which had accompanied the 1991 CBA and had
been carried forward in the 1994 CBA, and to negotiate a "zipper clause."  Duray Aff. ¶ 9.

47.     Most of the 1991 Side Letters, including Side Letter 22 – the Mirroring
Agreement – were removed from the 1997 CBA.  Duray Aff. ¶ 9; see also FreightCar
Preliminary Injunction Brief (Dkt. #58-1) at 7 ("The parties only retained four side letters from
the 1991 CBA").

48.     Article XXI of the 1997 CBA, which FreightCar terms the "zipper clause" and on
which it relies, in pertinent part provides:

EXTENT OF AGREEMENT

This Agreement and the documents expressly referred to herein are the only
documents by which the parties intend to be contractually or statutorily bound.
Any document, not expressly referred to herein that may be brought forth by
either the Company or the Union after ratification of this Agreement may be
included as part of this Agreement, provided both parties agree to its inclusion.
All Appendices from previous agreements have either been consolidated into
Articles of this Agreement or in any event, are no longer part of this Agreement.

Dkt. #60-4 (Ewing Decl. Ex. 14) at Art. XXI.

49.     It is FreightCar's position in this litigation that the 1997 CBA "abrogated" the
Mirroring Agreement and replaced it with the 1993 SPD.  Duray Aff.  ¶ 14.

50.     In a letter from FreightCar's President dated June 3, 1999 addressing a change in
corporate ownership, FreightCar provided union employees "with information about how your

benefits will be handled following the acquisition, particularly…retiree health care and life insurance programs." See Palm Aff. Ex. C (part of Dkt. #40-4) (Ewing Decl. Ex. 15).

51.     As to these health and life insurance programs, FreightCar's President reassured employees that their benefits would continue just as they had under Bethlehem:

> **You will be eligible for the same retiree health and life insurance coverage through Johnstown America Corporation as you were through Bethlehem Steel and the current plan.**

Id. (emphasis added).

52.     Beginning around June of 2001, Bethlehem fell behind in its reimbursements to FreightCar for the cost of retiree benefits for retirees who were age 43 or older at the time of the 1991 sale. Duray Aff. ¶ 22.

53.     In October 2001, Bethlehem went into Chapter 11 bankruptcy. Duray Aff. ¶ 23.

54.     The 1997 CBA expired on October 31, 2001. Duray Aff. ¶ 24.

55.     In negotiations for a new CBA, FreightCar proposed that retiree insurance benefits be terminated to the extent that they were supported by reimbursement from Bethlehem but Bethlehem failed or refused to reimburse FreightCar for the cost of those benefits. Duray Aff. ¶ 24. According to Mr. Duray, the Union told FreightCar to take this proposal off the table. Id. As FreightCar recently expressed it here, "[i]n 2001, upon expiration of the 1997 collective bargaining agreement, FreightCar attempted to bargain over the retiree medical benefits, as required, and upon impasse, terminated these benefits." FreightCar Preliminary Injunction Brief (Dkt. #58-1) at 3.

56.     In his 55-page decision concerning 2001 bargaining, National Labor Relations Board Administrative Law Judge David Evans thoroughly reviewed the bargaining, both as to retiree healthcare and other issues, and concluded, among other things, that FreightCar engaged

"in a course of overall bad faith bargaining with the Union during contract negotiations."  In re

Johnstown America Corp., 2003 WL 1831898, at *54 (NLRB Div. of Judges, April 4, 2003).

57.     The NLRB judge ruled that FreightCar during bargaining in 2001 and 2002 failed

and refused to bargain in good faith and that its conduct, including insistence on proposals

related to retiree health insurance and other benefits for laid-off and retired employees, violated

§§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5).  2003 WL

1831898, at *53.

58.     In its ruling in the underlying case of Sowers, this Court relied on Judge Evans'

conclusion, finding as follows:

> A 2003 National Labor Relations Board administrative law judge ("ALJ") ruling
> recounts the FCA's efforts to eliminate special pensions, also termed shutdown
> pensions, and the benefits associated with them.  The ALJ concluded that…the
> Company violated the Act by "unilaterally implementing changes in the unit
> employees' terms and conditions of employment in the areas of employees Rule-
> of-65 and 70/80 pensions," specifically by "unilaterally eliminating the $400
> supplement and the health and life insurance benefits of employees retiring under
> the Rule-of-65 and 70/80 pensions."

Hayden v. Freightcar America, Inc., 2008 WL 375762, at *33 (W.D.Pa. Jan. 11, 2008)

(citations omitted).

59.     At no time during the initial 1991 labor negotiations or during any subsequent

round of bargaining before 2002 did FreightCar ever suggest to the Union that retiree welfare

benefits were terminable simply because the current labor agreement had expired.  See, e.g.,

Palm Aff. ¶ 13; Supp. Palm Decl. ¶ 2.

