**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION**

| | |
|---|---|
| **ANTHONY J. ZANGHI, KENNETH J. SOWERS, DOMINIC MCCUCH, JAMES HOHMAN, DARRELL SHETLER** *on behalf of themselves and others similarly situated, and* **UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC,** | **No.: 3:13-CV-00146** |
| **Plaintiffs,** | |
| **v.** | **Hon. Kim R. Gibson** |
| **FREIGHTCAR AMERICA, INC., JOHNSTOWN AMERICA CORPORATION, and JOHNSTOWN AMERICA CORPORATION USWA HEALTH & WELFARE PLAN,** | |
| **Defendants.** | |

## DEFENDANTS' CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

In support of its motion for summary judgment, and pursuant to Local Civil Rule 56(B)(1), defendants FreightCar America, Inc., Johnstown America Corporation, and Johnstown America Corporation USWA Health & Welfare Plan (collectively, "FreightCar" or "the Company") submits the following concise statement of material facts:

## INTRODUCTION

1.      This case involves claims brought under Section 301 of the Labor Management Relations Act ("LMRA"), and Sections 502(a)(1)(B) and 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA").  **Pls.' Compl., ¶¶ 14-15 (SJ Ex. 38.).**

2.      The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW") served as the collective bargaining representative for hourly employees at FreightCar's Johnstown, Pennsylvania rail car manufacturing facility.  **Pls.' Compl., ¶ 3 (SJ Ex. 38.)**  The USW negotiated collective bargaining agreements and employee benefit plan documents for these hourly employees.  **Pls.' Compl., ¶¶ 34, 36 (SJ Ex. 38.)**

3.      The class representatives, Anthony J. Zanghi, Kenneth J. Sowers, Dominic McCuch, James Hohman, and Darrell Shetler ("the Class Representatives"), represent a class comprised of: (1) former FreightCar employees that were represented by the USW at the time of their retirement from FreightCar, and who upon retirement received or were eligible to receive medical and life insurance benefits under the JAC-USWA Health and Welfare Plan ("the Retirees"); and (2) those individuals who received or were eligible to receive medical and life insurance benefits under the Plan as a spouse, surviving spouse, or dependent of an aforementioned FreightCar employee ("the Dependents").  **April 3, 2014 Order, 1 (SJ Ex. 39.)**

4.      FreightCar is a Delaware corporation with its principal place of business in Chicago, Illinois. **Pls.' Compl., ¶ 18 (SJ Ex. 38.)**  FreightCar manufactures and services railroad freight cars.  **Pls.' Compl., ¶ 18 (SJ Ex. 38.)**  Between 1991 and 2008, FreightCar operated a railcar fabrication plant in Johnstown, Pennsylvania ("the Johnstown Plant").  **Pls.' Compl., ¶ 20 (SJ Ex. 38.)**  The Retirees were employed by FreightCar at the Johnstown Plant. **Pls.' Compl., ¶ 5 (SJ Ex. 38.)**

5.      Johnstown America Corporation ("JAC") was a predecessor to FreightCar and was formed to purchase the Johnstown, Plant in 1991.  **Pls.' Compl., ¶ 19. (SJ Ex. 38.)**  JAC is now Johnstown America, LLC, a subsidiary of FreightCar.

6.      The Johnstown America Corporation USWA Health & Welfare Plan ("the JAC Health & Welfare Plan") is an ERISA employee benefit plan.  **Pls.' Compl., ¶ 22 (SJ Ex. 38.)**

## FACTS

### *FreightCar's Purchase of the Johnstown Plant*

7.      From 1923 until 1991, Bethlehem Steel Corporation ("Bethlehem") owned and operated the Johnstown Plant.  **Pls.' Compl., ¶ 3 (SJ Ex. 38.)**  Bethlehem's hourly employees at the Johnstown Plant were represented by the USW.  **Pls.' Compl., ¶ 3 (SJ Ex. 38.)**

8.      In May 1991, Bethlehem and FreightCar reached an agreement for the purchase and sale of Bethlehem's Freight Car Division, which included the Johnstown Plant.[1]  **Pls.' Compl., ¶ 3 (SJ Ex. 38.)**  Bethlehem and FreightCar agreed to a closing deadline of October 31, 1991. **McIver Decl. Ex. A (SJ Ex. 32.)**

9.      FreightCar recognized the USW as the exclusive bargaining representative of the Johnstown Plant's hourly employees.  **McIver Decl., ¶ 5 (SJ Ex. 31.)**  Throughout the summer and fall of 1991, FreightCar engaged in negotiations with the USW in an effort to reach a collective bargaining agreement that would govern the terms and conditions of employment at the Johnstown Plant following the closing of the sale.  **McIver Decl., ¶ 6 (SJ Ex. 31.)**

10.     In October 1991, the parties discussed the benefit plans that JAC would create for the represented employees if FreightCar closed on the Johnstown Plant.  **Christenson Decl., ¶ 5 (SJ Ex. 1.)**

11.     During these October 1991 negotiations regarding the benefit plans, the parties agreed that they would not draft and negotiate the benefit plans until after FreightCar closed on the Johnstown Plant. **Christenson Decl., ¶ 8 (SJ Ex. 1.)**

---

[1] A copy of the "Agreement of Purchase and Sale Between Bethlehem Steel and Freight Car Corporation" is included in FreightCar's Appendix in Support of Support of Summary Judgment ("FreightCar's Appendix") at **McIver Decl. Ex. A (SJ Ex. 32.).**

12.     The USW proposed during the October 1991 negotiations that FreightCar provide the employees the same benefits they received from Bethlehem.  **Christenson Decl., ¶ 5 (SJ Ex. 1.)**  In connection with this proposal, on October 10, 1991, the USW sent FreightCar copies of the Bethlehem plans and summary plan descriptions ("SPD") which described the benefits Bethlehem provided to the active employees.  **Christenson Decl., ¶ 5 (SJ Ex. 1.)**

13.     The plans and SPDs sent to FreightCar on October 10, 1991 included the Bethlehem Pension Agreement, the Bethlehem Supplemental Unemployment Benefit Plan, the Bethlehem 401(k) Retirement Plan, and the Program of Insurance Benefits for Hourly Paid Employees ("the Bethlehem PIB").[2]  **Christenson Decl., ¶ 5 (SJ Ex. 1.)**

14.     The Bethlehem PIB is a summary plan description of the welfare benefits Bethlehem provide to its active represented employees.[3]  **Christenson Decl., ¶ 13 (SJ Ex. 1.)**  It does not address retirees' benefits.  **Christenson Decl., ¶ 13 (SJ Ex. 1.)**

15.     FreightCar was not sent a copy of the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Bethlehem Steel Corporation ("the Bethlehem PHMB".)  **Christenson Decl., ¶ 7 (SJ Ex. 1); Garabedian Decl., ¶ 6 (SJ Ex. 16); Grove Dep. at 20:1-20:16 (SJ Ex. 40.)**

16.     In mid-October, FreightCar and the USW reached an agreement which they memorialized in a main collective bargaining agreement ("the 1991 CBA") and twenty-seven (27) "side letters" to the 1991 CBA.  **McIver Decl., ¶ 8 (SJ Ex. 31.)**  This agreement was tentative and would only become effective in the event that FreightCar closed on its purchase of the Johnstown Plant. **McIver Decl., ¶ 8 (SJ Ex. 31.)**

