**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION**

| | |
|---|---|
| **ANTHONY J. ZANGHI,** *et al.,* | |
| **Plaintiffs,** | **No.: 3:13-CV-00146** |
| **v.** | |
| **FREIGHTCAR AMERICA, INC.,** *et al.,* | |
| **Defendants.** | **Hon. Kim R. Gibson** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

James Clark Munro II
Michael J. Parrish, Jr.
Ronald P. Carnevali, Jr.
SPENCE, CUSTER, SAYLOR, WOLFE & ROSE, LLC
AmeriServ Financial Building, P.O. Box 28
Johnstown, Pennsylvania 15907
T: (814) 536-0735
F: (814) 539-1423

Nancy G. Ross (*pro hac vice*)
Sam P. Myler (*pro hac vice*)
Prashant Kolluri (*pro hac vice*)
Kirk Watkins (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606
T: (312) 372-2000
F: (312) 984-7700

*ATTORNEYS FOR DEFENDANTS FREIGHTCAR AMERICA, INC., JOHNSTOWN AMERICA, LLC,
AND JOHNSTOWN AMERICA CORPORATION USWA HEALTH & WELFARE PLAN*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     **INTRODUCTION** ........................................................................... 1

II.    **THE UNDISPUTED MATERIAL FACTS** ................................... 3

     A.     FreightCar's Purchase of the Johnstown Plant and the Parties' 1991 CBA ...................................................................................... 3

     B.     The Creation, Adoption, and Implementation of FreightCar's Employee Benefit Plans .................................................................. 4

         1.     The Drafting and Negotiation of the New FreightCar Benefit Plans ........................................................................ 4

         2.     The JAC Guide ..................................................................... 9

     C.     The 1997 CBA ............................................................................. 10

         1.     The Steelworkers Health and Welfare Fund ...................... 10

     D.     The 2001 Negotiations ................................................................ 11

     E.     The Settlement of *Deemer* and *Britt* and the 2005 Collective Bargaining Agreement .............................................................. 13

III.    **ARGUMENT** ................................................................................. 15

     A.     **Plaintiffs Cannot Overcome the Third Circuit's Presumption Against the Vesting of Retiree Welfare Benefits** ...................... 16

     B.     **FreightCar Never Agreed in any CBA or Plan Document to Provide Vested Retiree Benefits.** ............................................. 17

         1.     The 1991 CBA Did Not Mention, Let Alone, Create Vested Benefits ................................................................ 18

         2.     Neither Subsequent Plan Documents Nor CBAs Expressed an Intent to Vest Retiree Welfare Benefits ......................... 20

         3.     Judge Cindrich's Prior Ruling in *Deemer* Was Contrary to Third Circuit Law and Issued Without the Benefit of the Full Evidentiary Record .............................................................. 22

     C.     **The "Subject To" Language Proposed by the USW for Retiree Welfare Plans Neither Legally Nor Factually Prevents FreightCar from Terminating the Benefits.** ............................................... 23

1.    The Unambiguous Contract Language Establishes that
Retiree Benefits were Governed by the JAC Guide ............................................ 24

2.    The JAC Guide Unambiguously Allowed FreightCar to
Terminate Retiree Medical and Life Insurance Benefits ...................................... 26

IV.    CONCLUSION ........................................................................................................... 29

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baldwin v. University of Pittsburgh Med. Ctr.*,
   636 F.3d 69 (3d Cir. 2011)..................................................................................27

*Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. &*
   *Research Found.*
   334 F.3d 365 (3d Cir. 2003).................................................................................26

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................16

*Coolspring Stone Supply v. Am. States Life Ins. Co.*,
   10 F.3d 144 (3d Cir. 1993)....................................................................................16

*Curtiss–Wright Corp. v. Schoonejongen*,
   514 U.S. 73 (1995)................................................................................................17

*Guinta v. Accenture, LLP*,
   No. 08-3376, 2008 WL 4852934 (D.N.J. Nov. 7, 2008) .......................................27

*Hughes v. 3M Retiree Med. Plan*,
   134 F. Supp. 2d 1062 (D. Minn. 2001), *aff'd* 281 F.3d 786 (8th Cir. 2002) ..........28

*Intl. Chem. Workers Union Counsel of the UFCW v. PPG Indus.*,
   236 Fed. Appx. 789 (3d Cir. 2007)..............................................................17, 18, 29

*Lewis v. Allegheny Ludlum Corp.*,
   2012 WL 1328360 (W.D. Pa. Apr. 17, 2012)..................................................20, 23

*Lewis v. Allegheny Ludlum Corp.*,
   2013 WL 3989448 (W.D. Pa. Aug. 2, 2013) ............................................20, 21, 23

*Melrose, Inc. v. Pittsburgh*,
   613 F.3d 380 (3d Cir. 2010)..................................................................................16

*Saldana v. Kmart Corp.*,
   260 F.3d 228 (3d Cir. 2001)..................................................................................16

*Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc.*,
   298 F.3d 191 (3d Cir. 2002)..................................................................................17

*UAW v. Skinner*,
   188 F.3d 130 (3d Cir. 1999)........................................................................ *passim*

*U.S. ex rel. Bartlett v. Ashcroft*,
   No. 04-57, 2013 WL 5817665 (W.D. Pa. Oct. 29, 2013) ......................................................16

*U.S. v. Valko*,
   No. 09-242, 2011 WL 3510947 (W.D. Pa. Aug. 9, 2011) ....................................................16

**Statutes**

29 U.S.C. § 158(d) ...........................................................................................................................28

29 U.S.C. § 185(a) .............................................................................................................................1

29 U.S.C § 1022(a) ..........................................................................................................................26

29 U.S.C. §§ 1132(a)(1)(B), (a)(3) ...................................................................................................1

Defendants FreightCar America, Inc., Johnstown America Corporation, and Johnstown America Corporation USWA Health and Welfare Plan (collectively, "FreightCar") hereby submit this Memorandum in Support of their Motion for Summary Judgment.[1]

## I.      <u>INTRODUCTION</u>

In this lawsuit, the individual plaintiff retirees (the "Retirees") and the USW[2] ask this Court to infer the existence of an agreement by FreightCar to provide the Retirees with unalterable, lifetime medical and life insurance benefits.  No such inference is permitted.  To the contrary, the undisputed material facts, when applied to the governing law in the Third Circuit, mandate this Court's conclusion that retiree benefits were not vested, that FreightCar was entitled to modify or terminate such benefits, and that FreightCar therefore is entitled to summary judgment in this action.

In enacting ERISA as the exclusive regulation governing an employer's obligations regarding employee benefits,[3] Congress made a conscious decision not to require the vesting of retiree medical or life insurance benefits.  Rather, as the Third Circuit has repeatedly recognized, there is a presumption *against* lifetime vesting of such benefits upon retirement.  Vesting can only occur pursuant to a clear and express written agreement by the employer.  In the case at hand, undisputed material facts clearly demonstrate the lack of any clear and express agreement by FreightCar to provide vested medical and life insurance benefits to the Retirees.

---

[1] FreightCar also submits and incorporates by reference its Local Civil Rule 56(B)(1) Statement of Undisputed Material Facts (cited herein as "SUMF").

[2] USW, also referred to hereinafter as the "Union" and collectively with the Retirees as the "plaintiffs," refers to the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO/CLC.

[3] "ERISA" refers to the Employee Retirement Income Security Act of 1974.  Sections 502(a)(1)(B) and 502(a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), as well as Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), authorize FreightCar to terminate the Retirees' medical and life insurance benefits.

First, FreightCar did not clearly and expressly agree to provide the Retirees with unalterable, lifetime benefits in any collective bargaining agreement ("CBA") or other benefit plan document.  To the contrary, FreightCar consistently negotiated CBAs that were either (a) silent regarding the benefits of current and future retirees or (b) that explicitly provided for retiree benefits that could be modified by FreightCar.  Second, the governing benefit plan documents under which retiree benefits were provided expressly allowed FreightCar to unilaterally terminate the benefits, subject only to any contrary language in a governing CBA, of which there is none.

