IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION

| | |
|---|---|
| ANTHONY J. ZANGHI, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> FREIGHTCAR AMERICA, INC., *et al.*, <br><br> Defendants. | No.: 3:13-CV-00146 <br><br><br><br><br><br> Hon. Kim R. Gibson |

**DECLARATION OF ROBERT C. CHRISTENSON
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Robert C. Christenson, declare as follows:

1. I am over eighteen (18) years of age and am fully competent to make this declaration. I am under no disabilities, physical or legal, which would affect my declaration. If called upon as a witness, I could competently testify in open court to the facts set forth below, as I know each to be true based on my own personal knowledge.

2. I am an attorney licensed to practice in the State of Georgia and am a partner at the law firm of Fisher & Phillips LLC, located in Atlanta, Georgia.

3. Fisher & Phillips represented one of FreightCar America, Inc.'s predecessor corporations, Johnstown America Corporation ("JAC"), in labor and employment matters relating to its purchase of Bethlehem Steel Corporation's Johnstown, Pennsylvania rail car manufacturing facilities in 1991 ("the Johnstown Plant"). I was responsible for negotiating the terms of the employee benefit plans that JAC would create after it took over the operation of the Johnstown Plant.

4. In connection with the purchase of the Johnstown Plant, JAC recognized the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("the USW") as the exclusive bargaining representative for certain active Johnstown Plant employees. In fall 1991, JAC and the USW negotiated the collective bargaining agreement that would govern if JAC closed on the Johnstown Plant.

5. In the weeks prior to the October 31, 1991 closing deadline, the parties discussed the benefit plans that JAC would create for the active represented employees. The USW proposed that JAC offer the represented employees the same benefits they were receiving from Bethlehem. In connection with this proposal, the USW provided me with copies of the

Bethlehem plans and summary plan descriptions (SPDs) which described the benefits Bethlehem provided to the active employees.  A copy of the October 10, 1991 cover letter accompanying these documents is attached as <u>Christenson Declaration Exhibit A</u>.  The Bethlehem plans and SPDs I received were:

- The Hourly and O&T Pension Agreement between Bethlehem Steel Corporation and the USWA.
- The Bethlehem Supplemental Unemployment Benefit Plan.
- The Bethlehem 401(k) Retirement Plan.
- The Program of Insurance Benefits for Hourly Paid Employees.

6.  Prior to the October 28, 1991 closing, the USW and JAC did not discuss the substantive terms of the welfare benefit plans for future bargaining unit retirees.  Specifically, the USW did not propose that JAC provide them with vested medical or life insurance benefits; nor did the USW propose that retiree welfare benefits be provided for any certain duration.  Pursuant to the Agreement of Purchase and Sale between Bethlehem and JAC, Bethlehem retained responsibility for providing benefits to the retirees that had retired from Bethlehem prior to the sale.

7.  Although I was responsible for negotiating bargaining unit benefit plans on behalf of JAC, the USW did not provide me (or to my knowledge, anyone else at JAC) with a copy of the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Bethlehem Steel Corporation ("the Bethlehem PHMB").  Nor did the USW provide me (or to my knowledge, anyone else at JAC) with a copy of the Pensioners' and Surviving Spouses' Insurance Agreement between Bethlehem Steel Corporation and the United Steelworkers of America ("the Pensioners' Insurance Agreement").

8. After reviewing the benefits described in the Bethlehem plans and SPDs sent by the USW, JAC agreed to create benefit plans for its bargaining unit employees that mirrored the Bethlehem plans in all "material respects." However, given the impending October 31, 1991 closing deadline, the parties were unable to negotiate, draft, and finalize all of the terms of JAC's new benefit plans prior to closing. Therefore, the parties memorialized their understanding with respect to JAC's benefit plans in a side letter to the parties' 1991 collective bargaining agreement ("Side Letter 22"). A copy of Side Letter 22 is attached as Christenson Declaration Exhibit B.

9. By agreeing in Side Letter 22 to create employee benefit plans that mirrored Bethlehem's plans, JAC did not adopt any of Bethlehem's plans, including the Bethlehem PHMB. Instead, Side Letter 22 provided that the new JAC plans would "replace" the Bethlehem plans. Side Letter 22 also provided that drafts of the new FreightCar benefit plan documents would be sent to the USW for its review and comment.

10. After the sale closed on October 28, 1991, JAC began drafting its employee benefit plans for represented employees. Fisher & Phillips and Hewitt Associates ("Hewitt") were retained to draft, negotiate, and finalize the new benefit plan documents.

11. The qualified plans were drafted by Fisher & Phillips and reviewed by the USW in the spring of 1992. These plans were approved by Jeanette Stump, a USW benefits technician, and were then submitted to the IRS for determination letters. Correspondence relating to the USW's review and approval of certain qualified plans is attached as Christenson Declaration Exhibit C.

12. With respect to welfare benefits, SPDs of JAC's welfare benefit plans were drafted by Hewitt and reviewed by me prior to being sent to the USW for its approval.

13. When I reviewed the draft SPDs, I referred to the Program of Insurance Benefits for Hourly Paid Employees ("the Bethlehem PIB") that had been sent to me by the USW prior to the closing. A copy of the Bethlehem PIB is attached as <u>Christenson Declaration Exhibit D</u>. The Bethlehem PIB was a SPD of the Program of Insurance Benefits, which provided life insurance, sickness and accident benefits, medical benefits, dental benefits, and vision care benefits to Bethlehem's active hourly employees. The Bethlehem PIB did not apply to retirees and does not contain the Continuation of Coverage language found in the Bethlehem PHMB. A copy of the Bethlehem PHMB is attached as <u>Christenson Declaration Exhibit E</u>.

