**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION**

| | |
|---|---|
| ANTHONY J. ZANGHI, KENNETH J. SOWERS, DOMINIC MCCUCH, JAMES HOHMAN, DARRELL SHETLER on behalf of themselves and others similarly situated, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC, | Civil Action No.: 13-146<br><br>Class Action<br><br>Jury Trial Demanded<br><br>Electronically Filed plan<br><br>Judge Kim R. Gibson |
| Plaintiffs, <br> v. <br><br> FREIGHTCAR AMERICA, INC., JOHNSTOWN AMERICA CORPORATION, and JOHNSTOWN AMERICA CORPORATION USWA HEALTH & WELFARE PLAN, <br><br> Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
"CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS",
INCLUDING STATEMENT OF ADDITIONAL FACTS THAT WOULD BE MATERIAL
AND PRECLUDE ENTRY OF SUMMARY JUDGMENT FOR FREIGHTCAR**

Plaintiffs hereby respond to Defendants' "Concise Statement of Undisputed Material Facts" (Dkt. #119).

1.      This case involves claims brought under Section 301 of the Labor Management Relations Act ("LMRA"), and Sections 502(a)(1)(B) and 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA").  Pls.' Compl., ¶¶ 14-15 (SJ Ex. 38.).

UNDISPUTED BUT NO MATERIAL FACTS.  While Plaintiffs admit that the statements in this paragraph are undisputed, the statements set forth legal conclusions, not material facts.

2.       The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW") served as the collective bargaining representative for hourly employees at FreightCar's Johnstown, Pennsylvania rail car manufacturing facility.  Pls.' Compl., ¶ 3 (SJ Ex. 38.)  The USW negotiated collective bargaining agreements and employee benefit plan documents for these hourly employees.  Pls.' Compl., ¶¶ 34, 36 (SJ Ex. 38.)

PARTLY DISPUTED AND MATERIAL.  Plaintiffs deny that the USW negotiated all employee benefit plan documents.


3.       The class representatives, Anthony J. Zanghi, Kenneth J. Sowers, Dominic McCuch, James Hohman, and Darrell Shetler ("the Class Representatives"), represent a class comprised of: (1) former FreightCar employees that were represented by the USW at the time of their retirement from FreightCar, and who upon retirement received or were eligible to receive medical and life insurance benefits under the JAC-USWA Health and Welfare Plan ("the Retirees"); and (2) those individuals who received or were eligible to receive medical and life insurance benefits under the Plan as a spouse, surviving spouse, or dependent of an aforementioned FreightCar employee ("the Dependents").  April 3, 2014 Order, 1 (SJ Ex. 39.)

UNDISPUTED AND MATERIAL.


4.       FreightCar is a Delaware corporation with its principal place of business in Chicago, Illinois. Pls.' Compl., ¶ 18 (SJ Ex. 38.)  FreightCar manufactures and services railroad freight cars.  Pls.' Compl., ¶ 18 (SJ Ex. 38.)  Between 1991 and 2008, FreightCar operated a railcar fabrication plant in Johnstown, Pennsylvania ("the Johnstown Plant"). Pls.' Compl., ¶ 20 (SJ Ex. 38.)  The Retirees were employed by FreightCar at the Johnstown Plant. Pls.' Compl., ¶ 5 (SJ Ex. 38.)

UNDISPUTED AND PARTLY MATERIAL.  Plaintiffs admit that the facts in this paragraph are undisputed, and that the facts set forth in the second two sentences are material.  Plaintiffs deny that the facts set forth in the first two sentences are material.


5.       Johnstown America Corporation ("JAC") was a predecessor to FreightCar and was formed to purchase the Johnstown, Plant in 1991.  Pls.' Compl., ¶ 19. (SJ Ex. 38.)  JAC is now Johnstown America, LLC, a subsidiary of FreightCar.

PARTLY UNDISPUTED AND WHOLLY IMMATERIAL.  Plaintiffs admit that the first sentence in this paragraph is undisputed.  Contrary to Local Rule 56(B)(1), FreightCar has not cited any support for the fact set forth in the second sentence, and Plaintiffs are without knowledge as to whether this fact is accurate.  Plaintiffs deny that any fact in this paragraph is material.

6.      The Johnstown America Corporation USWA Health & Welfare Plan ("the JAC Health & Welfare Plan") is an ERISA employee benefit plan.  Pls.' Compl., ¶ 22 (SJ Ex. 38.)

UNDISPUTED AND NOT A MATERIAL FACT.  While the statement in this paragraph is undisputed, it is a conclusion of law, not a fact.

7.      From 1923 until 1991, Bethlehem Steel Corporation ("Bethlehem") owned and operated the Johnstown Plant.  Pls.' Compl., ¶ 3 (SJ Ex. 38.)  Bethlehem's hourly employees at the Johnstown Plant were represented by the USW.  Pls.' Compl., ¶ 3 (SJ Ex. 38.)

UNDISPUTED AND IMMATERIAL.

8.      In May 1991, Bethlehem and FreightCar reached an agreement for the purchase and sale of Bethlehem's Freight Car Division, which included the Johnstown Plant.  Pls.' Compl., ¶ 3 (SJ Ex. 38.)  Bethlehem and FreightCar agreed to a closing deadline of October 31, 1991.  McIver Decl. Ex. A (SJ Ex. 32.)

UNDISPUTED AND IMMATERIAL.

9.      FreightCar recognized the USW as the exclusive bargaining representative of the Johnstown Plant's hourly employees.  McIver Decl., ¶ 5 (SJ Ex. 31.)  Throughout the summer and fall of 1991, FreightCar engaged in negotiations with the USW in an effort to reach a collective bargaining agreement that would govern the terms and conditions of employment at the Johnstown Plant following the closing of the sale.  McIver Decl., ¶ 6 (SJ Ex. 31.)

UNDISPUTED AND MATERIAL.

10.     In October 1991, the parties discussed the benefit plans that JAC would create for the represented employees if FreightCar closed on the Johnstown Plant.  Christenson Decl., ¶ 5 (SJ Ex. 1.)

UNDISPUTED AND IMMATERIAL.

11.     During these October 1991 negotiations regarding the benefit plans, the parties agreed that they would not draft and negotiate the benefit plans until after FreightCar closed on the Johnstown Plant.  Christenson Decl., ¶ 8 (SJ Ex. 1.)

DISPUTED AND IMMATERIAL.  Plaintiffs deny that Paragraph 8 of the Christenson Declaration, FreightCar's only record support for these allegations, supports these allegations.  In addition, the parties negotiated in October 1991 that FreightCar's benefit plans would mirror Bethlehem's plans, including the Bethlehem PHMB and its Continuation of Coverage provision. The parties thus negotiated all material terms of FreightCar's benefit plans, including its retiree medical plan, **before** FreightCar closed on the Johnstown Plant.

FreightCar Manager Joseph Canini, who worked in FreightCar's Human Resources Department from November 15, 1993 through August 21, 2000, was formerly a union member and was part of the USW's 1991 negotiating team.  See Exhibit 1 to the August 22, 2014 Declaration of Pamina Ewing ("Ewing Decl.") in the accompanying Appendix, the Deposition Transcript of Joseph Canini ("Canini Dep.") at 37:14-23; see also April 30, 2003 Affidavit of Joseph S. Canini, Jr. ("Canini Aff.") (Dkt. # 126-31) ¶ 4. Mr. Canini testified as follows with respect to the 1991 negotiations that he attended:

> Q. And were you told by anyone that the mirroring agreement would serve to protect the benefits so that there would be no changes?
>
> A. I could sit here and say everybody agreed that it protected the benefits, whether you're talking Tex McIver, Tom Begel, Tom Ullig. I mean, they were all in agreement that nobody would lose any benefits.
>
> Q. And were these discussions related to the mirroring agreement related only to active benefits or did they encompass other types of benefits?
>
> A. All benefits.
>
> Q. Would that include retiree benefits?
>
> A. All benefits. The basis for my being so positive on that, working in a steel mill no picnic, you never made big money, but the benefits paid off. That's why I was so vehement in protecting those benefits.
>
> Q. Were you aware in 1991 that one of the benefits under the Bethlehem plan was that retiree insurance benefits, once an employee retired, would continue?
>
> A. Yes.
>
> Q.  In other words, they would continue as long as the employee was retired, were you aware of that?
>
> A. Yes.
>
> Q. And were you aware that under the Bethlehem plans, the way -- the only way that those benefits could change was if the company and union reached agreement to change them?

4

A. Right.

Canini Dep. at 88:2-89:10.

Furthermore, Andrew "Lefty" Palm was the USW's Director in charge of the District which included the Johnstown Plant and participated in 1991, 1994 and 1997 bargaining.  Affidavit of Andrew Palm (Dkt. #126-14) ¶ 4.  Mr. Palm testified as follows about 1991 negotiations:

> When we were negotiating for the Union's first contract with JAC in 1991, we considered it crucial that JAC agree to the same retiree medical benefits as Bethlehem Steel was providing at that time. One feature of retiree medical benefits for Bethlehem Steel retirees (and generally for all basic steel retirees) is that they are to continue throughout retirement and beyond contract expiration (unless the Union affirmatively agrees otherwise). The reason we considered it crucial in 1991 to have JAC agree on this issue was because we had a lot of people in our bargaining unit who had worked many years and would be retiring during the next ten years. Many were even eligible for immediate retirement from Bethlehem in 1991. We thought it would be totally unfair and inappropriate if these people lost their lifetime retiree medical benefits by virtue of the sale. We stated repeatedly to JAC negotiators that this issue was a deal breaker, in that we needed to have these retiree medical benefits or there would be no agreement. In the end, we achieved our goal.

Supplemental Declaration of Andrew Palm ("Supp. Palm Decl.") (Ewing Decl. Ex. 2) ¶ 4.

Also, Frank Barber, who was President of the USW Local 2685 from 1991 to 1993 and who was present during the 1991 negotiations when the parties agreed to the Mirroring Agreement, testified that Mr. McIver, FreightCar's chief spokesman, stated during 1991 negotiations that the welfare benefits to be received from FreightCar would be "just like Bethlehem's."  March 13, 2003 Affidavit of Frank Barber ("Barber Aff.") (Ewing Decl. Ex. 3) ¶¶ 3-4.

Plaintiffs deny that the allegations in this paragraph are material.  Rather, what is material are the collectively bargained terms set forth in the parties' "Mirroring Agreement," also referred to as "Side Letter 22," which Canini was discussing and which is at Dkt. #126-15.

12.    The USW proposed during the October 1991 negotiations that FreightCar provide the employees the same benefits they received from Bethlehem.  Christenson Decl., ¶ 5 (SJ Ex. 1.)  In connection with this proposal, on October 10, 1991, the USW sent FreightCar copies of the Bethlehem plans and summary plan descriptions ("SPD") which described the benefits Bethlehem provided to the active employees.  Christenson Decl., ¶ 5 (SJ Ex. 1.)

PARTLY DISPUTED AND IMMATERIAL.  Plaintiffs deny any implication that the parties limited their negotiations to "employees."  The parties did **not** limit the mirroring requirement to "employees" – to the contrary, the 1991 Mirroring Agreement expressly references "retirees," mandating that "Johnstown America Corporation shall be responsible for all benefits payable to its employees **or its retirees** which arise or are based on events which occurred after closing."

5

Dkt. #126-15 at 2 (emphasis added).  The Mirroring Agreement, also provides that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing." Id. at 2.  More broadly, the parties agreed to create "mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace."  Id. at 1.  Furthermore, the parties expressly excluded three types of benefits from the mirroring mandate -- a Profit Sharing Pool, an Employee Stock Ownership Plan, and a Special Profit Sharing Plan, demonstrating that the parties affirmatively excluded those benefits that they had agreed to exclude.  See id. at 1.  The parties agreed that the Mirroring Agreement encompassed both active and retiree benefits.  Canini Dep. at 88:2-89:10; Palm Aff. (Dkt. #126-14) ¶ 11.

In addition, FreightCar itself and its representatives have repeatedly admitted that the mirroring mandate in Side Letter 22 applied to the Bethlehem PHMB, which was applicable to retirees, and that the mirroring mandate applied to the Bethlehem PHMB's Continuation of Coverage provision in particular.  Thus, on September 19, 2013, FreightCar argued as follows in opposing Plaintiffs' preliminary injunction motion:

> The first issue this Court must address…is whether **the Bethlehem PHMB, which FreightCar agreed to mirror in Side Letter 22 to the 1991 CBA,** provides for vested welfare benefits under controlling Third Circuit case law. Since the beginning of the original Britt and Deemer litigation and throughout the renewed Pennsylvania and Illinois Actions, FreightCar has vigorously maintained that, under Skinner, plaintiffs do not have a right to vested medical benefits **under the Bethlehem PHMB**.

FreightCar's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("FreightCar's Preliminary Injunction Brief") (Dkt. #63) at 19 (emphasis added); see also id. at 6 ("Regarding FreightCar's obligation to provide medical benefits to the Retirees, Side Letter 22 provided the continuing obligation that FreightCar's 'bargaining unit welfare benefit plans *will mirror* existing Bethlehem plans and shall be effective immediately after closing.'") (emphasis in the original).

On July 8, 2013, FreightCar, by its current counsel, alleged as follows in its Complaint filed in the Northern District of Illinois:

> As part of the purchase of the Johnstown Facilities, Johnstown America entered into a collective bargaining agreement with the USW and agreed in a side letter to the collective bargaining agreement ("Side Letter 22") to "create mirror bargaining unit employee benefit plans material in all respects to the Bethlehem plans they replace."  **The Bethlehem plans in question provided for medical benefits to retirees or surviving spouses and life insurance benefits to retirees** "so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of [the Bethlehem plans], except as the Company and the Union may otherwise agree."

> Pursuant to Side Letter 22, Johnstown America provided medical and life insurance benefits which mirrored the benefits provided by the Bethlehem plans from 1991 until 1997.
>
> The parties agreed in the 1997 CBA to eliminate the mirroring agreement in Side Letter 22 and to instead provide that the provisions of the Johnstown America Employee Guide would govern retiree medical and life insurance benefits.

FreightCar's Illinois Complaint (Dkt. #126-10) ¶¶ 19, 20, 27 (emphasis added).

FreightCar averred as follows in its July 8, 2002 Answer in <u>Deemer</u>:

> The 1990 Pensioners' and Surviving Spouses' Insurance Agreement between Bethlehem and the Union, **which the Company agreed to mirror**, does not grant or create vested retiree health and/or life insurance benefits.  The right to retiree health and/or life insurance benefits is explicitly subject to reduction or termination by agreement of the Company and the Union: "Any pensioner . . . shall not have such coverage terminated or reduced . . . *except as the Company and Union may agree otherwise."*
>
> In 1997, the Company and the Union agreed during collective bargaining negotiations *inter alia,* to modify the health and life insurance benefits for pensioners and employees….The Company and the Union thereby agreed to install the JAC's Employee Guide as the document governing, *inter alia,* employee and pensioner health care and life insurance benefits.

Dkt. #126-16 ¶¶ 50-51 (italics emphasis in the original; bold emphasis added).

In its first summary judgment brief, filed August 9, 2002 in <u>Deemer</u> ("FreightCar's <u>Deemer</u> SJ Brief"), FreightCar asserted as follows:

> Among the plans to be mirrored was Bethlehem's "Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Bethlehem Steel Corporation and Subsidiary Companies," ("the Bethlehem PHMB").
>
> ***
>
> While Plaintiffs rely on the statement that coverage will not be terminated or reduced (First Amended Complaint at ¶¶ 2, 14), Defendants rely on the language immediately following: *"except as the Company and the Union may agree otherwise."*
>
> ***
>
> Putting aside labels, the better mode of analysis is to inquire whether the contingency expressed in the Bethlehem Insurance Agreement -- "except as the Company and Union may agree otherwise" -- was ever fulfilled. In fact, in this case it was. As set forth above in detail, in the 1997 negotiations, JAC and the Union expressly "agreed otherwise"-- they agreed that health and welfare

> benefits would thenceforth be governed by JAC's Employee Guide, rather than
> by any old Bethlehem plan or agreement. That is to say, under the terms of the
> Bethlehem Insurance Agreement, JAC and the Union had every right to replace
> the Bethlehem Insurance Agreement and, in 1997, they did so.
>
> ***
>
> the Bethlehem Insurance Agreement provided that expiration of that agreement
> would not terminate the benefits, but it expressly recognized that the company
> and Union could alter or terminate the benefits in future collective bargaining.

Deemer SJ Brief at 4, 5, 16, 16 n.2 (emphasis in the original).

In its March 25, 2003 Brief in Support of the Report and Recommendation issued by Magistrate
Judge Mitchell, FreightCar stated:

> It is an interesting theoretical question whether JAC would have been able to
> exercise the termination provision of JAC's Employee Guide to terminate retiree
> insurance before 1997, when it was still committed by the Mirroring Agreement
> to mirroring the Bethlehem Insurance Agreement. To the extent that the
> Bethlehem Insurance Agreement was more restrictive than JAC's Employee
> Guide, the Union might have had a case. But after 1997, the question was
> rendered moot by the abrogation of the Mirroring Agreement and the adoption of
> JAC's Employee Guide as the governing instrument.

FreightCar's March 25, 2003 Brief in Support of Report and Recommendation (Ewing Decl. Ex.
4) at 21 n.14.

In his ruling addressing the parties' cross motions for summary judgment in Deemer, Judge
Cindrich expressly relied on FreightCar's admission that it agreed to mirror the Bethlehem
PHMB (covering **retirees**), including its continuation of coverage clause.  Thus, Judge Cindrich
summarized FreightCar's argument as follows:  "Defendants argue that coverage could be
terminated because 'the company and union agreed otherwise.'"  Deemer Summary Judgment
Ruling (Dkt. #40-2) at 3.  The Court continued:

> It is defendant's burden, in overcoming the Union's vested right to retiree
> benefits, to show that the union and the company "agreed otherwise." There is
> substantial evidence in the record to support plaintiffs' position that no such
> agreement was reached.  It appears to be undisputed that Johnstown America
> continued to adhere to the Bethlehem PHMB until early 2002, long after the
> Mirroring Agreement was supposedly rejected under defendants' theory.

Id. at 3-4.

Magistrate Judge Mitchell's Report and Recommendation in Deemer (rejected by Judge Cindrich
on substantive grounds) shows that Magistrate Judge Mitchell extensively relied on FreightCar
representations that it now seeks to renounce:

8

> [Defendants] contend that the Mirroring Agreement, which was the document that bound JAC to provide employee benefits that were substantially similar to those provided at Bethlehem Steel, was abrogated in 1997 thereby relieving JAC of its obligation to mirror those benefits. Moreover, defendants contend that plaintiffs have ignored the subsequent language in the Bethlehem PHMB which provides that coverage shall not be terminated or reduced notwithstanding the expiration of this agreement, "except as the Company and the Union may agree otherwise." Because, defendants argue, the Company and the Union *did* agree otherwise in 1997 when they agreed to substitute the JAC Employee Guide for the Bethlehem PHMB, the language in the Bethlehem PHMB is no longer controlling.