60.     When the USW asked for the actual plan documents covering welfare benefits

(including benefits for retirees) in 2002, FreightCar stated that: "Plan documents do not exist for

the welfare plans i.e., health care, and sickness and accident plans, etc."  See Palm Aff. Ex. D

(part of Dkt. #40-4) (Ewing Decl. Ex. 16).

61.     By letter dated January 24, 2002, Bethlehem informed FreightCar that it would no longer provide reimbursements for FreightCar retiree insurance.  Duray Aff. ¶ 26.

62.     Before 2002, the only excuse FreightCar had ever offered for terminating benefits was that Bethlehem Steel was operating under Chapter 11 of the U.S. Bankruptcy Code and had "stopped reimbursing JAC for the cost of your post-retirement benefit premiums."  See, e.g., Palm Aff. ¶ 16 and Ex. E (Ewing Decl. Ex. 17) at 1.  FreightCar explained then that, at the time of the 1991 sale, "Bethlehem agreed to reimburse JAC for the cost of your post-retirement health insurance and life insurance," and that Bethlehem had now reneged on this agreement."  Palm Aff. ¶ 16 and Ex. E at 1.

63.     Even in its Deemer summary judgment brief, FreightCar took the position that it "never intended to or expected to bear" the costs for which Bethlehem had reimbursed it, and that it "never budgeted" for these costs.  FreightCar SJ Brief at 5.

64.     Again, neither the Union nor Retirees were parties to the alleged reimbursement agreement between FreightCar and Bethlehem.  Palm Aff. ¶ 17.

**The Deemer Case**

65.     After the Deemer class members had already retired, FreightCar by letters dated February 1, 2002 and March 6, 2002 announced that effective in May 1, 2002, it would cease paying for these retirees' medical coverage.  See Letters from JAC dated February 1, 2002 and March 6, 2002, which appear in the record as Exhibits E and F to the Palm Aff. (part of Dkt. #40-4) (Ewing Decl. Exs. 17 and 18); see also McCarthy Decl. ¶ 6.

66.     The Deemer class members encompassed all Retirees who retired from FreightCar after the 1991 sale and who were at least 43 years old at the time of sale.  See JAC Letter dated February 1, 2002 at 1(Ewing Decl. Ex. 17).

14

67.     On April 26, 2002, the <u>Deemer</u> plaintiffs filed their complaint in this Court, alleging that retiree benefits for a class of approximately 250 individuals were meant to last throughout retirement.  See Complaint at No. 02-CV-806 ("<u>Deemer</u> Complaint") (Ewing Decl. Ex. 19).

68.     The <u>Deemer</u> parties filed cross-motions for summary judgment.

69.     In his Report and Recommendation issued February 24, 2003, Magistrate Judge Mitchell recommended granting FreightCar's summary judgment motion and denying the <u>Deemer</u> plaintiffs' Motion.

**<u>The Court's Summary Judgment Ruling in Deemer</u>**

70.     On July 14, 2003, Judge Cindrich issued his ruling on the parties' cross-motions for summary judgment, rejecting the R&R.  July 14, 2003 Memorandum Opinion and Order in <u>Deemer</u> ("<u>Deemer</u> SJ Ruling") (Cindrich, J.) (Dkt. #40-2) (Ewing Decl. Ex. 1).

71.     The Court opened its discussion by stating FreightCar's three contentions:

> Defendants argue that the analysis of this case turns on three points: (1) whether the Mirroring Agreement was in effect in 2002; (2) whether defendants violated the Bethlehem Insurance Agreement; and (3) whether defendants complied with the authority granted them under the JAC Employee Guide, which defendants claim is the governing instrument for purposes of ERISA and the LMRA.

<u>Deemer</u> SJ Ruling at 2 (footnote omitted).  The Court's response was: "We disagree."  <u>Id.</u>

72.     The first issue, the Court explained, was not whether the Mirroring Agreement was in effect in 2002, but whether the employees' right to retirement benefits was "vested." <u>Deemer</u> SJ Ruling at 2.

73.     The Court began its vesting analysis with the finding that "[i]n the initial contract between Johnstown America and the Union, the Company agreed to mirror the retiree benefit plans that plaintiffs had received from Bethlehem."  <u>Deemer</u> SJ Ruling at 1.  As the Court found,

"this Agreement was executed between Johnstown America and the Union on October 18, 1991 and provided that Johnstown America would create employee benefit plans that would mirror in all material respects the Bethlehem plans they replaced." Id. at 2 n.1.