---

[2] A copy of the October 10, 1991 letter from Jeanette Stump to Robert Christenson enclosing the Bethlehem plan documents is included in FreightCar's Appendix at **Christenson Decl., Ex. A (SJ Ex. 2.)**
[3] A copy of the Bethlehem Program of Insurance Benefits for Hourly Paid Employees is included in FreightCar's Appendix at **Christenson Decl., Ex. D (SJ. Ex. 5.)**

17.     The 1991 CBA did not address FreightCar's employee benefit obligations.

**McIver Decl., ¶ 8 (SJ Ex. 31.)**

18.     The parties did not negotiate and draft new benefit plans prior to FreightCar

closing on the Johnstown Plant.  **Christenson Decl., ¶ 8 (SJ Ex. 1.)**

19.     Instead of drafting new plans, the parties arrived at an understanding with respect

to the benefit plans FreightCar would create if and when the sale closed.  **Christenson Decl., ¶ 8**

**(SJ Ex. 1.)**  This understanding was set forth in the twenty-second side letter to the 1991 CBA

("Side Letter 22").[4] **Christenson Decl., ¶ 8 (SJ Ex. 1.)**

20.     Side Letter 22 provided the following:

> This letter will serve to confirm our understanding as to employee benefit
> plans covering bargaining unit employees at [the Johnstown Plant] after
> closing of the [FreightCar]/Bethlehem sale.
>
> [FreightCar] will create mirror bargaining unit employee benefit plans
> identical in all material respects to the Bethlehem plans they replace.
> Within 60 days after closing of the [FreightCar]/Bethlehem sale,
> [FreightCar] will forward to the Union for review and comment draft
> copies of such plans, and [FreightCar] and the Union agree to use their
> best efforts to finalize such plans, subject to IRS approval if appropriate,
> within 120 days of closing.

**Christenson Decl. Ex. B (SJ Ex. 3.)**

21.     By agreeing to Side Letter 22, FreightCar did not agree that it would mirror the

employee benefit plans in every respect.  **Christenson Decl. Ex. B (SJ Ex. 3.)**  Instead Side

Letter 22 provided that the plans would mirror Bethlehem's only in "material respects."

**Christenson Decl. Ex. B (SJ Ex. 3.)**

22.     Side Letter 22 also made clear that FreightCar was not assuming Bethlehem's

employee benefit plans.  Side Letter 22 stated that FreightCar would "create" its own plans after

---

[4] A copy of Side Letter 22 of 27 to the 1991 CBA is included in FreightCar's Appendix at **Christenson Decl. Ex. B (SJ Ex. 3.)**

the closing and that these plans would "replace" the Bethlehem plans.  **Christenson Decl. Ex. B (SJ Ex. 3.)**

23.    Finally, to ensure that the new plans FreightCar would create after the closing met the USW's expectations and were consistent with what the parties negotiated, Side Letter 22 stated that drafts of the plans would be provided to the USW for its review and comment before they were finalized.  **Christenson Decl., ¶ 9 (SJ Ex. 1.)**

### *Creation and Adoption the Employee Benefit Plans*

24.    After the sale of the Johnstown Plant closed and the collective bargaining agreement between FreightCar and the USW had been reached, FreightCar began drafting the various benefit plans as agreed in Side Letter 22.  **Sokolow Dep. at 43:21-44:16 (SJ Ex. 41); Christenson Decl., ¶ 10 (SJ Ex. 1); McIver Decl., ¶ 11 (SJ Ex. 31.)**

25.    FreightCar retained benefits attorneys from Fisher & Phillips and consultants from Hewitt Associates ("Hewitt") to assist with the creation of these plans.  **Christenson Decl., ¶ 10 (SJ Ex. 31.)**  FreightCar, its attorneys, and its consultants worked with the USW for over a year to finalize the benefit plans FreightCar agreed to provide.  **Christenson Decl., ¶¶ 10, 26 (SJ Ex. 31); Garabedian Decl., ¶ 4 (SJ Ex. 16.)**

26.    FreightCar and the USW first drafted the qualified plans, such as the 401(k) and pension plans, which unlike the welfare benefit plans, needed to be submitted to the IRS.  **Christenson Decl., ¶ 11 (SJ Ex. 1.)**  Throughout the spring 1991, Frederick Benario at Fisher & Phillips worked with Jeanette Stump, a Pension Technician for the USW, to finalize the qualified plans.[5]  **Christenson Decl., ¶ 11 (SJ Ex. 1); Stump Dep. at 34:3-36:23 (SJ Ex. 42.)**  The qualified plans were approved by the USW in the summer of 1991 and then sent to the IRS for

---

[5] Copies of the correspondence between FreightCar and the USW relating to the negotiation of the terms of the qualified plans are included in FreightCar's Appendix at **Christenson Decl. Ex. C (SJ Ex. 4.).**

determination letters.  **Christenson Decl., ¶ 11 (SJ Ex. 1);** *See also* **Christenson Decl., Ex. C (SJ Ex. 4.)**

27.     The welfare benefit plans were created by FreightCar in the summer of 1992. **Christenson Decl., ¶ 12, 14 (SJ Ex. 1); Garabedian Decl., ¶ 7 (SJ Ex. 16.)**

28.     Robert Christenson from Fisher & Phillips and consultants at Hewitt Associates drafted the welfare benefit plans.  **Christenson Decl., ¶ 12 (SJ Ex. 1); Garabedian Decl., ¶ 3 (SJ Ex. 16.)**

29.     Christenson and Hewitt worked with Jerry Sokolow, a Benefits Technician for the USW, Ernie Esposito, a USW Staff Representative, and other USW representatives to finalize the welfare benefit plans.  **Christenson Decl., ¶ 16 (SJ Ex. 1); Sokolow Dep. at 44:17-45:23 (SJ Ex. 41.)**

30.     Christenson and Hewitt were provided copies of the Bethlehem Steel Program of Insurance Benefits ("the Bethlehem PIB"), which was a summary plan description of the life insurance, sickness and accident, medical, dental, and vision care benefits for Bethlehem's active represented employees.  Christenson had received a copy of the Bethlehem PIB from Stump in connection with the pre-closing negotiations. **Christenson Decl., ¶ 5 (SJ Ex. 1.)**  Hewitt had received a copy of the Bethlehem PIB from Glenn Grove.  **Grove Dep. at 20:1-20:16 (SJ Ex. 40.)**  Neither Christenson nor Hewitt recall receiving or reviewing a copy of the Bethlehem PHMB.  **Christenson Decl., ¶ 7 (SJ Ex. 1); Garabedian Decl., ¶ 6 (SJ Ex. 16.)**

31.     The Bethlehem PIB was used as a reference for determining the type and level of benefits FreightCar would provide to the represented employees covered by FreightCar's new benefit plans. **Garabedian Decl., ¶ 6 (SJ Ex. 16); Christenson Decl., ¶ 13 (SJ Ex. 1.)**  The