FreightCar's termination of the Retirees' benefits was not only consistent with the clear Third Circuit presumption against vesting, but it was also entirely consistent and expressly authorized by the governing documents, none of which provided for vested benefits.[4]  For these reasons, which are discussed in greater detail below, FreightCar respectfully requests that this Court grant its motion for summary judgment and resolve the parties' dispute once and for all by acknowledging FreightCar's unambiguous right under the LMRA and ERISA to terminate the Retirees' medical and life insurance benefits.

---

[4] Although FreightCar was under no obligation to provide vested benefits, and did not agree to do so, FreightCar did agree, in the context of a 1991 asset purchase transaction, to provide certain benefits after the transaction closed, if FreightCar was reimbursed by the seller (Bethlehem Steel Corporation) for the cost of such benefits.  When Bethlehem Steel Corporation terminated these reimbursements due to its imminent bankruptcy, FreightCar informed the USW that it had no choice but to terminate the corresponding benefits and the plaintiffs filed suit challenging FreightCar's ability to terminate the Retirees' medical and life insurance benefits. *Deemer v. Johnstown America Corporation*, No. 02-cv-806 (W.D.Pa.) ("*Deemer*"); *Britt v. Johnstown America Corporation*, No. 03-cv-01289 (W.D.Pa.) ("*Britt*"). The parties subsequently entered into an interim settlement agreement in 2005, which resolved the dispute until November 30, 2012, at which time FreightCar was entitled to cease paying the benefit costs under the 2005 settlement agreement and the parties would revert back to their prior legal positions. After negotiations between the parties to permanently resolve the dispute failed, FreightCar commenced litigation (which proceedings were consolidated with this lawsuit) in order to have the court declare its clear right to terminate the Retirees' benefits.

## II.   THE UNDISPUTED MATERIAL FACTS

### A.   FreightCar's Purchase of the Johnstown Plant and the Parties' 1991 CBA

From 1923 until 1991, Bethlehem Steel Corporation ("Bethlehem") operated a railcar fabrication plant in Johnstown, Pennsylvania (the "Johnstown Plant" or the "Plant").  (SUMF ¶ 3.)  In May 1991, FreightCar agreed to buy the Johnstown Plant.  (*Id.* ¶ 5.)  Bethlehem and FreightCar agreed to a closing date of October 31, 1991.  (*Id.* ¶ 8.)

Bethlehem's employees at the Plant were represented by the USW.  (*Id.* ¶ 2.)  FreightCar and the USW engaged in negotiations to ensure that they could agree on the relevant subjects of collective bargaining prior to the sale of the Plant.  (*Id.* ¶ 9.)  In October 1991, FreightCar and the USW reached an agreement with respect to the terms and conditions of employment that would apply to the Plant's represented employees after the sale closed (the "1991 CBA").[5]  (*Id.* ¶ 16.)  The 1991 CBA did not address FreightCar's obligations with respect to employee or future retirees' benefits. (*Id.* ¶ 17.)

In purchasing the Plant, FreightCar did not assume or adopt Bethlehem's existing employee and retiree benefit plans.  (*Id.* ¶ 22.)  Rather, during their negotiations, the USW and FreightCar agreed that FreightCar, in conjunction with the USW, would create new plans for the Plant's represented employees.  (*Id.* ¶ 20.) This agreement was memorialized in a "side letter" to the 1991 CBA ("Side Letter 22").  (*Id.* ¶ 19.)  Side Letter 22 provided as follows:

- [FreightCar] will create mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace;

- Within 60 days after closing of the [FreightCar]/Bethlehem sale, [FreightCar] will forward to the Union for review and comment draft copies of such plans and [FreightCar] and the Union agree to use their best

---

[5] Pursuant to the purchase and sale agreement, Bethlehem retained all responsibility for paying the benefits owed to represented Johnstown Plant employees that had retired from Bethlehem prior to the sale of the Johnstown Plant.  (*Id.* ¶ 22.)

> efforts to finalize such plans, subject to IRS approval if appropriate, within
> 120 days of closing.

(*Id.* ¶ 20.)

Pursuant to Side Letter 22, the parties agreed that instead of attempting to draft, negotiate, and agree to all of the terms of new employee benefit plans prior to the closing, they would defer the creation of these plans until after the sale was complete.  (*Id.* ¶ 19.)  In order to ensure that the plans FreightCar created satisfied the USW's expectations and reflected what the parties negotiated, FreightCar agreed to provide the USW with drafts of the plans for review and approval prior to their adoption and implementation.  (*Id.* ¶ 23.)

### B.     The Creation, Adoption, and Implementation of FreightCar's Employee Benefit Plans

Soon after the sale, and in accordance with the parties' agreement in Side Letter 22, FreightCar drafted new employee benefit plan documents for the Plant's represented employees with the assistance of outside counsel at Fisher & Phillips and employee benefit consultants at Hewitt Associates ("Hewitt").  (*Id.* ¶ 25.)  As shown below, FreightCar, its attorneys at Fisher & Phillips, and the consultants at Hewitt worked closely with the USW over the course of the next year to ensure that each of the plan documents met the USW's expectations and reflected what the parties agreed to during the 1991 negotiations.  (*Id.* ¶ 25.)  Once the plan documents were approved by the USW, the terms of the new employee benefit plans governed the represented employees' benefits both during employment and upon retirement.  (*Id.* ¶¶ 51, 53.)

1.     The Drafting and Negotiation of the New FreightCar Benefit Plans

Initial drafts of FreightCar's welfare plans, including its employee and retiree medical plans and life insurance plan,[6] were created in consultation with consultants at Hewitt and

_____

[6] In addition to the employee and retiree medical plans and life insurance plan, FreightCar also created a dental plan, a vision plan, a sickness and accident benefits plan, an

reviewed by Robert Christenson, an attorney at Fisher & Phillips.[7]  (*Id.* ¶ 28.)  Throughout the drafting process, Christenson and Hewitt referred to and relied upon Bethlehem's Program of Insurance Benefits for Hourly Paid Employees ("the Bethlehem PIB") to ensure that the new FreightCar plans mirrored the Bethlehem plans they replaced in the appropriate "material respects," as agreed in Side Letter 22.[8]  (*Id.* ¶¶ 30-31.)

     a.  <u>The Active Employee Welfare Plans</u>

  By July of 1992, Hewitt and Christenson had completed drafts of the new FreightCar dental plan, life insurance plan, sickness and accident plan, medical plan, severance plan, and 401(k) plan.  (*Id.* ¶ 32.)  FreightCar's July 1992 drafts of the medical and life insurance plans stated that these benefits would be provided by FreightCar to represented employees upon retirement, like the PIB, but did not provide for any given duration.  (*Id.* ¶ 33.)  To the contrary, the draft medical plan expressly provided in a section entitled "Situations that May Affect your Benefits" that the benefits could be lost or delayed if "[t]he plan is modified to reduce or eliminate certain benefits."  (*Id.* ¶ 34.)  Similarly, the draft life insurance plan provided that coverage could be lost if "[t]he plan, or part of the plan, ends."  (*Id.* ¶ 34.)

  FreightCar's July 1992 drafts were sent to the USW for review and comment.  (*Id.* ¶ 32.)  Jerry Sokolow, a USW benefits technician that worked closely with Christenson to finalize the

---

employee assistance plan, a severance plan, and a supplemental unemployment benefit plan.  (*Id.* ¶ 35.)

 [7] The qualified plans for represented employees, such as the pension plans and 401(k) plans, were drafted by Fred Benario, another attorney at Fisher & Phillips, and were revised by Jeanette Stump, a Benefits Technician for the USW.  (*Id.* ¶ 26.)  Like the welfare benefit plans, the qualified plans were reviewed and approved by the USW.  (*Id.* ¶ 27.)