14. By July 1992, Hewitt had completed drafts of the SPDs for JAC's life insurance, sickness and accident, medical, dental, vision, 401(k), and severance plans. Copies of these draft plans are attached as <u>Christenson Declaration Exhibit F</u>. I reviewed these initial drafts before sending them to the USW for review and comment.

15. While the July 1992 draft SPDs explained that life insurance and medical coverage would continue after retirement, neither draft SPD stated that the benefits were vested, would be provided for any certain duration, or that JAC was required to obtain the USW's consent prior to terminating them. The draft SPD of the medical plan explained that "medical benefits could be lost or delayed if . . . the plan [was] modified to reduce or eliminate certain benefits." The life insurance plan SPD similarly explained that "coverage could be lost [if] . . . the plan, or part of the plan, ends."

16. On July 31, 1992, I received a letter from Jerry Sokolow explaining that the USW bargaining committee responsible for the negotiation of the 1991 collective bargaining agreement had reviewed the July 1992 draft SPDs. Mr. Sokolow relayed a number of changes

requested by the bargaining committee.  A copy of Mr. Sokolow's July 31, 1992 letter is attached as <u>Christenson Declaration Exhibit G</u>.

17.     The changes proposed by the USW in their July 31, 1992 letter included a request that the SPDs be given effective dates of October 28, 1991, which was the date JAC closed on the Johnstown Plant.  The USW also proposed that JAC "reference collective bargaining agreement as far as the Company's right to amend and/or terminate" the plans.  These changes were incorporated into subsequent drafts of the SPDs created between August 1992 and January 1993.

18.     Around the time I received the USW's comments on the July 1992 draft plans, I sent the USW a draft of the administration guide that would apply to all of the represented employees' benefit plans.  At page 13, this draft guide contained language which reserved JAC's "right to end, suspend, or amend the plan at any time."  A draft of the administration guide containing the proposed reservation of rights language is attached as <u>Christenson Declaration Exhibit H</u>.

19.     The USW requested that the reservation of rights provision in the draft administration guide be revised to clarify that JAC's right to terminate the plans was "subject to collective bargaining."  This change was incorporated into subsequent drafts of the administration guide.  A draft of the administration guide containing the revised reservation of rights language at page 13 is attached as <u>Christenson Declaration Exhibit I.</u>

20.     In January 1993, I forwarded final drafts of the administration guide and the SPDs for the active employees' benefit plans to the USW for its approval.  On January 22, 1993, Mr. Sokolow wrote to me and informed me that "all of the SPD (Summary Plan Description)

books [had] been corrected to meet [the USW's] expectations and specifications." A copy of Mr. Sokolow's January 22, 1993 letter is attached hereto as <u>Christenson Declaration Exhibit J</u>.

21. The retiree medical plan SPD was sent to and approved by the USW separate from the active employees' SPDs. Drafts of the retiree medical plan SPD were sent to the USW in fall 1992. I discussed these drafts with the USW on a number of occasions throughout January and February 1993. While the USW provided comments on the retiree medical SPD, it never requested that it be revised to provide for vested or lifetime benefits; nor did it request that JAC include a provision requiring it to obtain the USW's consent prior to modifying the retiree medical benefits. Like the active SPDs, the retiree medical SPD provided that benefits could be lost if, "subject to the collective bargaining agreement, the plan [was] modified to reduce or eliminate certain benefits, or it end[ed]."

22. I sent a final draft of the retiree medical plan SPD to the USW for its approval on March 26, 1993. The cover letter that accompanied this draft is attached as <u>Christenson Declaration Exhibit K</u>.

23. On or about April 12, 1993, Mr. Sokolow called me to inform me that the March 26, 1993 draft was acceptable to the USW. A letter to a consultant at Hewitt regarding the USW's approval of the retiree medical SPD is attached as <u>Christenson Declaration Exhibit L</u>. Mr. Sokolow is identified as having been copied on this letter.

24. The final copies of the SPDs and the administration guide that were approved by the USW were compiled and formed a handbook referred to as the JAC Employee Guide ("the JAC Guide" or "the Employee Guide"). The JAC Guide is a small three-ring binder divided into several sections by tabs. Each section of the JAC Guide described a different benefit plan. The administration guide was the last section of the JAC Guide, and states at page 16, "Subject to

collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part." A copy of the JAC Guide is attached as <u>Christenson Declaration Exhibit M</u>. The retiree medical plan SPD was a separate section of the JAC Guide provided to employees upon their retirement, and stated at page 33 that "medical benefits could be lost if . . . [s]ubject to the collective bargaining agreement, the plan is modified to reduce or eliminate certain benefits, or it ends." Page 34 of the retiree medical SPD further stated that "The administrative information that applied to you as an active employee still applies." A copy of the JAC retiree medical plan SPD is attached as <u>Christenson Declaration Exhibit N</u>.

25. Formal plan documents were only created for the qualified plans, such as the pension and 401(k) plans, which must be submitted to the IRS. JAC did not draft, and the USW did not request, formal plan documents for the welfare benefit plans described in the JAC Guide. Instead, it was the parties' understanding that the insurance policies that provided the benefits described in the JAC Guide would govern in the event that there was an inconsistency or ambiguity in the JAC Guide. Accordingly, the JAC Guide references "formal *legal* documents" instead of formal plan documents. Furthermore, the JAC Guide defines "plan documents" to expressly include "insurance contracts" and "plan descriptions," such as the JAC Guide's SPDs.

26. The JAC Guide was distributed to the represented employees in May 1993. It was given an effective date of October 28, 1991. From the date it was distributed, it was the parties' understanding that employees and retirees were entitled to benefits on the terms set forth in the JAC Guide.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 15, 2014

Robert C. Christenson