February 24, 2003 Report and Recommendation in Deemer (Ewing Decl. Ex. 5) at 11 (emphasis in the original).

Finally, FreightCar representative Mark Duray gave the following sworn testimony:

> Now, we've already established that in 1991 Johnstown America was required to enact welfare plans, including retiree health plans that mirrored the Bethlehem plan; correct?
>
> ***
>
> A. Yes.
>
> Did Johnstown America in fact enact welfare benefit plans, including retiree health plans, that mirrored Bethlehem's?
>
> A. Yes.

Deposition Testimony of Mark Duray Dep. ("Duray Dep.") (Ewing Decl. Ex. 6) at 43:8-23.

Plaintiffs deny that what was "proposed" or "sent" is material. Rather, what is material are the collectively bargained terms set forth in the Mirroring Agreement, including its promise to "mirror existing Bethlehem plans" limited only by the exclusion of profit sharing and stock ownership plans, as well as its explicit reference to retiree benefits. The fact that a particular document was not "sent" to FreightCar does not establish that FreightCar did not already possess or have reason to know of that document, particularly where, as noted in response to allegations 14 and 15, below, (1) the Mirroring Agreement explicitly references retirees; (2) the PHMB is explicitly referred to in active employee documents which were indisputably provided; (3) active employee documents explicitly state that the PHMB is available at the Company offices; and (4) several FreightCar human relations officials were former Bethlehem employees from the Johnstown plant.

13.  The plans and SPDs sent to FreightCar on October 10, 1991 included the Bethlehem Pension Agreement, the Bethlehem Supplemental Unemployment Benefit Plan, the

Bethlehem 401(k) Retirement Plan, and the Program of Insurance Benefits for Hourly Paid Employees ("the Bethlehem PIB").  Christenson Decl., ¶ 5 (SJ Ex. 1.)

UNDISPUTED AND IMMATERIAL.  Plaintiffs do not know exactly each and every document that was "sent" to FreightCar on October 10, 1991 but deny that what was "sent" is material. Rather, what is material are the collectively bargained terms set forth in the Mirroring Agreement.  The fact that a particular document was not "sent" to FreightCar does not establish that FreightCar did not already possess or have reason to know of that document.

14.    The Bethlehem PIB is a summary plan description of the welfare benefits Bethlehem provide [sic] to its active represented employees.  Christenson Decl., ¶ 13 (SJ Ex. 1.)  It does not address retirees' benefits.  Christenson Decl., ¶ 13 (SJ Ex. 1.)

PARTLY DISPUTED, PARTLY IMMATERIAL, AND PARTLY A CONCLUSION OF LAW. The assertion that the Bethlehem PIB does not address retiree benefits is false and is disputed. The PIB explicitly provides for health and life insurance benefits for retirees.  In addition, whether the Bethlehem PIB is a summary plan description is a conclusion of law.

The PIB provides:

### *Hospital and Medical Coverage for Pensioners and Surviving Spouses*

**If you retire under the Company pension plan applicable to you on other than a deferred vested pension and at the time of such retirement have 15 or more years of continuous service, you and your eligible dependents will be enrolled for Company-paid hospital and physicians' services benefits under the <u>Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses</u> unless you elect otherwise.**  You may also elect optional major medical coverage under that Program, subject to deduction of premiums therefor from your pension checks. **You may obtain a copy of the booklet describing the above Program from the insurance office at the plant** or office where you work. If you are thinking of retiring you should ask for a copy of such booklet. In any event, you will be given a copy of the booklet shortly before you retire.

If during active employment you were entitled to elect services provided through a Health Maintenance Organization or prepaid group practice plan (HMO) and HMO services are available to retirees, you may elect at the time of retirement to be covered either through such HMO or under the Program of Hospital-Medical Benefits.

A person who becomes eligible to receive a Surviving Spouse's benefit under the Company pension plan applicable to you is also eligible for the hospital and medical coverage described in paragraphs 9. 28 and 9. 29. **A copy of the booklet describing the Program of Hospital-Medical Benefits**, together with descriptive

10

material and contribution rates, if any, relating to any applicable HMO coverage, **will be given to such person at the time the person becomes eligible for the Surviving Spouse's benefit** under the applicable Company pension plan.

***

*Life Insurance*

If you should die while you are an active employee, or during retirement on Company pension before you reach age 62, the beneficiary named by you will receive life insurance of $14,500 to $17,000, depending on your insurance classification. If you die after you have retired on pension and have reached age 62, the amount of life insurance is $5,000. *The detailed explanation is in Section 1.*

***

*Life Insurance After Retirement*

If you retire under the Company pension plan applicable to you prior to age 62, and at the time of retirement have 10  or more years of continuous service, and your basic life insurance is not being continued in accordance with the provisions relating to total disability, described in paragraph 1.1, your basic life insurance will be continued, without contributions from you, in the full amount (as determined from the above schedule on the basis of your insurance classification on your last day of work) until the end of the month in which you attain age 62. At the end of the month in which you attain age 62 , the amount of your basic life insurance will then be reduced to $5,000.

***

*Retirement*

If you retire under the Company pension plan applicable to you, your basic life insurance will be continued as set forth in paragraphs 1.2 and 1.4.

*Life Insurance after Retirement*

**Any Employee who shall have retired and who shall have become entitled to life insurance after retirement pursuant to the provisions of the insurance agreement and booklet applicable to such Employee at the time of retirement shall not have such life insurance terminated or reduced** (except as provided in such booklet) so long as he or she remains retired from the Company, **notwithstanding the expiration of such agreement or booklet or of this Agreement, except as the Company and the Union may agree otherwise.**

11

Dkt. #121-5 at 9, 13, 87, 89, 99 (bold emphasis added).

FreightCar's allegations in this paragraph are material to the extent that FreightCar seeks to use the (false) fact that the Bethlehem PIB does not address retiree benefits to suggest that FreightCar was ignorant of the Bethlehem PHMB and its Continuation of Coverage provision. Given FreightCar's suggestion that it was oblivious of the PHMB, it is material that the Bethlehem PIB put it on notice of that document.

15.     FreightCar was not sent a copy of the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Bethlehem Steel Corporation ("the Bethlehem PHMB".)  Christenson Decl., ¶ 7 (SJ Ex. 1); Garabedian Decl., ¶ 6 (SJ Ex. 16); Grove Dep. at 20:1-20:16 (SJ Ex. 40.)

DISPUTED AND IMMATERIAL.  Plaintiffs deny that what was "sent" is material.  Rather, what is material are the collectively bargained terms set forth in the Mirroring Agreement, including its promise to "mirror existing Bethlehem plans" limited only by the exclusion of profit sharing and stock ownership plans, as well as its explicit reference to retiree benefits.  In addition, the fact that a particular document was not "sent" to FreightCar does not establish that FreightCar did not already possess or have reason to know of that document, particularly where:

- FreightCar admits that it was "sent" and that it "reviewed" the Bethlehem Steel Program of Insurance Benefits ("the Bethlehem PIB").  FreightCar Facts ¶¶ 30-31.  The Bethlehem PIB (a) expressly references the Bethlehem PHMB; (b) explains that retirees and their eligible dependents will receive their retiree healthcare benefits pursuant to the Bethlehem PHMB; (c) explains that the Bethlehem PHMB is available "from the insurance office at the plant"; and (d) explains that employees will be provided with a copy of the Bethlehem PHMB upon retirement:

  ***Hospital and Medical Coverage for Pensioners and Surviving Spouses***

  **If you retire** under the Company pension plan applicable to you on other than a deferred vested pension and at the time of such retirement have 15 or more years of continuous service, **you and your eligible dependents will be enrolled for Company-paid hospital and physicians' services benefits under the <u>Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses</u> unless you elect otherwise.**  You may also elect optional major medical coverage under that Program, subject to deduction of premiums therefor from your pension checks.  **You may obtain a copy of the booklet describing the above Program from the insurance office at the plant** or office where you work.  If you are thinking of retiring you should ask for a copy of such booklet. In any event, you will be given a copy of the booklet shortly before you retire.

  Dkt. #121-5 (emphasis added).

- John Plunkard served as the Controller of the Freight Car Division of the Bethlehem Steel Corporation from 1988 until FreightCar purchased the Freight Car Division in 1991.

12

Excerpts from the Deposition Testimony of John Plunkard ("Plunkard Dep.") (Ewing Decl. Ex. 7) at 18:21-24.  Upon FreightCar's 1991 purchase, it appointed Mr. Plunkard as Chief Financial Officer and Vice President of Finance.  Id. at 19:10-15; 20:11-12.  At the time that Mr. Plunkard became FreightCar's CFO, he testified that he was familiar with the Bethlehem PHMB.  Id. at 26:13-18.

- Mr. Duray likewise came from Bethlehem: from 1988 through the sale to FreightCar, Mr. Duray served as the Human Resource Supervisor for Bethlehem's Freight Car Division.  Duray Aff. (Dkt. #126-12) ¶ 1.  He continued in the same position after the sale.  Id.

- Glenn Grove also came to FreightCar from Bethlehem, where he had worked since 1973.  Excerpts from the Deposition Testimony of Glenn Grove ("Grove Dep.") (Ewing Decl. Ex. 8) at 11:10-16.  He was Benefits Administrator for FreightCar beginning in 1991.  Id. at 13:16-22.

Accordingly, regardless of whether FreightCar was "sent" an actual copy of the Bethlehem PHMB, Plaintiffs dispute any contention that FreightCar lacked knowledge of retiree benefits. Because the Company agreed to "mirror existing Bethlehem plans," the care that the Company took in reviewing each of those plans prior to closing is not material.

16.   In mid-October, FreightCar and the USW reached an agreement which they memorialized in a main collective bargaining agreement ("the 1991 CBA") and twenty-seven (27) "side letters" to the 1991 CBA.  McIver Decl., ¶ 8 (SJ Ex. 31.)  This agreement was tentative and would only become effective in the event that FreightCar closed on its purchase of the Johnstown Plant.  McIver Decl., ¶ 8 (SJ Ex. 31.)

UNDISPUTED AND MATERIAL.

17.   The 1991 CBA did not address FreightCar's employee benefit obligations. McIver Decl., ¶ 8 (SJ Ex. 31.)

DISPUTED AND MATERIAL.  FreightCar has admitted that the Mirroring Agreement (which addresses FreightCar's employee and retiree benefit obligations) was incorporated and made part of the 1991 CBA:

The Mirroring Agreement was also known as Side Letter 22 of, incorporated in and made a part of the 1991 collective bargaining agreement by and between Johnstown America corporation (the "Company") and the United Steelworkers of America, AFL-CIO-CLC (the "Union") (the "1991 CBA").

FreightCar's Answer in Deemer (Dkt. #126-16) ¶ 44; see also Affidavit of FreightCar declarant Mark Duray (Dkt. #126-12) ¶¶ 5, 9 (averring that the Side Letters accompanied the 1991 CBA and proffering the 1991 CBA with the Side Letters attached).  The Mirroring Agreement in turn

expressly addressed FreightCar's employee benefit and retiree benefit obligations.  See response to No. 12, which is incorporated herein.

In addition, the 1991 CBA itself expressly references retiree benefit obligations:

> In the event of a permanent shutdown of the Plant prior to five years following the date of the sale, the Company will guarantee that each former Johnstown America Corporation Employee at the Plant will receive from the owner of' the Plant, from the Pension Benefit Guaranty Corporation (the "PBGC") and/or from the Johnstown America Corporation Pension Plan the same pension benefits, (including increased regular pension provided for by 70/80, ·Rule of 65 or permanent incapacity retirement), **the same retiree health and life insurance coverage**, and/or the same severance pay that he would have received had the Plant been shutdown as of the date of sale.

Dkt. #126-41 at 84 (emphasis added).

In light of the Mirroring Agreement, FreightCar's claim that the 1991 CBA did not address employee benefit obligations is false.  The fact that the Mirroring Agreement was part of the 1991 CBA is material.


18.     The parties did not negotiate and draft new benefit plans prior to FreightCar closing on the Johnstown Plant.  Christenson Decl., ¶ 8 (SJ Ex. 1.)

PARTLY DISPUTED AND MATERIAL.  The parties DID negotiate new benefit plans prior to FreightCar's closing on the Johnstown plant.  As set forth in the Mirroring Agreement, the parties negotiated that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and **shall be effective immediately after closing**."  Dkt. #126-15 at 2 (emphasis added).  Further, the parties negotiated that "Johnstown America Corporation will create mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace."  Id. at 1.

Plaintiffs deny the implication that the USW "negotiated" employee benefit plan documents after the closing.  Rather, from before FreightCar's acquisition of the Johnstown Facility until the adoption of the 1997 collective bargaining agreement ("CBA"), the parties' collectively bargained agreement as to employee benefits was the Mirroring Agreement, otherwise known as Side Letter 22.  As set forth in the Mirroring Agreement, the parties agreed to create "mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace."  Dkt. #126-15 at 1.  As to welfare benefit plans specifically, the parties agreed that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing."  Id. at 2.

As shown, the parties did negotiate the benefit plan terms prior to the closing.  If they had not, the Mirroring Agreement would not exist, and the Mirroring Agreement is material.

19. Instead of drafting new plans, the parties arrived at an understanding with respect to the benefit plans FreightCar would create if and when the sale closed.  Christenson Decl., ¶ 8 (SJ Ex. 1.)  This understanding was set forth in the twenty-second side letter to the 1991 CBA ("Side Letter 22").  Christenson Decl., ¶ 8 (SJ Ex. 1.)

UNDISPUTED AND MATERIAL.  Plaintiffs clarify that under the terms of Side Letter 22, "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing."  Dkt. #126-15.

20. Side Letter 22 provided the following:

> This letter will serve to confirm our understanding as to employee benefit plans covering bargaining unit employees at [the Johnstown Plant] after closing of the [FreightCar]/Bethlehem sale.

> [FreightCar] will create mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace.

> Within 60 days after closing of the [FreightCar]/Bethlehem sale, [FreightCar] will forward to the Union for review and comment draft copies of such plans, and [FreightCar] and the Union agree to use their best efforts to finalize such plans, subject to IRS approval if appropriate, within 120 days of closing.

> Christenson Decl. Ex. B (SJ Ex. 3.)

PARTLY DISPUTED AND PARTLY MATERIAL.  FreightCar has selectively quoted certain portions of the Mirroring Agreement and omitted other key provisions. Additional significant provisions include:

- "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing."  Dkt. #126-15 at 2.

- "Johnstown America Corporation shall be responsible for all benefits payable to its employees **or its retirees** which arise or are based on events which occurred after closing."  Id. at 2 (emphasis added).

- "Notwithstanding the foregoing, there shall be no requirement for Johnstown America Corporation to establish a mirror "Employee Investment Program," including an annual EIP Profit Sharing Pool, an Employee Stock Ownership Plan, and a Special Profit Sharing Plan (the 'Shortfall Plan.')"  Id. at 1.  This provision demonstrates that the parties expressly excluded those benefits that they agreed to exclude from the mirroring obligation.

Plaintiffs agree that many provisions in the Mirroring Agreement, including provisions omitted by FreightCar but that Plaintiffs quote above, are material.  Plaintiffs deny that a provision addressed to draft copies is material.


21.     By agreeing to Side Letter 22, FreightCar did not agree that it would mirror the employee benefit plans in every respect.  Christenson Decl. Ex. B (SJ Ex. 3.)  Instead Side Letter 22 provided that the plans would mirror Bethlehem's only in "material respects." Christenson Decl. Ex. B (SJ Ex. 3.)

DISPUTED, IMMATERIAL, AND PARTLY STATES A CONCLUSION OF LAW.  The first sentence states a conclusion of law, not of fact, and the terms of Side Letter 22 speak for themselves.  Furthermore, the Mirroring Agreement does not provide that the plans would mirror Bethlehem's "only" in material respects; it provides that "[FreightCar] will create mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace," **and** that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing."  Dkt. #126-15 at 1, 2.

The dispute is immaterial because the Company does not argue that the Continuation of Coverage clause, or the duration of retiree insurance benefits generally, does not constitute a "material" component of Bethlehem plans.  If it did, abundant evidence demonstrates that the parties intended to preserve retiree insurance benefits.

Also, in terms of what FreightCar "agreed to," as attested to by Frank Barber, who was President of the USW Local 2685 from 1991 to 1993 and who was present during the 1991 negotiations when the parties agreed to the Mirroring Agreement, Mr. McIver, FreightCar's chief spokesman during the 1991 negotiations, stated during these negotiations that the welfare benefits to be received from FreightCar would be "just like Bethlehem's."  Barber Aff. (Ewing Decl. Ex. 3) ¶¶ 3-4.  FreightCar Manager Joseph Canini, who worked in FreightCar's Human Resources Department from November 15, 1993 through August 21, 2000, was formerly a union member and was part of the USW's 1991 negotiating team.  April 30, 2003 Affidavit of Joseph S. Canini ("Canini Aff.') (Dkt. #126-31) ¶¶ 1-3.  He was present during the 1991 negotiations when Side Letter 22 was agreed on.  Id. ¶ 4.  During these negotiations, Mr. Canini confirmed, Mr. McIver, stated that the benefits to be received from FreightCar would be "just like Bethlehem's."  Id.

Also during 1991 negotiations, Mr. Canini asked Thomas Begel, FreightCar's Chief Executive Officer, what would happen to retiree health care benefits in the event that Bethlehem "went under."  Begel replied, "Don't worry about it, I will take care of it."  Canini Aff. ¶ 4.

Furthermore, Andrew "Lefty" Palm was the USW's Director in charge of the District which included the Johnstown Plant and participated in 1991, 1994 and 1997 bargaining.  Affidavit of Andrew Palm (Dkt. #126-14) ¶ 4.  Mr. Palm testified as follows about 1991 negotiations:

> When we were negotiating for the Union's first contract with JAC in 1991, we considered it crucial that JAC agree to the same retiree medical benefits as

16

Bethlehem Steel was providing at that time. One feature of retiree medical
benefits for Bethlehem Steel retirees (and generally for all basic steel retirees) is
that they are to continue throughout retirement and beyond contract expiration
(unless the Union affirmatively agrees otherwise). The reason we considered it
crucial in 1991 to have JAC agree on this issue was because we had a lot of
people in our bargaining unit who had worked many years and would be retiring
during the next ten years. Many were even eligible for immediate retirement from
Bethlehem in 1991. We thought it would be totally unfair and inappropriate if
these people lost their lifetime retiree medical benefits by virtue of the sale. We
stated repeatedly to JAC negotiators that this issue was a deal breaker, in that we
needed to have these retiree medical benefits or there would be no agreement. In
the end, we achieved our goal.