74.     Upon reviewing the mirrored benefit plan, the Bethlehem PHMB, the Court concluded that Retirees' benefits are vested, "except as the company and union may agree otherwise," a point which FreightCar did not dispute:

> The Bethlehem Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses" ("Bethlehem PHMB") that Johnstown America agreed to mirror mandated that pensioners ***"shall not have such coverage terminated or reduced…so long as the individual remains retired from the Company… notwithstanding the expiration of this agreement, except as the company and union may agree otherwise."*** We agree with the several courts that have construed this exact language that it creates vested retirement benefits.  Indeed, defendants do not argue that plaintiffs' rights were not vested.

 Deemer SJ Ruling at 2 (emphasis in the original).

75.     The Court continued that the second issue was not, as FreightCar framed it, whether FreightCar violated the Bethlehem PHMB, but rather whether FreightCar "can meet [its] burden to show that the company and the union agreed to modify the vested retirement benefits plan." Deemer SJ Ruling at 3.

76.     The Court articulated FreightCar's argument on this point as follows:

> Defendants argue that in 1997, the Union and Johnstown America agreed to a collective bargaining agreement ("CBA") with a "zipper clause" stating: "This Agreement and the documents expressly referred to herein are the only documents by which the parties intend to be contractually or statutorily bound .... All appendices from previous agreements have either been consolidated into Articles of this Agreement or in any event, are no longer part of this Agreement."  The 1997 CBA then expressly incorporated several of the Side Letters created in 1991. The 1997 collective bargaining agreement also provided that employees would be eligible for insurance and other benefits as set forth in "JAC's Employee Guide."

Deemer SJ Ruling at 3.

77.     The Court explained that the Magistrate Judge had reasoned as follows on this

point:

> …since Side Letter 22, which contained the Mirroring Agreement, was not
> specifically incorporated into the 1997 CBA, it was implicitly abrogated.  The
> Magistrate Judge further reasoned that retiree health and welfare benefits were
> thereafter governed by the JAC Employee Guide rather than the Bethlehem
> PHMB.  The Administrative Section of the JAC Employee Guide stated that
> "[s]ubject to collective bargaining, the company reserves the right to end,
> suspend, or amend the plans at any time, in whole or in part." The Magistrate
> Judge seized on this language to conclude that the Company merely had to raise
> the issue of retiree benefits during the negotiations, rather than securing the
> Union's agreement, to have authority to end retiree benefits

Deemer SJ Ruling at 3.

78.     The Court rejected FreightCar's argument and the Magistrate Judge's reasoning

because "[i]t is defendant's burden, in overcoming the Union's vested right to retiree benefits, to

show that the union and the company 'agreed otherwise,'" and there is "substantial evidence in

the record to support plaintiffs' position that no such agreement was reached."  Deemer SJ

Ruling at 3-4.

79.     The Court first observed that "defendants have not attempted to show that the

Union agreed in 1991 that retiree benefits would be contingent on Bethlehem's continued ability

to reimburse Johnstown America for those costs."  Deemer SJ Ruling at 2 n.2.

80.     Continuing its analysis, this Court found it significant that "[i]t appears to be

undisputed that Johnstown America continued to adhere to the Bethlehem PHMB until early

2002, long after the Mirroring Agreement was supposedly rejected under defendants' theory."

Deemer SJ Ruling at 4.

81.     The Court observed that the Deemer plaintiffs presented the "plausible

explanation" that the Mirroring Agreement was not retained after 1997 because it had already

achieved its purpose, *i.e.*, the creation of an employee benefit plan that mirrored the Bethlehem

PHMB.  <u>Deemer</u> SJ Ruling at 3.

82.     The Court proceeded to identify several problems with FreightCar's reliance on

the 1993 SPD.  <u>Deemer</u> SJ Ruling at 4.

83.     First, the Court explained, the term "subject to collective bargaining," as used in

the 1993 SPD, "is not irreconcilable with the term 'as the company and union may otherwise

agree,' which was used in the Bethlehem PHMB."  <u>Deemer</u> SJ Ruling at 4.

84.     Second, the Court relied upon the fact that the 1993 SPD was drafted in 1993,

when the Bethlehem PHMB was indisputably in effect and was not changed after the 1997

negotiations.  <u>Deemer</u> SJ Ruling at 4.

85.     Third, the Court emphasized that text in the 1993 SPD stated that it was merely a

summary document, thus creating "a strong inference" that the "actual plan document" referred

to in the 1993 SPD remained the Bethlehem PHMB.  <u>Deemer</u> SJ Ruling at 4.

86.     In conclusion, the Court sustained Plaintiffs' objections to the R&R, and ordered

a hearing to "assist its de novo review of the R&R."  <u>Deemer</u> SJ Ruling at 5.

87.     The Court stated that it would "consider any evidence that either side wishes to

present relating to contract interpretation and/or the appropriateness of injunctive relief."

<u>Deemer</u> SJ Ruling at 5.