"Continuation of Coverage" language found in the Bethlehem PHMB is not found anywhere in the Bethlehem PIB.[6]  **Christenson Decl., ¶ 13 (SJ Ex. 1.)**

32.     In July 1992, FreightCar sent drafts of the dental insurance, life insurance, vision insurance, sickness and accident, severance, 401(k), and health insurance plans for active employees to the USW for its review and comment.  **Christenson Decl., ¶ 14 (SJ Ex. 1); Sokolow Dep. at 64:15-65:23 (SJ Ex. 41)**; **Stump Dep. Ex. 8 (SJ Ex. 55.)**

33.     The draft medical and life insurance plans for active employees sent to the USW in July 1992 stated that those benefits would continue after retirement.[7]  **Christenson Decl., ¶ 15 (SJ Ex. 1.).**  However, they did not suggest that medical or life insurance benefits were vested or that FreightCar had in any way agreed to limit its right to terminate these benefits.  **Christenson Decl., ¶ 15 (SJ Ex. 1.).**

34.     The July 1992 draft medical plan made clear that "benefits could be lost or delayed if . . . [t]he plan is modified to reduce or eliminate certain benefits" or "the plan ends."  **Christenson Decl., ¶ 15 (SJ Ex. 1),** *see also* **Christenson Decl. Ex. F, Bates No. 4927 (SJ Ex. 7.)**  Similarly, the July 1992 draft life insurance plan stated that "coverage could be lost or a payment to your beneficiary could be delayed if . . . [t]he plan, or part of the plan, ends[.]"  **Christenson Decl., ¶ 15 (SJ Ex. 1),** *see also* **Christenson Decl. Ex. F, Bates No. 4978 (SJ Ex. 7.)**

35.     Upon receipt of the SPDs for the active employees, Sokolow contacted Ernie Esposito, a USW Staff Representative involved in the negotiation of the 1991 CBA, and asked that he and his bargaining committee review the July 1992 draft plans.  **Sokolow Dep. at 64:15-**

---

[6] A copy of  the 1990 Bethlehem PHMB is included in FreightCar's Appendix at **Christenson Decl. Ex. E (SJ Ex. 6.)**
[7] Copies of the draft plans sent to the USW are included in FreightCar's Appendix at **Christenson Decl. Ex. F (SJ Ex. 7.)**

**65:23 (SJ Ex.41.)**  Sokolow's cover letter to Esposito, which accompanied the aforementioned active represented employees' plans, stated:

> As we have discussed, enclosed are SPDs for [FreightCar] for the dental plan, life insurance, vision plan and S&A benefits.  Also, the [medical], severance plan and 401(k) plan.  You need to review these with the Committee to make sure that this is what was negotiated, then you and I and the Committee can meet to determine what changes, if any, we wish to insist that the Company make.

**Stump Dep. Ex. 8 (SJ Ex. 55.)**

36.     On July 31, 1992, after the plans were reviewed by Esposito, Sokolow, and other USW representatives, Sokolow wrote to Christenson to provide him with a "brief summary of the problems that the Committee ha[d] with the benefit books."[8]  **Sokolow Dep. at 65:7-65:23 (SJ Ex. 41); Christenson Decl., ¶ 16 (SJ Ex. 1.)**

37.     The USW requested, among other changes, that all of the plans be given "an effective date of October 28, 1991." **Christenson Decl. Ex. G (SJ Ex. 8.)**  They also wanted "all books to reference collective bargaining agreement as far as Company's right to amend or terminate the plan."  **Christenson Decl. Ex. G (SJ Ex. 8.)**

38.     Sokolow explained during his deposition in this case that the bargaining committee's request that the SPDs "reference collective bargaining agreement as far as Company's right to amend or terminate the plan" was intended to ensure that the terms of the collective bargaining agreements governed.  **Sokolow Dep. at 90:21-92:10 (SJ Ex. 41.)**

39.     After discussions with the USW, Christenson and consultants from Hewitt incorporated these and other suggested revisions into the draft plans.  **Christenson Decl., ¶ 17 (SJ Ex. 1.)**

---

[8] A copy of the July 31, 1991 letter from Sokolow to Christenson requesting changes to the draft SPDs sent to the USW is included in FreightCar's Appendix at **Christenson Decl. Ex. G (SJ Ex. 8.)**

40.     In January 1993, FreightCar forwarded final drafts of the active employees'

welfare benefit plans to the USW for its review.  **Christenson Decl., ¶ 20 (SJ Ex. 1.)**  Sokolow

wrote to Christenson on January 22, 1993 to inform him that the plans had been approved by the

Union.[9] **Christenson Decl., ¶ 20 (SJ Ex. 1.)**  Specifically, Sokolow stated:

> In accordance with our recent phone conversation, I have double-checked with
> Staff Representative Ernie Esposito, and I believe that all of the SPD (Summary
> Plan Description) books have now been corrected to meet our expectations and
> specifications.

**Christenson Decl. Ex. J (SJ Ex. 11.)**

41.     The medical benefits offered to retirees were set forth in a separate document

given to employees upon retirement.[10]  **Christenson Decl., ¶ 24 (SJ Ex. 1); Garabedian Decl.,**

**¶ 16; Grove Dep. at 26:18-27:10 (SJ Ex. 40.)**

42.     FreightCar sent drafts of the retiree medical plan to the USW in the fall of 1992

and discussed this plan with them on between the fall of 1992 and the spring of 1993.

**Christenson Decl., ¶ 21 (SJ Ex. 1); Sokolow Dep. at 62:21-63:14 (SJ Ex. 41);** *see also*

**Christenson Decl. Ex. K (SJ Ex. 12.)**

43.     The draft retiree medical plan sent to the USW did not provide that retiree

medical benefits were vested or would be provided for life. Nor did it include the Continuation

of Coverage provision found in the Bethlehem PHMB.  **Christenson Decl., ¶ 21. (SJ Ex. 1.)**

44.     During their discussions regarding the retiree medical plan, the USW never

insisted that FreightCar provide vested benefits or that it incorporate language similar to the

Continuation of Coverage provision found in Bethlehem's Pensioner's Insurance Agreement.