 [8] The Bethlehem PIB described the Bethlehem represented employees' life insurance, sickness and accident benefits, medical benefits, dental benefits, and vision care benefits.  (*Id.* ¶¶ 18-22.)  Stump provided Christenson with a copy of the 1990 Bethlehem PIB during the parties' negotiations of Side Letter 22.  (*Id.* ¶¶ 20.)  Hewitt received a copy of the 1986 Bethlehem PIB from Glenn Grove, who served as the Benefit Plan Administrator for the Johnstown Plant both before and after its sale to FreightCar.

plans, forwarded FreightCar's drafts to Ernie Esposito, a USW Staff Representative who was involved in the negotiation of the 1991 CBA, on July 23, 1992.  (*Id.* ¶ 35.)  In his cover letter, Sokolow wrote:

> As we have discussed, enclosed are SPDs for [FreightCar] for the dental plan, life insurance, vision plan and S&A benefits.  Also, the [medical], severance plan and 401(k) plan. . . .  You need to review these with the Committee to make sure that this is what was negotiated, then you and I and the Committee can meet to determine what changes, if any, we wish to insist that the Company make.

(*Id.* ¶ 35.)

On July 31, 1992, after the plans were reviewed by Esposito and other USW representatives, Sokolow wrote to Christenson to provide him with a "brief summary of the problems that the Committee ha[d] with the benefit books" and to "request[] a 'roundtable' discussion with the Company to iron out differences."  (*Id.* ¶ 36.)  Sokolow did not insist upon language vesting benefits for retirees, or requiring that retiree benefits be provided for any particular length of time.  (*Id.* ¶¶ 37-39.)  Sokolow only requested that all of the "benefit books" be revised to "reference collective bargaining agreement as far as [the] Company's right to amend or terminate the plan."  (*Id.* ¶¶ 37-39.)  As Sokolow explained in his deposition, the bargaining committee's request was intended to ensure that the terms of the collective bargaining agreements governed the employees' rights to benefits.  (*Id.* ¶ 37-39.)  Sokolow also asked that FreightCar revise the July 1992 drafts to provide for an effective date of October 28, 1991—the date FreightCar took ownership of the Johnstown Plant.  (*Id.* ¶ 37.)  FreightCar agreed to incorporate these and other changes into the plans. (*Id.* ¶ 39.)

In January 1993, FreightCar forwarded final drafts of the welfare benefit plans to the USW for its approval.  (*Id.* ¶ 30.)  Sokolow wrote to Christenson on January 22, 1993 to inform him that the plans had been approved by the USW.  (*Id.* ¶40.)  Specifically, Sokolow stated:

- 6 -

In accordance with our recent phone conversation, I have double-checked with Staff Representative Ernie Esposito, and I believe that all of the SPD (Summary Plan Description) books have now been corrected to meet our expectations and specifications.

(*Id.* ¶ 40.)

b.   The Plan Administration Document

In addition to the aforementioned welfare plans, Christenson and Hewitt also drafted a plan administration document applicable to all of FreightCar's benefit plans for represented employees.  (*Id.* ¶ 47.)  The draft plan administration document did not include any language vesting benefits or otherwise limiting FreightCar's right to terminate any of its welfare benefit plans.  (*Id.* ¶ 52.)  Like the welfare benefit plans themselves, the plan administration document reserved FreightCar's right to modify or terminate the plans.  (*Id.* ¶ 52.) Specifically, FreightCar's initial draft of the plan administration document provided that:

The company reserves the right to end, suspend, or amend the plan at any time, in whole or in part.  This means the plan may be discontinued in part or in its entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented.  If any changes are made, you'll be notified.

(*Id.* ¶ 52.)

FreightCar's draft plan administration document was forwarded to the USW for its review in late 1992.  (*Id.* ¶ 48.)  The above-excerpted reservation of rights was revised based on conversations with the USW to clarify that FreightCar's right to end, suspend, or amend the plans was "subject to collective bargaining."  (*Id.* ¶ 48.)  The USW approved the plan administration document in January 1993 at the same time that it approved the new employee welfare plans between FreightCar and the Union.  (*Id.* ¶ 48.)

In its final form, the plan administration document provided that the benefits being provided by FreightCar were not guaranteed and were subject to change.  (*Id.* ¶ 52.) Specifically, the plan administration section stated:

> Nothing in this guide says or implies that participation in these plans is a guarantee of continued employment with the company, nor is it a guarantee that benefit levels, the price of coverage, eligibility rules, or any other term or condition of the plans will remain unchanged in future years.
>
> *   *   *   *   *
>
> Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part.  This means the plans may be discontinued in part or in their entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented.  If any changes are made, you'll be notified.

(*Id.* ¶ 52.)

c.    The Retiree Medical Plan

In Summer 1992, FreightCar began to create the retiree medical benefit plan by editing the active employee medical plan it had previously drafted and was in the process of finalizing with the USW.  (*Id.* ¶ 42.)  At no time during the preparation of the retiree medical plan, or any other health plan, did FreightCar, Christenson or Hewitt review or refer to the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses ("Bethlehem PHMB" or "PHMB") created by Bethlehem for its retirees.  (*Id.* ¶¶ 15, 30.)  Nor did they review or refer to the separate Pensioners' and Surviving Spouses' Insurance Agreement between Bethlehem and the USW attached to the PHMB.   (*Id.* ¶ 31.)

FreightCar discussed the retiree medical plan with the USW on a number of occasions throughout the fall of 1992 and spring of 1993.  (*Id.* ¶ 42.)  Freightcar never agreed to vest retiree medical benefits and never promised that benefits would be provided for any duration.  (*Id.* ¶ 44.)  Like the represented employees' welfare plans, the retiree medical plan sent to the USW for

- 8 -

review and approval incorporated the language the Union had requested that FreightCar could amend or terminate the plan, subject to the collective bargaining agreement. (*Id.* ¶ 52.) By letter dated April 13, 1993, Christenson informed Hewitt that he had "received a phone call from Jerry Sokolow confirming that the draft of the Retiree Medical SPD is acceptable to the Steelworkers." (*Id.* ¶¶ 45-46.) A courtesy copy of Christenson's letter to Hewitt was forwarded to Sokolow. (*Id.* ¶¶ 45-46.)

      2.    The JAC Guide

After the various benefit plans were approved by the USW, they were compiled by Hewitt into an employee handbook referred to as "JAC's Employee Guide" (the "JAC Guide" or "Guide"). (*Id.* ¶ 49.) The Administration Section of the JAC Guide identified the summary plan descriptions set forth therein and their respective insurance contracts as the governing ERISA plan documents. (*Id.* ¶ 53.) The JAC Guide was divided into several sections with each section describing a different benefit plan. (*Id.* ¶ 50.) The plan administration document common to all of the plans was provided at the back of the Guide. (*Id.* ¶ 47.)

The retiree medical plan was a separate document that employees were provided upon retirement to be inserted in the JAC Guide as a replacement for the active employees' medical plan. (*Id.* ¶ 50.) The active employee and retiree medical benefits described in the JAC Guide were provided through a Blue Cross Blue Shield insurance agreement ("the BCBS policy"). (*Id.* ¶ 53.)

Copies of the JAC Guide were distributed to the represented employees in May 1993 and were given an effective date of October 28, 1991, as requested by the USW. (*Id.* ¶ 51.) By drafting and adopting the plan documents in the JAC Guide, FreightCar fulfilled its obligation under Side Letter 22 to create new employee benefit plans to replace the plans previously maintained by Bethlehem. (*Id.* ¶ 56.)

- 9 -

C.    **The 1997 CBA**

While the 1991 and 1994 CBAs between FreightCar and the USW were silent with

respect to employee and retiree benefits, the 1997 CBA made clear that the insurance and other

benefits provided to employees would be governed by the JAC Guide.  (*Id.* ¶¶ 55-58.)  The 1997

CBA included a "zipper clause," which provided that "this Agreement and the documents

expressly referred to herein are the only documents by which the parties intend to be

contractually or statutorily bound."  (*Id.* ¶ 58.)  Among the "documents expressly referred to" in

the zipper clause were the "Summary Plan Descriptions" contained in the JAC Guide.  (*Id.* ¶ 58.)

In addition to referring implicitly to the JAC Guide in its zipper clause, the 1997 CBA

stated explicitly that:

> The parties agree that employees shall be eligible for insurance and other benefits
> as set forth in "JAC's Employee Guide" for Represented P&M employees, as
> amended during the negotiations which preceded the execution of the collective
> bargaining agreements.[9]

(*Id.* ¶ 60.)  The 1997 CBA did not make any reference to the Bethlehem PIB, the Bethlehem

PHMB or any other Bethlehem benefit program.  (*Id.* ¶¶ 60-61.)