Supp. Palm Decl. (Ewing Decl. Ex. 2) ¶ 4.

Plaintiffs deny that FreightCar's allegations in Paragraph 21 are material.  Even if FreightCar
were "only" bound to mirror the Bethlehem plans "in all material respects," there is no question
that the Continuation of Coverage provision is material within the meaning of the Mirroring
Agreement.

22.     Side Letter 22 also made clear that FreightCar was not assuming Bethlehem's employee
        benefit plans.  Side Letter 22 stated that FreightCar would "create" its own plans after the
        closing and that these plans would "replace" the Bethlehem plans.  Christenson Decl. Ex.
        B (SJ Ex. 3.)

DISPUTED AND IMMATERIAL AND PARTLY STATES A CONCLUSION OF LAW.  The
first sentence of this paragraph, "Side Letter 22 also made clear that FreightCar was not
assuming Bethlehem's employee benefit plans," states a disputed conclusion of law. The
Mirroring Agreement speaks for itself.  Plaintiffs also dispute that FreightCar has accurately
quoted the Mirroring Agreement in the second sentence.  Rather, the Mirroring Agreement
provides that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror
existing Bethlehem plans and shall be effective immediately after closing."  Dkt. #126-15 at 2.
Thus, even though FreightCar had not yet **drafted** written plan documents as of the closing date,
FreightCar welfare benefit plans that mirrored Bethlehem's were immediately effective.
Plaintiffs deny that these allegations are material.

23.     Finally, to ensure that the new plans FreightCar would create after the closing met the
        USW's expectations and were consistent with what the parties negotiated, Side Letter 22
        stated that drafts of the plans would be provided to the USW for its review and comment
        before they were finalized.  Christenson Decl., ¶ 9 (SJ Ex. 1.)

DISPUTED AND IMMATERIAL.  The Mirroring Agreement provides that "Johnstown
America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans
and shall be effective **immediately** after closing."  Dkt. #126-15 at 2 (emphasis added).

Plaintiffs dispute that FreightCar has accurately quoted the Mirroring Agreement.  Dkt. #126-15 at 1, 2.  Plaintiffs deny that FreightCar's allegations in this paragraph are material.


24.     After the sale of the Johnstown Plant closed and the collective bargaining agreement between FreightCar and the USW had been reached, FreightCar began drafting the various benefit plans as agreed in Side Letter 22.  Sokolow Dep. at 43:21-44:16 (SJ Ex. 41); Christenson Decl., ¶ 10 (SJ Ex. 1); McIver Decl., ¶ 11 (SJ Ex. 31.)

DISPUTED AND IMMATERIAL AND PARTLY STATES A CONCLUSION OF LAW. Plaintiffs deny that the cited section from the deposition transcript of Jerry Sokolow supports this proposition.  The question of whether the documents drafted by FreightCar were plans or summary plan descriptions is a conclusion of law, not a statement of fact.  Plaintiffs dispute that FreightCar began drafting "various benefit plans" – rather, the materials drafted by FreightCar were, on their face, summary plan descriptions, at least with respect to summary plan description titled "JAC's Employee Guide" ("1993 SPD") which FreightCar distributed in 1993. It was only upon ratification of the 1997 CBA that the 1993 SPD arguably became a plan document.

By letter dated March 1, 2002 from FreightCar's Human Resource Manager Charles Howard to Raymond Jastrzab (Dkt. #126-22), FreightCar advised the USW that as of that 2002 date, FreightCar had not drafted any "Plan documents" for healthcare plans:

> I am writing in response to your request for plan documents for represented employees of Johnstown America Corporation....Plan documents do not exist for the welfare plans i.e., health care, and sickness and accident plans, etc.  The Summary Plan Description is all that exists for these plans.

Id.

Further, the 1993 SPD includes a May 1993 letter addressed to "Dear Employee" that states that "this handbook serves as the summary plan description required by the Employee Retirement Income Security Act of 1974, as amended."  1993 SPD (Dkt. #126-23) at FCA000215.  The letter also states that the handbook contained only "**summaries** of the benefit plans" (emphasis added), and that "Each benefit plan has legal documents that may be referred to whenever a question concerning your coverage arises.  In the event of a difference between the summary and the legal documents, the legal documents shall control."  1993 SPD (Dkt. #126-23) at FCA000215.  The 1993 SPD also stated:  "This booklet is intended as a general summary of your benefits under the plan.  The specific details of this plan are in the actual plan document, which controls your benefits."  1993 SPD (Dkt. #126-25) at handwritten page number 6. Another notice similarly provides: "This guide attempts to provide a simple explanation of the provisions of your benefit.  Complete technical information on the plans can be found in formal legal documents available in the human resources department.  If there's any omission, if this guide is unclear, or if this guide and the plans differ, the plans as stated in the legal documents must take precedence."  1993 SPD (Dkt. #126-23) at FCA 000437.

Furthermore, Mr. Duray testified as follows with respect to the 1993 SPD's status as such: "Q. And would it be fair to state that the JAC guide was a summary plan description of the various benefit plans that JAC had, including retiree health? A. Yes." Duray Dep. (Dkt. #126-20) at 63:18-23. In addition, FreightCar declarant Tom Garbedian averred on this point, *inter alia*, that "[b]y July 1992, we had completed drafts of all of the SPDs for the represented employees' benefit plans"; "Christenson informed us that the USW had requested certain changes to the draft SPDs"; and "in late 1992, we also finished a draft of the SPDs of the retiree medical plan that JAC intended to offer to the represented employees upon their retirement." Dkt. #121-16 ¶¶ 7, 8, 9.

Plaintiffs deny that the allegations in this paragraph are material.


25.     FreightCar retained benefits attorneys from Fisher & Phillips and consultants from Hewitt Associates ("Hewitt") to assist with the creation of these plans. Christenson Decl., ¶ 10 (SJ Ex. 31.) FreightCar, its attorneys, and its consultants worked with the USW for over a year to finalize the benefit plans FreightCar agreed to provide. Christenson Decl., ¶¶ 10, 26 (SJ Ex. 31); Garabedian Decl., ¶ 4 (SJ Ex. 16.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND PARTLY A CONCLUSION OF LAW. Plaintiffs dispute that the referenced documents created by FreightCar, at least with respect to the 1993 SPD, were "plans" as opposed to SPDs, and states that this presents a question of law. Plaintiffs dispute that the 1993 SPD was a "plan" for the reasons stated in response to No. 24, above, which Plaintiffs incorporate herein. Plaintiffs deny that the allegations in this paragraph are material.


26.     FreightCar and the USW first drafted the qualified plans, such as the 401(k) and pension plans, which unlike the welfare benefit plans, needed to be submitted to the IRS. Christenson Decl., ¶ 11 (SJ Ex. 1.) Throughout the spring 1991, Frederick Benario at Fisher & Phillips worked with Jeanette Stump, a Pension Technician for the USW, to finalize the qualified plans. Christenson Decl., ¶ 11 (SJ Ex. 1); Stump Dep. at 34:3-36:23 (SJ Ex. 42.) The qualified plans were approved by the USW in the summer of 1991 and then sent to the IRS for determination letters. Christenson Decl., ¶ 11 (SJ Ex. 1); *See also* Christenson Decl., Ex. C (SJ Ex. 4.)

PARTLY DISPUTED, PARTLY IMMATERIAL AND PARTLY A CONCLUSION OF LAW. Plaintiffs deny that the cited record material supports the allegation that the USW drafted anything. Plaintiffs dispute that the cited record support, which says nothing about events occurring in 1991, support these allegations with respect to the referenced dates. Plaintiffs state that whether the referenced 401(k) and pension documents were "qualified plans" is a question of law, not a statement of fact. Paragraph 11 of Mr. Christenson's Declarations states that "the qualified plans were drafted by [FreightCar attorneys] Fisher & Phillips." Dkt. #121-1 ¶¶ 10-11. Plaintiffs deny that any of the allegations in this paragraph are material.

27.  The welfare benefit plans were created by FreightCar in the summer of 1992.
     Christenson Decl., ¶ 12, 14 (SJ Ex. 1); Garabedian Decl., ¶ 7 (SJ Ex. 16.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND PARTLY A CONCLUSION OF
LAW.  Plaintiffs dispute that the referenced documents created by FreightCar were "plans" as
opposed to SPDs, and state that this presents a question of law.  Plaintiffs dispute that the 1993
SPD was a "plan" for the reasons stated in response to No. 24, above, which Plaintiffs
incorporate herein.  Plaintiffs deny that the allegations in this paragraph are material.

28.  Robert Christenson from Fisher & Phillips and consultants at Hewitt Associates drafted
     the welfare benefit plans.  Christenson Decl., ¶ 12 (SJ Ex. 1); Garabedian Decl., ¶ 3 (SJ
     Ex. 16.)

PARTLY DISPUTED, WHOLLY IMMATERIAL. AND PARTLY A CONCLUSION OF
LAW.  Plaintiffs dispute that the referenced documents created by FreightCar were "plans" as
opposed to SPDs and states that this presents a question of law.  Plaintiffs dispute that the 1993
SPD was a "plan" for the reasons stated in response to No. 24, above, which Plaintiffs
incorporate herein.  Plaintiffs have no basis for disputing that Robert Christenson from Fisher &
Phillips and consultants at Hewitt Associates drafted the documents.  Plaintiffs deny that the
allegations in this paragraph are material.

29.  Christenson and Hewitt worked with Jerry Sokolow, a Benefits Technician for the USW,
     Ernie Esposito, a USW Staff Representative, and other USW representatives to finalize
     the welfare benefit plans.  Christenson Decl., ¶ 16 (SJ Ex. 1); Sokolow Dep. at 44:17-
     45:23 (SJ Ex. 41.)

PARTLY DISPUTED AND IMMATERIAL AND PARTLY A CONCLUSION OF LAW.
Plaintiffs dispute that the referenced documents created by FreightCar were "plans" as opposed
to SPDs in 1992-1993, and state that this presents a question of law.  Plaintiffs dispute that the
1993 SPD was a "plan" for the reasons stated in response to No. 24, above, which Plaintiffs
incorporate herein.  Plaintiffs also dispute that the record support cited by FreightCar supports
the assertion that there were any communications between FreightCar and the USW with
respect to the referenced documents other than between Mr. Christenson and Mr. Sokolow.
Plaintiffs deny that the allegations in this paragraph are material.

30.  Christenson and Hewitt were provided copies of the Bethlehem Steel Program of
     Insurance Benefits ("the Bethlehem PIB"), which was a summary plan description of the
     life insurance, sickness and accident, medical, dental, and vision care benefits for
     Bethlehem's active represented employees.  Christenson had received a copy of the
     Bethlehem PIB from Stump in connection with the pre-closing negotiations. Christenson
     Decl., ¶ 5 (SJ Ex. 1.)  Hewitt had received a copy of the Bethlehem PIB from Glenn
     Grove.  Grove Dep. at 20:1-20:16 (SJ Ex. 40.)  Neither Christenson nor Hewitt recall
     receiving or reviewing a copy of the Bethlehem PHMB.  Christenson Decl., ¶ 7 (SJ Ex.
     1); Garabedian Decl., ¶ 6 (SJ Ex. 16.)

UNDISPUTED, IMMATERIAL, AND PARTLY STATES A CONCLUSION OF LAW.   The question of whether the Bethlehem PIB was a summary plan description is a question of law. The assertion that Christenson and Hewitt do not recall reviewing the PHMB does not establish that FreightCar did not already possess or have reason to know of that document, particularly where, as noted in response to allegations 14 and 15 above, which Plaintiffs incorporate herein, (1) the Mirroring Agreement explicitly references retirees; (2) the PHMB is explicitly referred to in active employee documents which were indisputably provided; (3) active employee documents explicitly state that the PHMB is available at the Company offices; and (4) several FreightCar human relations officials were former Bethlehem employees from the Johnstown plant.

31.     The Bethlehem PIB was used as a reference for determining the type and level of benefits FreightCar would provide to the represented employees covered by FreightCar's new benefit plans. Garabedian Decl., ¶ 6 (SJ Ex. 16); Christenson Decl., ¶ 13 (SJ Ex. 1.)  The "Continuation of Coverage" language found in the Bethlehem PHMB is not found anywhere in the Bethlehem PIB.  Christenson Decl., ¶ 13 (SJ Ex. 1.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND PARTLY STATES A CONCLUSION OF LAW.  Plaintiffs do not dispute that the persons who drafted the FreightCar SPDs referred to the Bethlehem PIB.  Plaintiffs do dispute any implication that FreightCar was not bound by the terms of the Bethlehem PHMB simply because the persons who drafted the SPDs may not have reviewed that document.  Plaintiffs refer to their above responses to Nos. 12, 14 and 15 on this point, which they incorporate herein.  Plaintiffs also note that the question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.

Plaintiffs also dispute the second sentence.  Contrary to the averment of Mr. Christenson, and despite his assertion that he reviewed the Bethlehem PIB, the Bethlehem PIB expressly includes the Continuation of Coverage language found in the Bethlehem PHMB as to life insurance after retirement:

> ### Life Insurance after Retirement
>
> **Any Employee who shall have retired and who shall have become entitled to life insurance after retirement pursuant to the provisions of the insurance agreement and booklet applicable to such Employee at the time of retirement shall not have such life insurance terminated or reduced** (except as provided in such booklet) so long as he or she remains retired from the Company, **notwithstanding the expiration of such agreement or booklet or of this Agreement, except as the Company and the Union may agree otherwise.**

Dkt. #121-5 at 99 (bold emphasis added).

With respect to the Continuation of Coverage provision as to retiree healthcare, the Bethlehem PIB expressly provides that retirees and their eligible dependents "will be enrolled for Company-paid hospital and physicians' services benefits **under the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses** unless you elect otherwise" (emphasis added), and further provides:

> ### *Hospital and Medical Coverage for Pensioners and Surviving Spouses*
>
> **If you retire** under the Company pension plan applicable to you on other than a deferred vested pension and at the time of such retirement have 15 or more years of continuous service, **you and your eligible dependents will be enrolled for Company-paid hospital and physicians' services benefits under the <u>Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses</u> unless you elect otherwise.** You may also elect optional major medical coverage under that Program, subject to deduction of premiums therefor from your pension checks. **You may obtain a copy of the booklet describing the above Program from the insurance office at the plant** or office where you work. If you are thinking of retiring you should ask for a copy of such booklet. In any event, you will be given a copy of the booklet shortly before you retire.

Dkt. #121-5 (emphasis added).

The Bethlehem PIB thus incorporates the Bethlehem PHMB as to retirees, and the Bethlehem PHMB in turn provides:

> Continuation of Coverage
>
> Any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise**.**

Bethlehem PHMB (Dkt. #126-18) at 57.

Plaintiffs deny that any of the allegations in this paragraph are material.

32.     In July 1992, FreightCar sent drafts of the dental insurance, life insurance, vision insurance, sickness and accident, severance, 401(k), and health insurance plans for active employees to the USW for its review and comment. Christenson Decl., ¶ 14 (SJ Ex. 1); Sokolow Dep. at 64:15-65:23 (SJ Ex. 41); Stump Dep. Ex. 8 (SJ Ex. 55.)

UNDISPUTED, WHOLLY IMMATERIAL, AND PARTLY STATES A CONCLUSION OF LAW. Plaintiffs do not deny that FreightCar sent drafts of documents describing the cited benefits to the USW. The question of whether the documents that FreightCar was drafting in

1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.  Plaintiffs note that FreightCar does not herein assert – and that the Stump Deposition cover letter exhibit cited herein (which appears in the record at Dkt. #121-55) does not reflect – that FreightCar sent the USW drafts of either the retiree health insurance SPD or the "last section which contained plan administration information that governed all of the plans in the Guide."  As FreightCar declarant Tom Garbedian explained on this point:

> The JAC Guide was a three-ring binder divided into several sections. Each section of the JAC Guide described a different employee benefit plan, except for the last section, which contained plan administration information that governed all of the plans in the Guide. The retiree medical SPD was a separate document which was designed to be given to employees upon their retirement and inserted into the JAC Guide.

Dkt. #121-16 ¶ 13.

Plaintiffs deny that the allegations in this paragraph are material.


33.     The draft medical and life insurance plans for active employees sent to the USW in July 1992 stated that those benefits would continue after retirement.  Christenson Decl., ¶ 15 (SJ Ex. 1.).  However, they did not suggest that medical or life insurance benefits were vested or that FreightCar had in any way agreed to limit its right to terminate these benefits.  Christenson Decl., ¶ 15 (SJ Ex. 1.).

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND PARTLY STATES A CONCLUSION OF LAW.   Plaintiffs do not dispute the first sentence, although Plaintiffs question why FreightCar repeatedly cites the averments of counsel to characterize written documents rather than citing the pertinent portions of the documents themselves.  Further, the question of whether the documents that FreightCar was sending in 1992-1993 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.  The statements in the second sentence are conclusions of law. Plaintiffs deny them and address the legal question of vesting in their accompanying brief and in their original summary judgment brief, which they incorporate herein.  Plaintiffs deny that any of these statements are material as they concern mere drafts.


34.     The July 1992 draft medical plan made clear that "benefits could be lost or delayed if…[t]he plan is modified to reduce or eliminate certain benefits" or "the plan ends."  Christenson Decl., ¶ 15 (SJ Ex. 1), *see also* Christenson Decl. Ex. F, Bates No. 4927 (SJ Ex. 7.)  Similarly, the July 1992 draft life insurance plan stated that "coverage could be lost or a payment to your beneficiary could be delayed if . . . [t]he plan, or part of the plan, ends[.]"  Christenson Decl., ¶ 15 (SJ Ex. 1), *see also* Christenson Decl. Ex. F, Bates No. 4978 (SJ Ex. 7.)

PARTLY DISPUTED, IMMATERIAL, AND PARTLY STATES A CONCLUSION OF LAW.
The question of whether the draft "made clear" the point advocated by FreightCar is a question
of law, not of fact.  Plaintiffs deny that any of these statements are material as they concern mere
drafts, not the final controlling documents.  Furthermore, with respect to retiree medical and life
insurance benefits, it was also immaterial what these drafts provided since under the Mirroring
Agreement and the mirrored Bethlehem PHMB, retiree benefits could not be "lost or delayed"
unless the Union so agreed.