88.     Following up on its summary judgment decision, the Court issued an August 28,

2003 Memorandum Order that denied without prejudice the cross-motions for summary

judgment, to be reasserted after planned discovery closed:

> The court held a status conference on August 20, 2003. At the conference, the
> parties informed the court that no discovery had been conducted in the case. The
> parties further presented a joint discovery plan that provided for a close of
> discovery on January 30, 2004, followed by a hearing in March 2004. In light of

our order dated July 15, 2003 and the parties' discovery plan, it is hereby ordered that all pending motions are denied without prejudice to reassert at the close of discovery.

Ewing Decl. Ex. 20 (Dkt. #60-1)

**<u>Additional Evidence Adduced During Deemer Discovery</u>**

89.     Following the Court's summary judgment ruling, the parties proceeded to engage in discovery which produced significant evidence relevant to Plaintiffs' Motion for Summary Judgment.  As subsequently recited in the <u>Britt-Deemer</u> Settlement Agreement, "[t]he parties in <u>Deemer</u> conducted months of discovery, which included many depositions and production of thousands of pages of documents."  Dkt #40-7 (Ewing Decl. Ex. 21) at 4.  The <u>Britt-Deemer</u> Settlement Agreement further recites that, "[l]ike the parties in <u>Deemer</u>, the parties in <u>Britt</u> conducted discovery, which included the production of documents."  <u>Id.</u> at 5.

90.     FreightCar and Plaintiffs specifically agreed in the <u>Britt-Deemer</u> Settlement Agreement that the parties "shall be able to make full use of depositions, documents and other materials thus far produced" in <u>Britt</u> and <u>Deemer</u> in any renewed litigation.  <u>Britt-Deemer</u> Settlement Agreement § 16(f).

91.     Mark Duray was deposed during <u>Deemer</u> discovery on December 18, 2003.  See December 18, 2003 Deposition Transcript of Mark Duray ("Duray Dep.") (Ewing Decl. Ex. 22). Mr. Duray signed the principal declaration relied upon by FreightCar in the instant case in opposing Plaintiffs' motion for preliminary injunction.  See Duray Aff. (Dkt. #60-2) (Ewing Decl. Ex. 4).

92.     Mr. Duray was also FreightCar's Manager of Labor Relations from 1994 through 1998 and Vice President for Human Resources from 1998 through at least 2003.  Duray Aff. ¶ 1.  Beginning in 1998, he was the top HR person at FreightCar.   Duray Dep. at 156:19-22,

167:11-18 (Ewing Decl. Ex. 22).  Mr. Duray was also a member of FreightCar's negotiating committee during the 1997 negotiations.  Duray Decl. ¶ 8.

93.     John Plunkard was deposed during Deemer discovery on May 27, 2004.  Mr. Plunkard was FreightCar's Chief Financial Officer from 1991 through 1993, and again from 1998 to 1999.  Excerpts from May 27, 2004 Deposition Transcript of John Plunkard ("Plunkard Dep.") at 14:21-15:7, 15:19-16:10 (Ewing Decl Ex. 23).

94.     Mr. Plunkard was the person on FreightCar's management committee in 1997 who was most knowledgeable about health care negotiations.  Plunkard Dep. at 49:3-15.

95.     In his testimony, Mr. Duray confirmed the Court's ruling that "[i]t appears to be undisputed that Johnstown America continued to adhere to the Bethlehem PHMB until early 2002, long after the Mirroring Agreement was supposedly rejected under defendants' theory." Deemer SJ Ruling at 3.  In particular, Mr. Duray testified that the retiree health benefits provided by FreightCar in 1999 mirrored those provided in the Bethlehem plan.  Duray Dep. at 162:2-13.

96.     Mr. Duray further testified that FreightCar did in fact enact welfare benefit plans, including retiree health plans, that mirrored Bethlehem's.  Duray Dep. at 43:19-23.

97.     Mr. Duray likewise testified that FreightCar had all the mirrored Bethlehem Plans "up and running."  Duray Dep. at 102:23-103-2.

98.     Mr. Duray's testimony was also consistent with the Court's emphasis on the fact that the 1993 SPD was drafted in 1993, when the Bethlehem PHMB was indisputably in effect, and the Guide was not changed after the 1997 negotiations.  See Deemer SJ Ruling at 4.  He testified that the 1993 SPD first came out in 1993 or close to that year.  Duray Dep. at 62:11-13.

99.     Mr. Duray also testified that the Mirroring Agreement was still in effect when the 1993 SPD came out in 1993.  Duray Dep. at 63:13-17.  As testified to by Glenn Grove,

FreightCar's benefit administrator at the time, the 1993 SPD encompassed the Mirroring

Agreement.  Excerpts from the December 10, 2003 Deposition Transcript of Glenn Grove

("Grove Dep.") (Ewing Decl. Ex. 24) at 13:16-22; 22:2-16.