**Christenson Decl., ¶ 21 (SJ Ex. 1.)**

---

[9] A copy of Sokolow's January 22, 1993 letter to Christenson approving the draft SPDs is included in FreightCar's Appendix at **Christenson Decl. Ex. J (SJ Ex. 11.)**
[10] A copy of the separate retiree medical SPD is including in FreightCar's Appendix at **Christenson Decl. Ex. N (SJ Ex. 15.)**

45.     Christenson sent a final draft of the retiree medical plan to the USW for its approval on March 26, 1993.[11]  **Christenson Decl., ¶ 22 (SJ Ex. 1.)**

46.     Sokolow contacted Christenson on April 12, 1993 and informed him that the March 26, 1993 draft was acceptable to the USW.[12]  **Christenson Decl., ¶ 23 (SJ Ex. 1); Sokolow Dep. at 62:21-63:25 (SJ Ex. 41.)**

47.     In addition to the active employee welfare plans and the retiree medical plan, FreightCar created a single plan administration document which was designed to govern the administration of all of the FreightCar welfare benefit plans. **Christenson Decl., ¶ 18 (SJ Ex. 1.)**

48.     The administration document contained a section expressly reserving FreightCar's rights, including its right to "end, suspend, or amend the plans at any time, in whole or in part," subject to collective bargaining.[13]  **Christenson Decl., ¶ 19 (SJ Ex. 1.)**  The administration section was reviewed by and discussed with the USW before it was ultimately approved in January 1993. **Christenson Decl., ¶ 20 (SJ Ex. 1.)**

49.     After the various welfare benefit plans were reviewed and approved by the USW, they were compiled into an employee handbook referred to as the JAC Employee Guide ("the JAC Guide").[14]  **Christenson Decl., ¶ 23 (SJ Ex. 1.)**

50.     The JAC Guide is a small three-ring binder divided into several sections. **Christenson Decl., ¶ 24 (SJ Ex. 1); Garabedian Decl., ¶ 13 (SJ Ex. 16.)**  Each section of the JAC Guide described a different benefit plan, except for the last section, which provided the administrative information common to all of the plans.  **Christenson Decl., ¶ 24 (SJ Ex. 2);**

---

[11] A copy of Christenson's March 26, 1993 enclosing a final draft of the retiree medical section is included in FreightCar's Appendix at **Christenson Decl. Ex. K (SJ Ex. 12.)**
[12] A copy of Christenson's April 13, 1993 letter to Hewitt informing them that the USW had approved the retiree section is included in FreightCar's Appendix at **Christenson Decl. Ex. L (SJ Ex. 13.)**
[13] A copy of the final draft of the administration section containing the approved reservation of rights language is included in FreightCar's Appendix at **Christenson Decl. Ex. I (SJ Ex. 16.)**
[14] A copy of the JAC Guide is included in FreightCar's Appendix at **Christenson Decl. Ex. M (SJ. Ex. 14.)**

**Garabedian Decl., ¶ 13 (SJ Ex. 16.)**  The retiree medical plan section was provided to employees upon their retirement to be inserted into the binder.  **Christenson Decl., ¶ 24 (SJ Ex. 1); Garabedian Decl., ¶ 13 (SJ Ex. 16); Grove Dep. at 26:18-27:10(SJ Ex. 40.)**

51.     The JAC Guide was distributed to the represented employees in May 1993. **Christenson Decl., ¶ 26 (SJ Ex. 1); Jastrzab Aff., ¶ 2 (SJ Ex. 43.)**  The JAC Guide was given an effective date of October 28, 1991, as agreed by FreightCar and the USW.  **Christenson Decl., ¶¶ 17, 26 (SJ Ex. 1.)**

52.     In its final form, as approved by the USW and distributed to the Johnstown Plant's represented employees, the relevant provisions in the JAC Guide provided as follows:

(a)     The Active Employee Medical Plan. While the medical plan only applied to "full-time represented employee[s]" and their dependents, it explained that "if you retire under [FreightCar's] pension plan for represented employees and have worked continuously at [FreightCar] for 15 or more years, you and your eligible dependents will be enrolled for retiree medical coverage under the medical plan."  **Christenson Decl. Ex. M at Bates No. 1290 (SJ Ex. 14.)**  The active medical plan informed the employees that they would "get detailed information and literature from the human resources department when [they] retiree."  **Christenson Decl. Ex. M, Bates 1290 (SJ Ex. 14.)**

(b)     The Retiree Medical Plan.  The retiree medical plan given to eligible employees upon retirement explained that it "provide[d] coverage similar to the coverage [employees] had while [they] were active employees."  **Christenson Decl. Ex. N,  3 (SJ Ex. 15.)** The retiree medical plan section did not suggest that benefits were vested or lifetime, it did not include a guarantee or promise that benefits would be provided for any particular duration, and it did not require that FreightCar obtain the USW's consent prior

to terminating or amending the benefits provided to retirees.  **Christenson Decl., ¶ 21 (SJ Ex. 1.)**  To the contrary, the retiree medical plan explained that benefits could be lost or delayed if, "subject to the collective bargaining agreement, the plan is modified to reduce or eliminate certain benefits, or it ends."  **Christenson Decl. Ex. N, 33 (SJ Ex. 15.)**

(c)   <u>The Administration Section</u>.  The administration section, which applied to both the active and retiree medical plans, did not state that employees or retirees were entitled to vested benefits or benefits for any particular duration.  **Christenson Decl., ¶ 24 (SJ Ex. 1.)**  The administration section also did not require FreightCar to obtain the USW's consent prior to amending or terminating retirees' medical or life insurance benefits.  **Christenson Decl., ¶ 24 (SJ Ex. 1.)**  To the contrary, the administration section stated:

Nothing in this guide says or implies that participation in these plans is a guarantee of continued employment with the company, **nor is it a guarantee that benefit levels, the price of coverage, eligibility rules, or any other term or condition of the plans will remain unchanged in future years.**

**Christenson Decl. Ex. M, Bates 1369 (SJ Ex. 14.)**

\* \* \* \* \*

Subject to collective bargaining, **the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part.  This means the plans may be discontinued in part or in their entirety** or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented.  If any changes are made, you'll be notified.

**Christenson Decl. Ex. M, Bates 1370 (SJ Ex. 14.)**

53.   The JAC Guide administration section also provided that for the plans described therein, "Plan documents include[d] insurance contracts and copies of documents filed by the

plan with the Internal Revenue Service or U.S. Department of Labor, life annual reports and plan descriptions." **Christenson Decl. Ex. M, Bates 1364 (SJ. Ex. 14.)**

54.     While Side Letter 22 provided that FreightCar would create plans that mirrored the Bethlehem employee benefit plans in "all material respects," the USW stated that it "did not compare the Bethlehem agreement to the Johnstown America Employee Guide" after it was created.  **USW-International Dep. ¶ 141:2-14 (SJ Ex. 44.)**

### The 1994 Collective Bargaining Agreement

55.     FreightCar and the USW began negotiations in September 1994 to negotiate a successor agreement to the 1991 CBA.[15]  **McIver Decl., ¶ 13 (SJ Ex. 31.)**  The parties did not discuss retiree medical and life insurance benefits in 1994.  **McIver Decl., ¶ 13 (SJ Ex. 31.)**

56.     The 1994 CBA does not reference either active employees' or retirees' welfare benefits.  **McIver Decl., ¶ 13 (SJ Ex. 31.)**  The 1994 CBA also does not reference Side Letter 22, which the parties agreed was no longer binding.[16] **McIver Decl., ¶ 14 (SJ Ex. 31.)**

### The 1997 Collective Bargaining Agreement

57.     In 1997, FreightCar's goal during collective bargaining was to ensure that the parties' agreement reflected the fact that FreightCar did not operate under the "basic steel" type of contract the USW had previously negotiated with Bethlehem as part steel industry coordinated bargaining.  **McIver Decl., ¶ 15 (SJ Ex. 31.)**

58.     To clarify that FreightCar was not operating under a basic steel agreement, the 1997 CBA included a "zipper clause," which stated:

> **This Agreement and the documents expressly referred to herein are the only documents by which the parties intend to be contractually or statutorily**