1.    The Steelworkers Health and Welfare Fund

Until 1997, the active employee and retiree medical benefits set forth in the JAC Guide

were provided through a BCBS indemnity plan, and it was the BCBS policy which set forth the

terms of coverage.  (*Id.* ¶ 62.)  As a cost-saving alternative to the indemnity plan, the USW

proposed in 1997 that FreightCar replace its BCBS indemnity plan with a Point-of-Service plan

offered by the Steelworkers Health and Welfare Fund (the "Fund").  (*Id.* ¶¶ 63-65.)  FreightCar

agreed to the USW's proposal, and in 1998, the parties signed a Steelworkers Health and

Welfare Fund Participation Agreement (the "Participation Agreement").  (*Id.* ¶ 67.)

---

[9] The amendments to the JAC Guide referenced in Appendix 9 of the 1997 CBA related
to benefit plans that are not at issue in this litigation.

Instead of FreightCar providing insurance coverage directly to employees and retirees through BCBS, the Participation Agreement provided that FreightCar would make fixed monthly contributions to the Fund on behalf of each employee and retiree.  (*Id.* ¶ 68.)  These contributions were pooled with the contributions of other employers to secure insurance coverage for SHWF plan participants.  (*Id.* ¶ 69.)  The terms of this insurance coverage were set forth in a separate Steelworkers Health and Welfare Plan (the "SHWF Plan Document"), and an associated Summary Plan Description of the Medical and Vision Care Benefits for Johnstown America Corporation (the "SHWF Plan SPD").  (*Id.* ¶ 70.)  While these documents described active employee and retiree benefits in detail, they had no language with respect to the duration of benefits.  (*Id.* ¶ 72.)  By agreeing to provide benefits through the SHWF Plan, the Fund effectively replaced BCBS as the plan administrator and coverage provider.  (*Id.* ¶¶ 62-65.)

### D.   The 2001 Negotiations

In the fall of 2001, FreightCar and the USW began negotiations to reach a successor agreement to the 1997 CBA.  (*Id.* ¶ 73.)  A significant issue during these negotiations was FreightCar's need to reduce trailing benefits and legacy costs.  (*Id.* ¶ 74.)  The costs associated with the medical benefits of FreightCar retirees since the sale had become particularly burdensome.  (*Id.* ¶ 74.)  Pursuant to the 1991 purchase and sale agreement, Bethlehem had agreed to reimburse FreightCar for the cost of some of these retiree medical benefits.  (*Id.* ¶ 75.)  However, in July 2001, Bethlehem's reimbursements stopped.  (*Id.* ¶ 75.)

After Bethlehem filed for bankruptcy on October 15, 2001, it became apparent that Bethlehem would be unable to fulfill its reimbursement obligation under the 1991 purchase and sale agreement.  (*Id.* ¶ 75.)  FreightCar, facing an unanticipated liability of approximately $1.2 million per year, presented its first economic proposal to the USW during the parties' collective bargaining negotiations on October 25, 2001.  (*Id.* ¶ 78.)  This proposal included a provision that

FreightCar could terminate the medical benefits for FreightCar retirees if Bethlehem failed to reimburse FreightCar for these costs.  (*Id.* ¶ 80.)  Upon reviewing the proposal, the USW informed FreightCar that it did not know if it was authorized to negotiate on behalf of the current retirees.  (*Id.* ¶ 82.)

At the parties' November 14, 2001 bargaining session, the USW reviewed each provision in FreightCar's October 25, 2001 economic proposal.  (SUMF ¶ 86.)  With respect to the provision relating to FreightCar's need to terminate retirees' medical benefits, the USW asked for clarification and for information relating to the retirees that would be affected.  (*Id.* ¶ 86.)  When asked whether the USW represented the retirees, the USW stated that it did not.  (*Id.* ¶ 86.)  FreightCar informed the USW that if it were forced to bear this unanticipated liability, the already strained negotiations would become even more difficult.  (*Id.* ¶ 87.)

At the conclusion of the November 28, 2001 negotiations, FreightCar tendered its second economic proposal, which was entitled its Fourth Draft of Employer Proposal for Agreement. (*Id.* ¶ 89.)  This proposal again included a provision regarding FreightCar's need to terminate retirees' medical benefits if Bethlehem's reimbursements stopped.  (*Id.* ¶ 90.)  Rather than insist that FreightCar assume this liability, which would have required significant concessions by the members of the bargaining unit represented by the USW, the USW took the position that this liability was not a proper subject of collective bargaining and that the proposed language should be removed from the parties' contract.  (*Id.* ¶ 94.)  FreightCar expressly confirmed that the USW understood what FreightCar's intentions were with respect to the retirees' benefits, and the USW confirmed that FreightCar had fulfilled its obligation to inform them of this change.  (*Id.* ¶ 95.)

On December 18, 2001, FreightCar presented the USW with its third economic proposal, which was entitled its "Fifth Draft and Final Employer Proposal for Agreement ("the Fifth and

Final Proposal"). (*Id.* ¶ 97.)  Given the position the USW took at the November 29, 2001 bargaining session with respect to retiree benefits, FreightCar's Fifth and Final Proposal was revised to reference only prospective retirees; it did not reference individuals that were already retired. (*Id.* ¶ 98.)  FreightCar explained this revision to the USW and the USW did not object or attempt to bargain on behalf of retirees. (*Id.* ¶ 100.)

The USW, however, refused to agree to the Fifth and Final Proposal. (*Id.* ¶ 101.) FreightCar consequently refused to negotiate further and insisted that the USW submit its Fifth and Final Proposal to the bargaining unit for a vote. (*Id.* ¶ 102.)  On January 10, 2002, the Fifth and Final Proposal was rejected. (*Id.* ¶ 103.)  FreightCar informed the USW that it believed the parties were at impasse and that it intended to implement its final offer. (*Id.* ¶ 104.)

Following FreightCar's implementation of the Fifth and Final Proposal, the USW filed a charge with the National Labor Relations Board ("NLRB") alleging that FreightCar had failed to bargain in good faith during the 2001 negotiations and that FreightCar's implementation of the Fifth and Final Proposal was unlawful.[10] (*Id.* ¶ 105.)

Shortly thereafter, FreightCar amended the JAC Guide to terminate the retiree medical benefits for certain past retirees. (*Id.* ¶ 106.)  Two class action lawsuits, *Deemer* and *Britt* were subsequently filed on these individuals' behalf. (*Id.* ¶¶ 106, 117.)

**E.    The Settlement of *Deemer* and *Britt* and the 2005 Collective Bargaining Agreement**

*Deemer* involved claims by certain individuals who had retired from FreightCar, challenging FreightCar's decision to terminate their retirement benefits. (*Id.* ¶ 107.)  In *Deemer*, the parties filed pre-discovery cross-motions for summary judgment. (*Id.* ¶ 108.)  Magistrate

_____

[10] While Administrative Law Judge David Evans found that FreightCar did not bargain in good faith during the 2001 negotiations, FreightCar's decision to terminate retiree benefits was not at issue during these proceedings.  *See In re Johnstown America Corporation*, NLRB Case No. 6CA 32504

Judge Robert Mitchell recommended to District Court Judge Robert Cindrich that FreightCar's motion for summary judgment be granted and the *Deemer* plaintiffs' motion be denied.  The *Deemer* plaintiffs appealed Magistrate Mitchell's Report and Recommendation ("R&R"), and Judge Cindrich rejected the R&R, finding that benefits were likely vested based upon law *now rejected* by the Third Circuit.  (*Id.* ¶ 112.)  Judge Cindrich instead requested an evidentiary hearing to assist the Court in its review of Magistrate Mitchell's R&R.  (*Id.* ¶ 114.)  However, an evidentiary hearing never took place, and Judge Cindrich never ruled on the parties' cross-motions for summary judgment.  (*Id.* ¶ 116.)  Instead, a scheduling order was entered, and the parties' respective motions were dismissed without prejudice to be reasserted after discovery was complete.  (*Id.* ¶ 116.)  *Deemer* was settled at the close of discovery.  (*Id.* ¶ 124.)