35.     Upon receipt of the SPDs for the active employees, Sokolow contacted Ernie Esposito, a
        USW Staff Representative involved in the negotiation of the 1991 CBA, and asked that
        he and his bargaining committee review the July 1992 draft plans.  Sokolow Dep. at
        64:15-65:23 (SJ Ex.41.)  Sokolow's cover letter to Esposito, which accompanied the
        aforementioned active represented employees' plans, stated:

> As we have discussed, enclosed are SPDs for [FreightCar] for the dental
> plan, life insurance, vision plan and S&A benefits.  Also, the [medical],
> severance plan and 401(k) plan.  You need to review these with the
> Committee to make sure that this is what was negotiated, then you and I
> and the Committee can meet to determine what changes, if any, we wish
> to insist that the Company make.

        Stump Dep. Ex. 8 (SJ Ex. 55.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, PARTLY STATES A QUESTION OF
LAW. The question of whether the documents that FreightCar was drafting in 1992-93 were
"plans" as opposed to summary plan descriptions presents a question of law, not a question of
fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary
plan descriptions; Plaintiffs do not otherwise dispute this allegation.  These allegations
concerning a cover letter are immaterial.

36.     On July 31, 1992, after the plans were reviewed by Esposito, Sokolow, and other USW
        representatives, Sokolow wrote to Christenson to provide him with a "brief summary of
        the problems that the Committee ha[d] with the benefit books."  Sokolow Dep. at 65:7-
        65:23 (SJ Ex. 41); Christenson Decl., ¶ 16 (SJ Ex. 1.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND PARTLY STATES A QUESTION OF
LAW.  Plaintiffs do not deny that Mr. Sokolow sent a letter to Mr. Christenson on or about July
31, 1992.   The contents of letter itself speak for itself.  The question of whether the documents
that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions
presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on
their face that they were, draft summary plan descriptions.  Plaintiffs deny that the record
materials cited by FreightCar demonstrate that the referenced documents were reviewed by Mr.
Esposito or Mr. Sokolow.  The letter does not reflect that FreightCar provided the USW with

either the specific draft SPD provisions pertaining to retiree health insurance or the specific draft SPD provisions pertaining to guide administration.  Plaintiffs do not otherwise dispute this allegation, other than to note that the letter speaks for itself.  These allegations concerning a cover letter are immaterial.

37.     The USW requested, among other changes, that all of the plans be given "an effective date of October 28, 1991." Christenson Decl. Ex. G (SJ Ex. 8.)  They also wanted "all books to reference collective bargaining agreement as far as Company's right to amend or terminate the plan."  Christenson Decl. Ex. G (SJ Ex. 8.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND PARTLY STATES A QUESTION OF LAW.  The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.  The cited cover letter speaks for itself.  Plaintiffs deny that any of these allegations concerning a cover letter are material.

38.     Sokolow explained during his deposition in this case that the bargaining committee's request that the SPDs "reference collective bargaining agreement as far as Company's right to amend or terminate the plan" was intended to ensure that the terms of the collective bargaining agreements governed.  Sokolow Dep. at 90:21-92:10 (SJ Ex. 41.)

DISPUTED AND PARTLY IMMATERIAL.

Plaintiffs dispute that FreightCar in this one sentence has accurately summarized the testimony it has cited, which extends for almost two pages.  Mr. Sokolow testified as follows:

Q. That subject to collective bargaining agreement language [qualifying the Company's right to amend or terminate benefits], was that the language that you were asking to be put into the draft agreement?

A. I asked that they put in language that said subject to the collective bargaining agreement.

**Q. What was your intention when you asked to have that language put in there?**

**A. Oh, very simply that the collective bargaining agreement, not the summary plan description, is what's going to govern. That this collective bargaining agreement and any subsequent collective bargaining agreements, that's the only way that we can change any of these benefits, by mutual negotiations, either now or in the future.**

25

Q. If there was a conflict between the collective bargaining and the summary plan description, which document governs in your opinion?

A. No question about it; the collective bargaining agreement would govern.

**Q. If someone wanted to look for their rights to a certain benefit, what document would be the document they would be looking at?**

**A. Well, they would start with the collective bargaining agreement because that would specifically talk about their rights and that would be something that would be signed off on by both parties.**

Dkt. #121-41 at 91:5-92:10 (emphasis added).

Mr. Sokolow's full testimony on this specific point (and not FreightCar's characterization of that testimony) is material.  Mr. Sokolow's reference to "starting with the collective bargaining agreement" must be understood in terms of the CBA in effect at that time, the 1991 CBA.  The 1991 CBA **included** the Mirroring Agreement, as FreightCar has admitted:

The Mirroring Agreement was also known as Side Letter 22 of, incorporated in and made a part of the 1991 collective bargaining agreement by and between Johnstown America corporation (the "Company") and the United Steelworkers of America, AFL-CIO-CLC (the "Union") (the "1991 CBA").

FreightCar's Answer in <u>Deemer</u> (Dkt. #126-16) ¶ 44.

39.     After discussions with the USW, Christenson and consultants from Hewitt incorporated these and other suggested revisions into the draft plans.  Christenson Decl., ¶ 17 (SJ Ex. 1.)

PARTLY DISPUTED, PARTLY MATERIAL, AND PARTLY A QUESTION OF LAW.
Plaintiffs dispute this allegation to the extent that it states that FreightCar made any additional revisions "suggested" by the USW other than the ones specifically set forth in Mr. Sokolow's July 31, 1992 letter.  The cited paragraph in Mr. Christenson's Declaration states only that particular changes proposed by the USW in the July 31, 1992 letter were incorporated into the draft documents.  Dkt. #121-1 ¶ 17.  The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.  The allegation in this paragraph is material to extent that the 1993 SPD includes the "subject to collective bargaining" and "subject to the collective bargaining agreement" provisions.

40.     In January 1993, FreightCar forwarded final drafts of the active employees' welfare benefit plans to the USW for its review.  Christenson Decl., ¶ 20 (SJ Ex. 1.)  Sokolow wrote to Christenson on January 22, 1993 to inform him that the plans had been approved by the Union.  Christenson Decl., ¶ 20 (SJ Ex. 1.)  Specifically, Sokolow stated:

> In accordance with our recent phone conversation, I have double-checked with Staff Representative Ernie Esposito, and I believe that all of the SPD (Summary Plan Description) books have now been corrected to meet our expectations and specifications.

Christenson Decl. Ex. J (SJ Ex. 11.)

PARTLY DISPUTED, IMMATERIAL, STATES A CONCLUSION OF LAW.  The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions. Plaintiffs do not otherwise dispute these allegations, which are immaterial.

41.   The medical benefits offered to retirees were set forth in a separate document given to employees upon retirement.  Christenson Decl., ¶ 24 (SJ Ex. 1); Garabedian Decl., ¶ 16; Grove Dep. at 26:18-27:10 (SJ Ex. 40.)

DISPUTED IN PART AND IMMATERIAL.  Plaintiffs dispute the implication that no other documents described retiree medical benefits because, at the time of its drafting, the 1991 CBA, including the Mirroring Agreement, provided a contractual obligation to "mirror" the existing Bethlehem plans.  These plans included the Bethlehem PHMB with its Continuation of Coverage provision, as well as provisions of the Bethlehem PIB which describe retiree medical benefits. Bethlehem PHMB (Dkt. #126-18); Bethlehem PIB (Dkt. #121-5 at 89-90); see also Dkt. #121-14 at 36.

Plaintiffs point out significant doubt as to whether a separate document describing retiree medical benefits was distributed to retirees.  See Canini Aff (Dkt. #126-31) ¶ 9 (having attended retirement meetings with employees and management, no separate retiree medical insurance booklet was distributed).

Plaintiffs deny that these allegations are material.

42.   FreightCar sent drafts of the retiree medical plan to the USW in the fall of 1992 and discussed this plan with them in between the fall of 1992 and the spring of 1993. Christenson Decl., ¶ 21 (SJ Ex. 1); Sokolow Dep. at 62:21-63:14 (SJ Ex. 41); *see also* Christenson Decl. Ex. K (SJ Ex. 12.)

PARTLY DISPUTED, IMMATERIAL, PARTLY STATES A CONCLUSION OF LAW.  The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions. Plaintiffs do not otherwise dispute these allegations, which are immaterial.

43.    The draft retiree medical plan sent to the USW did not provide that retiree medical benefits were vested or would be provided for life.  Nor did it include the Continuation of Coverage provision found in the Bethlehem PHMB.  Christenson Decl., ¶ 21. (SJ Ex. 1.)

DISPUTED, IMMATERIAL, AND STATES CONCLUSION OF LAW.  Whether retiree medical benefits are vested is a question of law, as is the question of whether the referenced document is a plan or an SPD.  As Plaintiffs show in their accompanying summary judgment brief and in their opening summary judgment brief, retiree medical benefits are "vested" insofar as FreightCar may not unilaterally reduce or terminate them; they are not "vested for life" insofar as the USW could expressly agree in collective bargaining to reduce or terminate the benefits.  It is immaterial what was provided for in a draft SPD or other draft document.

Plaintiffs do not dispute that the draft SPD did not parrot the Continuation of Coverage language set forth in the Bethlehem PHMB.  However, Plaintiffs dispute that the draft did not include the Continuation of Coverage provision found in the Bethlehem PHMB in the broader sense that the draft necessarily followed the mirroring mandate in Side Letter 22 and can reasonably be read to require agreement prior to making changes to retiree benefits.

The allegations in the second sentence are immaterial because the document at issue is a mere draft.  In addition, as FreightCar repeatedly has admitted, including through its current counsel in this case, FreightCar was bound by the Mirroring Agreement through 1997.  See FreightCar Preliminary Injunction Brief at 25 (citing "the **undisputed fact** that before its abrogation in 1997, FreightCar had continuing obligations under Side Letter 22") (emphasis added); id. at 3 ("No matter where the burden is placed, the facts as confirmed by Magistrate Judge Mitchell in Deemer show that during the 1997 negotiations to reach a collective bargaining agreement, the Union and FreightCar eliminated the Retirees' purported right to medical benefits unless the Union and FreightCar agreed otherwise, and instead provided that these benefits could be changed, subject to collective bargaining"); id. at 14 (referencing "the parties' agreement to replace the Bethlehem PHMB with JAC's Employee Guide in 1997"); FreightCar's July 8, 2013 Illinois Complaint (Dkt. #126-10) ¶ 20 ("Pursuant to Side Letter 22, Johnstown America provided medical and life insurance benefits which mirrored the benefits provided by the Bethlehem plans from 1991 until 1997"); id. at heading between ¶¶ 20 & 21 ("Johnstown America and the USW Renegotiated the Agreement to Mirror Benefits in 1997 and Established that Retiree Medical and Life Insurance Benefits Would Be Provided Pursuant to Johnstown America's Employee Guide").  Given these admissions that FreightCar was bound by the Mirroring Agreement through 1997, it doesn't matter whether a draft document or the final 1993 SPD included the exact phrases that necessarily were mirrored.  No evidence suggests that the parties intended to relieve the Company of its obligation to continue to provide retiree insurance benefits except where union agreement is reached.

44.    During their discussions regarding the retiree medical plan, the USW never insisted that FreightCar provide vested benefits or that it incorporate language similar to the Continuation of Coverage provision found in Bethlehem's Pensioner's Insurance Agreement.  Christenson Decl., ¶ 21 (SJ Ex. 1.)

PARTLY DISPUTED AND WHOLLY IMMATERIAL.  Contrary to this allegation, USW sought and obtained incorporation of language similar to the Continuation of Coverage provision, *i.e.*, language stating that FreightCar could reduce or terminate benefits **only** pursuant to the parties' collective bargaining agreement and pursuant to collective bargaining.  See letter dated July 31, 1002 from Jerry Sokolow to Robert Christianson (Dkt. #126-28) (stating generally that "we want all books to reference collective bargaining agreement as far as Company's right to amend and or terminate the plan," and as to medical insurance specifically "Delete [purported reservation of rights provision] or subject to collective bargaining agreement."); 1993 SPD (Dkt. #126-26) at handwritten page number 6 (stating as follows with respect to employee health benefits "This plan is subject to the rights and obligations of collective bargaining.  The company may amend or terminate the plan only through this process"); 1993 SPD (Dkt. #126-23) at 14 (stating as to life insurance that coverage could be lost if "Subject to collective bargaining, the plan, or part of the plan, ends"); 1993 SPD (Dkt. #126-24) at 11 (stating as to all the SPDs in the overall 1993 SPD that "The plans are subject to the collective bargaining process"); 1993 SPD (Dkt. #126-24) at 16 (stating as to all the SPDs in the overall 1993 SPD that "Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part").  As explained in Plaintiffs' opening and accompanying summary judgment briefs, this Court, per Judge Diamond, as well as the Fourth Circuit, have equated language nearly identical to the Continuation of Coverage provision with language nearly identical to the "subject to collective bargaining" provisions in the 1993 SPDs, concluding that both preclude a company from unilaterally modifying or terminating benefits.

This allegation is immaterial because the USW had no need to "insist" on inclusion of a Continuation of Coverage provision identical to the one in the Bethlehem PHMB because that provision was already part of the parties' collectively bargained agreement pursuant to the Mirroring Agreement – Side Letter 22 to the 1991 and 1994 CBAs.  See the Mirroring Agreement (Dkt. #126-15); Bethlehem PHMB (Dkt. #126-18) at 57.  FreightCar affiant Mark Duray has attested (in an Affidavit proffered by FreightCar's current counsel in this case on September 19, 2013) that the Mirroring Agreement was carried forward in the 1994 CBA.  Dkt. #60-2 ¶ 9 ("Going into the 1997 negotiations, JAC set as a goal to eliminate the side letters which had accompanied the 1991 CBA (and been carried forward in the 1994 CBA)…"); see also id. ¶ 11 (referencing so-called "[a]brogation of the Mirroring Agreement in the 1997 negotiations…").

This point is made clear because the 1991 CBA was in full force in 1992-1993 and the 1991 CBA contained a no strike clause which precluded the Union from enforcing changes to the negotiated agreements, stating that "[d]uring the term of this Agreement neither the Union nor any Employee shall engage in or in any way encourage or sanction any strike or other action which shall interrupt or interfere with work or production at the Plant."  Dkt. 126-41 at 2.

The participants who addressed the drafts of the 1993 SPD did not view their work as "negotiations."  On the contrary, the purpose of the review was to develop booklets that would be simple enough for bargaining unit members to understand.  The booklets were intended to describe the same benefits that Bethlehem had provided, but in simple language.  The production of the booklets was not a "negotiation" and was not intended to be a "negotiation" because (1) the parties had already negotiated benefits terms, in the form of the pre-closing Mirroring

Agreement, Side Letter 22 to the 1991 CBA, which provided that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing."  There was no contract being negotiated in connection with the benefit books, and the bargaining committee was not authorized to change any of the mirrored Bethlehem benefits.  The document which resulted from this review, the 1993 SPD, provided the same benefits as the Bethlehem benefits, including protections for retiree coverage. August 18, 2014 Declaration of Joseph S. Canini ("August 18, 2014 Canini Decl.") (Ewing Decl. Ex. 13) ¶ 5.

Finally, the question of whether retiree medical benefits are "vested" is a question of law.

45.  Christenson sent a final draft of the retiree medical plan to the USW for its approval on March 26, 1993.  Christenson Decl., ¶ 22 (SJ Ex. 1.)

PARTLY DISPUTED AND IMMATERIAL.

The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.  This allegation is immaterial.

46.  Sokolow contacted Christenson on April 12, 1993 and informed him that the March 26, 1993 draft was acceptable to the USW.  Christenson Decl., ¶ 23 (SJ Ex. 1); Sokolow Dep. at 62:21-63:25 (SJ Ex. 41.)

UNDISPUTED AND IMMATERIAL.

47.  In addition to the active employee welfare plans and the retiree medical plan, FreightCar created a single plan administration document which was designed to govern the administration of all of the FreightCar welfare benefit plans.  Christenson Decl., ¶ 18 (SJ Ex. 1.)

PARTLY UNDISPUTED, IMMATERIAL, AND STATES A CONCLUSION OF LAW.  The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.

48.  The administration document contained a section expressly reserving FreightCar's rights, including its right to "end, suspend, or amend the plans at any time, in whole or in part," subject to collective bargaining.  Christenson Decl., ¶ 19 (SJ Ex. 1.)  The administration

section was reviewed by and discussed with the USW before it was ultimately approved in January 1993.  Christenson Decl., ¶ 20 (SJ Ex. 1.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND STATES CONCLUSIONS OF LAW. The 1993 SPD speaks for itself, and FreightCar's instant characterization of that document states a conclusion of law.  See Dkt. #126-24 at 11 (stating as to all the SPDs in the overall 1993 SPD that "The plans are subject to the collective bargaining process"); 1993 SPD (Dkt. #126-24) at 16 (stating as to all the SPDs in the overall 1993 SPD that "Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part"). Plaintiffs deny that any of the allegations in this paragraph are material.

49.     After the various welfare benefit plans were reviewed and approved by the USW, they were compiled into an employee handbook referred to as the JAC Employee Guide ("the JAC Guide").  Christenson Decl., ¶ 23 (SJ Ex. 1.)

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND STATES A CONCLUSION OF LAW. The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.  Plaintiffs deny that the allegations in this paragraph are material.

50.     The JAC Guide is a small three-ring binder divided into several sections.  Christenson Decl., ¶ 24 (SJ Ex. 1); Garabedian Decl., ¶ 13 (SJ Ex. 16.)  Each section of the JAC Guide described a different benefit plan, except for the last section, which provided the administrative information common to all of the plans.  Christenson Decl., ¶ 24 (SJ Ex. 2); Garabedian Decl., ¶ 13 (SJ Ex. 16.)  The retiree medical plan section was provided to employees upon their retirement to be inserted into the binder.  Christenson Decl., ¶ 24 (SJ Ex. 1); Garabedian Decl., ¶ 13 (SJ Ex. 16); Grove Dep. at 26:18-27:10 (SJ Ex. 40).

PARTLY DISPUTED, WHOLLY IMMATERIAL, AND STATES A CONCLUSION OF LAW. The question of whether the documents that FreightCar was drafting in 1992-93 were "plans" as opposed to summary plan descriptions presents a question of law, not a question of fact, and Plaintiffs aver that they were, and stated on their face that they were, draft summary plan descriptions.  Plaintiffs point out the significant doubt as to whether a retiree medical insert was provided to employees upon retirement.  See response to No. 41, above.  Plaintiffs deny that the allegations in this paragraph are material.