     100.    Mr. Duray testified as follows with respect to the 1993 SPD's status as such:

> Q.  And would it be fair to state that the JAC guide was a summary plan
> description of the various benefit plans that JAC had, including retiree health?
>
> A.  Yes.

Duray Dep. at 63:18-23.  He also testified that he knows how to read and understand summary

plan descriptions.  Id. at 162:21-163:4.

     101.    Mr. Duray's testimony also confirmed the Court's point that the 1993 SPD stated

that it was merely a summary document, thus creating "a strong inference" that the "actual plan

document" referred to in the 1993 SPD remained the Bethlehem PHMB.  See Deemer SJ Ruling

at 4.  He testified that the 1993 SPD was a summary plan description of FreightCar's benefit

plans, including retiree health.  Duray Dep. at 63:18-23.

     102.    Mr. Duray also confirmed the Court's conclusion that the Deemer plaintiffs had

presented a "plausible explanation" that the Mirroring Agreement was not retained after 1997

because it had already achieved its purpose, i.e., the creation of an employee benefit plan that

mirrored the Bethlehem PHMB.  See Deemer SJ Ruling at 3.  Mr. Duray testified:

> Q.  And if Johnstown America did create a retiree healthcare plan, if it mirrored
> Bethlehem's, once it did so, and if it did discharge its obligations then there would
> be no need for this side letter [the Mirroring Agreement] in 1997, correct?
>
>                            ***
>
> A.  Yes.

Duray Dep. at 114:21-115:6.

103.    Also on this point, Mr. Duray testified as follows with regard to statements of Tex

McIver, one the two leaders of 1997 negotiations for FreightCar (Duray Dep. at 134:24-

135:135:3):

> Q.  Would you agree that Tex McIver gave, as the reason for removing the side
> letters, that these things were no longer needed, they were obsolete, that all
> obligations under the side letters were all removed, had already been taken care
> of?
>
> A.  Yes.

Duray Dep. at 135:13-21.

104.    Mr. Plunkard also confirmed this point, testifying that at the time that the

Mirroring Agreement (Side Letter 22) was removed, the mirroring requirement had already been

accomplished:

> Q.  Well, you testified that in 1991, or shortly after the closing of the sale, that the
> Bethlehem benefit plans for the bargaining units, the welfare benefit plans had
> been mirrored.  So my question is, in 1997, there was no --- that purpose had
> already been --- or that requirement had already been accomplished?
>
> A.  I would say there was no need, in my opinion, for that letter, once we had
> accomplished the requirement, yes.

Plunkard Dep at 43:22-44:8.

105.    One of the Company's other bargainers, Claud ("Tex") McIver, confirmed that in

the earlier round of bargaining, in 1994, the Company had sought to have several side letters

removed, including Side Letter 22, specifically because the obligations created by the Company

in the letter had been met.  February 25, 2004 Deposition Transcript of Claud McIver (Ewing

Decl. Ex. 25) at 38:17-39:1.

106.    As to the removal of various side letters, Mr. Duray averred that during 1997

negotiations, FreightCar "achieved the Union's agreement to abrogate all of the 1991 side letters

except numbers 4, 5, 13 and 26."  Duray Aff. ¶ 9.  Mr. Duray testified that numerous side letters

besides Side Letter 22 (the Mirroring Agreement) were removed because they had already achieved their purpose.  See Duray Dep. at 85:5-86:9 (Side Letter 1 removed because the obligation it addressed had been discharged and there was no need to keep it in the CBA); id. at 86:10-87:4 (obligations in Side Letter 2 discharged in 1991); id. at 87:5-87:24 (FreightCar had nothing further to do under Side Letter 3 – it had already done what the letter obligated it to do); id. at 87:4-88:4 (Side Letters 4 and 5 were not removed from the contract); id. at 88:4-89:12 (witness did not know whether FreightCar discharged its obligations under Side Letter 6); id. at 89:13-20 (FreightCar discharged its obligations under Side Letter 7); id. at 90:6-20 (witness did not know whether FreightCar discharged its obligations under Side Letter 8); id. at 90:22-91:11 (Side Letter 9 concerned language that was to be included in 1991 contract); id. at 91:12-92:4) (obligations under Side Letter 10 discharged); id. at 92:6-93:3 (witness did not know whether FreightCar discharged its obligations under Side Letter 11); id. at 94:11-13 (Side Letter 13 stayed in the contract); id. at 94:19-95:9 (FreightCar discharged its obligations under Side Letter 14); id. at 97:5-97:19 (no longer any need for Side Letter 17); id. at 97:20-98:5 (no longer any need for Side Letter 18); id. at 98:15-99:5 (no further need for Side Letter 19 because FreightCar discharged its obligations); id. at 99:6-11 (witness did not know whether FreightCar discharged its obligations under Side Letter 20).