---

[15] A copy of the 1994 Agreement Between Johnstown America Corporation and United Steelworkers of America, AFL-CIO is included FreightCar's Appendix at **Howard Decl. Ex. B (SJ Ex. 19.)**
[16] Copies of contract proposals exchanged in 1994 which reflect the parties' agreement to delete Side Letter 22 are included in FreightCar's Appendix at **McIver Decl. Ex. C. (SJ Ex. 20.)**

**bound**.  Any document not expressly referred to herein that may be brought forth by either the Company or the Union after ratification of this Agreement may be included as part of this Agreement, provided both parties agree to its inclusion

**Howard Decl. Ex. C, p.73 (SJ Ex. 20.)**

59.     Among the "documents expressly referred to" in the zipper clause were "Summary Plan Descriptions," **Howard Decl. Ex. C, p.73 (SJ Ex. 20),** which included all of the plans set forth in the JAC Guide.  **McIver Decl., ¶ 16 (SJ Ex. 1.)**

60.     The 1997 CBA also included a separate appendix that expressly stated that welfare benefits were to be provided under the JAC Guide.  **Howard Decl. Ex. C, p.90 (SJ Ex. 20.)**  Appendix 9 stated:

> The parties agree that employees shall be eligible for insurance and other benefits as set forth in "JAC's Employee Guide" for Represented P&M employees, as amended during the negotiations which preceded the execution of the collective bargaining agreements.[17]

**Howard Decl. Ex. C, p.90 (SJ Ex. 20.)**

61.     The 1997 CBA did not incorporate Side Letter 22 through the zipper clause or anywhere else.  **McIver Decl., ¶ 16 (SJ Ex. 1.)**  The 1997 CBA also did not provide or suggest that retirees' benefits were vested, would be provided for any particular duration, or could only be terminated or amended with the USW's consent. **McIver Decl., ¶ 18 (SJ Ex. 1.)**

### *The Steelworkers Health and Welfare Fund*

62.     Prior to the 1997 negotiations, the active employee and retiree medical benefits described in the JAC Guide were administered by Blue Cross Blue Shield pursuant to an insurance contract and indemnity agreement with FreightCar ("the BCBS Insurance Agreement").  **USW-International Dep. at 219:2-8 (SJ Ex. 44.)**

- 15 -

63.     During the 1997 negotiations, the USW proposed that FreightCar provide employee and retiree medical benefits through the Steelworkers Health and Welfare Fund Point-of-Service Plan ("the SHWF Plan").  **USW-International Dep. at 19:20-20:6 (SJ Ex. 44.)**

64.     The SHWF Plan required the participants to obtain services from a network hospital or doctor.  **USW-International Dep. at 19:4-25 (SJ Ex. 44.)**

65.     There were savings associated with switching from the indemnity plan to the SHWF Plan.  **USW-Local Dep. at 57:20-60:2 (SJ Ex. 45.)**

66.     The USW proposed and agreed to the SHWF Plan because the savings would be passed on to the active employees in the form of higher wages and more generous benefits. **USW-Local Dep. at 57:20-60:2 (SJ Ex. 45.)**

67.     FreightCar agreed to the proposed SHWF Plan and the parties executed a Steelworkers Health and Welfare Fund Participation Agreement ("the Participation Agreement") in 1998.[18]  **McIver Decl., ¶ 21 (SJ Ex. 31.)**

68.     Under the SHWF Participation Agreement, FreightCar was required to make fixed monthly contributions to the SHWF Fund on behalf of each employee and retiree.  **McIver Decl., ¶ 21 (SJ Ex. 31.)**

69.     The fund contributions were used to secure insurance coverage through the Select Blue Point-of-Service plan. **McIver Decl., ¶ 21 (SJ Ex. 31.)**

70.     The terms of the insurance coverage were contained in the SHWF Plan Document and the Summary Plan Description of the Medical and Vision Care Benefits for Johnstown America Corporation ("the SHWF Plan SPD").[19]  **McIver Decl., ¶ 20 (SJ Ex. 31.)**

---

[18] A copy of the 1998 Participation Agreement is included in FreightCar's Appendix at **McIver Decl. Ex. F (SJ Ex. 37.)**
[19] Copies of the SHWF Plan Document and the SHWF SPD are included in FreightCar's Appendix at **McIver Decl. Exs. D, E (SJ Exs. 35, 36.)**

71.     The SHWF SPD was distributed to the employees and retirees.  **USW-International Dep. at 50:18-21 (SJ Ex. 44.)**

72.     These two documents described the active employee and retiree benefits in detail, but they did not provide that benefits were vested, that the benefits would be provided for a particular duration, or that participating employers' were required to obtain the USW's consent prior to modifying the benefits provided to retirees.  **McIver Decl., ¶ 22 (SJ Ex. 31.)**

### *The 2001 Collective Bargaining*

73.     In September 2001, FreightCar and the USW began negotiations to reach a successor agreement to the 1997 CBA.  **Howard Decl., ¶ 4 (SJ Ex. 17.)**

74.     FreightCar explained during these negotiations that its primary goal was to reduce trailing benefits and legacy costs, such as retiree welfare benefits.  **Howard Decl., ¶ 4 (SJ Ex. 17.)**

75.     FreightCar explained to the USW that retiree welfare benefits had become particularly burdensome because Bethlehem's unanticipated bankruptcy filing in 2001 prevented it from fulfilling its obligation under the 1991 purchase and sale agreement to reimburse FreightCar for the cost of certain retirees ("the reimbursable retirees") welfare benefits.[20]  **USW-International Dep. at 89:12-90:17 (SJ Ex. 44.)**

76.     At the time of the 2001 negotiations, the present value of these benefits for accounting purposes was approximately $30 million.  **Karan Aff., ¶ 5 (SJ Ex. A.)**

77.     FreightCar explained to the USW that the cost of these benefits had grown to over $1,200,000 per year.  **Howard Decl., ¶ 9 (SJ Ex. 46.)**

---

[20] In connection with the 1991 purchase and sale of the Johnstown Plant, Bethlehem agreed to reimburse FreightCar for the cost of providing retiree welfare benefits to those Bethlehem employees that would ultimately retire from FreightCar, but that were over the age of 43 at the time the Plant was sold ("the reimbursable retirees").