*Britt,* which was filed over a year after *Deemer*, involved claims by a group of FreightCar retirees challenging FreightCar's decision to eliminate certain types of pension formulas.  (*Id.* ¶ 117.)  While the relief requested by the *Britt* plaintiffs included retiree medical and life insurance benefits, FreightCar's right to modify or terminate these benefits after the plaintiffs' retirement was not at issue in *Britt*.  (*Id.* ¶ 119.)  *Britt* was settled at the same time as *Deemer*.  (*Id.* ¶ 124.)

After the parties settled *Deemer* and *Britt*, as well as the NLRB charge, FreightCar and the USW also reached a new collective bargaining agreement in 2005.  (*Id.* ¶ 120.)  With respect to retiree medical benefits, Article XIX of the 2005 CBA provided:

> Effective January 1, 2005 active employees and *current* and future eligible retirees and their eligible dependents will be covered by the Steelworkers Health and Welfare Fund POS Plan as set forth in the *Employee Guide*.

(*Id.* ¶ 122.) (emphasis added.)  This provision ensured that *all* retiree benefits were governed by the terms set forth in the SHWF Plan, its SPD and the JAC Guide.  (*Id.* ¶ 122.)  With respect to FreightCar's obligation to provide these benefits, the 2005 CBA incorporated the *Deemer* and

*Britt* settlements and provided that FreightCar would pay $700 per month for each non-Medicare eligible household and $450 per month for each Medicare-eligible retiree.  (*Id.* ¶ 124.)  Under the 2005 CBA, FreightCar was required to begin these contributions on December 1, 2004 and continue these contributions "until the later of November 30, 2012 or the expiration of a successor Agreement to this Collective Bargaining Agreement."  (*Id.* ¶ 124.)  There was no successor agreement to the 2005 CBA.  (*Id.* ¶¶ 125-126.)  FreightCar fulfilled the terms of the 2005 CBA by continuing to make contributions through November 30, 2012.[11]  (*Id.* ¶¶ 132-137.)  In fact, FreightCar continued contributions voluntarily for almost one more year, until FreightCar terminated them on November 1, 2013 after efforts to reach a compromise with the Retirees for future benefits failed.  (*Id.* ¶ 135.)

## III.   <u>ARGUMENT</u>

As this Court recently noted, "[s]ummary judgment is appropriate only where … there is no genuine issue as to any material fact … and the moving party is entitled to judgment as a matter of law."  *U.S. ex rel. Bartlett v. Ashcroft*, No. 04-57, 2013 WL 5817665, at *1 (W.D. Pa. Oct. 29, 2013) (quoting *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010)); Fed. R. Civ. P. 56(a).  Issues of fact are genuine if the evidence is such that the Court could return a verdict for the non-moving party.  *Bartlett*, 2013 WL 5817665 at *1.  Further, a factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*

Once the moving party meets its burden to demonstrate that the evidence contained in the record does not create a genuine issue of material fact, the party opposing summary judgment

---

[11] In 2007, FreightCar announced that it intended to shut down the Johnstown Plant.  (*Id.* ¶ 125.)  After engaging in decision and effects bargaining, FreightCar agreed to continue retiree healthcare on the terms set forth in the 2005 CBA and *Deemer/Britt* settlement.  (*Id.* ¶¶ 129-130.) Neither of those agreements provided for vested, lifetime welfare benefits upon retirement, nor did they require the USW's consent before benefits were changed or terminated.  (*Id.* ¶¶ 130-131.)

- 15 -

"'may not rest upon the mere allegations or denials' of the pleadings, but 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Bartlett*, 2013 WL 5817665 at *2 (quoting *Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir. 2001)).  "'For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations)'" for the court to find for the nonmovant.  *Id.* (quoting *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993)).  Where the party opposing summary judgment fails to make a sufficient showing of an element for which that party will bear the burden of proof at trial, and which is an essential element of that party's case, summary judgment is appropriate.  *U.S. v. Valko*, No. 09-242, 2011 WL 3510947, at *1 (W.D. Pa. Aug. 9, 2011) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

>    **A.    Plaintiffs Cannot Overcome the Third Circuit's Presumption Against the Vesting of Retiree Welfare Benefits**

To avoid summary judgment against them, the plaintiffs bear the burden to prove a *clear and express* agreement by FreightCar to provide the Retirees with vested medical and life insurance benefits, or to terminate those benefits only with the USW's consent.  *See UAW v. Skinner*, 188 F.3d 130 (3d Cir. 1999).  The plaintiffs cannot prove either.  The undisputed evidence in the record shows FreightCar never promised or agreed to provide lifetime medical and life insurance benefits in any agreement with the Retirees or the Union, and never agreed to change or terminate those benefits only with the Union's consent.

Employers are "generally free … for *any reason at any time*, to adopt, modify or terminate welfare plans."  *Skinner,* 188 F.3d at 138 (citing *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)) (emphasis added).  Accordingly, the Third Circuit applies a "presumption against vesting" of retiree welfare benefits.  *Smathers v. Multi-Tool,*

*Inc./Multi-Plastics, Inc.*, 298 F.3d 191, 196 (3d Cir. 2002).  The Third Circuit has cautioned that an employer's agreement to "relinquish [its] right to unilaterally terminate [retiree welfare] benefits and provide for lifetime vesting . . . is not to be inferred lightly and must be stated in *clear and express* language" in the collective bargaining agreements or other plan documents. *Intl. Chem. Workers Union Counsel of the UFCW v. PPG Indus. ("PPG II"),* 236 Fed. Appx. 789, 793 (3d Cir. 2007) (quoting *Skinner*, 188 F.3d at 138-39) (emphasis added).  It is the plaintiffs' burden, not the employer's, to prove by a preponderance of the evidence that the employer agreed to provide vested, lifetime benefits that could not be unilaterally terminated. *Skinner,* 188 F.3d at 138-39.

While the plaintiffs here claim that FreightCar cannot unilaterally terminate retiree medical and life insurance benefits because those benefits are vested, they cannot point to any clear and express terms in any of the parties' agreements that provide for lifetime, unalterable benefits.  *See Skinner*, 188 F.3d at 139 ("[T]o vest benefits is to render them forever unalterable"); *PPG II,* 236 Fed. Appx. at 793 ("[A] determination of vesting . . . must be stated in clear and express language.").  The most that the USW ever asked for in negotiating the FreightCar plan documents was that the language be revised to state that FreightCar's right to amend or terminate welfare benefits be subject to the collective bargaining agreement. As shown below, there is nothing in any collective bargaining agreement that limits FreightCar's right to change or terminate the benefits of retired employees.  Rather, the CBA language only circles back to the JAC Guide.  Since the plaintiffs cannot prove an essential element of their claim, namely an agreement by FreightCar to vest the benefits in question and not unilaterally terminate them, FreightCar is entitled to summary judgment.

**B.    FreightCar Never Agreed in any CBA or Plan Document to Provide Vested Retiree Benefits.**

- 17 -

1.      The 1991 CBA Did Not Mention, Let Alone, Create Vested Benefits

While Plaintiffs try hard to impose on FreightCar their agreement with Bethlehem

regarding futures changes to benefits, in fact, nothing leading up to the sale of the Johnstown

Plant, or even thereafter, evinced a clear and express intention by FreightCar to provide the

Retirees with vested, unalterable, medical and life insurance benefits.  *See Skinner,* 188 F.3d at

141 (recognizing as clear and express durational language that benefits "will continue for the life

of the retiree" or "shall remain unalterable for the life of the retiree").  In fact, that would have

been a right *greater* than the employees had while employed by Bethlehem.  (SUMF ¶ 31) ("Any

pensioner . . . shall not have coverage terminated . . . notwithstanding expiration of this

Agreement, except as the Company and the Union may agree otherwise.")  To the contrary, in

response to FreightCar's inclusion of clear and express language reserving its right to change or

terminate benefits from the very first negotiations, the USW requested only, in the course of

multiple reviews of the draft plan documents, that the language say that this right would be

subject to the collective bargaining agreement.  (*Id.* ¶ 39.)