51.     The JAC Guide was distributed to the represented employees in May 1993. Christenson Decl., ¶ 26 (SJ Ex. 1); Jastrzab Aff., ¶ 2 (SJ Ex. 43.)  The JAC Guide was given an effective date of October 28, 1991, as agreed by FreightCar and the USW.  Christenson Decl., ¶¶ 17, 26 (SJ Ex. 1.)

UNDISPUTED AND IMMATERIAL.

31

52.     In its final form, as approved by the USW and distributed to the Johnstown Plant's represented employees, the relevant provisions in the JAC Guide provided as follows:

(a)     The Active Employee Medical Plan. While the medical plan only applied to "full-time represented employee[s]" and their dependents, it explained that "if you retire under [FreightCar's] pension plan for represented employees and have worked continuously at [FreightCar] for 15 or more years, you and your eligible dependents will be enrolled for retiree medical coverage under the medical plan." Christenson Decl. Ex. M at Bates No. 1290 (SJ Ex. 14.) The active medical plan informed the employees that they would "get detailed information and literature from the human resources department when [they] retiree." Christenson Decl. Ex. M, Bates 1290 (SJ Ex. 14.)

(b)     The Retiree Medical Plan.  The retiree medical plan given to eligible employees upon retirement explained that it "provide[d] coverage similar to the coverage [employees] had while [they] were active employees." Christenson Decl. Ex. N,  3 (SJ Ex. 15.) The retiree medical plan section did not suggest that benefits were vested or lifetime, it did not include a guarantee or promise that benefits would be provided for any particular duration, and it did not require that FreightCar obtain the USW's consent prior to terminating or amending the benefits provided to retirees. Christenson Decl., ¶ 21 (SJ Ex. 1.) To the contrary, the retiree medical plan explained that benefits could be lost or delayed if, "subject to the collective bargaining agreement, the plan is modified to reduce or eliminate certain benefits, or it ends." Christenson Decl. Ex. N, 33 (SJ Ex. 15.)

(c)     The Administration Section.  The administration section, which applied to both the active and retiree medical plans, did not state that employees or retirees were entitled to vested benefits or benefits for any particular duration. Christenson Decl., ¶ 24 (SJ Ex. 1.) The administration section also did not require FreightCar to obtain the USW's consent prior to amending or terminating retirees' medical or life insurance benefits. Christenson Decl., ¶ 24 (SJ Ex. 1.) To the contrary, the administration section stated:

Nothing in this guide says or implies that participation in these plans is a guarantee of continued employment with the company, nor is it a guarantee that benefit levels, the price of coverage, eligibility rules, or any other term or condition of the plans will remain unchanged in future years.

Christenson Decl. Ex. M, Bates 1369 (SJ Ex. 14.)

*    *    *    *    *

Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part.  This means the plans may be discontinued in part or in their entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented.  If any changes are made, you'll be notified.

Christenson Decl. Ex. M, Bates 1370 (SJ Ex. 14.)

PARTLY DISPUTED, PARTLY IMMATERIAL, AND STATES CONCLUSIONS OF LAW.  FreightCar's characterization of the "relevant" portions of the 1993 SPD states a conclusion of law, not a finding of fact, and Plaintiffs dispute that characterization. FreightCar's statements such as "the retiree medical plan section did not suggest that benefits were vested or lifetime" also state conclusions of law as opposed to facts, and Plaintiffs dispute these legal conclusions.  Plaintiffs do not dispute that quoted provisions are accurately quoted but state that these provisions must be read in context, and in connection with other provisions in the document.  Plaintiffs also point out significant doubt as to whether a retiree medical insert was provided to employees upon retirement. See response to No. 41, above.

Plaintiffs admit that some terms of the 1993 SPD are material but that document speaks for itself and FreightCar's characterizations and selective quotation from the SPD are not material.

53.     The JAC Guide administration section also provided that for the plans described therein, "Plan documents include[d] insurance contracts and copies of documents filed by the plan with the Internal Revenue Service or U.S. Department of Labor, life annual reports and plan descriptions."  Christenson Decl. Ex. M, Bates 1364 (SJ. Ex. 14.)

UNDISPUTED AND IMMATERIAL.  Plaintiffs do not dispute that the quoted provision is accurately quoted but state that the provision must be read in context, and in connection with other provisions in the document.

54.     While Side Letter 22 provided that FreightCar would create plans that mirrored the Bethlehem employee benefit plans in "all material respects," the USW stated that it "did not compare the Bethlehem agreement to the Johnstown America Employee Guide" after it was created.  USW-International Dep. ¶ 141:2-14 (SJ Ex. 44.)

DISPUTED AND IMMATERIAL.  FreightCar has selectively and inaccurately quoted from the 2002 deposition testimony of a USW Rule 30(b)(6) designee.  The witness testified:

A.  The Bethlehem agreement governs our –I mean, that's the Bible. The Bethlehem mirrored agreement is our Bible that we went and we continue to go by.

Q. And is it the union's position that the Bethlehem agreement and the Johnstown Employee Guide were supposed to be the same?

A. The Employee Guide was just a simple summary written in language that the employee could understand that was supposed to reflect exactly what the mirrored Bethlehem legal documents were.

Q. So is it the union's position that the Employee Guide was the same as the Bethlehem agreement but in more simple language?

A. We did not compare.  I mean, that was generated strictly by the company.

USW-International Dep. (Dkt. #121-44) at 140:14-25.  Plaintiffs deny that the selectively quoted and misquoted testimony set forth by FreightCar is material.

55.  FreightCar and the USW began negotiations in September 1994 to negotiate a successor agreement to the 1991 CBA.  McIver Decl., ¶ 13 (SJ Ex. 31.)  The parties did not discuss retiree medical and life insurance benefits in 1994.  McIver Decl., ¶ 13 (SJ Ex. 31.)

PARTLY DISPUTED AND IMMATERIAL.  Plaintiffs dispute the allegation that "the parties did not discuss retiree medical and life insurance benefits in 1994."  Mr. McIver, the FreightCar representative whose declaration FreightCar cites in support of this allegation, testified as follows about his effort in 1994 bargaining to eliminate various side letters, including the Mirroring Agreement:

Q.  Okay.  And then once the medical plan was implemented, pursuant to the mirroring agreement or Side Letter 22, was there any purpose to be served by retaining that Side Letter in subsequent collective bargaining agreements?

A.  No.  In fact, in 1994 I sought to have it removed, along with many others that I thought had sunsetted.  My term.

Q.  Did you express that position across the bargaining table; that it had sunsetted?

A.  Among other letters, yes.

Q.  Okay. Did you see a problem with retaining Side Letters where -- what did you mean by sunsetted, so that we have that clear?

A.  That the obligations created for the Company in the letter itself had been met.

Q.  Okay.

A.  And there was no purpose in having the letter retained.  Simply a clean-up effort to be frank.  It's just trying to get a big book into a little book.

McIver Dep. at 38:12-39:5.  Mr. McIver's testimony is consistent with the testimony of FreightCar Manager Joseph Canini, who worked in FreightCar's Human Resources Department

34

from November 15, 1993 through August 21, 2000.  Canini Aff.  (Dkt. # 126-31) ¶ 2.  Mr.
Canini was a member of FreightCar's bargaining team during 1994 bargaining.  Id. ¶ 6.  At his
deposition, Mr. Canini testified as follows with respect to 1994 negotiations:

> Q. And what were those discussions?
>
> A. They wanted to clean up the contract. They wanted to remove some of the
> letters.
>
> Q. Okay. And how did that pertain to health benefits?
>
> A. They insisted that the removal of, what number is it, 22? Somebody help me
> here.  The mirroring agreement, 22?
>
> Q. Right. That's Side Letter 22, uh-huh.
>
> A. Okay. They said it wasn't necessary to continue it. They just wanted to house
> clean the contract to make the contract as small -- as compact as they could. I
> was totally against removing any letters.  I was guaranteed, and now I'm a
> management employee, **I was guaranteed by Tex McIver that it was strictly
> house cleaning.  Mark Duray said, who was my boss now, told me there's no
> problem removing that letter.  Everything is guaranteed**.
>
> **Q. And what did you understand him to mean by saying everything is
> guaranteed?**
>
> **A. That the employees would not lose anything on their benefit package.**

Canini Dep. (Ewing Decl. Ex. 1) at 65:22-66:22 (emphasis added); see also Canini Aff. (Dkt.
#126-31) ¶ 6.

Furthermore, FreightCar cites Paragraph 13 of Mr. McIver's Declaration (Dkt. #121-31) to
support its claim that "the parties did not discuss retiree medical and life insurance benefits in
1994."  Yet Mr. McIver testified that a document reviewed by him and that he remembered
showed that during 1994 bargaining, the parties discussed the establishment of a joint committee
to review healthcare or provide alternatives.  McIver Dep. at 84:1-85:4.

Plaintiffs deny that any of the allegations in Paragraph 55 are material.


56.     The 1994 CBA does not reference either active employees' or retirees' welfare benefits.
        McIver Decl., ¶ 13 (SJ Ex. 31.)  The 1994 CBA also does not reference Side Letter 22,
        which the parties agreed was no longer binding.  McIver Decl., ¶ 14 (SJ Ex. 31.)

DISPUTED AND IMMATERIAL.  Like the 1991 CBA, the 1994 CBA **included** the Mirroring
Agreement – Side Letter 22 –as part of the parties' collectively bargained agreement, and the

Mirroring Agreement addressed retiree welfare benefits.  See Mirroring Agreement (Dkt. #126-15).  FreightCar affiant Mark Duray has attested (in an Affidavit proffered by FreightCar's current counsel in this case on September 19, 2013) that the Mirroring Agreement was carried forward in the 1994 CBA.  Dkt. #60-2 ¶ 9 ("Going into the 1997 negotiations, JAC set as a goal to eliminate the side letters which had accompanied the 1991 CBA (and been carried forward in the 1994 CBA)…").  Mr. Duray also averred that "[t]here was no change in the 1994 CBA that is pertinent to this case."  Id. ¶7.  Rather, Mr. Duray attested, the parties' so-called "[a]brogation of the Mirroring Agreement" occurred "in the 1997 negotiations…").  Id. ¶ 11.

The only support FreightCar offers for its claim that the parties "agreed" that Side Letter 22 was no longer binding in 1994 is paragraph 14 of Mr. McIver's Declaration, which states in full:

> By the time the 1994 negotiations began, the JAC Guide had been drafted, approved by the USW, and distributed to the represented employees.  Accordingly, the parties agreed during the 1994 negotiations that Side Letter 22 was no longer necessary because JAC had satisfied its obligations provided therein.  Contract proposals exchanged by the parties which evidence their agreement to delete Side Letter 22 are attached as McIver Declaration Exhibit C.

Dkt. #121-31 ¶ 14.  Creation and distribution of the 1993 SPD does **not** establish that FreightCar satisfied its obligations under the Mirroring Agreement.  The USW **never** agreed that FreightCar had satisfied its obligations by 1994, and FreightCar cites no record support whatsoever for this claim.  As shown above, FreightCar and its representatives have repeatedly admitted and averred that Side Letter 22 carried forward through the 1997 contract negotiations.  See, most notably, Mr. Duray's sworn statement proffered in the instant litigation at Dkt. #60-2 ¶ 9 ("Going into the 1997 negotiations, JAC set as a goal to eliminate the side letters which had accompanied the 1991 CBA (**and been carried forward in the 1994 CBA**)…") (emphasis added); FreightCar's July 8, 2013 Illinois Complaint (Dkt. #126-10) ¶ 20 ("Pursuant to Side Letter 22, Johnstown America provided medical and life insurance benefits which mirrored the benefits provided by the Bethlehem plans from 1991 until 1997"); id. at heading between ¶¶ 20 & 21 ("Johnstown America and the USW Renegotiated the Agreement to Mirror Benefits in 1997 and Established that Retiree Medical and Life Insurance Benefits Would Be Provided Pursuant to Johnstown America's Employee Guide"); id. ¶ 24 ("The 1997 CBA expressly referred to a number of side letters from earlier collective bargaining agreements…The 1997 CBA did not incorporate Side Letter 22 by reference, resulting in the abrogation of that agreement by the parties"); id. ¶ 27 ("In short, the parties agreed in the 1997 CBA to eliminate the mirroring agreement in Side Letter 22 and to instead provide that the provisions of the Johnstown America Employee Guide would govern retiree medical and life insurance benefits"): FreightCar's September 19, 2013 Preliminary Injunction Brief (Dkt. #63) at 25 (citing "the undisputed fact that before its abrogation in 1997, FreightCar had continuing obligations under Side Letter 22"); see also FreightCar's Answer in Deemer (Dkt. #126-16) ¶ 47 ("the Mirroring Agreement was abrogated effective November 1, 1997, when the Company and the Union negotiated and agreed to replace the Mirroring Agreement with the JAC's Employee Guide as the document governing, *inter alia,* employee and pensioner health care and life insurance benefits.").

The "contract proposals" referenced by Mr. McIver in Paragraph 14 of his Declaration and proffered by FreightCar at Dkt. #121-34 contain no description of their use, meaning or outcome. Any suggestion that the Mirroring Agreement had already been abrogated by 1994 is belied by Mr. Duray's sworn statement and other facts just cited which make clear that the Mirroring Agreement was continued in the 1994 CBA.

Plaintiffs deny that FreightCar's allegations in this Paragraph are material.

57.     In 1997, FreightCar's goal during collective bargaining was to ensure that the parties' agreement reflected the fact that FreightCar did not operate under the "basic steel" type of contract the USW had previously negotiated with Bethlehem as part steel industry coordinated bargaining.  McIver Decl., ¶ 15 (SJ Ex. 31.)

DISPUTED AND IMMATERIAL.  Since this matter commenced in 2002 and continuing through 2013, FreightCar has repeatedly and consistently stated that its "goal" in 1997 bargaining was to eliminate the Side Letters.  In the sworn statement of Mr. Duray, proffered by FreightCar on September 19, 2013, Mr. Duray averred:  "Going into the 1997 negotiations, JAC set as a goal to eliminate the side letters which had accompanied the 1991 CBA (and been carried forward in the 1994 CBA)…."  Dkt. #60-2 ¶ 9.  Mr. Duray's 27-paragraph Affidavit included no reference whatsoever to anything akin to basic steel type contracts or steel industry coordinated bargaining.  See Dkt. #60-2 ¶¶ 1-27.  In its September 18, 2013 Preliminary Injunction Brief, FreightCar likewise represented as follows:  "Going into the negotiation over the 1997 CBA, FreightCar set as a goal to eliminate the side letters which had accompanied the 1991 CBA (including Side Letter 22)."  Dkt. #59 at 23.  Nowhere in its 49-page brief does FreightCar allude to basic steel type contracts or coordinated bargaining, rather in connection with its "goal" in 1997 bargaining or otherwise.  What is undisputed is that the subject of the duration of retiree health benefits never came up in 1997 negotiations.   See also Judge Cindrich's summary judgment ruling in Deemer ("Deemer SJ Ruling") (Dkt. #126-3) at 2 (citing Supp. Palm Decl. (Ewing Decl. Ex. 2) ¶ 2).

Plaintiffs deny that FreightCar's "goal" in 1997 bargaining is material.

58.     To clarify that FreightCar was not operating under a basic steel agreement, the 1997 CBA included a "zipper clause," which stated:

> This Agreement and the documents expressly referred to herein are the only documents by which the parties intend to be contractually or statutorily bound.  Any document not expressly referred to herein that may be brought forth by either the Company or the Union after ratification of this Agreement may be included as part of this Agreement, provided both parties agree to its inclusion

Howard Decl. Ex. C, p.73 (SJ Ex. 20.)

37

PARTLY DISPUTED AND IMMATERIAL.  Plaintiffs dispute that the 1997 CBA included a zipper clause in order to "clarify that FreightCar was not operating under a basic steel agreement," and FreightCar offers absolutely no record support for this claim.  The cited record material is merely the 1997 CBA, which does not include any statement as to why the quoted clause was included.  Plaintiffs do not dispute that the quoted language appears in the 1997 CBA.  It is also undisputed that the subject of the duration of retiree health benefits never came up in 1997 negotiations.   See also Deemer SJ Ruling at 2, citing Supp. Palm Decl. ¶ 2 (Ewing Decl. Ex. 2) Plaintiffs deny that the purpose for including the quoted language in the 1997 is material.

59.    Among the "documents expressly referred to" in the zipper clause were "Summary Plan Descriptions," Howard Decl. Ex. C, p.73 (SJ Ex. 20), which included all of the plans set forth in the JAC Guide.  McIver Decl., ¶ 16 (SJ Ex. 1.)

PARTLY DISPUTED, IMMATERIAL, AND STATES A CONCLUSION OF LAW.
FreightCar  attempts to have it both ways within the single sentence of this allegation, equating the "Summary Plan Descriptions" which Plaintiffs do not dispute were referenced in the 1997 CBA with "the plans set forth in the JAC Guide."  Whether the JAC Guide documents are "plans" is a question of law.  Plaintiffs deny that the allegations in this sentence are material.

60.    The 1997 CBA also included a separate appendix that expressly stated that welfare benefits were to be provided under the JAC Guide.  Howard Decl. Ex. C, p. 90 (SJ Ex. 20.)  Appendix 9 stated:

> The parties agree that employees shall be eligible for insurance and other benefits as set forth in "JAC's Employee Guide" for Represented P&M employees, as amended during the negotiations which preceded the execution of the collective bargaining agreements.

Howard Decl. Ex. C, p.90 (SJ Ex. 20.)

UNDISPUTED AND MATERIAL.

61.    The 1997 CBA did not incorporate Side Letter 22 through the zipper clause or anywhere else.  McIver Decl., ¶ 16 (SJ Ex. 1.)  The 1997 CBA also did not provide or suggest that retirees' benefits were vested, would be provided for any particular duration, or could only be terminated or amended with the USW's consent. McIver Decl., ¶ 18 (SJ Ex. 1.)

DISPUTED, IMMATERIAL, AND STATES CONCLUSIONS OF LAW.

FreightCar Benefit Administrator Glenn Grove testified:

> And, did you have an understanding prior to the 1997 bargaining that one of JAC's purposes was to change anything that had to do with the Bethlehem agreement?
>
> A. No.

> Q. After the 1997 bargaining, after the contract was completed, did anything change with regard to how Bethlehem retirees were treated with regard to the medical benefits?
>
> A. No.

Grove Dep. (Ewing Decl. Ex. 8) at 19.  It is also undisputed that the subject of the duration of retiree health benefits never came up in 1997 negotiations.   See also Deemer SJ Ruling at 2 (citing Supp. Palm Decl. ¶ 2).