107.    In additional testimony with regard to the 1997 negotiations, Mr. Duray testified that health benefits were actually **improved** during these negotiations.  Duray Dep. at 135:22-136:4; id. at 144:18-145:2.

108.    Mr. Duray also testified that a statement of FreightCar's priorities for 1997 bargaining document stating that the Company was not asking employees to give up any covered

benefits was consistent with his understanding of FreightCar's position in the 1997 negotiations. Duray Dep. at 138:3-140:16.

109.    Mr Duray testified with regard to 1997 negotiations as follows:

**Q.  You agree there was no intent to reduce retiree health benefits, correct?**

**A.  Correct.**

Duray Dep. at 145:8-12, 145:19-22 (emphasis added).

110.    Mr. Plunkard was not even aware of the existence of the continuation of coverage provision at the time of the 1997 negotiations.  Plunkard Dep. at 39:23-40:19.

111.    Mr. Plunkard testified that during 1997 bargaining (Plunkard Dep. at 44:15-18), he authored a document titled "1997 Labor Contract Required Changes" ("FreightCar 1997 Bargaining Priorities") (Ewing Decl. Ex. 26) which identified what he felt were the critical issues on health care, to establish talking points for FreightCar's strategy sessions.  Plunkard Dep. at 47:10-48:21.

112.    The FreightCar 1997 Bargaining Priorities were FreightCar's negotiating goals with respect to healthcare.  Plunkard Dep. at 49:16-20.  Other than the listed goals, there were no other health care goals.  Id. at 50:2-6.

113.    The FreightCar 1997 Bargaining Priorities stated with respect to health care goals that "the main issue here is the provider."  FreightCar 1997 Bargaining Priorities at 1; see also Plunkard Dep. at 50:7-14.  This was Mr. Plunkard's view of the problem or issue with health care in 1997.  Id.

114.    The FreightCar 1997 Bargaining Priorities proceeded to address FreightCar's ability to shop for the best value and states: "**the company is not asking the employee to give**

**up any of the covered benefits**."  FreightCar 1997 Bargaining Priorities at 1 (emphasis added); see also Plunkard Dep. at 50:15-24.

115.    The second health care goal identified by Mr. Plunkard in the FreightCar 1997 Bargaining Priorities concerned the cost of continuing coverage for laid off employees. FreightCar 1997 Bargaining Priorities at 2; see also Plunkard Dep. at 51:4-10.

116.    Mr. Plunkard also authored a second document that identified "three critical issues" concerning health care insurance for 1997 bargaining, referred to herein as the "Critical Issues Memo."  See Ewing Decl. Ex. 27.  This document stated, and Mr. Plunkard testified, that the three critical health care issues for 1997 bargaining were the provider, coverage for laid off employees, and the complicated nature of the sickness and accident benefit.  Critical Issues Memo; Plunkard Dep. at 52:9-54:11.

117.    Mr. Plunkard testified that at the time of the 1997 negotiations, there was no indication that Bethlehem would not continue paying for retiree health and life insurance benefits.  Plunkard Dep. at 63:7-11.

118.    Mr. Plunkard further testified that at the time of the 1997 negotiations, it was his belief and FreightCar's belief that Bethlehem would continue paying for retiree health and life insurance benefits.  Plunkard Dep. at 63:12-18.

119.    It was Mr. Plunkard's view at the time of the 1997 negotiations that Bethlehem, and not FreightCar, was responsible for these benefits.  Id. at 63:19-64:7.  This was also the view of James Cirar, FreightCar's President and CEO at the time.  Excerpts from the May 25, 2005 Deposition Transcript of James Cirar ("Cirar Dep.") (Ewing Decl. Ex. 28) at 12:2-5; 54:16-55:2 ("Q.  Okay.  Did you have an understanding as to whether [FreightCar] had any obligation

independent of Bethlehem Steel's obligation, to provide retiree healthcare benefits?  A.  It was always my understand that the company did not.").

120.    Mr. Duray testified that other than improvements to pension calculations, there were no changes to the 1993 SPD as a result of 1994 or 1997 negotiations.  Duray Dep. at 69:12-25.

121.     Mr. Duray also testified that the only reason he gave to the Union before May 2002 for continuation of retiree health payments being an issue was the fact that Bethlehem had stopped reimbursing the company.  Duray Dep. at 131:7-14.

122.    FreightCar's benefit administrator at the time, Glenn Grove, testified as follows:

Q. And, did you have an understanding prior to the 1997 bargaining that one of JAC's purposes was to change anything that had to do with the Bethlehem agreement?

A. No.

Q. After the 1997 bargaining, after the contract was completed, did anything change with regard to how Bethlehem retirees were treated with regard to the medical benefits?

A. No.

Grove Dep. (Ewing Decl. Ex. 24) at 13:16-22; 23:4-14.