78. During the 2001 negotiations, FreightCar presented its first economic proposal to the USW on October 25, 2001.[21] **Howard Decl., ¶ 6 (SJ Ex. 17.)**

79. The October 25th proposal included two provisions designed to limit FreightCar's retiree medical benefit costs. **Howard Decl., ¶ 6 (SJ Ex. 17.)**

80. With respect to both the current and future reimbursable retirees, Paragraph (9) of FreightCar's first economic proposal provided that if Bethlehem failed to reimburse FreightCar for these retirees' medical benefits, the cost of such benefits would become the responsibility of the individual reimbursable retirees. **Howard Decl. Ex. F, ¶ 9 (SJ Ex. 23.)**

81. For all other current and future retirees, Paragraph (8) of the proposal would have capped FreightCar's responsibility for these retirees' premium contributions at the rates in effect as of January 1, 2002. **Howard Decl. Ex. F, ¶ 8 (SJ Ex. 23.)**

82. After receiving the October 25, 2001 economic proposal and reviewing the provisions addressing retirees' benefits, the USW informed FreightCar that it did not know if it was authorized to negotiate on behalf of past retirees. **NLRB Hearing Tr. at 110:2-111:17 (SJ Ex. 47.)**

83. At the NLRB proceeding the USW would ultimately file, the lead negotiator for the USW during the 2001 negotiation testified as follows with respect to FreightCar's first economic proposal:

> **I told the company . . . that I wasn't sure whether I represented these employees**, **they didn't pay union dues**, and although, you know, there were issues that were mandatory to be discussed, there were other issues the we could discuss permissively, and I thought that if I were to agree with the company, that they could stop paying healthcare for these [retirees] . . . I thought maybe this group of people could actually sue the union**; that we weren't their bargaining agent, they weren't paying union dues to us, and that I was, you know, "reluctant even to discuss this with you."**

---

[21] A copy of the October 25, 2001 economic proposal is included in FreightCar's Appendix at **Howard Decl. Ex. F (SJ Ex. 23.)**

**NLRB Hearing Tr. at 110:2-111:17 (SJ Ex. 47.)**

84. The USW informed FreightCar during the October 25, 2001 meeting that it would discuss whether it represented the retirees with its legal department. **NLRB Hearing Tr. at 110:2-111:17 (SJ Ex. 47.)**

85. The next time the parties discussed paragraphs (8) and (9) of FreightCar's October 25 proposal was during their November 14, 2001 bargaining session.[22] **Howard Decl., ¶ 8 (SJ Ex. 17.)**

86. During November 14 negotiations the USW asked for clarification with respect to FreightCar's intention to eliminate the benefits of the then-retired reimbursable retirees and cap its premium contributions for the non-reimbursable retirees. **Howard Decl., ¶ 8 (SJ Ex. 17.)** The USW also asked that FreightCar tell them which reimbursable retirees would be affected. **Howard Decl., ¶ 8 (SJ Ex. 17.)** FreightCar asked whether the USW represented retired individuals. **Howard Decl., ¶ 8 (SJ Ex. 17.)** The USW responded by stating that it did not represent the retirees. **Howard Decl., ¶ 8 (SJ Ex. 17.)**

87. FreightCar explained during the November 14 meeting that the reimbursable retirees' benefits represented a $1.2 million yearly liability that FreightCar had not anticipated or budgeted for, and that this liability had the potential to significantly impact the negotiations. **Howard Decl., ¶ 9 (SJ Ex. 17.)**

88. After FreightCar announced at the November 14 negotiations that it was stopping insurance coverage for the reimbursable retirees, the USW did not object because they felt that the USW did not represent them. ***In re Johnstown America Corp.*, N.L.R.B. Case 6-CA-32504, at 18:35-40 (SJ Ex. 48.)**

---

[22] Bargaining notes produced by the USW in this case which reflect the November 14, 2001 negotiations are included in FreightCar's Appendix at **Howard Decl. Ex. H (SJ Ex. 25.)**

89.    On November 28, 2014, FreightCar tendered its "Fourth Draft of Employer

Proposal for Agreement" ("the Fourth Draft Proposal"), which was its first plenary proposal.[23]

**Howard Decl., ¶ 10 (SJ Ex. 17.)**

90.    FreightCar's Fourth Draft Proposal incorporated its October 25 economic

proposals relating to retirees' medical benefits.  **Howard Decl., ¶ 10 (SJ Ex. 17.)**

91.    Article XIX, Section 1(f) of the Fourth Draft Proposal provided with respect to

the non-reimbursable retirees that:

> All current and future retirees not eligible to retire under the eligibility criteria as
> described in the 1991 Agreement of Purchase and Sale will be provided a
> managed care healthcare plan, whereby the Employer will make the premium
> contributions at the rates in effect as of January 1, 2002, with any increases in the
> costs of such premiums being the responsibility of the individual retirees.

**Howard Decl. Ex. H, p.33 (SJ Ex. 25.)**  Article XIX, Section 1(g) provided with respect

to the reimbursable retirees that:

> The Employer will continue its contributions toward existing and future retiree
> healthcare benefits for retirees for whom the cost of such coverage is the
> responsibility of Bethlehem Steel under the 1991 Agreement of Purchase and Sale
> at the rates in effect as of January 1, 2002.  **If Bethlehem Steel fails to fulfill its
> responsibility for these benefits, the costs of such benefits will be the
> responsibility of the individual retirees.**

**Howard Decl. Ex. H, p.33 (SJ Ex. 25.)**

92.    After FreightCar tendered its Fourth Draft Proposal it again explained that the

reimbursable retirees' benefits represented an unanticipated $1.2 million per year liability.[24]

**Howard Decl., ¶ 11 (SJ Ex. 17.)**  FreightCar asked the USW whether the active employees were

prepared to agree to $1.2 million per year in concessions to enable FreightCar to continue these

payments.  **Howard Decl., ¶ 11 (SJ Ex. 17.)**

---

[23] A copy of the November 28, 2001 Fourth Draft Proposal is included in FreightCar's Appendix at **Howard Decl.
Ex. 25.**
[24] Bargaining notes produced by the USW in this case which reflect the parties' November 28, 2001 negotiations are
included in FreightCar's Appendix **Howard Decl. Ex. I (SJ Ex. 26.)**

93.     When the USW reviewed the Fourth Proposal with FreightCar during the parties' November 29, 2014 negotiation session, the USW informed FreightCar that it did not believe that past retirees' benefits were a proper subject of collective bargaining.[25] **Howard Decl., ¶ 12 (SJ Ex. 17.)**

94.     The USW asked that FreightCar remove Section 1(f) and Section 1(g) from the proposed collective bargaining agreement.  **Howard Decl., ¶ 12 (SJ Ex. 17.)**

95.     FreightCar agreed to take the proposals relating to then-current retirees out of the draft agreement, but it informed the USW that it intended to terminate the reimbursable retirees' benefits if Bethlehem did not continue to reimburse FreightCar. **Howard Decl., ¶ 12 (SJ Ex. 17.)**

96.     The USW confirmed that it understood what FreightCar's intentions were with respect to the then-current retirees.  **Howard Decl., ¶ 12 (SJ Ex. 17.)**

97.     On December 18, 2001, FreightCar distributed its "Fifth Draft and Final Employer Proposal for Agreement" ("the Final Proposal").[26]  **Howard Decl., ¶ 13 (SJ Ex. 17.)**

98.     Article XIX, Section 1 of FreightCar's final proposal was revised to remove all references to both reimbursable and non-reimbursable retirees.  **Howard Decl., ¶ 13 (SJ Ex. 17.)**

99.     Article XIX, Section 1 (f) of FreightCar's Final Proposal provided:

> **All current employees** who are not eligible to retire under the eligibility criteria as described in the 1991 Agreement of Purchase and Sale will be provided a managed care healthcare plan, whereby the Employer will make the premium contributions at the rates in effect as of October 31, 2001. . . . Any increases in the costs of such premiums beyond one hundred fifty percent (150%) will be the responsibility of the individual retiree.