After Bethlehem agreed to sell the Johnstown Plant to FreightCar, the USW and

FreightCar executed the 1991 CBA and twenty-seven side letters.  Neither the 1991 CBA nor

twenty-six of the twenty-seven side letters entered into before the plan documents were drafted

even addressed retiree welfare benefits.  (*Id.* ¶ 19.)  The only discussion of the welfare benefits

that FreightCar agreed to provide after the sale was in Side Letter 22, which stated that

FreightCar would agree to "create mirror bargaining unit employee benefit plans identical in all

material respects to the Bethlehem plans they replace."  (*Id.* ¶ 20.)  The letter notably did not

make any representation as to the duration of the retiree medical and life insurance benefits that

would be provided under these newly created plans.  In fact, while the letter carefully noted

when FreightCar's responsibility for such benefits would begin, *i.e.* FreightCar would only be

- 18 -

responsible for benefits to its retirees "which arise or are based on events which occurred after closing," the letter said nothing about promising that these benefits last forever.  (*Id.* ¶ 20.)

While the plaintiffs maintain that because Bethlehem agreed to vested benefits, FreightCar was also required to do so, in fact, the Bethlehem welfare plans that FreightCar agreed to mirror in Side Letter 22 *themselves did not provide Bethlehem's retirees with vested* benefits.  Indeed, that question has already been decided against the Union.  As recently as last year, Judge Conti reviewed the *exact same language* from the Bethlehem PHMB that the plaintiffs rely on here to claim that their benefits are vested.  In two well-reasoned opinions, Judge Conti held that as a matter of law the Bethlehem PHMB language the plaintiffs here point to does not "satisfy the *Skinner* standard for finding that vested ERISA benefits exist."  *See Lewis v. Allegheny Ludlum Corp.*, 2013 WL 3989448, at *6 (W.D. Pa. Aug. 2, 2013) ("*Lewis II*"); *Lewis v. Allegheny Ludlum Corp.*, 2012 WL 1328360, at *4 (W.D. Pa. Apr. 17, 2012) ("*Lewis I*"), *appeal pending*, Appeal No. 13-3636 (3d Cir. 2013).[12]  Judge Conti's decisions in *Lewis I* and *Lewis II* are the death knell for plaintiffs' contention that the Bethlehem PHMB provides for vested welfare benefits from FreightCar.

In an attempt to avoid the import of the *Lewis* decisions, the plaintiffs paradoxically claim that the benefits under the Bethlehem PHMB were "vested," but were subject to change if FreightCar and the USW agreed otherwise.  (Compl. ¶¶ 37-38.)  Notwithstanding that *this*

---

[12] The plaintiffs in this case "claim that their benefits are vested" under the same continuation of coverage clause of the Bethlehem PHMB at issue in *Lewis*.  (Dkt. No. 1, Compl. ¶¶ 37-38; Dkt. No. 39, TRO Mem. at 22.)  *See Lewis II*, 2013 WL 3989448 at *4 ("At issue between the parties is whether the language of the continuation of coverage clause creates a vested right to no-cost health insurance for as long as retirees and their dependents are eligible for benefits.").  Judge Conti held in *Lewis I* that the applicable contract language—"except as the company and union may agree otherwise"—prevented the plaintiffs' welfare benefits from vesting under *Skinner*.  *Lewis I*, 2012 WL 1328360 at *4.  In previously finding to the contrary, Judge Cindrich did not have the benefit of Judge Conti's analysis.

*argument was tried and rejected in Lewis II*, the plaintiffs continue to assert it here.  The

argument, however, directly collides with *Skinner*, which instructs that "to vest benefits *is to*

*render them forever unalterable.*" 188 F.3d at 139 (emphasis added).

Joseph Stuligross, counsel for the USW in this case, was a fact witness in the *Lewis* case.

*See Lewis II*, 2013 WL 3989448, at *8.  Stuligross testified about the USW's belief that under

the Bethlehem PHMB "the benefits were vested, but subject to modification."  *Id.*  Judge Conti

refused to accept the *Lewis* plaintiffs' proffered interpretation, noting that "plaintiffs selectively

quote Stuligross in an effort to support a finding that the USW intended the benefits to be

vested," but "his statements reflect, at most, a qualified use of the word 'vested.'"  *Id.*  The court

continued that Stuligross "never used the word 'vested' without qualifying it, reflecting his

understanding that 'vested' is a legal term of art that carries a very specific meaning in this

context."  *Id.*  Judge Conti concluded that Stuligross's testimony failed to show "the parties'

intention that the retirees' welfare benefits vested."  *Id.* at *9.

> 2.  Neither Subsequent Plan Documents Nor CBAs Expressed an Intent to Vest Retiree Welfare Benefits

After Bethlehem's sale of the Johnstown Plant to FreightCar in 1991, FreightCar and the

USW prepared and adopted the benefit books which were then compiled into the JAC Guide.

Nothing in those books stated that retiree medical and life insurance benefits would be

unalterable or provided for life.  In fact, the plaintiffs make no such claim.  On the contrary, the

books addressing retiree medical and life insurance benefits clearly explained that:

- Retirees' medical benefits "could be lost or delayed if . . .   subject to the collective bargaining agreement, the plan is modified to reduce or  eliminate certain benefits, or it ends;

- Retiree life insurance benefits would end if "the plan, or part of the plan, ends";

- "Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part.  This means the plans may be

discontinued in part or in their entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented"; and

- "Nothing in this guide says or implies that participation in these plans is a guarantee of continued employment with the company, nor is it a guarantee that benefit levels, the price of coverage, eligibility rules, or any other term or condition of the plans will remain unchanged in future years."

(*Id.* ¶ 52.)  Under *Skinner* and its progeny, benefit terms that reserve FreightCar's right to terminate retiree medical and life insurance benefits "at any time," even with the USW's insistence on reference to the collective bargaining agreement prior to termination (which as shown herein says nothing about any duration, let alone lifetime benefits), suffice to defeat any alleged notion of vested benefits.  *See Lewis II*, 2013 WL 3989448 at *9 (holding that the benefits were "never intended to vest, since vested benefits are not subject to modification").

Subsequent CBAs between FreightCar and the USW did not alter the unvested nature of these benefits.  The 1994 CBA, like the 1991 CBA, made no mention of retiree medical and life insurance benefits.  (SUMF ¶ 55.)  The subsequent CBA in 1997 stated only that "employees shall be eligible for insurance and other benefits as set forth in JAC's Employee Guide."  (*Id.* ¶ 60.)  Neither that CBA nor the JAC Guide made any representation of lifetime benefits or welfare benefits for any set duration.  Instead, the JAC Guide expressly reserved FreightCar's right to terminate the benefits at any time, only "subject to the collective bargaining agreement," which itself directed that the JAC Guide would govern the benefits.[13]  (*Id.* ¶ 52.)

Nor did the 2005 CBA promise lifetime or vested medical and life insurance benefits. Like the 1997 CBA, it expressly incorporated the JAC Guide.  (SUMF ¶ 60.)  It further

---

[13] The parties' agreement to provide benefits through the SHWF Plan, instead of through the indemnity plan FreightCar had previously offered, did not affect FreightCar's right to amend the retiree welfare plans.  Neither the Participation Agreement, the SHWF Plan document, nor the SHWF SPD contain any language vesting retiree medical and life insurance benefits.

- 21 -

incorporated the *Deemer* and *Britt* settlements, and expressly limited FreightCar's obligation to provide retiree medical and life insurance benefits to "the later of November 30, 2012 or the expiration of a successor [CBA]." [14]

The 2005 CBA was the last CBA between the parties.  (*Id.* ¶ 125.)  Given that there was no successor CBA, under the express language in the 2005 CBA, the parties' agreement allowed FreightCar to terminate retiree benefits after November 30, 2012.  (*Id.* ¶ 123 -124.)  FreightCar did not exercise that right until November 2013, one year later than it had agreed in negotiating the 2005 CBA.  (*Id.* ¶ 137.)

> 3.  Judge Cindrich's Prior Ruling in *Deemer* Was Contrary to Third Circuit Law and Issued Without the Benefit of the Full Evidentiary Record

Throughout this case, the plaintiffs have repeatedly relied on Judge Cindrich's July 16, 2003 Order sustaining their objections to the Magistrate's R&R in the *Deemer* lawsuit, to argue that the Retirees' benefits are vested and plaintiffs are thus entitled to summary judgment in this case.  Even if it had persuasive value, Judge Cindrich's ruling has been overtaken both by subsequent law and facts.