In addition, the bargainers recognized that FreightCar had been wholly unsuccessful in achieving benefit reductions in 1997 bargaining.  In a 55-page decision by National Labor Relations Board Administrative Law Judge David Evans, In re Johnstown America Corp., 2003 WL 1831898 (NLRB Div. of Judges, April 4, 2003), Judge Evans concluded:

> As Duray testified, during the 1997 negotiations the Respondent had strenuously attempted to reduce its trailing and legacy costs (again, costs that were incurred by payments to retirees and laid-off employees).  The Union's bitter opposition and its possession of significant bargaining power in 1997 (most probably because of better economic conditions) prevented the Respondent from securing those reductions during those negotiations.

Dkt. #121-48 at 37.

Plaintiffs dispute that the parties agreed in 1997 or at any earlier time to eliminate the protections for retiree insurance benefits requiring a collectively bargained agreement with the union before any alterations could be made. There is simply no record evidence of any such intent.

As to the written agreement, the 1997 CBA provided that "employees shall be eligible for insurance and other benefits as set forth in 'JAC's Employee Guide,'" the 1993 SPD.  The 1993 SPD in turn mirrored the Bethlehem PHMB, as it was bound to do by the collectively bargained 1991 Mirroring Agreement.  The Bethlehem PHMB includes the Continuation of Coverage provision:

> **Continuation of Coverage**
>
> Any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise**.**

Bethlehem PHMB (Dkt. #126-18) at 57.  The mandated mirroring was achieved through various provisions in the 1993 SPD, including in Dkt. #126-26 at handwritten page number 6 (stating as

follows with respect to employee health benefits "This plan is subject to the rights and obligations of collective bargaining.  The company may amend or terminate the plan only through this process"); see also 1993 SPD (Dkt. #126-23) at 14 (stating as to life insurance that coverage could be lost if "Subject to collective bargaining, the plan, or part of the plan, ends"); 1993 SPD (Dkt. #126-24) at 11 (stating as to all the SPDs in the overall 1993 SPD that "The plans are subject to the collective bargaining process"); 1993 SPD (Dkt. #126-24) at 16 (stating as to all the SPDs in the overall 1993 SPD that "Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part").  Thus, FreightCar had no unilateral right to modify or terminate retiree medical benefits, but could do so only in conjunction with the USW in collective bargaining.  FreightCar's contentions (such as its assertions that benefits were not "vested") are conclusions of law, not facts, material or otherwise.

### The Steelworkers Health and Welfare Fund

62.     Prior to the 1997 negotiations, the active employee and retiree medical benefits described in the JAC Guide were administered by Blue Cross Blue Shield pursuant to an insurance contract and indemnity agreement with FreightCar ("the BCBS Insurance Agreement"). USW-International Dep. at 219:2-8 (SJ Ex. 44.)

UNDISPUTED AND IMMATERIAL.

63.     During the 1997 negotiations, the USW proposed that FreightCar provide employee and retiree medical benefits through the Steelworkers Health and Welfare Fund Point-of-Service Plan ("the SHWF Plan").  USW-International Dep. at 19:20-20:6 (SJ Ex. 44.)

UNDISPUTED AND IMMATERIAL.

64.     The SHWF Plan required the participants to obtain services from a network hospital or doctor.  USW-International Dep. at 19:4-25 (SJ Ex. 44.)

UNDISPUTED AND IMMATERIAL.

65.     There were savings associated with switching from the indemnity plan to the SHWF Plan.  USW-Local Dep. at 57:20-60:2 (SJ Ex. 45.)

UNDISPUTED AND IMMATERIAL.

66.     The USW proposed and agreed to the SHWF Plan because the savings would be passed on to the active employees in the form of higher wages and more generous benefits. USW-Local Dep. at 57:20-60:2 (SJ Ex. 45.)

PARTLY DISPUTED AND IMMATERIAL.  FreightCar has summarized and oversimplified almost three pages of testimony in a single sentence.  Plaintiffs would refer the Court to the cited testimony.  See, e.g., Dkt. #121-45 at 59:10-17 ("Q. Because you would get some increases somewhere else in wages or something else?  A. That would be -- that's negotiations.  There's only so much on the table and it's a give and take; and there was a cost savings to the company.  We kind of knew with the cost savings that we could recoup some of that and put it into some other areas of the contract.")  Plaintiffs deny that these allegations are material.

67.     FreightCar agreed to the proposed SHWF Plan and the parties executed a Steelworkers Health and Welfare Fund Participation Agreement ("the Participation Agreement") in 1998.  McIver Decl., ¶ 21 (SJ Ex. 31.)

UNDISPUTED AND IMMATERIAL.

68.     Under the SHWF Participation Agreement, FreightCar was required to make fixed monthly contributions to the SHWF Fund on behalf of each employee and retiree. McIver Decl., ¶ 21 (SJ Ex. 31.)

UNDISPUTED AND IMMATERIAL.

69.     The fund contributions were used to secure insurance coverage through the Select Blue Point-of-Service plan. McIver Decl., ¶ 21 (SJ Ex. 31.)

UNDISPUTED AND IMMATERIAL.

70.     The terms of the insurance coverage were contained in the SHWF Plan Document and the Summary Plan Description of the Medical and Vision Care Benefits for Johnstown America Corporation ("the SHWF Plan SPD").  McIver Decl., ¶ 20 (SJ Ex. 31.)

DISPUTED, IMMATERIAL, AND STATES A CONCLUSION OF LAW.  Under the express terms of the 1997 CBA:

        The parties agree that employees shall be eligible for insurance and other benefits as set forth in "JAC's Employee Guide" for Represented P&M employees, as amended during the negotiations which preceded the execution of the collective bargaining agreements.

Dkt. #121-20 at 90.  The extent to which the "terms of the insurance coverage" were or were not contained in the various documents is a question of law, and this question is not material.

71.     The SHWF SPD was distributed to the employees and retirees.  USW-International Dep. at 50:18-21 (SJ Ex. 44.)

UNDISPUTED AND IMMATERIAL.

72.     These two documents described the active employee and retiree benefits in detail, but they did not provide that benefits were vested, that the benefits would be provided for a particular duration, or that participating employers' were required to obtain the USW's consent prior to modifying the benefits provided to retirees.  McIver Decl., ¶ 22 (SJ Ex. 31.)

UNDISPUTED, IMMATERIAL, AND STATES A CONCLUSION OF LAW.  Interpretation of the terms of the cited documents presents a question of law, not of material fact.  It is immaterial what was stated in the SHWF SPD.  Plaintiffs admit that vesting obligations are contained in collectively bargained agreements between the employer and the union, not Health and Welfare Fund documents.  FreightCar has asserted that the 1993 SPD is the controlling document, averring that "effective November 1, 1997…the Company and the Union negotiated and agreed to replace the Mirroring Agreement with the JAC's Employee Guide as the document governing, *inter alia,* employee and pensioner health care and life insurance benefits."  FreightCar's Answer in <u>Deemer</u> (Dkt. #126-16) ¶ 47; see also FreightCar's Illinois Complaint (Dkt. #126-10) ¶¶ 27 ("In short, the parties agreed in the 1997 CBA to…provide that the provisions of the Johnstown America Employee Guide would govern retiree medical and life insurance benefits").  Also, the question of whether retiree medical benefits are "vested" is a question of law.

*The 2001 Collective Bargaining*

73.     In September 2001, FreightCar and the USW began negotiations to reach a successor agreement to the 1997 CBA.  Howard Decl., ¶ 4 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

74.     FreightCar explained during these negotiations that its primary goal was to reduce trailing benefits and legacy costs, such as retiree welfare benefits.  Howard Decl., ¶ 4 (SJ Ex. 17.)

DISPUTED IN PART AND IMMATERIAL.  In its discussion of 2001 bargaining, FreightCar cites repeatedly to the transcript of proceedings that resulted in a 55-page decision concerning the 2001 bargaining authored by National Labor Relations Board Administrative Law Judge David Evans.  FreightCar also has proffered and relied on the decision itself as record evidence.

See Dkt. #121-48 (In re Johnstown America Corp., 2003 WL 1831898 (NLRB Div. of Judges, April 4, 2003)); FreightCar Statement of Facts Nos. 88 and 105 (relying on In re Johnstown America Corp.).

In the NLRB ruling, Judge Evans thoroughly reviewed the bargaining, both as to retiree healthcare and other issues, and concluded, among other things, that FreightCar engaged "in a course of overall bad faith bargaining with the Union during contract negotiations." Dkt. #121-48 at 54. With respect to FreightCar's goal of reducing trailing benefits and legacy costs, Judge Evans concluded as follows:

> As Duray testified, during the 1997 negotiations the Respondent had strenuously attempted to reduce its trailing and legacy costs (again, costs that were incurred by payments to retirees and laid-off employees). The Union's bitter opposition and its possession of significant bargaining power in 1997 (most probably because of better economic conditions) prevented the Respondent from securing those reductions during those negotiations. As the economy deteriorated, and more unit employees were laid off, the Respondent assuredly came to realize that its relative bargaining power had increased and that it might achieve in 2001 what it had failed to achieve in 1997. At no point, however, could the Respondent have imagined that the Union would lie down and meekly accept extensive proposals that were as radically disadvantageous as those that the Respondent proposed herein. In fact, the Respondent offered evidence that the 2001 Local Union officers had campaigned on a platform of no give-backs, and the Respondent assuredly knew from that factor that negotiations would be difficult. That is, long before mid-August, the Respondent necessarily knew that it was going to make proposals that would require a great deal of time to negotiate (if not cause a strike). Nevertheless the Respondent substantially delayed the initial bargaining session in an obvious effort to send bargaining beyond the October 31 expiration date of the 1997 contract and thus put the pressure on the employees, and on the Union, that is inherent in the loss of current contractual coverage.

Dkt. #121-48 at 37.

Plaintiffs deny that FreightCar's stated goal in 2001 bargaining is material.


75.     FreightCar explained to the USW that retiree welfare benefits had become particularly burdensome because Bethlehem's unanticipated bankruptcy filing in 2001 prevented it from fulfilling its obligation under the 1991 purchase and sale agreement to reimburse FreightCar for the cost of certain retirees ("the reimbursable retirees") welfare benefits. USW-International Dep. at 89:12-90:17 (SJ Ex. 44.)

UNDISPUTED AND IMMATERIAL.

76.   At the time of the 2001 negotiations, the present value of these benefits for accounting purposes was approximately $30 million.  Karan Aff., ¶ 5 (SJ Ex. A.)

UNDISPUTED AND IMMATERIAL.

77.   FreightCar explained to the USW that the cost of these benefits had grown to over $1,200,000 per year.  Howard Decl., ¶ 9 (SJ Ex. 46.)

UNDISPUTED AND IMMATERIAL.

78.   During the 2001 negotiations, FreightCar presented its first economic proposal to the USW on October 25, 2001.  Howard Decl., ¶ 6 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

79.   The October 25th proposal included two provisions designed to limit FreightCar's retiree medical benefit costs. Howard Decl., ¶ 6 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

80.   With respect to both the current and future reimbursable retirees, Paragraph (9) of FreightCar's first economic proposal provided that if Bethlehem failed to reimburse FreightCar for these retirees' medical benefits, the cost of such benefits would become the responsibility of the individual reimbursable retirees.  Howard Decl. Ex. F, ¶ 9 (SJ Ex. 23.)

UNDISPUTED AND IMMATERIAL.

81.   For all other current and future retirees, Paragraph (8) of the proposal would have capped FreightCar's responsibility for these retirees' premium contributions at the rates in effect as of January 1, 2002.  Howard Decl. Ex. F, ¶ 8 (SJ Ex. 23.)

UNDISPUTED AND IMMATERIAL.

82.   After receiving the October 25, 2001 economic proposal and reviewing the provisions addressing retirees' benefits, the USW informed FreightCar that it did not know if it was

authorized to negotiate on behalf of past retirees.  NLRB Hearing Tr. at 110:2-111:17 (SJ Ex. 47.)

PARTLY DISPUTED AND IMMATERIAL.  FreightCar has characterized almost two pages of testimony in a single sentence, oversimplifying the testimony.  Mr. Jastrzab testified in pertinent part as follows in the transcript pages cited by FreightCar:

> I told the company, Mr. McDermott, the representative of the company, that I wasn't sure whether I represented these employees, they didn't pay union dues, and although, you know, there were issues that were mandatory to be discussed, there was other issues that we could discuss permissive, and I thought that if I were to agree with the company, that they could stop paying healthcare for these - - by the way, it was 220 of them, approximately, 220 retirees, that were former Bethlehem Steel and retired from Johnstown America, within the last, I am going to say ten years, and they were proposing not paying their healthcare, I told Mr. McDermott that I thought maybe this group of people could actually sue the union; that we weren't their bargaining agent, they weren't paying union dues to us, and that I was, you know, "reluctant even to discuss this with you." But he said that he would take a look at that, and I told him I was going to have our legal department advise me on that.

Dkt. #121-47 at 111:2-17.  Further, Mr. Jastrzab testified that he told FreightCar's negotiator as follows with respect to FreightCar's proposal to eliminate Class members' retiree medical benefits:

> A. I recall Mr. McDermott stating that Bethlehem Steel was paying for healthcare benefits for employees who were 43 years old or older on the day of the sale, and that they were making quarterly payments; I recall him saying that they had stopped making these payments in June of 2001, I don't recall whether he said it was the last payment they got was in June, or that was the month that they owed them for, and that they were continuing to pay for this, but that it was very costly, and that if Bethlehem didn't make the payments, they were going to stop paying. And I voiced my opposition to that, and said that the contract is with the United Steelworkers of America, and not Bethlehem Steel, and he had an obligation, or the company had an obligation to pay this premium, and if Bethlehem Steel was stiffing them, that was a problem they should take up with Bethlehem Steel, not with the employees. That they had an obligation to pay that healthcare. And he didn't agree with that.

NLRB Transcript (Ewing Decl. Ex. 10) at 312:24-313:7.

83.     At the NLRB proceeding the USW would ultimately file, the lead negotiator for the USW during the 2001 negotiation testified as follows with respect to FreightCar's first economic proposal:

> I told the company . . . that I wasn't sure whether I represented these employees, they didn't pay union dues, and although, you know, there

were issues that were mandatory to be discussed, there were other issues the we could discuss permissively, and I thought that if I were to agree with the company, that they could stop paying healthcare for these [retirees] . . . I thought maybe this group of people could actually sue the union; that we weren't their bargaining agent, they weren't paying union dues to us, and that I was, you know, "reluctant even to discuss this with you."

NLRB Hearing Tr. at 110:2-111:17 (SJ Ex. 47.)

UNDISPUTED AND IMMATERIAL.

84.     The USW informed FreightCar during the October 25, 2001 meeting that it would discuss whether it represented the retirees with its legal department.  NLRB Hearing Tr. at 110:2-111:17 (SJ Ex. 47.)

UNDISPUTED AND IMMATERIAL.

85.     The next time the parties discussed paragraphs (8) and (9) of FreightCar's October 25 proposal was during their November 14, 2001 bargaining session.  Howard Decl., ¶ 8 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

86.     During November 14 negotiations the USW asked for clarification with respect to FreightCar's intention to eliminate the benefits of the then-retired reimbursable retirees and cap its premium contributions for the non-reimbursable retirees.  Howard Decl., ¶ 8 (SJ Ex. 17.)  The USW also asked that FreightCar tell them which reimbursable retirees would be affected. Howard Decl., ¶ 8 (SJ Ex. 17.)  FreightCar asked whether the USW represented retired individuals.  Howard Decl., ¶ 8 (SJ Ex. 17.)  The USW responded by stating that it did not represent the retirees.  Howard Decl., ¶ 8 (SJ Ex. 17.)

 UNDISPUTED AND IMMATERIAL.

87.     FreightCar explained during the November 14 meeting that the reimbursable retirees' benefits represented a $1.2 million yearly liability that FreightCar had not anticipated or budgeted for, and that this liability had the potential to significantly impact the negotiations.  Howard Decl., ¶ 9 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

88.      After FreightCar announced at the November 14 negotiations that it was stopping
insurance coverage for the reimbursable retirees, the USW did not object because they
felt that the USW did not represent them.  *In re Johnstown America Corp.*, N.L.R.B. Case
6-CA-32504, at 18:35-40 (SJ Ex. 48.)

UNDISPUTED AND IMMATERIAL.  Plaintiffs do not dispute that the NLRB judge found this
fact with respect to what occurred during negotiations on November 14, 2001.  The bargaining in
2001 involved a number of significant concessionary proposals in addition to the proposals
addressed to retiree medical insurance benefits.  Plaintiffs here set forth the NLRB' key findings
and pertinent NLRB testimony.

With respect to FreightCar's October 25, 2001 proposal, Judge Evans found:

> The Respondent proposed that (the approximately 220) retirees who had been
> employed by Bethlehem Steel, and on whose behalf Bethlehem Steel was
> making quarterly contributions to the Respondent's health insurance costs, would
> be responsible for those contributions if Bethlehem Steel failed to make its
> payments. Jastrzab testified that McDermott told the Union's committee that
> Bethlehem Steel was having financial troubles, that the Respondent was
> concerned that Bethlehem Steel may not be able to make future payments and
> that those factors were the reasons for the proposal. Jastrzab told McDermott that
> he was not sure that the Union represented those employees and that he would
> respond later.

NLRB Ruling (Dkt. #121-48) at 14.

With respect to the October 29, 2001 bargaining session, Mr. Jastrzab testified:

> On No. 9, that was the one where they were proposing not having to pay the
> healthcare insurance of former Bethlehem Steel employees, who were 43 years
> old, we rejected that proposal, and we said that we, as the Steelworkers, and our
> main organization, would do everything, we would endeavor to do everything
> possible, to prevent Bethlehem Steel from not paying them.

NLRB Transcript (Ewing Decl. Ex. 10) at 136:18-23.

With respect to the November 14, 2001 bargaining session, Mr. Jastrzab testified:

> A. I recall Mr. McDermott stating that Bethlehem Steel was paying for Healthcare
> benefits for employees who were 43 years old or older on the day of the sale, and
> that they were making quarterly payments; I recall him saying that they had
> stopped making these payments in June of 2001, I don't recall whether he said it
> was the last payment they got was in June, or that was the month that they owed
> them for, and that they were continuing pay for this, but that it was very costly,
> and that if Bethlehem didn't make the payments, they were going to stop paying.
> And I voiced my opposition to that, and said that the contract is with the United

Steelworkers of America, and not Bethlehem Steel, and he had an obligation, or the company had an obligation to pay this premium, and if Bethlehem Steel was stiffing them, that was a problem they should take up with Bethlehem Steel, not with the employees. That they had an obligation to pay that healthcare. And he didn't agree with that.