**Procedural History in the Underlying Litigation after Deemer Summary Judgment Ruling**

123.    Britt plaintiffs filed their complaint on August 29, 2003.  See Complaint at No. 03-CV-1298 ("Britt Complaint") (Ewing Decl. Ex. 29).  They also had worked at the Johnstown Facility, but, unlike the Deemer plaintiffs, they were not at least 43 years old at the time of sale and did not have their benefits terminated until 2003.  The Britt plaintiffs alleged that they had earned rights to receive certain pension supplements as well as the same retiree medical

insurance benefits at issue in <u>Deemer</u>, and that FreightCar had abridged these rights by refusing to pay these benefits.  See <u>id.</u>

124.    On July 1, 2004, the Court certified the <u>Britt</u> class.  <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *3.

125.    On September 27, 2004, the Court certified the <u>Deemer</u> class.  <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *2.

126.    Negotiations to settle the <u>Deemer</u> and <u>Britt</u> litigation took place from September through November 2004 and ultimately resulted in the "<u>Britt</u>-<u>Deemer</u> Settlement Agreement" (Dkt. #40-7) (Ewing Decl. Ex. 21), which the Court approved.

127.    As to retiree medical benefits, the Settlement Agreement put a plan in place for both the <u>Deemer</u> and <u>Britt</u> classes which required that FreightCar make $700 monthly contributions for households including a class member not eligible for Medicare and $450 monthly contributions for households including a class member eligible for Medicare.  <u>Britt</u>-<u>Deemer</u> Settlment Agreement § 16(e).  These contributions were to last at least through November 2012, and if FreightCar were to cease contributions at any point after that, Retirees could then re-file their lawsuits in this Court.  <u>Britt</u>-<u>Deemer</u> Settlement Agreement § 16(f); see also McCarthy Decl. ¶ 7 (stating that under the terms of the <u>Britt</u>-<u>Deemer</u> settlement, FreightCar would continue to make contributions towards the health insurance benefits of the retirees until at least November 30, 2012, and continue the life insurance benefits in effect at the time).

128.    The Settlement Agreement provided that in the re-filed lawsuits, the parties would "retain their legal positions that they asserted in the <u>Britt</u> and <u>Deemer</u> litigations," so that the "Plaintiffs [could] continue to assert both that alteration of benefits is unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated

level of benefits provided under the 1997 collective bargaining agreement (e.g., no deductibles, contributions, etc.)."  Britt-Deemer Settlement Agreement § 16(f).

129.   In 2007, after FreightCar announced that it was closing the Johnstown Facility, the Sowers plaintiffs filed that lawsuit.  See Complaint in No. 07-CV-201 ("Sowers Complaint") (Ewing Decl. Ex. 30).

130.   The Sowers plaintiffs were active employees of the Johnstown Facility who were close to attaining eligibility for retirement benefits.  Zanghi Dismissal Ruling, 2014 WL 130985, at *3.  The Sowers plaintiffs alleged that FreightCar violated Section 510 of ERISA, 29 U.S.C. § 1140, because it "deliberately idled" much of the Johnstown plant and laid off long-service union employees to prevent them from attaining eligibility for pension benefits.  Id.  These benefits included the same retiree welfare benefits at issue in Deemer and Britt.  Id.

131.   In Sowers, this Court granted the Sowers' plaintiffs motion for preliminary injunction and ruled that substantial evidence showed that FreightCar's purpose in closing the Johnstown Facility was to leave many senior employees just short of attaining the years of age and service necessary to qualify for shutdown pensions as well as the retiree health benefits that accompanied these pensions.  See Hayden v. FreightCar America, Inc., 2008 WL 375762 (W.D.Pa. Jan. 11, 2008).

132.   The Court also granted the Sowers' plaintiffs' motion for class certification. Zanghi Dismissal Ruling, 2014 WL 130985, at *3.

133.   While the case was on appeal, the parties reached a settlement under which the affected class members – over 200 persons not in the Britt and Deemer classes – were allowed to accrue sufficient additional service to qualify them for pensions and retiree health insurance

benefits.  The <u>Sowers</u> Settlement Agreement (Dkt. #40-8) (Ewing Decl. Ex. 31) in pertinent part provides:

> Current retirees and employees who retire under the terms of the <u>Sowers/Hayden</u> Litigation Settlement Agreement will continue to be eligible for retiree healthcare coverage under applicable terms and conditions of the CBA and under applicable terms and conditions of the court settlements in the <u>Deemer</u> and <u>Britt</u> cases.  The Companies and the Union reserve their respective legal positions on the issue of whether the Companies have the right to make future changes to retiree healthcare after expiration of the time periods established in Appendix 5 of the CBA and in the court settlements in the <u>Deemer</u> and <u>Britt</u> cases.