---

[25] Bargaining notes produced by the USW in this case which reflect the parties' November 29, 2001 negotiations are included in FreightCar's Appendix at **Howard Decl. Ex. J (SJ Ex. 27.)**
[26] A copy of FreightCar's December 18, 2001 Fifth Draft and Final Employer Proposal for Agreement is included in FreightCar's Appendix at **Howard Decl. Ex. K (SJ Ex. 28.)**

**Howard Decl. Ex. K, p.35 (SJ Ex. 28.)**  With respect to the reimbursable retirees, Article XIX,

Section 1(g) provided that:

> **For current employees** who retire under the eligibility criteria as described in the 1991 Agreement of Purchase and Sale, the Employer will pay the costs of healthcare and life insurance coverage only so long as Bethlehem Steel reimburses the Employer for those costs.  If Bethlehem Steel fails to fulfill its responsibility for these benefit costs, such [costs] will be the responsibility of the individual retirees.

**Howard Decl. Ex. K, p. 35 (SJ Ex. 28.)**

100.    FreightCar explained that these revisions reflected the USW's position that it did

not represent retirees and that retirees' medical benefits were not a proper subject of collective

bargaining.  **Howard Decl., ¶ 14 (SJ Ex. 17.)**

101.    After the USW rejected FreightCar's Fifth and Final Proposal, FreightCar

informed the USW that it believed the parties were an impasse.  **Howard Decl., ¶ 15 (SJ**

**Ex. 17.)**

102.    FreightCar asked the USW to present the Final Proposal to the bargaining unit for

a vote.  **Howard Decl., ¶ 15 (SJ Ex. 17.)**

103.    The bargaining unit voted on and rejected the Fifth and Final Proposal on January

10, 2002. **Howard Decl., ¶ 15 (SJ Ex. 17.)**

104.    FreightCar informed the USW that it intended to implement its Final Proposal

effective January 21, 2002. **Howard Decl., ¶ 15 (SJ Ex. 17.)**

105.    The USW responded by filing a charge with the National Labor Relations Board

alleging that FreightCar violated Section 8(a)(5) of the National Labor Relations Act by failing

to bargain in good faith with the USW during the 2001 negotiations.  ***See In re Johnstown***

***America Corporation*, NLRB Case No. 6-CA-32504 (SJ Ex. 48.)**

### *FreightCar's Amendment of the JAC Guide*

106.    On March 6, 2002, FreightCar again wrote to the reimbursable retirees to inform them that FreightCar could "no longer continue to absorb the cost of [their] post-retirement health and life insurance coverage" and that it would "discontinue paying these costs as of May 1, 2002."[27]  **Howard Decl., ¶ 16 (SJ Ex. 17.)**  FreightCar's Board of Directors subsequently adopted a formal resolution amending the JAC Guide to include the following language in the medical plan's section regarding retiree medical benefits:

> Effective May 1, 2002, coverage shall not be provided to reimbursable retirees unless Bethlehem Steel Corporation contemporaneously reimburses the company for the cost of such coverage.  For example, while Bethlehem Steel Corporation is in bankruptcy and fails or refuses to reimburse the company, no coverage shall be provided to reimbursable employees except to the extent that the company can arrange replacement coverage and the reimbursable retiree pays the full cost of such coverage.

**Howard Decl. Ex. M, p.2 (SJ Ex. 30.)**

### *The* **Deemer** *Litigation*

107.    On April 26, 2002, the USW and a putative class consisting of reimbursable retirees and their dependents filed suit challenging FreightCar's decision to terminate their welfare benefits.  ***Deemer v. Johnstown America Industries, Inc.*, Civ. No. 02-cv-806 (W.D. Pa. 2002).**

108.    On June 28, 2002, before any discovery was conducted, and before FreightCar had even answered their complaint, the *Deemer* plaintiffs filed a "Motion for Summary Judgment and Permanent Injunction, or in the Alternative, Motion for Preliminary Injunction."  ***Deemer* Docket, Dkt. Nos. 6, 14 (SJ Ex. 49.)**

---

[27] A copy of FreightCar's March 6, 2002 letter to the retirees informing them of Bethlehem's refusal to reimburse FreightCar for the reimbursable retirees' benefits is included in FreightCar's Appendix at **Howard Decl. Ex. L (SJ Ex. 29.)**

109.    On July 11, 2002, the Court ordered that FreightCar respond to the *Deemer* plaintiffs' motion in 30 days.  ***Deemer* Docket, Dkt. No. 16 (SJ Ex. 49.)**

110.    On August 9, 2002, FreightCar filed its response to the *Deemer* plaintiffs' alternative motions, and also filed its own cross-motion for summary judgment.  ***Deemer* Docket, Dkt. No. 25 (SJ Ex. 49.)**

111.    After full briefing on the parties' respective motions for summary judgment, Magistrate Judge Robert C. Mitchell recommended that FreightCar's motion for summary judgment be granted and that the *Deemer* plaintiffs' motions for summary judgment be denied. ***Deemer* Docket, Dkt. No. 48 (SJ Ex. 49.)**

112.    The *Deemer* plaintiffs objected to Magistrate Mitchell's recommendation. ***Deemer* Docket, Dkt. No. 49 (SJ Ex. 49.)**

113.     Judge Cindrich exercised his discretion pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) to "accept new evidence as part of [his] *de novo* review of [Magistrate Mitchell's R & R.]"  **Cindrich Memorandum Opinion, p.4 (SJ Ex. 50.)**

114.    To assist him in his *de novo* review of Magistrate Mitchell's R&R, Judge Cindrich ordered an evidentiary hearing to be held on Wednesday, August 13, 2003.  **Cindrich Memorandum Opinion, p.4 (SJ Ex. 50.)**

115.    However, on August 5, 2003, the parties filed a joint motion to continue the hearing to allow for discovery. ***Deemer* Docket, Dkt. No. 69 (SJ Ex. 49.)**

116.    Judge Cindrich granted their joint motion to continue the hearing and also denied their respective motions for summary judgment without prejudice to be reasserted at the close of discovery. ***Deemer* Docket, Dkt. No. 69 (SJ Ex. 49.)**

### *The* **Britt** *Litigation*

117.    In addition to amending the JAC Guide's medical plan to eliminate retiree medical benefits for the reimbursable retirees, in 2002, FreightCar eliminated the monthly pension supplement and the health and life insurance benefits it had previously provided to represented employees that retired under certain special pension formulas.  **Britt Complaint, ¶ 28 (SJ Ex. 51.)**

118.    In August 2003, a putative class of current and former FreightCar employees who "applied or will apply for 70/80 or Rule of 65 retirement benefits" filed a lawsuit in which they alleged that the unilateral eliminate of these benefits violated the parties' collective bargaining agreements and the terms of FreightCar's pension and retiree medical plans.  **Britt Complaint, ¶ 28 (SJ Ex. 51.)**

119.    Issues relating to the duration of FreightCar's obligation to provide these benefits and whether FreightCar's retiree medical benefits were "vested" or "lifetime" were not addressed in *Britt*. **Britt Complaint, ¶ 28 (SJ Ex. 51.)**

### *The 2005 Collective Bargaining Agreement*

120.    In 2005, entered their first collective bargaining agreement since 1997.  **Howard Decl. Ex. D (SJ Ex. 21.)**

121.    Active employees' and retirees' medical benefits were addressed in Article XIX of the 2005 CBA and a side letter relating to the parties' settlement of the *Deemer* and *Britt* litigation.  **Howard Decl. Ex. D, Bates USW FCA00347 (SJ Ex. 21.)**

122.    Article XIX to the 2005 CBA provided:

Effective January 1, 2005 active employees and **current and future eligible retirees** and their eligible dependents will be covered by the Steelworkers Health and Welfare Fund POS Plan as set forth in the Employee Guide.