In his Order, Judge Cindrich held that retiree benefits were "vested" under the Bethlehem PHMB, even though the PHMB allowed the company and the USW to change the benefits.  (*Id.* ¶ 113.)  Judge Conti held to the contrary in the *Lewis* cases—that the exact same language in the Bethlehem PHMB *did not* vest retiree benefits.  *See supra* Section III.B.1.  Moreover, Judge

---

[14] As further evidence of the limited duration for the benefits in dispute and FreightCar's right to change them, the Appendix to the 2005 CBA stated, "*[i]n any event*, the Company's contributions for retiree and/or surviving spouse coverage as described above *will remain unchanged until the later of* November 30, 2012 or the expiration of a successor Agreement to this Collective Bargaining Agreement."  (SUMF ¶¶ 123-124) (emphasis added.)

Cindrich's holding was inherently paradoxical because, as *Skinner* teaches, "to vest benefits is to render them *forever unalterable*."[15]  188 F.3d at 139 (emphasis added).

Importantly, Judge Cindrich did not have the benefit of completed discovery prior to considering the parties' arguments—nor did the parties' subsequent agreements in 2005 and 2008 exist.  At the time of his ruling, the parties had yet to take any significant discovery in *Deemer*, and consequently, did not present Judge Cindrich with all of the evidence.  (*Id.* ¶ 108.) Based on the parties' assertions, Judge Cindrich determined that FreightCar continued to adhere to the Bethlehem PHMB until early 2002.  (*Id.* ¶ 113.)  The record now establishes—after completion of discovery—that shortly after the sale of the Plant in 1991, and in accordance with FreightCar's agreement to "create" new plans, FreightCar and the USW negotiated and agreed to new plans which were set forth in the JAC Guide.  The 1997 CBA incorporated the JAC Guide, explaining that it governed the terms of plaintiffs' insurance benefits.  Furthermore, the evidence shows that by 1998, the USW and FreightCar had moved the Retirees into the SHWF Plan. Moving forward, Judge Cindrich did not have the benefit of the parties' subsequent bargaining agreement in 2005 and the plant shutdown agreement in 2008.  These agreements clearly establish that FreightCar could terminate the Retirees' benefits upon the later of November 30, 2012 or the expiration of a successor bargaining agreement, of which there was none.  Judge Cindrich's July 14, 2003 Order has been overtaken by subsequent events.

### C.  The "Subject To" Language Proposed by the USW for Retiree Welfare Plans Neither Legally Nor Factually Prevents FreightCar from Terminating the Benefits.

The plaintiffs have nothing to dispute the long line of evidence in the record showing that from the very beginning in 1991, FreightCar never agreed to provide unalterable, lifetime retiree

---

[15] In so ruling, Judge Cindrich apparently improperly relied on cases adopting the Third Circuit's *Yard-Man* inference, which the Third Circuit has expressly rejected.  (SUMF ¶ 113.)

welfare benefits.  Instead, plaintiffs hedge their bets and argue that even if the benefits were not

vested, FreightCar needed the USW's consent to make the changes.  This argument fails for two

reasons.  First, FreightCar never adopted the durational language in the Bethlehem PHMB

plaintiffs rely upon for their assertion.  Second, the "subject to" language the USW proposed

upon review of the draft plan documents said nothing about needing the USW's consent.  The

USW asked only that the collective bargaining agreement be referenced.  That the USW failed to

insist on clear and express language in the CBAs limiting FreightCar's right to terminate benefits

does not expand plaintiffs' rights.  As Mr. Sokolow himself testified, he wanted it clear that the

CBAs "governed."  (SUMF ¶ 38.)

> 1.   The Unambiguous Contract Language Establishes that Retiree Benefits
>       were Governed by the JAC Guide

Critical to the plaintiffs' effort to reinstate their welfare benefits is their theory that

despite the negotiation of all new FreightCar plans after the sale, FreightCar continued to be

"bound by the specific language in the *Bethlehem PHMB*."  (Compl. ¶ 57) (emphasis added.)

This allegation is mere argument, and a meritless at that.  Uncontroverted evidence, including

letters and statements by the USW's representatives, prove that after the sale of the Johnstown

Plant, FreightCar and the USW agreed to new welfare plans for actives and retirees, none of

which contained the continuation of coverage language.

The plain terms of Side Letter 22 contemplated the creation of *new* welfare plans that

provided benefits to FreightCar employees and future retirees.  (*Id.* ¶ 20) (providing that

FreightCar "will *create* mirror bargaining unit employee benefits plans identical in all material

respects to the Bethlehem plans they *replace*.") (emphasis added.)  To fulfill its obligation,

FreightCar prepared initial drafts of these plans, including the active and retiree medical and life

insurance plans.  (*Id.* ¶¶ 24-32.)  FreightCar sent them to the USW for review and approval on

- 24 -

more than one occasion.  (*Id.* ¶¶ 24-32.)  Upon review, the USW's only comment having anything to do with benefit duration was its request that "all books . . . reference collective bargaining agreement as far as the Company's right to amend or terminate the plan."  (*Id.* ¶ 38.)  FreightCar agreed to the USW's request, and the USW thereafter approved the final versions of the plan books.  Those were the same books compiled into the JAC Guide.  (*Id.* ¶ 49.)

As agreed in Side Letter 22, FreightCar employees and retirees received the same level of benefits "identical in all material respects" to the Bethlehem plans the new plans replaced.   In fact, FreightCar relied on the Bethlehem PIB in drafting the medical plan.  Like the benefits provided under the Bethlehem PHMB, the medical benefits received by FreightCar employees were provided by BCBS.  (SUMF ¶ 30.)  At the USW's request, the new plans were also given an effective date of October 28, 1991—the closing date of the FreightCar purchase.  (*Id.* ¶ 37.)  Thus, from the very beginning of FreightCar's involvement with the Johnstown Plant, the medical benefit book included in the JAC Guide, and the BCBS policy, were the *only* documents which governed the benefits.

The plaintiffs' efforts to try to renounce the JAC Guide fail by the terms of the actual agreements with the USW.  In the 1997 CBA, the parties expressly agreed that employees would be "eligible for insurance and other benefits as set forth in JAC's Employee Guide."  (*Id.* ¶ 60.)  In the 2005 CBA, the parties again agreed that "active employees and current and future eligible retirees … will be covered by the Steelworkers Health and Welfare Fund POS Plan *as set forth in* the Employee Guide."  (*Id.* ¶ 122) (emphasis added.)  Finally, in the 2008 plant closing agreement, the parties agreed that "current retirees and employees … will continue to be eligible for retiree healthcare coverage under the applicable terms and conditions of the [2005] CBA."

(*Id.* ¶ 130.)  The 2005 CBA, in turn, provided for benefits as set forth in the JAC Guide.  (*Id.* ¶ 122.)

Plaintiffs reason that the JAC Guide books do not govern benefits because they are only summary plan descriptions ("SPD"), and that therefore the controlling plan document must be the PHMB.[16]  (*See* TRO Mem. at 10-11.)  A fatal problem with the plaintiffs' argument is the Bethlehem PHMB *itself* is also an SPD.  (SUMF ¶ 31) ("This booklet is [a] summary plan description . . . .").  The only other plan document governing the retiree medical benefits offered to retirees before 1998 was the Blue Cross Blue Shield policy insuring the benefits.

The plaintiffs' incredulous reliance on the PHMB after FreightCar bought the Johnstown Plant is further validated by the parties' agreement in 1997 to replace the indemnity plan provided under the BCBS policy with the SWHF Plan.  (*Id.* ¶¶ 62-67.)  When the parties agreed that coverage would be provided by the SWHF Plan, a new plan document and SPD governed.  (*Id.* ¶ 70.)  The uncontested evidence shows that as of 1998, the SHWF Plan, its SPD and the JAC Guide were the only governing plan documents which the parties agreed would govern the terms of the retiree medical and life insurance benefits at issue in this case.  None of those documents stated that the USW's consent was necessary for FreightCar to terminate benefits, nor did they reference the Bethlehem PIB or Bethlehem PHMB.