Q. Was there some later discussion about whether that subject should be one that would continue to be bargained over at the bargaining table?

A. He put it in the form for proposal, and I think I testified to the fact, I said that I questioned whether we bargained for retirees that were already retired and receiving healthcare benefits, whether I could actually bargain across the table at Johnstown America, and agree to take healthcare away from them, or not pay for their healthcare. And I believe his response was, "Okay. Then we will just take it off the table."

Q. And you are saying that Mr. McDermott took that issue off the table?

A. Yes, that's what he said, "I will take that off the table, "something like that.

Q. And was that something that the union asked him to do; do you recall how that came about?

A. I don't recall asking him to take it off. I recall saying that I didn't know whether it was legal for me to be negotiating for them, especially give backs. I told him, I remember saying, "I have no problem negotiating benefit increases for them, but as soon as I negotiate a give back for them, they are going to sue me." So I didn't know whether it was proper for me to be discussing taking healthcare off of retirees. And his response to me was, "Okay. Then we will just take that off the table," something like -- yeah, that's exactly what he said, "We will just take that off the table."

NLRB Transcript (Ewing Decl. Ex. 10) at 119:17-121-12.

The NLRB relied on the following testimony of FreightCar witness and attorney Joseph McDermott as to bargaining on November 29, 2001:

McDermott further testified that, when the parties were discussing the Respondent's proposal that retirees pay portions of their health insurance premiums that Bethlehem Steel failed to pay, members of the Union's committee stated that they did not want to take to the membership for a ratification vote any proposal that would adversely affect retirees.

NLRB Ruling (Dkt. #121-48) at 21.

As to the December 18, 2001 bargaining session, the NLRB found as follows:

> The Respondent continued to propose that any failure of Bethlehem Steel to pay its share of retirement costs of some retirees (i.e., those who were working for Bethlehem, and who had reached age 43, when the Respondent purchased the facility) would also be the responsibility of those retirees. The Union· continued to propose that the Respondent pay all increases during the life of the successor contract and that the Respondent pay whatever Bethlehem Steel did not.

NLRB Ruling (Dkt. #121-48) at 28.

As to the June 7, 2002 bargaining session, the NLRB found as follows: "on June 7, [FreightCar] increased its offer to pay insurance premiums that Bethlehem Steel was refusing to pay."  NLRB Ruling (Dkt. #121-48) at 34.

Plaintiffs deny that any of these findings of fact are material.

89.    On November 28, 2014, FreightCar tendered its "Fourth Draft of Employer Proposal for Agreement" ("the Fourth Draft Proposal"), which was its first plenary proposal.  Howard Decl., ¶ 10 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

90.    FreightCar's Fourth Draft Proposal incorporated its October 25 economic proposals relating to retirees' medical benefits.  Howard Decl., ¶ 10 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

91.    Article XIX, Section 1(f) of the Fourth Draft Proposal provided with respect to the non-reimbursable retirees that:

> All current and future retirees not eligible to retire under the eligibility criteria as described in the 1991 Agreement of Purchase and Sale will be provided a managed care healthcare plan, whereby the Employer will make the premium contributions at the rates in effect as of January 1, 2002, with any increases in the costs of such premiums being the responsibility of the individual retirees.

Howard Decl. Ex. H, p.33 (SJ Ex. 25.)  Article XIX, Section 1(g) provided with respect to the reimbursable retirees that:

> The Employer will continue its contributions toward existing and future retiree healthcare benefits for retirees for whom the cost of such coverage is the responsibility of Bethlehem Steel under the 1991 Agreement of

> Purchase and Sale at the rates in effect as of January 1, 2002.  If
> Bethlehem Steel fails to fulfill its responsibility for these benefits, the
> costs of such benefits will be the responsibility of the individual retirees.

Howard Decl. Ex. H, p.33 (SJ Ex. 25.)

UNDISPUTED AND IMMATERIAL.

92.    After FreightCar tendered its Fourth Draft Proposal it again explained that the
       reimbursable retirees' benefits represented an unanticipated $1.2 million per year
       liability.  Howard Decl., ¶ 11 (SJ Ex. 17.)  FreightCar asked the USW whether the active
       employees were prepared to agree to $1.2 million per year in concessions to enable
       FreightCar to continue these payments.  Howard Decl., ¶ 11 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

93.    When the USW reviewed the Fourth Proposal with FreightCar during the parties'
       November 29, 2014 negotiation session, the USW informed FreightCar that it did not
       believe that past retirees' benefits were a proper subject of collective bargaining.  Howard
       Decl., ¶ 12 (SJ Ex. 17.)

DISPUTED AND IMMATERIAL

The NLRB cited and relied on the following testimony of FreightCar witness and attorney
Joseph McDermott as to bargaining on November 29, 2001:

> McDermott further testified that, when the parties were discussing the
> Respondent's proposal that retirees pay portions of their health insurance
> premiums that Bethlehem Steel failed to pay, members of the Union's committee
> stated that they did not want to take to the membership for a ratification vote any
> proposal that would adversely affect retirees.

NLRB Ruling (Dkt. #121-48) at 21.

94.    The USW asked that FreightCar remove Section 1(f) and Section 1(g) from the proposed
       collective bargaining agreement.  Howard Decl., ¶ 12 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

95.    FreightCar agreed to take the proposals relating to then-current retirees out of the draft
       agreement, but it informed the USW that it intended to terminate the reimbursable

retirees' benefits if Bethlehem did not continue to reimburse FreightCar. Howard Decl., ¶ 12 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

96.    The USW confirmed that it understood what FreightCar's intentions were with respect to the then-current retirees.  Howard Decl., ¶ 12 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

97.    On December 18, 2001, FreightCar distributed its "Fifth Draft and Final Employer Proposal for Agreement" ("the Final Proposal").  Howard Decl., ¶ 13 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

98.    Article XIX, Section 1 of FreightCar's final proposal was revised to remove all references to both reimbursable and non-reimbursable retirees.  Howard Decl., ¶ 13 (SJ Ex. 17.)

UNDISPUTED AND IMMATERIAL.

99.    Article XIX, Section 1 (f) of FreightCar's Final Proposal provided:

> All current employees who are not eligible to retire under the eligibility criteria as described in the 1991 Agreement of Purchase and Sale will be provided a managed care healthcare plan, whereby the Employer will make the premium contributions at the rates in effect as of October 31, 2001. . . . Any increases in the costs of such premiums beyond one hundred fifty percent (150%) will be the responsibility of the individual retiree.

Howard Decl. Ex. K, p.35 (SJ Ex. 28.)  With respect to the reimbursable retirees, Article XIX, Section 1(g) provided that:

> For current employees who retire under the eligibility criteria as described in the 1991 Agreement of Purchase and Sale, the Employer will pay the costs of healthcare and life insurance coverage only so long as Bethlehem Steel reimburses the Employer for those costs.  If Bethlehem Steel fails to fulfill its responsibility for these benefit costs, such [costs] will be the responsibility of the individual retirees.

Howard Decl. Ex. K, p. 35 (SJ Ex. 28.)

UNDISPUTED AND IMMATERIAL.

100.    FreightCar explained that these revisions reflected the USW's position that it did not
        represent retirees and that retirees' medical benefits were not a proper subject of
        collective bargaining.  Howard Decl., ¶ 14 (SJ Ex. 17).

PARTLY DISPUTED AND IMMATERIAL.  Plaintiffs dispute this to the extent it may imply
that the USW acceded to FreightCar's proposal that FreightCar not be responsible for Class
members' retiree health care and life insurance benefits.  As concluded by the NLRB in the
ruling proffered by FreightCar with its summary judgment submission as to FreightCar's final
offer:

> Healthcare insurance for retirees….The Respondent continued to propose that any
> failure of Bethlehem Steel to pay its share of retirement costs of some retirees
> (i.e., those who were working for Bethlehem, and who had reached age 43, when
> the Respondent purchased the facility) would also be the responsibility of those
> retirees. The Union continued to propose that the Respondent pay all increases
> during the life of the successor contract and that the Respondent pay whatever
> Bethlehem Steel did not.

NLRB Ruling (Dkt. #121-48) at 28.  Plaintiffs dispute that these allegations are material.

101.    After the USW rejected FreightCar's Fifth and Final Proposal, FreightCar informed the
        USW that it believed the parties were at impasse.  Howard Decl., ¶ 15 (SJ Ex. 17).

Undisputed and immaterial.  Plaintiffs note that the NLRB determined that no proper impasse
was reached.  The NLRB concluded as follows:

> I have found above that no impasse existed on or after December 18, and I have
> concluded that the Respondent has therefore violated Section 8(a)(5) by
> terminating bargaining on that date and by implementing the terms of its last
> proposal on January 21. As well, for the foregoing reasons I find and conclude
> that on and after January 21 the Respondent violated Section 8(a)(5) by
> unilaterally implementing changes in the unit employees' terms and conditions of
> employment in the areas of employees' Rule of 65 and 70/80 pensions,
> supplemental unemployment benefits, SIP, healthcare and seniority.

Id. at 47.

102.    FreightCar asked the USW to present the Final Proposal to the bargaining unit for a vote.
        Howard Decl., ¶ 15 (SJ Ex. 17.)

Undisputed and immaterial.

103.   The bargaining unit voted on and rejected the Fifth and Final Proposal on January 10, 2002. Howard Decl., ¶ 15 (SJ Ex. 17.)

Undisputed and immaterial.

104.   FreightCar informed the USW that it intended to implement its Final Proposal effective January 21, 2002. Howard Decl., ¶ 15 (SJ Ex. 17.)

Undisputed and immaterial.

105.   The USW responded by filing a charge with the National Labor Relations Board alleging that FreightCar violated Section 8(a)(5) of the National Labor Relations Act by failing to bargain in good faith with the USW during the 2001 negotiations.  *See In re Johnstown America Corporation*, NLRB Case No. 6-CA-32504 (SJ Ex. 48.)

UNDISPUTED AND MATERIAL.  FreightCar fails to point out that after hearing testimony from such witnesses as FreightCar declarants Mark Duray, Charles Howard, and Glen Karan (see NLRB Transcript proffered herewith at Ewing Decl. Ex. 10), the NLRB, per Judge Evans, issued a 55-page ruling in favor of the USW and against FreightCar, concluding that FreightCar failed to bargain in good faith during the 2001 negotiations.  See Dkt. #121-48 (NLRB ruling proffered by FreightCar).

The NLRB concluded as follows:

I have found above that no impasse existed on or after December 18, and I have concluded that the Respondent has therefore violated Section 8(a)(5) by terminating bargaining on that date and by implementing the terms of its last proposal on January 21. As well, for the foregoing reasons I find and conclude that on and after January 21 the Respondent violated Section 8(a)(5) by unilaterally implementing changes in the unit employees' terms and conditions of employment in the areas of employees' Rule of 65 and 70/80 pensions, supplemental unemployment benefits, SIP, healthcare and seniority.

Id. at 47.

With respect to retiree life insurance benefits, the NLRB relied on the following 1993 SPD provision:

**When You Retire**

> If you retire at or after age 62, your basic life insurance will be reduced to $5,000.
>
> **If You Retiree Before Age 62**
>
> If you retire before you turn age 62…you'll keep the same coverage as other active employees until you turn 62. Then your coverage will be reduced to $5,000.

NLRB Ruling (Dkt. #121-48) at 48 (quoting from Dkt. #126-23 at 9).  The NLRB observed that, unlike with respect to retiree health insurance, there "is no reference to the pension plan in the Employee Guide's statement of life insurance.  NLRB Ruling at 48.  Therefore, the NLRB reasoned, FreightCar was foreclosed from arguing that by proposing to eliminate certain pension as it did in 2001 bargaining, FreightCar had "effectively proposed eliminating life insurance benefits for employees who sought to retire under either of those plans.  coverage." Id. at 48-49.  "Accordingly," the NLRB concluded, "even without my above finding that the parties were not at impasse in May, I would find and conclude that the Respondent had not proposed elimination of the life insurance benefits for employees who retired under either Rule of 65 or 70/80 pension plans before it unilaterally eliminated that benefit.  And for that reason, as well as my finding that the parties were not at impasse in May, I would find that the Respondent violated Section 8(a)(5) by eliminating the benefit of life insurance for employees who retired with Rule of 65 or 70/80 pensions." Id. at 49.

*FreightCar's Amendment of the JAC Guide*

106.   On March 6, 2002, FreightCar again wrote to the reimbursable retirees to inform them that FreightCar could "no longer continue to absorb the cost of [their] post-retirement health and life insurance coverage" and that it would "discontinue paying these costs as of May 1, 2002."  Howard Decl., ¶ 16 (SJ Ex. 17.)  FreightCar's Board of Directors subsequently adopted a formal resolution amending the JAC Guide to include the following language in the medical plan's section regarding retiree medical benefits:

> Effective May 1, 2002, coverage shall not be provided to reimbursable retirees unless Bethlehem Steel Corporation contemporaneously reimburses the company for the cost of such coverage.  For example, while Bethlehem Steel Corporation is in bankruptcy and fails or refuses to reimburse the company, no coverage shall be provided to reimbursable employees except to the extent that the company can arrange replacement coverage and the reimbursable retiree pays the full cost of such coverage.

Howard Decl. Ex. M, p.2 (SJ Ex. 30.)

PARTLY DISPUTED AND MATERIAL.  Plaintiffs dispute the allegation to the extent that FreightCar is contending that the JAC Guide is the formal "plan document" that it properly amended.   Indeed, FreightCar previously stated that no plan document existed as of 2002. See

letter dated March 1, 2002 from FreightCar's Human Resource Manager to Raymond Jastrzab (Dkt. #126-22).

*The* Deemer *Litigation*

107.    On April 26, 2002, the USW and a putative class consisting of reimbursable retirees and their dependents filed suit challenging FreightCar's decision to terminate their welfare benefits.  *Deemer v. Johnstown America Industries, Inc.*, Civ. No. 02-cv-806 (W.D. Pa. 2002).

UNDISPUTED AND MATERIAL.

108.    On June 28, 2002, before any discovery was conducted, and before FreightCar had even answered their complaint, the *Deemer* plaintiffs filed a "Motion for Summary Judgment and Permanent Injunction, or in the Alternative, Motion for Preliminary Injunction." *Deemer* Docket, Dkt. Nos. 6, 14 (SJ Ex. 49.)

UNDISPUTED AND IMMATERIAL.  Plaintiffs filed their motion for summary judgment in conjunction with a motion for preliminary injunction.

109.    On July 11, 2002, the Court ordered that FreightCar respond to the *Deemer* plaintiffs' motion in 30 days.  *Deemer* Docket, Dkt. No. 16 (SJ Ex. 49.)

UNDISPUTED AND IMMATERIAL.

110.    On August 9, 2002, FreightCar filed its response to the *Deemer* plaintiffs' alternative motions, and also filed its own cross-motion for summary judgment.  *Deemer* Docket, Dkt. No. 25 (SJ Ex. 49.)

UNDISPUTED AND IMMATERIAL.

111.    After full briefing on the parties' respective motions for summary judgment, Magistrate Judge Robert C. Mitchell recommended that FreightCar's motion for summary judgment be granted and that the *Deemer* plaintiffs' motions for summary judgment be denied. *Deemer* Docket, Dkt. No. 48 (SJ Ex. 49.)

UNDISPUTED AND IMMATERIAL.

112.    The *Deemer* plaintiffs objected to Magistrate Mitchell's recommendation.  *Deemer* Docket, Dkt. No. 49 (SJ Ex. 49.)

UNDISPUTED AND IMMATERIAL.


113.    Judge Cindrich exercised his discretion pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) to "accept new evidence as part of [his] *de novo* review of [Magistrate Mitchell's R & R.]"  Cindrich Memorandum Opinion, p.4 (SJ Ex. 50.)

UNDISPUTED AND IMMATERIAL.


114.    To assist him in his *de novo* review of Magistrate Mitchell's R&R, Judge Cindrich ordered an evidentiary hearing to be held on Wednesday, August 13, 2003.  Cindrich Memorandum Opinion, p.4 (SJ Ex. 50.)

UNDISPUTED AND IMMATERIAL.


115.    However, on August 5, 2003, the parties filed a joint motion to continue the hearing to allow for discovery. *Deemer* Docket, Dkt. No. 69 (SJ Ex. 49.)

UNDISPUTED AND IMMATERIAL.


116.    Judge Cindrich granted their joint motion to continue the hearing and also denied their respective motions for summary judgment without prejudice to be reasserted at the close of discovery.  *Deemer* Docket, Dkt. No. 69 (SJ Ex. 49.)

UNDISPUTED AND IMMATERIAL.


*The* Britt *Litigation*

117.    In addition to amending the JAC Guide's medical plan to eliminate retiree medical benefits for the reimbursable retirees, in 2002, FreightCar eliminated the monthly pension supplement and the health and life insurance benefits it had previously provided to represented employees that retired under certain special pension formulas.  *Britt* Complaint, ¶ 28 (SJ Ex. 51.)

UNDISPUTED AND MATERIAL.

118.    In August 2003, a putative class of current and former FreightCar employees who "applied or will apply for 70/80 or Rule of 65 retirement benefits" filed a lawsuit in which they alleged that the unilateral eliminate of these benefits violated the parties' collective bargaining agreements and the terms of FreightCar's pension and retiree medical plans. *Britt* Complaint, ¶ 28 (SJ Ex. 51.)

UNDISPUTED AND MATERIAL.

119.    Issues relating to the duration of FreightCar's obligation to provide these benefits and whether FreightCar's retiree medical benefits were "vested" or "lifetime" were not addressed in *Britt*. *Britt* Complaint, ¶ 28 (SJ Ex. 51.)

DISPUTED, IMMATERIAL, AND STATES A CONCLUSION OF LAW.  Whether the <u>Britt</u> litigation concerned the duration of retiree benefits is a question of law.  The 2005 <u>Britt-Deemer</u> Settlement Agreement explicitly addressed the duration of retiree medical benefits:

>    Thereafter, the parties retain their legal positions that they asserted in the <u>Britt</u> and <u>Deemer</u> litigations.  For example, Defendant [FreightCar] continues to assert that under the terms of the [FreightCar] Plans, it can reduce or eliminate retiree medical benefits after the expiration of collective bargaining agreements, and Plaintiffs continue to assert both that alteration of benefits is unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated level of benefits provided under the 1997 collective bargaining agreement (e.g., no deductibles, contributions, etc.).  Accordingly, if in the future, Defendant [FreightCar] fails to make the contributions specified in paragraph 16(e), Plaintiffs have the right to re-file with the Court the <u>Britt</u> and <u>Deemer</u> litigations against all Defendants…"

Dkt. #126-6 at 16.