<u>Sowers/Hayden</u> Settlement Agreement ¶ 7; see also FreightCar Complaint ¶ 39 ("On August 5, 2008, FreightCar and the USW settled the subsequent <u>Sowers</u> Litigation, which addressed issues related to a plant closing.  As part of that settlement, FreightCar agreed to make contributions to retiree medical coverage and continue life insurance benefits for the former employees of the closed plant, identified in the caption above, under the terms of the Settlement Agreement in the <u>Deemer</u> Litigation and <u>Britt</u> Litigation").

134.    FreightCar closed the Johnstown Facility in 2008.  McCarthy Decl. ¶ 3; FreightCar Answer ¶ 68 (Dkt. #76).

**Procedural History of the Present Case**

135.    In June 2011, FreightCar, the USW and class counsel who represented the retirees in the <u>Deemer</u>, <u>Britt</u>, and <u>Sowers</u> litigation began negotiations towards the goal of reaching an agreement whereby FreightCar would continue contributions for Retirees' health and life insurance benefits beyond November 30, 2012.  McCarthy Decl. ¶ 8.  These negotiations continued through into 2013.  <u>Id.</u> ¶¶ 8-10.

136.    On July 8, 2013, FreightCar filed a declaratory judgment action in the United States District Court for the Northern District of Illinois, requesting a declaration that FreightCar

has the legal right to terminate retiree welfare benefits.  <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *4.

137.     On July 9, 2013, FreightCar sent counsel for the USW a copy of the Illinois complaint, along with a letter stating that, effective October 1, 2013, FreightCar would "cease all Company contributions provided under the [2005] Settlement Agreement for retiree medical coverage" and would "no longer provide the life insurance benefits set forth in Section 16(i) of the [2005] Settlement Agreement to the <u>Deemer</u>, <u>Britt</u>, and <u>Sowers</u> groups of retirees."  <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *4.

138.     Class Representatives and the USW filed their Complaint (Dkt. #1) in this Court on July 9, 2013.  Plaintiffs assert that the termination of Retirees' health and life insurance benefits violates Section 301 of the LMRA and Section 502 of ERISA.  <u>Id.</u>

139.     On July 10, 2013, FreightCar mailed notice to 653 retirees and surviving spouses, advising them that FreightCar's contributions for their retiree benefits would end effective October 1, 2013.  FreightCar's Brief in Support of Motion to Dismiss or Transfer ("FreightCar Dismissal Brief") (Dkt. #18) at 9 (citing McCarthy Decl. ¶ 13).

140.     On September 5, 2013, Plaintiffs filed a motion for Temporary Restraining Order and Preliminary Injunction, asking the Court to enjoin FreightCar from terminating Retirees' health and life insurance benefits until the Court entered a final ruling on the merits.  Dkt. #38. The Court has not ruled on this motion.

141.     On October 25, 2013, Plaintiffs filed a motion for class certification.  Dkt. #70. FreightCar never responded to that motion or sought leave to extend its time for responding to that motion.

142.     Effective November 1, 2013, FreightCar terminated all of its contributions for health and life insurance benefits for Retirees.  Dkt. #65 (Consent Order providing that FreightCar would extend date for termination of benefit contributions to November 1, 2013).

143.     On January 14, 2014, the Court denied FreightCar's motion to dismiss or transfer this case to the Northern District of Illinois, and for stay.  See <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985.

144.     In denying FreightCar's motion for stay, the Court observed that "it is in the interests of all parties to proceed with this litigation as expeditiously as possible."  <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *8.

145.     The District Court for the Northern District of Illinois thereafter transferred FreightCar's declaratory judgment action to this Court, concluding that "the same circumstances discussed in detail by the Pennsylvania court weigh in favor of transferring the case pending before this court to Pennsylvania."  Dkt. #113 in No. 13-4889 (N.D.Ill. Jan. 14, 2014).

Respectfully submitted,

/s/ William T. Payne
William T. Payne
wpayne@fdpklaw.com
Feinstein Doyle Payne & Kravec, LLC
*Pittsburgh North Office*
12 Eastern Avenue
Pittsburgh, PA 15215
(412) 492-8797

Pamina Ewing
pewing@fdpklaw.com
Joel R. Hurt
jhurt@fdpklaw.com
Feinstein Doyle Payne & Kravec, LLC
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA 15219
(412) 281-8400

*Counsel for Plaintiffs Anthony J. Zanghi,*
*Kenneth J. Sowers, Dominic McCuch, James*
*Hohman, and Darrell Shetler*

Dated: February 18, 2014

Joseph P. Stuligross
Associate General Counsel
jstuligross@usw.org
United Steelworkers
Five Gateway Center, Suite 807
Pittsburgh, PA 15222
(412) 562-2526

*Counsel for Plaintiff United Steel, Paper*
*And Forestry, Rubber, Manufacturing,*
*Energy, Allied Industrial And Service*
*Workers International Union, AFL-*
*CIO/CLC*