**Howard Decl. Ex. D, p. 60 (SJ Ex. 21.)**

123.    Article XIX to the 2005 CBA ensured that all retirees' medical benefits were governed by the terms of the JAC Guide and the SHWF Plan.  **Howard Decl. Ex. D, p. 60 (SJ Ex. 21.)**

124.    With respect to FreightCar's obligation to provide these benefits, the 2005 CBA incorporated the *Deemer* and *Britt* settlements and provided that FreightCar would contribute $700 per month for each household with at least one non-Medicare eligible retiree and $450 per month for each Medicare-eligible retiree.  **Howard Decl. Ex. D, p. 60 (SJ Ex. 21.)**  FreightCar was required to begin these monthly contributions on December 1, 2004 and continue them "until the later of November 30, 2012 or the expiration of a successor Agreement to [the 2005 CBA.]"  **Howard Decl. Ex. D, p. 88 (SJ Ex. 21.)**  The 2005 CBA further provided, "In any event, the Company's contributions for retiree and/or surviving spouse coverage as described above will remain unchanged until the later of November 30, 2012 or the expiration of a successor Agreement to this CBA."  **Howard Decl. Ex. D, p. 88 (SJ Ex. 21.)**

### *The 2008 Plant Shutdown*

125.    In 2007, FreightCar informed the USW that it intended to close the Johnstown Plant.  The parties engaged in decisional bargaining, but were unable to reach an agreement that would allow FreightCar to continue operating the Johnstown Plant.

126.    Before FreightCar and the USW began effects bargaining, a putative class of FreightCar employees filed a lawsuit in the Western District of Pennsylvania challenging FreightCar's decision to close the Johnstown Plant.  ***Hayden v. FreightCar America, Inc.*, Civ. No. 07-cv-00201 (W.D. Pa. 2007).**

127.    The *Hayden* plaintiffs alleged that FreightCar's decision to close the Plant was designed to prevent them from accruing the years of service necessary to become vested in certain types of pensions.  ***Sowers* Complaint, ¶¶ 44-50 (SJ Ex. 52.)**

128.     After this Court granted the *Hayden* plaintiffs' motion for a preliminary injunction and ordered that the class be reinstated to allow them to accrue the years of service they required, FreightCar, the USW, and the *Sowers* plaintiffs negotiated a combined settlement/shutdown agreement.[28] **Howard Decl. Ex. E (SJ Ex. 22.)**

129.     Under their "FCA/Union Settlement Agreement" ("the Shutdown Agreement"), the parties acknowledged at the 2005 CBA terminated May 15, 2008 and that FreightCar "closed the [Johnstown Plant] effective May 16, 2008, after affording the Union a full and fair opportunity to engage in decisional and effects bargaining in accordance with the National labor Relations Act." **Howard Decl. Ex. E, p. 2 (SJ Ex. 22.)**

130.     With respect to retiree medical benefits, the parties agreed that then-current retirees' benefits would continue to be provided as set forth in the 2005 CBA and pursuant to the applicable terms and conditions of the *Deemer* and *Britt* settlements. **Howard Decl. Ex. E, p. 2 (SJ Ex. 22.)**

131.     The Shutdown Agreement also provided that the *Sowers* plaintiffs would similarly be entitled to retiree medical benefits under the 2005 CBA and the *Deemer* and *Britt* settlements. **Howard Decl. Ex. E, p. 5 (SJ Ex. 22.)**

### The Expiration of the **Deemer/Britt** *Settlement and the Instant Lawsuit*

132.     Under their 2005 settlement of *Deemer* and *Britt*, FreightCar was only required to make monthly contributions toward the retirees' medical benefits until November 30, 2012 or the expiration of a successor Agreement to the 2005 CBA. **Howard Decl. Ex. D, p. 88 (SJ Ex. 21.)**

---

[28] A copy of the 2008 Plant Shutdown Agreement is included in FreightCar's Appendix at **Howard Decl. Ex. E (SJ Ex. 22.)**

133.    If FreightCar stopped its contributions after November 30, 2012, the parties would be returned to the legal positions they occupied prior to the *Deemer* and *Britt* litigation. **Howard Decl. Ex. D, p. 88 (SJ Ex. 21.)**

134.    In June 2011, FreightCar, the USW, and counsel for the *Deemer* and *Britt* plaintiffs began negotiations to reach an agreement for the continuation of retirees' welfare benefits beyond November 30, 2012.  **Payne Decl., ¶ 9 (SJ Ex. 53.)**

135.    FreightCar continued its contributions under the *Deemer* and *Britt* settlement while the parties attempted to reach an agreement.  **Ross Decl., ¶ 17 (SJ Ex. 54.)**

136.    Despite almost two years of negotiations, which included numerous meetings and even a formal mediation, the parties could not reach an agreement.  **Ross Decl., ¶ 17 (SJ Ex. 54.)**

137.    In July 2013, FreightCar advised the plaintiffs in this case that it intended to cease its contributions effective October 1, 2013.  FreightCar also filed a declaratory judgment action in the Northern District of Illinois.  ***FreightCar America, Inc. v. USW*, 13:cv-4889 (N.D. Ill.)** The plaintiffs responded by filing the instant lawsuit in this Court.

Dated: July 17, 2014                         Respectfully Submitted,

                                             /s/ *Sam P. Myler*
                                             James Clark Munro II
                                             Michael J. Parrish, Jr.
                                             Ronald P. Carnevali, Jr.
                                             SPENCE, CUSTER, SAYLOR, WOLFE & ROSE, LLC
                                             AmeriServ Financial Building, P.O. Box 280
                                             Johnstown, Pennsylvania 15907
                                             T: (814) 536-0735
                                             F: (814) 539-1423

                                             Nancy G. Ross (*pro hac vice*)
                                             Prashant Kolluri (*pro hac vice*)
                                             Sam P. Myler (*pro hac vice*)
                                             Kirk Watkins (*pro hac vice*)
                                             MCDERMOTT WILL & EMERY LLP
                                             227 West Monroe Street
                                             Chicago, Illinois 60606
                                             T: (312) 372-2000
                                             F: (312) 984-7700

                                             **ATTORNEYS FOR DEFENDANTS FREIGHTCAR
                                             AMERICA, INC., JOHNSTOWN AMERICA, LLC,
                                             AND JOHNSTOWN AMERICA CORPORATION
                                             USWA HEALTH & WELFARE PLAN**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system this 17th day of July, 2013.  Any other counsel of record will be served by facsimile transmission and/or first class mail.

/s/ <i>Sam P. Myler</i>_____
Sam P. Myler