        2.       <u>The JAC Guide Unambiguously Allowed FreightCar to Terminate Retiree Medical and Life Insurance Benefits</u>

In the course of drafting the retiree medical plan, the USW expressly agreed to the following language regarding change or termination:

---

[16] An SPD is a description of the employee benefit plan written in a manner able to be understood by the average plan participant, but also containing enough detail to reasonably apprise the participants and beneficiaries of their rights and obligations under the plan. 29 U.S.C § 1022(a).  Courts have held that a document labeled an SPD can nevertheless function as the governing plan document. *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.* 334 F.3d 365, 378 (3d Cir. 2003).

> Retiree medical benefits "could be lost or delayed if … subject to the collective bargaining agreement, the plan is modified to reduce or eliminate certain benefits or it ends."

(*Id.* ¶ 52.)  In fact, the USW itself proposed the addition "subject to collective bargaining agreement."  (*Id.* ¶ 37.)  The foregoing language remained the governing contract language addressing FreightCar's ability to terminate retiree medical benefits until the parties' last agreement in 2005.  That language is clear and unambiguous.  *See Baldwin v. University of Pittsburgh Med. Ctr.,* 636 F.3d 69, 76 (3d Cir. 2011) ("where the words of the contract clearly manifest the parties' intent, a court need not 'resort to extrinsic aids or evidence.'").  In its common sense meaning, absent any language to the contrary in the CBA, FreightCar had the ability to terminate retiree medical benefits.  *Guinta v. Accenture, LLP,* No. 08-3376, 2008 WL 4852934, at *8 (D.N.J. Nov. 7, 2008) ("Contracts should be construed according to the plain and ordinary meaning of their terms.").  Nothing in any CBA between FreightCar and the USW restricted FreightCar's right to terminate retiree medical benefits.  In fact, the *only* reference to retiree medical benefits in *any* CBA between the parties stated that benefits would be governed by the JAC Guide.

The section of the JAC Guide addressing life insurance benefits, including retiree life insurance benefits, similarly permitted FreightCar to terminate the benefits.  The life insurance plan in the JAC Guide provided that "coverage could be lost … if … [s]ubject to collective bargaining, the [life insurance] plan, or part of the plan, ends."  (*Id.* ¶ 52.)  Likewise, the general language in the plan administration section at the back of the JAC Guide stated that "subject to collective bargaining, the company reserves the right to end … the plans at any time."  (*Id.* ¶ 52.)

At the very most, all that plaintiffs can argue is that the USW's proposed language in these separate documents required FreightCar to bargain before changing the benefits.  (*See* Dkt.

- 27 -

No. 83 at 22) ("[T]he 'process' of collective bargaining as required by the National Labor Relations Act carries the mutual obligation of an employer and a labor organization 'to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement'") (quoting 29 U.S.C. § 158(d).) FreightCar did just that, *and more*, on several occasions.[17]

During the 2001 CBA negotiations, FreightCar attempted to collectively bargain over benefits for past retirees, *but the USW refused to do so*. (SUMF ¶ 94-95.) In fact, after FreightCar repeatedly raised the issue of past retirees' benefits during the negotiations, the USW told FreightCar to remove all references to past retirees from the draft agreements FreightCar proposed to the USW. Having attempted to bargain—and reached an impasse as a result of the USW's refusal to discuss past retirees' benefits—FreightCar properly exercised its right under the terms of the JAC Guide to terminate the retirees' medical and life insurance benefits.[18]

Notwithstanding plaintiffs' incorrect assertion that FreightCar could not unilaterally terminate the retiree medical and life insurance benefits in 2001 upon reaching an impasse, plaintiffs' argument is of no moment in deciding this case.[19] That is because FreightCar and the

---

[17] *See also Hughes v. 3M Retiree Med. Plan*, 134 F. Supp. 2d 1062, 1073 (D. Minn. 2001), *aff'd* 281 F.3d 786 (8th Cir. 2002) (holding as a matter of law that the phrase "subject to collective bargaining as required" did not require the company to submit any changes in retiree medical benefits to collective bargaining because retiree welfare benefits are a permissive, not mandatory, subject of collective bargaining).

[18] The plaintiffs have maintained that FreightCar's collective bargaining in the 2001 CBA negotiations was not in good faith, and in support, they reference an NLRB charge the USW filed against FreightCar in 2002. But nowhere in the NLRB finding does it address the parties' bargaining over benefits for persons already retired. In any event, the ALJ's decision was on appeal when the parties subsequently settled their differences and returned to the bargaining table.

[19] Even a finding that the "subject to collective bargaining" language is ambiguous would not defeat summary judgment in favor FreightCar. In *Skinner*, the Third Circuit held that a relinquishment of an employer's right to unilaterally terminate retiree welfare benefits and provide for lifetime vesting *cannot* be ambiguous. 188 F.3d at 138-39; *see also PPG II*, 236 Fed.

Union *subsequently* returned to the bargaining table in 2005, and reached an agreement over the benefits at dispute here.  Not only did FreightCar and the USW and the class members here enter into the settlement of the *Deemer* and *Britt* lawsuits at that time, the USW and FreightCar also reached an agreement that "current and future eligible retirees" would receive benefits as set forth in the JAC Guide until *the later of* November 30, 2012 or the expiration of a successor CBA to the 2005 CBA.  (SUMF ¶ 55.)  That agreement is expressly memorialized in the parties 2005 CBA.[20]  (*Id.* ¶ 55.)  Neither the 2005 CBA, the parties' final CBA, nor the *Deemer* and *Britt* settlements incorporated therein gave the plaintiffs a right to lifetime medical and life insurance benefits.   When FreightCar terminated retiree benefits after the expiration of its obligations under the final 2005 CBA, it did so in full compliance with the last CBA between the parties, and the negotiated terms in the JAC Guide.

## IV.   <u>CONCLUSION</u>

The Third Circuit has stressed that an employer's agreement to give up its right to unilaterally change retiree welfare benefits "should not be inferred lightly."  The undisputed record evidence is devoid of the "clear and express" language the Third Circuit requires to find vested benefits. FreightCar acted in accordance with the terms of the CBAs between the parties, as well as the governing plan documents, and is entitled to summary judgment in its favor.

---

Appx. *at* 793.  Rather, it must be "clear and express," and the plaintiffs have the burden to make such a showing.  *Id.*  Here, the plaintiffs make no such showing, nor can they: the "subject to collective bargaining" language demanded by the USW for the welfare plan terms does not clearly and expressly equate with the requirement of the USW's consent or lifetime vesting.

[20] The parties' 2008 shutdown agreement further confirmed the parties' agreement that "current retirees and employees" would continue to be eligible for retiree benefits under the applicable terms and conditions of the 2005 CBA and the settlement agreements reached in *Deemer* and *Britt*.  (*Id.* ¶ 130.)

Dated: July 17, 2014                    Respectfully Submitted,

                                        /s/ *Sam P. Myler*
                                        James Clark Munro II
                                        Michael J. Parrish, Jr.
                                        Ronald P. Carnevali, Jr.
                                        SPENCE, CUSTER, SAYLOR, WOLFE & ROSE, LLC
                                        AmeriServ Financial Building, P.O. Box 280
                                        Johnstown, Pennsylvania 15907
                                        T: (814) 536-0735
                                        F: (814) 539-1423

                                        Nancy G. Ross (*pro hac vice*)
                                        Prashant Kolluri (*pro hac vice*)
                                        Sam P. Myler (*pro hac vice*)
                                        Kirk Watkins (*pro hac vice*)
                                        MCDERMOTT WILL & EMERY LLP
                                        227 West Monroe Street
                                        Chicago, Illinois 60606
                                        T: (312) 372-2000
                                        F: (312) 984-7700

                                        **ATTORNEYS FOR DEFENDANTS FREIGHTCAR
                                        AMERICA, INC., JOHNSTOWN AMERICA, LLC,
                                        AND JOHNSTOWN AMERICA CORPORATION
                                        USWA HEALTH & WELFARE PLAN**