*The 2005 Collective Bargaining Agreement*

120.    In 2005, [sic] entered their first collective bargaining agreement since 1997.  Howard Decl. Ex. D (SJ Ex. 21.)

UNDISPUTED AND IMMATERIAL.  Plaintiffs presume FreightCar intended to reference FreightCar and the USW.

121.    Active employees' and retirees' medical benefits were addressed in Article XIX of the 2005 CBA and a side letter relating to the parties' settlement of the *Deemer* and *Britt* litigation.  Howard Decl. Ex. D, Bates USW FCA00347 (SJ Ex. 21.)

UNDISPUTED AND IMMATERIAL.


122.    Article XIX to the 2005 CBA provided:

> Effective January 1, 2005 active employees and current and future eligible retirees and their eligible dependents will be covered by the Steelworkers Health and Welfare Fund POS Plan as set forth in the Employee Guide.

Howard Decl. Ex. D, p. 60 (SJ Ex. 21.)

DISPUTED IN PART AND IMMATERIAL.  Plaintiffs dispute any implication that the 2005 CBA reflects an intent by the parties that the Company gained a right to alter retiree insurance benefits unilaterally.  To the contrary, the 2005 CBA incorporated the parties' settlement of Britt and Deemer and explicitly preserved the parties' rights:

> Both parties retain their legal positions that they asserted in the Britt and Deemer litigation.  For example, the Company continues to assert that it can reduce or eliminate retiree medical benefits after expiration of the Agreement, and the Union and retirees continue to assert both that alteration of benefits was unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated level of benefits provided under the 1997 collective bargaining agreement (no deductibles, contributions, etc.). Accordingly, neither the Union nor the retirees are waiving any right to reactivate the Britt and Deemer litigations (against all defendants) if in the future the company breaches its obligations to make the contributions specified herein.

Dkt. #121-21 at Appendix 5.  Plaintiffs do not dispute that the 2005 CBA includes the quoted language. Plaintiffs deny that FreightCar's allegations in this paragraph are material.


123.    Article XIX to the 2005 CBA ensured that all retirees' medical benefits were governed by the terms of the JAC Guide and the SHWF Plan.  Howard Decl. Ex. D, p. 60 (SJ Ex. 21.)

DISPUTED, IMMATERIAL AND STATES A CONCLUSION OF LAW.  The 2005 CBA expressly provides:

> Both parties retain their legal positions that they asserted in the Britt and Deemer litigation. For example, the Company continues to assert that it can reduce or eliminate retiree medical benefits after expiration of the Agreement, and the Union and retirees continue to assert both that alteration of benefits was unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated level of benefits provided under the 1997 collective bargaining agreement (no deductibles, contributions, etc.). Accordingly, neither the Union nor the retirees are waiving any right to reactivate the Britt and Deemer

litigations (against all defendants) if in the future the company breaches its
obligations to make the contributions specified herein.

Dkt. #121-21 at Appendix 5. Article XIX to the 2005 CBA states merely that "Effective January
1, 2005 active employees and current and future eligible retirees and their eligible dependents
will be covered by the Steelworkers Health and Welfare Fund POS Plan as set forth in the
Employee Guide." Dkt. #121-21 at 60. In light of the other quoted 2005 CBA language, this
provision does not "ensure" that all retirees' medical benefits were exclusively governed by the
terms of the JAC Guide and the SHWF Plan, but this is in any event a question of law. Plaintiffs
deny that FreightCar's allegations in this paragraph are material.

124.    With respect to FreightCar's obligation to provide these benefits, the 2005 CBA
        incorporated the *Deemer* and *Britt* settlements and provided that FreightCar would
        contribute $700 per month for each household with at least one non-Medicare eligible
        retiree and $450 per month for each Medicare-eligible retiree. Howard Decl. Ex. D, p. 60
        (SJ Ex. 21.) FreightCar was required to begin these monthly contributions on December
        1, 2004 and continue them "until the later of November 30, 2012 or the expiration of a
        successor Agreement to [the 2005 CBA.]" Howard Decl. Ex. D, p. 88 (SJ Ex. 21.) The
        2005 CBA further provided, "In any event, the Company's contributions for retiree
        and/or surviving spouse coverage as described above will remain unchanged until the
        later of November 30, 2012 or the expiration of a successor Agreement to this CBA."
        Howard Decl. Ex. D, p. 88 (SJ Ex. 21.)

UNDISPUTED AND IMMATERIAL.


*The 2008 Plant Shutdown*

125.    In 2007, FreightCar informed the USW that it intended to close the Johnstown Plant. The
        parties engaged in decisional bargaining, but were unable to reach an agreement that
        would allow FreightCar to continue operating the Johnstown Plant.

DISPUTED AND IMMATERIAL. In violation of Local Rule 56(B)(1), FreightCar cites no
record support for these factual assertions. This Court has itself exhaustively reviewed and
analyzed the evidence on this point, in Hayden v. FreightCar America, Inc., 2008 WL 375762
(W.D.Pa. Jan. 11, 2008). The Court summarized its conclusions about the events of 2007 as
follows:

        …FCA's timing in its Johnstown layoffs and its imminent shutdown of the
        Johnstown facility was motivated by a specific intent to interfere with the special
        pension group subclass's attainment of the necessary age and service
        requirements of their special pensions…FCA looked to at least enact a massive
        furlough if not a permanent shutdown of the Johnstown facility if it did not attain
        the cost concessions (including pension benefits) from the union that it desired.

FCA did not seek to proceed immediately with a shutdown because it sought to avoid the triggering of special pension eligibility for the members of its workforce and preferred to keep them employed, but at a lower cost than what was bargained for under the CBA. However, FCA continually considered its options concerning furloughs and shutdown and the timing of these events was chosen based upon the most advantageous economic scenario for FCA, particularly with regard to saving pension costs by preventing as many employees as possible from accruing pension benefits.

***

FCA's decision to furlough its employees at different points in 2007 was made with the age and accrued service requirements being a factor in the decision to furlough and the timing of the furlough. Thus, the furloughs and their timing had as a "determinative factor" a discriminatory motive to interfere with the Rule-of 65 and 70/80 subclasses' eligibility for their pensions by preventing them from attaining the necessary age and service requirements for those pensions.  The timing of Carroll's comments as noted by Jastrzab evince the fact that FCA had as its policy the intention to furlough those persons approaching the necessary service and age requirements of special pensions within the term of the current CBA, whether or not the rail car industry backlog of orders remained high or low. Therefore, the decision to furlough by FCA was determined by a goal to prevent any further pension obligations from arising when FCA shutdown the Johnstown facility.

Id. at **60, 61, 63.

126.	Before FreightCar and the USW began effects bargaining, a putative class of FreightCar employees filed a lawsuit in the Western District of Pennsylvania challenging FreightCar's decision to close the Johnstown Plant.  *Hayden v. FreightCar America, Inc.*, Civ. No. 07-cv-00201 (W.D. Pa. 2007).

UNDISPUTED AND PARTLY MATERIAL.  It is material that this lawsuit was filed; the timing of its filing is immaterial.

127.	The *Hayden* plaintiffs alleged that FreightCar's decision to close the Plant was designed to prevent them from accruing the years of service necessary to become vested in certain types of pensions.  *Sowers* Complaint, ¶¶ 44-50 (SJ Ex. 52.)

UNDISPUTED AND IMMATERIAL.

128.    After this Court granted the *Hayden* plaintiffs' motion for a preliminary injunction and ordered that the class be reinstated to allow them to accrue the years of service they required, FreightCar, the USW, and the *Sowers* plaintiffs negotiated a combined settlement/shutdown agreement.  Howard Decl. Ex. E (SJ Ex. 22.)

UNDISPUTED AND MATERIAL.


129.    Under their "FCA/Union Settlement Agreement" ("the Shutdown Agreement"), the parties acknowledged at the 2005 CBA terminated May 15, 2008 and that FreightCar "closed the [Johnstown Plant] effective May 16, 2008, after affording the Union a full and fair opportunity to engage in decisional and effects bargaining in accordance with the National labor Relations Act."  Howard Decl. Ex. E, p. 2 (SJ Ex. 22.)

UNDISPUTED AND IMMATERIAL.


130.    With respect to retiree medical benefits, the parties agreed that then-current retirees' benefits would continue to be provided as set forth in the 2005 CBA and pursuant to the applicable terms and conditions of the *Deemer* and *Britt* settlements. Howard Decl. Ex. E, p. 2 (SJ Ex. 22.)

UNDISPUTED AND MATERIAL.  The cited settlement agreement provision is actually on page 5.


131.    The Shutdown Agreement also provided that the *Sowers* plaintiffs would similarly be entitled to retiree medical benefits under the 2005 CBA and the *Deemer* and *Britt* settlements.  Howard Decl. Ex. E, p. 5 (SJ Ex. 22.)

UNDISPUTED AND MATERIAL.

**STATEMENT OF EXTRINSIC FACTS THAT WOULD BE MATERIAL AND
PRECLUDE ENTRY OF SUMMARY JUDGMENT FOR FREIGHTCAR
IN THE EVENT THAT THE COURT CONCLUDES THAT
IT NEEDS TO REVIEW THE EXTRINSIC EVIDENCE**

As shown in Plaintiffs' Statement of Material Facts in Support of Third Motion for

Summary Judgment, as well as in Plaintiffs' memorandum in support of that Motion, the

controlling contractual language in this case unambiguously favors Plaintiffs, and summary

judgment should be entered in their favor as to FreightCar's liability.  However, in the event that

the Court concludes that the governing language is ambiguous and that it accordingly must

review the extrinsic evidence, the following extrinsic material facts would preclude entry of

summary judgment in FreightCar's favor.

1.      Mr. Canini testified as follows during his deposition:

Q. Now, in Paragraph 8 you talk about how you -- it was the express belief of my
management colleagues with whom I spoke or heard express an opinion on this
subject and that's the subject is that it was your belief that retiree health care
benefits for union members and their eligible spouses or dependents were
provided and could not be changed without the agreement of the union. Who are
the management colleagues that you are referring to in this paragraph?

A. Would have to be Glenn Grove, Mark Duray, Patty Salsbury, the people in
human resources, because believe me, nobody else in the company wanted
anything else to do with me.

Q. Did you -- do you recall sitting here today the people you just mentioned
expressing that?

A. Yes.

Q. Okay. Let's take those one at a time.  You said Mark Duray, when do you
recall Mr. Duray expressing that?

A. Any time we talked about it, because I kept telling him it would be a big
mistake to make changes slash concessions. Anytime we got in a discussion and
that part would come up, he'd say, Joe, we're not trying to take anything away
from anybody. Glenn Grove, who took a very laid back position when it came to
any kind of conflict, would say the same thing, the union would have to agree to
any changes.

Canini Dep. (Ewing Decl. Ex. 1) at 37:14-23; 81:12-82:19.

2.      In or about mid-January 1998, before the 1997 CBA was ratified, Mr. McIver,

FreightCar's chief spokesman during 1997 negotiations, went to the home of Frank Barber.

Barber Aff. ¶¶ 5-9.  Mr. Barber averred as follows about what Mr. McIver stated at this visit:

> When Tex McIver came to my home, I told him that if he wanted to get the
> contract passed, he needed to "sweeten" the pension. McIver made it clear that the
> company was interested not only in passage of the contract, but also in
> encouraging the more senior employees to retire. I told him that if he wanted the
> more senior employees to vote for the contract and to retire, the monthly pension
> would need to be increased because we really needed the additional pension to go
> along with our lifetime health benefits. McIver replied that he would do what he
> could to improve pensions, but said we should feel fortunate to have lifetime
> health benefits, adding: "Frank, you know that 'Big Shoes' (referring to JAC CEO
> Thomas Begel) would never mess with your retiree health benefits. He knows
> that's a sacred cow."

Id. ¶ 9.

3.      Shortly before Mr. Barber retired in March 1998, he met with Glenn Grove,

FreightCar's benefit expert.  Barber Aff. ¶ 11.  Mr. Grove went over pension, early retirement

supplements, health and other benefits.  Mr. Barber asked Mr. Grove if his benefits were going to

stay the same.  Id.  Mr. Barber further averred that Mr. Grove told him he would lose his vision

and dental care benefits, the amount of life insurance would change, but all of the other benefits

stay the same.  Id.  Mr. Barber further averred:  "I said 'Until I die?' He said, 'Yes.'"  Id.

4.      Many other retirees have averred that Mr. Grove told them at the time that they

retired that their healthcare and/or life insurance benefits would be for life.  See Sealed

Declarations at Dkt. #53-0 for Michael Barelick (at ¶ 6); Dkt. #53-3 for Barry Chanonick (at ¶

6); Dkt. #53-7 for Elmer Grove (at ¶ 6); Dkt. #53-11 for Paula S. Kuzma (at ¶ 6); Dkt. #53-15 for

Scott J. Miller (at ¶ 6); Dkt. #53-17 for Joseph Papcun (at ¶ 6); Dkt. #53-21 for Michael

Strushensky (at ¶ 6); Dkt. #53-23 for David Waltimire (at ¶ 6); Dkt. #53-25 for Thomas Evans

(at ¶ 6).

     5.     Mr. Canini attested that in his capacity as a management representative, he was

present at a number of pre-retirement meetings that Union employees and their wives had with

Glenn Grove.  Canini Aff. ¶ 9.  He further attested:

> At these meetings, Grove went over pension, early retirement supplements, health
> and other benefits with them. They sometimes asked if their benefits were going
> to stay the same. Grove said that they would lose vision and dental care, and the
> amount of life insurance would change, but all of the other benefits would stay the
> same. Grove never expressed the opinion at a pre-retirement meeting or in the
> office generally that he believed that retiree health care benefits for Union
> employees could be changed or that the Union had agreed to change the duration
> of these benefits during the 1997 round of bargaining.

<u>Id.</u>

     6.     In a letter from FreightCar's President dated June 3, 1999 addressing a change in

corporate ownership, FreightCar provided union employees "with information about how your

benefits will be handled following the acquisition, particularly…retiree health care and life

insurance programs."  See Dkt. #126-43.  As to these health and life insurance programs,

FreightCar's President reassured employees that their benefits would continue just as they had

under Bethlehem:

> **You will be eligible for the same retiree health and life insurance coverage
> through Johnstown America Corporation as you were through Bethlehem
> Steel and the current plan.**

<u>Id.</u> (emphasis added).

     7.     At no time during the 1991 negotiations or during any other negotiations

preceding 2001 did FreightCar ever suggest to any Union negotiators that retiree welfare benefits

were terminable simply because the pending labor agreement expired.  Affidavit of Andrew

Palm (Dkt. #126-14) ¶ 13.

8.      John Sabo worked for Bethlehem and then FreightCar from 1964 until 2001. March 13, 2003 Affidavit of John Sabo ("Sabo Aff.") (Ewing Decl. Ex. 11) ¶ 1.  Mr. Sabo averred as follows:

> Shortly before my retirement in February 2001, my wife, Suzanne, and I met with Glenn Grove, the JAC official assigned to explain retirement benefits. Grove reviewed my retirement benefits with us. He explained the pension calculations, and told me that I would be receiving three (3) different pension checks: one from Bethlehem, one from JAC and one from TTL He reviewed the survivor benefit option with us. He said that after retirement I would no longer have vision and dental coverage, and that my life insurance benefit would be reduced. He also said retiree health benefits would be paid for by JAC for our lifetimes.

Id. ¶ 8.

9.      Even though FreightCar appeared to be fulfilling its obligations to retirees under the Mirroring Agreement through early 2002, it never actually reduced to writing a separate "mirror" plan tracking the language of the Bethlehem PHMB.  June 27, 2002 Affidavit of Andrew Palm ("Palm Aff.") (Dkt. #126-14) ¶ 14.  In fact, when Union representatives asked for the actual plan documents covering welfare benefits (including benefits for retirees), FreightCar admitted in a letter dated March 1, 2002 that: "Plan documents do not exist for the welfare plans i.e., health care, and sickness and accident plans, etc."  See Dkt. #126-22.  From the viewpoint of the Union and in accordance with the Mirroring Agreement, the terms set forth in the Bethlehem PHMB became the terms of FreightCar's retiree medical and life insurance Plans.  Palm Aff. ¶ 14.

## PLAINTIFFS' STATEMENT OF FACTS CONTRARY TO "FACTS" SET FORTH IN FREIGHTCAR'S SUMMARY JUDGMENT BRIEF THAT ARE NOT INCLUDED IN FREIGHTCAR'S STATEMENT OF FACTS

1.      FreightCar asserts in its summary judgment brief that "FreightCar did agree, in the context of a 1991 asset purchase transaction, to provide certain benefits after the transaction

closed, **if** FreightCar was reimbursed by the seller (Bethlehem Steel Corporation) for the cost of such benefits." FreightCar Br. at 2 n.4 (emphasis added). FreightCar fails to cite any support for this claim, which is wrong. The Purchase Agreement provides with respect to "[t]he obligation to pay benefits including, without limitation, health [and] life [insurance]," that "[FreightCar] shall be responsible for all benefits which are payable to its employees under the terms of Buyer's benefit plans and which arise or are based on events which occurred after Closing." Agreement of Purchase and Sale Between Bethlehem and FreightCar (Ewing Decl. Ex. 12) at 33-34. Indeed, FreightCar asserts that "Bethlehem's unanticipated bankruptcy filing in 2001 prevented it from fulfilling its obligation under the 1991 purchase and sale agreement to reimburse FreightCar for the cost of certain retirees ('the reimbursable retirees') welfare benefits." FreightCar Facts ¶ 75.

Respectfully submitted,

/s/ William T. Payne

William T. Payne
wpayne@fdpklaw.com
Feinstein Doyle Payne & Kravec, LLC
*Pittsburgh North Office*
12 Eastern Avenue
Pittsburgh, PA 15215
(412) 492-8797

Pamina Ewing
pewing@fdpklaw.com
Joel R. Hurt
jhurt@fdpklaw.com
Stephen M. Pincus
spincus@fdpklaw.com
Feinstein Doyle Payne & Kravec, LLC
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA 15219
(412) 281-8400

Joseph P. Stuligross
   Associate General Counsel
   jstuligross@usw.org
United Steelworkers
   Five Gateway Center, Suite 807
   Pittsburgh, PA 15222
   (412) 562-2526

*Counsel for Plaintiff United Steel, Paper*
   *and Forestry, Rubber,*
   *Manufacturing, Energy, Allied*
   *Industrial and Service Workers*
   *International Union, AFL-*
   *CIO/CLC*

_Counsel for Plaintiffs Anthony J. Zanghi,_
_Kenneth J. Sowers, Dominic McCuch,_
_James Hohman, and Darrell Shetler_
_and the Class_

Dated:  August 22, 2014