**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION**

| | |
|---|---|
| **ANTHONY J. ZANGHI,** *et al.*, | |
| **Plaintiffs,** | No.: 3:13-CV-00146 |
| **v.** | |
| **FREIGHTCAR AMERICA, INC.,** *et al.*, | |
| **Defendants.** | **Hon. Kim R. Gibson** |

## RESPONSE TO PLAINTIFFS' CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      This Court summarized the twelve years of litigation in this case in Zanghi v. FreightCar America, Inc., 2014 WL 130985 (W.D. Pa. Jan. 14, 2014) ("Zanghi Dismissal Ruling").

**RESPONSE:**

FreightCar denies that Paragraph (1) is undisputed.  FreightCar admits that the Court summarized certain aspects of the litigation related to this case in *Zanghi v. FreightCar America, Inc.*, 2014 WL 130985 (W.D. Pa. Jan. 14, 2014).  However, FreightCar does not admit that the Court's summary contains all of the materially relevant facts.

2.      This case arises from three underlying class actions in this Court: United Steelworkers of America, AFL-CIO-CLC, Geraldine Deemer, and Darrell Shetler v. Johnstown America Corporation, No. 02-CV-806 (W.D. Pa.) ("Deemer"); United Steelworkers of America AFL-CIO-CLC, Reggie Britt, et al. v. Johnstown America Corporation, No. 03-CV-1298 (W.D. Pa.) ("Britt"); and Sowers v. FreightCar America, Inc., No. 07-CV-201 (W.D. Pa.) ("Sowers") (collectively, "Underlying Litigation").

**RESPONSE:**

FreightCar denies that Paragraph (2) is undisputed.  FreightCar admits that this case is related to the *Deemer* litigation.  However, FreightCar denies that this case arises from either the

*Britt* or the *Sowers* litigation.  Neither *Britt* nor *Sowers* addressed whether retirees' welfare benefits were vested or whether FreightCar's right to unilaterally modify or terminate these benefits was in any way limited.  **FCA SUMF ¶¶ 119, 127.**

3.      The *Deemer* plaintiffs filed their complaint in this Court on April 26, 2002 alleging that retiree benefits for a class of approximately 250 individuals were meant to last throughout retirement.  *See* Complaint at No. 02-CV-806 ("<u>Deemer</u> Complaint") (Declaration of Pamina Ewing ("Ewing Decl.") Ex. A.  The <u>Deemer</u> class members encompassed all retirees who retired from FreightCar after a 1991 sale and who were at least 43 years old at the time of that sale (and their spouses).  *See* JAC Letter dated February 1, 2002 at 1 (Ewing Decl. Ex. B).

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (3) is undisputed.

4.      The *Deemer* parties filed cross-motions for summary judgment.

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (4) is undisputed.

5.      In a Report and Recommendation issued February 24, 2003, Magistrate Judge Mitchell recommended granting FreightCar's summary judgment motion and denying the <u>Deemer</u> plaintiffs' motion.

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (5) is undisputed.

6.      On July 14, 2003, Judge Cindrich issued a ruling on the parties' cross-motions for summary judgment, rejecting the Report and Recommendation in language favorable to the <u>Deemer</u> plaintiffs' position.  *See* July 14, 2003 Memorandum Opinion and Order in <u>Deemer</u> ("<u>Deemer</u> SJ Ruling") (Cindrich, J.) (Ewing Decl. Ex. C).

**<u>RESPONSE:</u>**

FreightCar denies that Paragraph (6) is undisputed.  Judge Cindrich's July 14, 2003 Order was not a "ruling on the parties' cross-motions for summary judgment."  **Cindrich Memorandum Opinion, pp. 4-5 (FCA SJ Ex. 50).**  Rather, Judge Cindrich ruled on the plaintiffs' objections to Magistrate Mitchell's Report and Recommendation.  *Id.*  Judge Cindrich ordered an evidentiary hearing "to assist [the Court in] its *de novo* review of the R&R."  *Id.*  The

parties' cross-motions for summary judgment remained pending until being denied *without prejudice* on August 28, 2003 to allow discovery to proceed.  **Deemer Docket, Dkt. No. 69 (FCA SJ Ex. 49).**

> 7.     Following up on its summary judgment decision, the Court issued an August 28, 2003 Memorandum Order that denied without prejudice the cross-motions for summary judgment, to be asserted after planned discovery closed:

> > The court held a status conference on August 20, 2003.  At the conference, the parties informed the court that no discovery had been conducted in the case.  The parties further presented a joint discovery plan that provided for a close of discovery on January 30, 2004, followed by a hearing in March 2004.  In light of our order dated July 15, 2003 and the parties' discovery plan, it is hereby ordered that all pending motions are denied without prejudice to reassert at the close of discovery.

**RESPONSE:**

FreightCar admits that Paragraph (7) is undisputed.

> 8.     The <u>Britt</u> plaintiffs filed their complaint on August 29, 2003.  *See* Complaint at No. 03-CV-1298 ("<u>Britt</u> Complaint") (Ewing Decl. Ex. E).  They also had worked at the Johnstown Facility, but, unlike the <u>Deemer</u> plaintiffs, they were not at least 43 years old at the time of the sale and did not have their benefits terminated until 2003.  The <u>Britt</u> plaintiffs alleged that they had earned rights to receive certain pension supplements as well as the same retiree medical insurance benefits at issue in <u>Deemer</u>, and that FreightCar had abridged these rights by refusing to pay these benefits.  *See* <u>id.</u>

**RESPONSE:**

FreightCar denies that Paragraph (8) is undisputed.  FreightCar admits the *Britt* plaintiffs filed their complaint on August 29, 2003 and that they also worked at the Johnstown Facility. However, FreightCar denies *Britt* involved a class of individuals that "were not at least 43 years old at the time of the sale and did not have their benefits terminated until 2003." The *Britt* class consisted of: (1) persons who were participants in the JAC Pension Plan; (2) who satisfied the age, years of service, and layoff status that would entitle them to Rule of 65 or Rule of 70/80 pensions; and (3) to whom JAC did not to provide full Rule of 65 retirement or Rule of 70/80 benefits.  **Deemer/Britt Settlement Agreement, pp. 10-11 (Dkt. No. 40-7).**

FreightCar admits that the *Britt* plaintiffs alleged that they had earned rights to receive certain pension supplements as well as the same retiree medical insurance benefits at issue in *Deemer*, and that the *Britt* plaintiffs further alleged that FreightCar had abridged these rights by refusing to pay these benefits.  However, FreightCar states its right to modify or terminate those benefits unilaterally was not at issue in *Britt*.  **Britt Complaint, ¶ 28 (FCA SJ Ex. 51)** ("Issues relating to whether retiree medical and life insurance benefits under the JAC Retiree Welfare plan were 'vested' or 'lifetime' are the subject of [*Deemer*].").

9.     Following the Court's summary judgment ruling in <u>Deemer</u>, the parties proceeded to engage in discovery which produced significant evidence relevant to Plaintiffs' Motion for Summary Judgment.  As subsequently recited in the <u>Britt-Deemer</u> Settlement Agreement, "[t]he parties in <u>Deemer</u> conducted months of discovery, which included many depositions and production of thousands of pages of documents."  Ewing Decl. Ex. F at 4.  The <u>Britt-Deemer</u> Settlement Agreement further recites that, "[l]ike the parties in <u>Deemer</u>, the parties in <u>Britt</u> conducted discovery, which included the production of documents."  <u>Id.</u> at 5.

**<u>RESPONSE:</u>**

FreightCar denies that Paragraph (9) is undisputed.  FreightCar admits that the plaintiffs have quoted excerpts from the parties' settlement agreement in *Deemer* and *Britt*.  However, FreightCar denies the plaintiffs' characterization of the discovery in *Deemer* as resulting in "significant evidence" relevant to Plaintiffs' Motion for Summary Judgment.

10.     FreightCar and plaintiffs specifically agreed in the <u>Britt-Deemer</u> Settlement Agreement that the parties "shall be able to make full use of depositions, documents and other materials thus far produced" in <u>Britt</u> and <u>Deemer</u> in any renewed litigation.  <u>Britt-Deemer</u> Settlement Agreement § 16(f).

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (10) is undisputed.

11.     On July 1, 2004, the Court certified the <u>Britt</u> class, and on September 27, 2004, the Court certified the <u>Deemer</u> class.  <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *2-3.

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (11) is undisputed.

12.     Negotiations to settle the <u>Deemer</u> and <u>Britt</u> litigation took place from September through November 2004 and ultimately resulting in the "<u>Britt</u>-<u>Deemer</u> Settlement Agreement" (Ewing Decl. Ex. F), which the Court approved.

**RESPONSE:**

FreightCar admits that Paragraph (12) is undisputed.

13.     As to retiree medical benefits, the <u>Britt</u>-<u>Deemer</u> Settlement Agreement put a plan in place for both the <u>Deemer</u> and <u>Britt</u> classes which required that FreightCar make $700 monthly contributions for households including a class member not eligible for Medicare and $450 monthly contributions for households including a class member eligible for Medicare. <u>Britt</u>-<u>Deemer</u> Settlement Agreement § 16(e).  These contributions were to last at least through November 2012, and if FreightCar were to cease contributions at any point after that, Retirees could then re-file their lawsuits in this Court.  <u>Britt</u>-<u>Deemer</u> Settlement Agreement § 16(f); *see* also Declaration of Thomas McCarthy ("McCarthy Decl.") (Ewing Decl. Ex. G) ¶ 7 (stating that under the terms of the <u>Britt</u>-<u>Deemer</u> settlement, FreightCar would continue to make contributions towards the health insurance benefits of the retirees until at least November 30, 2012, and continue the life insurance benefits in effect at the time).

**RESPONSE:**

FreightCar admits that Paragraph (13) is undisputed.

14.     The Settlement Agreement provided that in the re-filed lawsuits, the parties would "retain their legal positions that they asserted in the <u>Britt</u> and <u>Deemer</u> litigations," so that the "Plaintiffs [could] continue to assert both that alteration of benefits is unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated level of benefits provided under the 1997 collective bargaining agreement (*e.g.*, no deductibles, contributions, etc.)."  <u>Britt</u>-<u>Deemer</u> Settlement Agreement § 16(f).

**RESPONSE:**

FreightCar admits that Paragraph (14) is undisputed.

15.     As to life insurance benefits, the Settlement Agreement provided that "Defendant JAC will reinstate the retiree life insurance program and will provide future benefits consistent with that Program."  <u>Britt</u>-<u>Deemer</u> Settlement Agreement § 16(i).  Unlike the provisions for contributions applicable to health insurance benefits, under which FreightCar was to provide benefits through 2012, the life insurance provision simply reinstated benefits and contained no durational limitation.  <u>Id.</u>

**RESPONSE:**

FreightCar denies that Paragraph (15) is undisputed.  FreightCar admits that the

Settlement Agreement provided that "Defendant JAC will reinstate the retiree life insurance

program and will provide future benefits consistent with that Program."  FreightCar also admits

that the life insurance provision in the Settlement Agreement reinstated benefits and did not

provide that they were to last for any specific duration. ***Deemer/Britt* Settlement Agreement,

p. 17 (Dkt. No. 40-7).**  Rather, the *Deemer-Britt* Settlement Agreement provided that life

insurance benefits would be provided consistent with "that Program."  The program did not limit

FreightCar's ability to terminate retirees' life insurance benefits.

16.     FreightCar has falsely alleged that the <u>Britt</u>-<u>Deemer</u> Settlement Agreement
"expressly provided" that it was free to stop making contributions for life insurance benefits as
of November 30, 2012.  *See* FreightCar Complaint ¶ 5 ("Under the Settlement Agreement,
FreightCar agreed to make certain levels of contributions to the medical coverage for the Retiree
Defendants and to continue to provide life insurance benefits at their amount at the time.
However, the Settlement Agreement expressly provided that as of November 30, 2012,
FreightCar could cease making these contributions.").

**RESPONSE:**

FreightCar denies that Paragraph (16) is undisputed.  FreightCar denies it "falsely

alleged" that the *Deemer-Britt* Settlement Agreement expressly provided that it was free to stop

making contributions for life insurance benefits as of November 30, 2012.  The *Deemer-Britt*

Settlement Agreement did not require that FreightCar provide life insurance benefits for any

certain duration. ***Deemer/Britt* Settlement Agreement, p. 17 (Dkt. No. 40-7).**  Rather, it stated

only that life insurance benefits would be provided consistent with "the retiree life insurance

program." ***Id.***  The "program" did not entitle the plaintiffs to vested life insurance benefits.

17.     In 2007, after FreightCar announced that it was closing the Johnstown Facility,
the <u>Sowers</u> plaintiffs filed their lawsuit.  *See* Complaint in No. 07-CV-201 ("<u>Sowers</u> Complaint")
(Ewing Decl. Ex. H).

**RESPONSE:**

FreightCar admits that Paragraph (17) is undisputed.

18.     The <u>Sowers</u> plaintiffs were active employees of the Johnstown Facility who were
close to attaining eligibility for retirement benefits.  <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985,
at *3.  The <u>Sowers</u> plaintiffs alleged that FreightCar violated Section 510 of ERISA, 29 U.S.C.

§ 1140, because it "deliberately idled" much of the Johnstown plant and laid off long-service union employees to prevent them from attaining eligibility for pension benefits.  Id.  These benefits included the same retiree welfare benefits at issue in Deemer and Britt.  Id.

**RESPONSE:**

FreightCar denies that Paragraph (18) is undisputed.  FreightCar admits that the *Sowers* plaintiffs were active employees of the Johnstown Facility who were close to attaining eligibility for retirement benefits.  FreightCar also admits that the *Sowers* plaintiffs alleged that FreightCar violated Section 510 of ERISA, 29 U.S.C. § 1140, because it "deliberately idled" much of the Johnstown plant and laid off long-service union employees to prevent them from attaining eligibility for pension benefits.  However, FreightCar denies that the retiree welfare benefits at issue in *Deemer* and *Britt* were the same retiree welfare benefits at issue in *Sowers*.  The welfare benefits at issue in the *Deemer* and *Britt* lawsuits were based upon collective bargaining agreements subsequently superseded by the 2005 CBA.  **Howard Decl. Ex. D, p. 60 (FCA SJ Ex. 21).**

19.    In Sowers, this Court granted the plaintiffs' motion for a preliminary injunction and ruled that substantial evidence showed that FreightCar's purpose in closing the Johnstown Facility was to leave many senior employees just short of attaining the years of age and service necessary to qualify for shutdown pensions as well as the retiree health benefits that accompanied these pensions.  *See* Hayden v. FreightCar America, Inc., 2008 WL 375762 (W.D. Pa. Jan. 11, 2008).

**RESPONSE:**

FreightCar denies that Paragraph (19) is undisputed.  FreightCar denies that the Court found "substantial evidence" that FreightCar's purpose in shutting down the plant was to interfere with senior employees' ability to qualify for shutdown pensions, as well as retiree health benefits that accompanied these pensions.  With respect to one of the two subclasses, the Court found that the *Sowers* plaintiffs "failed to demonstrate specific intent on the part of

FreightCar to discriminate against the deferred vested pension subclass[.]" ***Hayden v.***

***FreightCar America, Inc.***, Civ. No. 07-cv-00201, at p. 84 (W.D. Pa. 2007).

      20.    The Court granted the <u>Sowers'</u> plaintiffs' motion for class certification. <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *3.

**<u>RESPONSE:</u>**

      FreightCar admits that Paragraph (20) is undisputed.

      21.    While the case was on appeal, the parties reached a settlement under which the affected class members—over 200 persons not in the <u>Britt</u> and <u>Deemer</u> classes—were allowed to accrue sufficient additional service to qualify them for pensions and retiree health insurance benefits. The <u>Sowers</u> Settlement Agreement (Ewing Decl. Ex. I) in pertinent part provides:

> Current retirees and employees who retire under the terms of the <u>Sowers/Hayden</u> Litigation Settlement Agreement will continue to be eligible for retiree healthcare coverage under applicable terms and conditions of the CBA and under applicable terms and conditions of the court settlements in the <u>Deemer</u> and <u>Britt</u> cases. The Companies and the Union reserve their respective legal positions on the issue of whether the Companies have the right to make future changes to retiree healthcare after expiration of the time periods established in Appendix 5 of the CBA and in the court settlements in the <u>Deemer</u> and <u>Britt</u> cases.

<u>Sowers/Hayden</u> Settlement Agreement ¶ 7.

**<u>RESPONSE:</u>**

      FreightCar denies that Paragraph (21) is undisputed. FreightCar denies that "the affected class members . . . were allowed to accrue sufficient additional service to qualify them for pensions and retiree health insurance benefits." The *Sowers* Settlement Agreement did not state that the *Sowers* class was allowed "to accrue sufficient additional service to qualify them for pension and retiree health insurance benefits." ***See Sowers/Hayden*** **Settlement Agreement (Dkt. No. 126-9).**

      22.    FreightCar has admitted that under the <u>Sowers</u> settlement, life insurance benefits were to be provided to the <u>Sowers</u> class members under the same terms as these benefits were to be provided to the <u>Deemer</u> and <u>Britt</u> class members. *See* FreightCar's July 8, 2013 Complaint in <u>FreightCar America, Inc. v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial And Service Workers International Union, AFL-CIO/CLC</u>, (No. 13-4889 in N.D. Ill., now transferred here) ("FreightCar Complaint") (Ewing Decl. Ex. J) ¶ 39 ("On

August 5, 2008, FreightCar and the USW settled the subsequent <u>Sowers</u> Litigation, which addressed issues related to a plant closing. As part of that settlement, FreightCar agreed to make contributions to retiree medical coverage and continue life insurance benefits for the former employees of the closed plant, identified in the caption above, under the terms of the Settlement Agreement in the <u>Deemer</u> Litigation and <u>Britt</u> Litigation"); *see also* FreightCar's Brief in Opposition to Plaintiffs' Preliminary Injunction Motion (Dkt. #59) at 10 n.10 ("The <u>Sowers</u> settlement provided that the <u>Sowers</u> plaintiffs would receive health and life insurance under the 2005 Settlement Agreement in <u>Deemer</u> and <u>Britt</u>").

**RESPONSE:**

FreightCar denies that Paragraph (22) is undisputed. FreightCar denies that under the

*Sowers* settlement, life insurance benefits were to be provided to the *Sowers* class members

under the same terms as these benefits were to be provided to the *Deemer* and *Britt* class

members. The *Sowers* settlement is silent with respect to the *Sowers* class members' rights to

continued life insurance benefits. ***See Sowers/Hayden* Settlement Agreement (Dkt. No. 126-**

**9).**

23.     FreightCar closed the Johnstown Facility in 2008. McCarthy Decl. ¶ 3; FreightCar Answer (Dkt. #76) ¶ 68.

**RESPONSE:**

FreightCar admits that Paragraph (23) is undisputed.

24.     In June 2011, FreightCar, the USW and class counsel who represented the retirees in the <u>Deemer</u>, <u>Britt</u>, and <u>Sowers</u> litigation began negotiations towards the goal of reaching an agreement whereby FreightCar would continue contributions for Retirees' health and life insurance benefits beyond November 30, 2012. McCarthy Decl. ¶ 8. These negotiations continued through into 2013. <u>Id.</u> ¶¶ 8-10.

**RESPONSE:**

FreightCar admits that Paragraph (24) is undisputed.

25.     On July 8, 2013, FreightCar filed a declaratory judgment action in the United States District Court for the Northern District of Illinois, requesting a declaration that FreightCar has the legal right to terminate retiree welfare benefits. <u>Zanghi</u> Dismissal Ruling, 2014 WL 130985, at *4.

**RESPONSE:**

FreightCar admits that Paragraph (25) is undisputed.

26.     On July 9, 2013, FreightCar sent counsel for the USW a copy of the Illinois complaint, along with a letter stating:

> FreightCar will be exercising its right under Section 16(f) of the Settlement Agreement entered into by the parties dated February 28, 2005, and effective October 1, 2013, will cease all Company contributions provided under the Settlement Agreement for retiree medical coverage.   Additionally, as of October 1, 2013, the Company will no longer provide the life insurance benefit set forth in Section 16(i) of the Settlement Agreement to the Deemer, Britt, and Sowers groups of retirees.

Ewing Decl. Ex. K.

**RESPONSE:**

FreightCar admits that Paragraph (26) is undisputed.

27.     After receiving this notice from FreightCar, Class Representatives and the USW filed their Complaint (Dkt. #1) in this Court on July 9, 2013.  Plaintiffs assert that the termination of Retirees' health and life insurance benefits violates Section 301 of the LMRA and Section 502 of ERISA.  Id.

**RESPONSE:**

FreightCar admits that Paragraph (27) is undisputed.

28.     On July 10, 2013, FreightCar mailed notice to 653 retirees and surviving spouses, advising them that FreightCar's contributions for their retiree benefits would end effective October 1, 2013.  FreightCar's Brief in Support of Motion to Dismiss or Transfer ("FreightCar Dismissal Brief") (Dkt. #18) at 9 (citing McCarthy Decl. ¶ 13).

**RESPONSE:**

FreightCar admits that Paragraph (28) is undisputed.

29.     Effective November 1, 2013, FreightCar terminated all of its contributions for health and life insurance benefits for Retirees.  Dkt. #65 (Consent Order providing that FreightCar would extend date for termination of benefit contributions to November 1, 2013).

**RESPONSE:**

FreightCar admits that Paragraph (29) is undisputed.

30.     By Memorandum and Order of Court entered January 14, 2014 (Dkt. #73)—the Zanghi Dismissal Ruling—the Court denied FreightCar's Motion to Dismiss or Transfer.

**RESPONSE:**

FreightCar admits that Paragraph (30) is undisputed.

31.     On February 18, 2014, Plaintiffs' filed the Second Motion for Summary Judgment as to Liability (Dkt. #82); the first motion was filed in <u>Deemer.</u>

**RESPONSE:**

FreightCar denies that Paragraph (31) is undisputed. FreightCar admits that the plaintiffs'

"Second Motion for Summary Judgment as to Liability" was filed on February 18, 2014.

However, FreightCar denies that the plaintiffs' motion for summary judgment filed in *Deemer*

was a pleading filed in the instant action.

32.     Following a March 25, 2014 Rule 16 status conference, the Court:
(1) consolidated FreightCar's now-transferred Illinois action with the pending case filed by Plaintiffs; (2) ordered that the case be bifurcated in two stages, with the issue of liability to be determined before the issue of damages; (3) allowed three months of additional discovery; (4) ordered the withdrawal of Plaintiffs' Second Motion for Summary Judgment, with the parties to file summary judgment motions on July 17, 2014. *See* April 3, 2014 Order (Dkt. #100).

**RESPONSE:**

FreightCar admits that Paragraph (32) is undisputed.  FreightCar further states that the

Court also denied the plaintiffs' motion for injunctive relief without prejudice.  **April 3, 2014**

**Order (Dkt. No. 100).**

33.     By Order entered April 17, 2014, the Court certified the following class as to liability:

> (1) former FreightCar employees that were represented by the USW at the time of their retirement from FreightCar, and who upon retirement received or were eligible to receive medical and life insurance benefits under the JAC-USWA Health and Welfare Plan (the "Plan"); and (2 those individuals who received or were eligible to receive medical and life insurance benefits under the Plan as a spouse, surviving spouse, or dependent of an aforementioned former FreightCar employee.

Dkt. #107.

**RESPONSE:**

FreightCar admits that Paragraph (33) is undisputed.

**The Undisputed Facts**

1.      Plaintiffs Anthony J. Zanghi, Kenneth J. Sowers, Dominic McCuch, James Hohman, and Darrell Shetler ("Class Representatives") retired from a Johnstown railcar facility ("Johnstown Facility") formerly operated by Defendant FreightCar America, Inc. ("FreightCar"). FreightCar Complaint ¶ 13.

**RESPONSE:**

FreightCar admits that Paragraph (1) is undisputed.

2.      The Class Representatives proceed in this case on behalf of themselves and a proposed class of retirees of the Johnstown Facility, together with the surviving spouses of these retirees (collectively, "Retirees").  Complaint (Dkt. #1) ¶¶ 1-2.

**RESPONSE:**

FreightCar admits that Paragraph (2) is undisputed.  However, FreightCar notes that on

April 17, 2014, the Court certified the class defined in Paragraph (33) above.  **April 3, 2014**

**Order (Dkt. No. 100).**

3.      Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("Union" or "USW") was the collective bargaining representative for hourly employees at the Johnstown Facility and negotiated the collective bargaining agreements with FreightCar relating to the retiree health and life insurance benefits at issue in this case.  FreightCar Complaint ¶¶ 2, 14.

**RESPONSE:**

FreightCar admits that Paragraph (3) is undisputed.

4.      Defendant FreightCar manufactures railcars at fabrication facilities in Alabama, Illinois, and Virginia.  McCarthy Decl. ¶ 3.

**RESPONSE:**

FreightCar admits that Paragraph (4) is undisputed.

5.      The Johnstown America Corporation USWA Health & Welfare Plan ("Plan"), also a Defendant, "provides that FreightCar will make contributions toward life and health insurance benefits for FreightCar's union retirees that worked at its former Johnstown, Pennsylvania fabrication facility."  McCarthy Decl. ¶ 5.

**RESPONSE:**

FreightCar admits that Paragraph (5) is undisputed.

6.      This case arises from three underlying class actions in this Court: <u>United Steelworkers of America, AFL-CIO-CLC, Geraldine Deemer, and Darrell Shetler v. Johnstown America Corporation,</u> No. 02-CV-806 (W.D. Pa.) ("<u>Deemer</u>"); <u>United Steelworkers of America AFL-CIO-CLC, Reggie Britt, et al. v. Johnstown America Corporation</u>, No. 03-CV-1298 (W.D. Pa.) ("<u>Britt</u>"); and <u>Sowers v. FreightCar America. Inc.</u>, No. 07-CV-201 (W.D. Pa.) ("<u>Sowers</u>") (collectively, "Underlying Litigation").  FreightCar Complaint ¶ 15.

**RESPONSE:**

FreightCar denies that Paragraph (6) is undisputed.  FreightCar admits that this case is

related to *Deemer*.  FreightCar denies that this case arises from either the *Britt* or *Sowers*

litigation.  Neither *Britt* nor *Sowers* addressed whether retirees' welfare benefits were vested or

whether FreightCar's right to unilaterally modify or terminate these benefits was in any way

limited.  **FCA SUMF ¶¶ 119, 127.**

7.      The Johnstown Facility operated for many years as the Freight Car division of Bethlehem Steel Corporation ("Bethlehem").  August 7, 2002 Affidavit of Mark J. Duray proffered by FreightCar ("Duray Aff.") (Ewing Decl. Ex. L) ¶ 2.

**RESPONSE:**

FreightCar admits that Paragraph (7) is undisputed.

8.      Bethlehem Steel sold the assets of the Freight Car division in 1991 to Johnstown America Corporation ("JAC"), FreightCar's predecessor.  FreightCar Summary Judgment Brief in <u>Deemer</u> ("FreightCar SJ Brief") (Ewing Decl. Ex. M) at 4; *see also* Duray Aff. ¶ 3.

**RESPONSE:**

FreightCar admits that Paragraph (8) is undisputed.

9.      The 1991 purchase agreement, to which the USW was not a party**,** provided that Bethlehem would reimburse FreightCar for retiree insurance costs for those FreightCar employees who were 43 at the time of the October 28, 1991 sale and who subsequently retired with eligibility for retiree insurance benefits from FreightCar.  Duray Aff. ¶ 6; June 27, 2002 Affidavit of Andrew Palm ("Palm Aff.") (Ewing Decl. Ex. N) ¶ 17.

**RESPONSE:**

FreightCar admits that Paragraph (9) is undisputed.

10.      In connection with the 1991 sale, FreightCar recognized the USW as the collective bargaining representative of the Johnstown Facility bargaining unit employees.  Duray Aff. ¶ 3.

**RESPONSE:**

FreightCar admits that Paragraph (10) is undisputed.

11.    Also in connection with the 1991 sale, FreightCar and the USW entered into a Letter Agreement dated October 18, 1991, referred to as the "Mirroring Agreement."  Duray Aff. ¶¶ 3-4.  The Mirroring Agreement, which is in the form of a letter from FreightCar President W.G. Brader, appears in the record as Exhibit B to the Palm Aff. (Ewing Decl. Ex. O).

**RESPONSE:**

FreightCar admits that Paragraph (11) is undisputed.

12.    The Mirroring Agreement is also known as "Side Letter 22" and was one of 27 side letters to the 1991 CBA.  Duray Aff. ¶ 4.

**RESPONSE:**

FreightCar admits that Paragraph (12) is undisputed.

13.    The Mirroring Agreement was incorporated in and made part of the 1991 CBA. FreightCar's Answer in <u>Deemer</u> (Ewing Decl. Ex. P) ¶ 44.

**RESPONSE:**

FreightCar denies that Paragraph (13) is undisputed.  FreightCar denies that Side

Letter 22 was "incorporated in and made part of the 1991 CBA."  Nothing in either Side

Letter 22 or the 1991 CBA suggests that the former was incorporated into the latter.  ***See***

**Christenson Decl. Ex. B (FCA SJ Ex. 3); Howard Decl. Ex. A (FCA SJ Ex. 18).**

14.    As averred by Mr. Duray, pursuant to the Mirroring Agreement, "JAC was obligated to mirror the Bethlehem benefit plans."  Duray Aff. ¶ 6; *see also* FreightCar SJ Brief at 5 ("While JAC was obligated to mirror the Bethlehem benefit plans, the 1991 purchase agreement obligated Bethlehem to reimburse JAC for retiree insurance costs . . .").

**RESPONSE:**

FreightCar denies that Paragraph (14) is undisputed.  FreightCar admits that the plaintiffs

have quoted Mr. Duray's affidavit.  However, FreightCar denies that Mr. Duray's averment fully

or accurately describes the parties' obligations under Side Letter 22.  Mr. Duray testified that he

had not reviewed the Bethlehem plan, **Duray Dep. at 40:21-25 (FCA Supp. SJ Ex. 56),** and did

not have any idea what benefits were provided by that plan, *id.* **at 40:14-20.** Mr. Duray also testified that he did not participate in the 1991 negotiations that led to the execution of Side Letter 22. **Id. at 33:9-13.** Accordingly, Mr. Duray testified that he did not know what the parties meant by their use of the word "mirror." Specifically, Mr. Duray testified: "I'm having a problem with the mirroring, because I wasn't present at the negotiations to know what the plan should look like, so I can't form an opinion on those." **Id. at 110:1-17.** Mr. Duray testified that he did not have any opinion as to whether FreightCar was required to provide benefits for the retirees' lifetimes. **Id. at 49:3-50:7.**

15.    Under the Mirroring Agreement, FreightCar agreed to establish employee benefit plans in general for the members of the bargaining unit "that were identical in all material respects to the Bethlehem plans they replace." Mirroring Agreement at 1; *see also* Duray Aff. ¶ 4.

**RESPONSE:**

FreightCar denies that Paragraph (15) is undisputed. Side Letter 22 does not provide that FreightCar agreed to establish employee benefit plans "in general" for the members of the bargaining unit "that were identical in all material respects to the Bethlehem plans they replace."

**Christenson Decl. Ex. B (FCA SJ Ex. 3).**

16.    In addition to requiring the establishment of an identical program of benefits generally, the Mirroring Agreement provides as follows with respect to welfare benefit plans:

> **Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing** [of the sale]. . . . **Johnstown America shall be responsible for all benefits payable to its employees or its retirees which arise or are based on events which occurred after closing.**

Mirroring Agreement at 2 (emphasis added).

**RESPONSE:**

FreightCar denies that Paragraph (16) is undisputed. FreightCar denies that Side Letter 22 required FreightCar to establish "an identical program of benefits generally." Side

Letter 22 did not require that the plans created by FreightCar be "identical" to the Bethlehem

plans.  **Christenson Decl. Ex. B (FCA SJ Ex. 3).**  Side Letter 22 stated:

> [FreightCar] will create mirror bargaining unit employee benefit plans identical in
> all material respects to the Bethlehem plans they replace.  Within 60 days after
> [the closing] FreightCar will forward to the Union for review and commend draft
> copies of such plans, and [the parties] agree to use their best efforts to finalize
> such plans[.]

*Id.*

17.     Then-USW Director Andrew Palm participated in the labor negotiations in
connection with the 1991 sale.  Palm Aff. ¶¶ 4-5.

**RESPONSE:**

FreightCar admits that Paragraph (17) is undisputed.

18.     Mr. Palm explained as follows with regard to the Mirroring Agreement:

> When we were negotiating for the Union's first contract with JAC in 1991, we
> considered it crucial that JAC agree to the same retiree medical benefits as
> Bethlehem Steel was providing at that time.  One feature of retiree medical
> benefits for Bethlehem Steel retirees (and generally for all basic steel retirees) is
> that they are to continue throughout retirement and beyond contract expiration
> (unless the Union affirmatively agrees otherwise).  The reason we considered it
> crucial in 1991 to have JAC agree on this issue was because we had a lot of
> people in our bargaining unit who had worked many years and would be retiring
> during the next ten years.  Many were even eligible for immediate retirement from
> Bethlehem in 1991.  We thought it would be totally unfair and inappropriate if
> these people lost their lifetime retiree medical benefits by virtue of the sale.  We
> stated repeatedly to JAC negotiators that this issue was a deal breaker, in that we
> needed to have these retiree medical benefits or there would be no agreement.  In
> the end, we achieved our goal.

September 9, 2002 Supplemental Declaration of Andrew Palm ("Supp. Palm Decl.")
(Ewing Decl. Ex. Q) ¶ 3.

**RESPONSE:**

FreightCar denies that Paragraph (18) is undisputed. First, Mr. Palm's testimony is not

admissible in support of a motion for summary judgment.  An "affiant must ordinarily set forth

facts, rather than opinions or conclusions.  An affidavit that is essentially conclusory and lacking

in specific facts is inadequate to satisfy the movant's burden." *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985). Mr. Palm's testimony as to what he believed would be "unfair and inappropriate," what issues he considered to be "crucial" during the negotiations, and that he believes the USW "achieved [its] goal," is irrelevant, self-serving, conclusory, and extrinsic evidence that is inadequate to satisfy the plaintiffs' burden.

Furthermore, Mr. Palm's testimony that this issue was "crucial" is belied by the absence of any evidence that retiree benefits were discussed during the 1991 negotiations. The USW never proposed or insisted that retiree medical or life insurance benefits be vested or that FreightCar otherwise agree to limit its right to modify or terminate retirees' benefits. Mr. Palm's statement that the USW "stated repeatedly to JAC negotiators that this issue was a deal breaker" is contradicted by the testimony of Mr. McIver and Mr. Christenson, who testified that the duration of retiree benefits were not an issue during these negotiations. **Christenson Decl. ¶ 6 (FCA SJ. Ex. 1); McIver Decl. ¶ 7 (FCA SJ Ex. 31).**

19. "Among the plans to be mirrored," FreightCar has admitted, "was Bethlehem's 'Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Bethlehem Steel Corporation and Subsidiary Companies' ('the Bethlehem PHMB')." FreightCar SJ Brief at 4.

**RESPONSE:**

FreightCar denies that Paragraph (19) is undisputed. First, FreightCar denies that statements made in *Deemer* qualify as judicial admissions in this case. An admission is binding only "for the purpose of the case in which the admissions are made[.]" *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972). The summary judgment brief referenced in Paragraph (19) was filed in *Deemer*, a case that was closed almost a decade ago. ***Deemer Docket, Dkt. Nos. 72, 144-46 (FCA SJ Ex. 49).*** Furthermore, to be binding, "admissions must be unequivocal" and must be "statements of fact that require evidentiary proof, not statements of

legal theories." *Glick*, 458 F.2d at 1291.  Statements in FreightCar's brief in *Deemer* fail to meet this exacting standard.  The parties' summary judgment briefs in *Deemer* were also filed before they had the opportunity to conduct discovery.  ***Deemer* Docket, Dkt. No. 72 (FCA SJ Ex. 49).** In fact, Judge Cindrich denied the parties' cross-motions *without prejudice* to be reasserted after the parties had an opportunity to fully develop their positions through discovery.  *Id.*  FreightCar admits that it agreed to create a retiree medical and life insurance plan that mirrored Bethlehem's retiree medical and life insurance plan in all material respects.  **Christenson Decl. Ex. B (FCA SJ Ex. 3).**  FreightCar admits that the Bethlehem PHMB was a summary plan description of Bethlehem's retiree medical and life insurance plan.  **Christenson Decl. Ex. E, p. 1 (FCA SJ Ex. 6).**  FreightCar denies that the "Pensioners' and Surviving Spouses' Health Insurance Agreement" ("the Pensioners' Insurance Agreement") or its Continuation of Coverage provision were part of Bethlehem's retiree medical and life insurance plan or the summary description of that plan, specifically the Bethlehem PHMB.  *Id.* **at 55-58.**

20.     The "Forward" to this Bethlehem plan states that "[t]his booklet is the summary plan description . . . of the Program of Hospital-Medical Benefits which has been established pursuant to the Pensioners' and Surviving Spouses' Health Insurance Agreement dated June 1, 1989, between [the company and the union] which is reproduced as an addendum to this booklet."  This document appears in the record as Exhibit A to the Palm Aff. (Ewing Decl. Ex. R) at 1.  The Forward further states that "This booklet constitutes a part of such Agreement, which continues until December 31, 1993, and thereafter, subject to negotiations between the Company and the Union which may take place no earlier than 1993."  Id.

**RESPONSE:**

FreightCar admits that Paragraph (20) is undisputed.  However, FreightCar denies that the Pensioners' and Surviving Spouses' Health Insurance Agreement was part of Bethlehem's retiree medical and life insurance plan or the Bethlehem PHMB.  Bethlehem's retiree medical and life insurance plan and the Bethlehem PHMB were created pursuant to the Pensioner's Insurance Agreement.  **Christenson Decl. Ex. E, p. 56 (FCA SJ Ex. 6)** ("Pensioners' and

Surviving Spouses' Health Insurance" means the Program of Hospital Medical Benefits (hereinafter "Program") established by this Agreement and described in the booklet adopted by the parties which constituted a part of this Agreement as though incorporated herein."). The Pensioner's Insurance Agreement was not part of the retiree medical and life insurance plan or Bethlehem PHMB. *Id.*

21.     The Forward also states with respect to the Program of Hospital-Medical Benefits:

> The Pensioners' and Surviving Spouses' Health Insurance Agreement and the rules, regulations and arrangements referred to above form the basis on which the Program is administered, but if there is any inconsistency, such Insurance Agreement governs.

Id. at 2.

**RESPONSE:**

FreightCar admits that Paragraph (21) is undisputed.  However, FreightCar denies that the Pensioners' and Surviving Spouses' Health Insurance Agreement was part of Bethlehem's retiree medical and life insurance plan or the Bethlehem PHMB.  Bethlehem's retiree medical and life insurance plan and the Bethlehem PHMB were created pursuant to the Pensioner's Insurance Agreement.  **Christenson Decl. Ex. E, p. 56 (FCA SJ Ex. 6)** ("Pensioners' and Surviving Spouses' Health Insurance" means the Program of Hospital Medical Benefits (hereinafter "Program") established by this Agreement and described in the booklet adopted by the parties which constituted a part of this Agreement as though incorporated herein.").  The Pensioner's Insurance Agreement was not part of the retiree medical and life insurance plan or the Bethlehem PHMB.  *Id.*

22.     Pagination for the "SPD booklet" and the "Insurance Agreement" is consecutive, and they are collectively referred as the "Bethlehem PHMB."  *See* Bethlehem PHMB.

**RESPONSE:**

FreightCar denies that Paragraph (22) is undisputed.  FreightCar admits that "pagination for the SPD booklet" and the "Insurance Agreement is consecutive."  However, FreightCar disputes the plaintiffs' statement that the Bethlehem PHMB and the separate Pensioners' Insurance Agreement are "collectively referred to as the 'Bethlehem PHMB.'"  FreightCar states that the Bethlehem PHMB refers to the summary plan description of the retiree medical and life insurance plan.  **Christenson Decl. Ex. E, p. 56 (FCA SJ Ex. 6)** ("Pensioners' and Surviving Spouses' Health Insurance" means the Program of Hospital Medical Benefits (hereinafter "Program") established by this Agreement and described in the booklet adopted by the parties which constituted a part of this Agreement as though incorporated herein.").  Bethlehem agreed to offer this program of benefits pursuant to a separate document, the "Pensioners' and Surviving Spouses' Insurance Agreement" with the USW.  *Id.* **at 55-56.**

23.     The Bethlehem PHMB was maintained pursuant to a collective bargaining agreement between Bethlehem and the Union.  FreightCar SJ Brief at 5.

**RESPONSE:**

FreightCar admits that Paragraph (23) is undisputed.

24.     The Bethlehem PHMB provided that the company would pay the entire cost of hospital and physician's coverage.  Bethlehem PHMB at 1.

**RESPONSE:**

FreightCar admits that Paragraph (24) is undisputed.  However, FreightCar notes that the "major medical benefits" were to be paid for by the retirees.  **Christenson Decl. Ex. E, p. 1 (FCA SJ Ex. 6)** ("The hospital and physicians' services benefits of this Program, which are paid for entirely by the Company, ***and the optional major medical benefits of this Program, which are paid for entirely by pensioners and surviving spouses electing such coverage***, are provided in accordance with agreements entered into by the Insurance Board under the Social Insurance

- 20 -

Plan of Bethlehem Steel Corporation and Subsidiary Companies on behalf of the Company with

Blue Cross and Blue Shield.").

     25.     The Bethlehem PHMB states as follows with respect to health insurance in its

"Continuation of Coverage" provision:

> **Continuation of Coverage**
>
> **Any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise.**

Bethlehem PHMB at 57 (emphasis added).

**RESPONSE:**

     FreightCar denies that Paragraph (25) is undisputed.  FreightCar admits that the plaintiffs

have quoted the Continuation of Coverage provision from the Pensioners' Insurance Agreement.

However, FreightCar denies that the Continuation of Coverage provision was part of the

Bethlehem of PHMB.  The Continuation of Coverage provision was part of the Pensioner's

Insurance Agreement, which was a separate document.  **Christenson Decl. Ex. E, pp. 55-56**

**(FCA SJ Ex. 6).**  The Pensioner's Insurance Agreement was a collectively bargained agreement

that required Bethlehem to create the retiree medical and life insurance plans described by the

Bethlehem PHMB.  ***Id.***

     26.     FreightCar admits that "[t]he Bethlehem welfare benefit plan FreightCar agreed to mirror" includes this Continuation of Coverage provision.  See FreightCar Brief in Opposition to Plaintiffs' Preliminary Injunction Motion ("FreightCar Preliminary Injunction Brief") (Dkt. #59) at 6.

**RESPONSE:**

     FreightCar denies that Paragraph (26) is undisputed.  First, FreightCar denies that the

Continuation of Coverage provision was part of Bethlehem's retiree medical and life insurance

benefit plan.  FreightCar states that the Continuation of Coverage provision was part of a

collectively bargained agreement between Bethlehem and the USW, which gave rise to, but was

not a part of, Bethlehem's retiree medical and life insurance benefit plan.  **Christenson Decl.**

**Ex. E, pp  55-56 (FCA SJ Ex. 6).**  Furthermore, FreightCar denies that the quoted language

from its preliminary injunction brief constitutes a judicial admission as to which specific terms

constituted the Bethlehem "welfare benefit plan."  FreightCar's reference to Bethlehem's welfare

benefit plan in the context of its discussion of the Continuation of Coverage language is not an

"unequivocal statement" that would qualify as a judicial admission.  *Philadelphia Reinsurance*

*Group v. Employers Ins. of Wausau*, 61 Fed. App'x 816, 819 (3d Cir. 2003) ("To be binding,

judicial admissions must be unequivocal.  An unequivocal statement is one that is clear,

unambiguous, and expresses only one meaning.")

      27.     The Bethlehem PHMB similarly provides with respect to retiree life insurance:

Life Insurance After Retirement

Any Pensioner entitled to life insurance pursuant to the provisions of the
insurance agreement and booklet applicable at the time of retirement shall not
have such life insurance terminated or reduced (except as provided in such
booklet) so long as he or she remains retired from the Company, notwithstanding
the expiration of such agreement or booklet or this Agreement, except as the
Company and the Union may agree otherwise.

Bethlehem PHMB at 57.

**<u>RESPONSE:</u>**

      FreightCar denies that Paragraph (27) is undisputed.  FreightCar denies that the "Life

Insurance After Retirement" provision was part of the Bethlehem retiree medical and life

insurance benefit plan.  FreightCar states that the "Life Insurance After Retirement" provision

was part of a collectively-bargained insurance agreement between Bethlehem and the USW,

which gave rise to, but was not a part of, Bethlehem's retiree medical and life insurance benefit

plan.  **Christenson Decl. Ex. E, pp. 55-56 (FCA SJ Ex. 6).**

28.     FreightCar does not dispute that the "Continuation of Coverage" and "Life
Insurance After Retirement" provisions are controlling, and indeed has expressly stated that it
relies on the language providing "except as the Company and the Union may agree otherwise."
FCA SJ Brief at 16 n.2 ("the Bethlehem Insurance Agreement provided that expiration of that
agreement would not terminate the benefits, but it expressly recognized that the company and
Union could alter or terminate the benefits in future collective bargaining"); *see also* id. at 15
("[the PHMB] expressly states that benefits may not be reduced or terminated 'except as the
Company and Union may agree otherwise.'"); FreightCar Answer in <u>Deemer</u> (Ewing Decl. Ex.
P) ("The 1990 Pensioners' and Surviving Spouses' Insurance Agreement between Bethlehem
and the Union, which the Company agreed to mirror, does not grant or create vested retiree
health and/or life insurance benefits.  The right to retiree health and/or life insurance benefits is
explicitly subject to reduction or termination by agreement of the Company and the Union").

**<u>RESPONSE:</u>**

FreightCar denies that Paragraph (28) is undisputed.  FreightCar denies that the

statements the plaintiffs quote prove that FreightCar does not dispute the Continuation of

Coverage provision is controlling or that FreightCar relies on that language for the material

issues in dispute in this case.  FreightCar states only that if these provisions did control, they are

nevertheless inconsistent with the plaintiffs' claim that the retirees' benefits were "vested."  ***See***

**FCA Sum. J. Brief, at pp. 18-19 (Dkt. No. 120-1).**  Further, FreightCar denies that the

Continuation of Coverage and Life Insurance After Retirement provisions were ever agreed to,

adopted, or mirrored by FreightCar.  FreightCar states that the Continuation of Coverage

provision and the Life Insurance After Retirement provision were part of a collectively-

bargained insurance agreement between Bethlehem and the USW, which gave rise to, but was

not a part of, Bethlehem's retiree medical and life insurance benefit plan.  **Christenson Decl.**

**Ex. E, pp. 55-56 (FCA SJ Ex. 6).**

Furthermore, FreightCar denies that the excerpts quoted from FreightCar's prior briefs

and pleadings in *Deemer* constitute judicial admissions.  None of these statements were made in

this case. *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) (holding statements can only qualify as judicial admissions for the purposes of the case in which they are made).

29.     FreightCar also does not dispute that the mirroring requirement remained in effect until November 1, 1997: " . . . JAC and the Union expressly agreed that JAC was no longer bound to mirror any of the Bethlehem programs and that JAC's Employee Guide would govern beginning November 1, 1997 . . ." FreightCar's September 30, 2002 Summary Judgment Reply Brief (Ewing Decl. Ex. S) at 12.

**RESPONSE:**

FreightCar denies that Paragraph (29) is undisputed.  FreightCar denies that the quote the plaintiffs rely on proves their allegation.  In fact, the parties agreed as early as 1994 that Side Letter 22 would not be carried forward because the USW approved, and FreightCar distributed, the JAC Employee Guide in May 1993.  **McIver Decl. ¶ 14 (FCA SJ Ex. 31).**  FreightCar admits however that the parties expressly agreed in 1997 that FreightCar was not bound by Side Letter 22 and that JAC's Employee Guide would govern.  **Howard Decl. Ex. C, pp. 73, 90 (FCA SJ Ex. 20).**

30.     Nowhere does the Bethlehem PHMB reserve for the employer a **unilateral** right to reduce or terminate benefits.  *See* Bethlehem PHMB; *see also* Palm Decl. ¶ 7.

**RESPONSE:**

FreightCar admits that Paragraph (30) is undisputed.  However, FreightCar states that the Bethlehem PHMB never governed the relationship between FreightCar and the USW or the Retirees.  **FCA Sum. J. Brief, at p. 25 (Dkt. No. 120-1).**  FreightCar further states that in any event, an employer has no obligation to reserve its right to modify or terminate benefits.  Absent language relinquishing its right to terminate benefits, an employer may do so for any reason at any time.  *See UAW v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999).

31.     Mark Duray was deposed during <u>Deemer</u> discovery on December 18, 2003.  *See* Excerpts from December 18, 2003 Deposition Transcript of Mark Duray ("Duray Dep.") (Ewing Decl. Ex. T).  Mr. Duray signed the principal declaration relied upon by FreightCar in the instant

case in opposing Plaintiffs' motion for preliminary injunction.  *See* Duray Aff. (Ewing Decl. Ex. L) at Dkt. #60-2.

**RESPONSE:**

FreightCar denies that Paragraph (31) is undisputed.  FreightCar denies that Mr. Duray signed the "principal declaration" relied upon by FreightCar in the instant case in opposing Plaintiffs' motion for preliminary injunction.  Furthermore, FreightCar denies that the statements made in Mr. Duray's deposition or in his declaration in *Deemer* constitute judicial admissions by FreightCar in this case.  An admission is binding only "for the purpose of the case in which the admissions are made[.]"  *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972).

32.     Mr. Duray was FreightCar's Manager of Labor Relations from 1994 through 1998 and Vice President for Human Resources from 1998 through at least 2003.  Duray Aff. ¶ 1. Beginning in 1998, he was the top HR person at FreightCar.  Duray Dep. at 156:19-22, 167:11-18.  Mr. Duray was also a member of FreightCar's negotiating committee during 1997 negotiations.  Duray Decl. ¶ 8.

**RESPONSE:**

FreightCar admits Paragraph (32) is undisputed.

33.     Mr. Duray testified that FreightCar did in fact enact welfare benefit plans, including retiree health plans, that mirrored Bethlehem's.  Duray Dep. at 43:19-23.

**RESPONSE:**

FreightCar denies that Paragraph (33) is undisputed.  FreightCar admits that Mr. Duray testified that FreightCar created a retiree health plan that mirrored Bethlehem's.  However, Mr. Duray testified that he did not participate in the 1991 negotiations that led to the execution of Side Letter 22, **Duray Dep. at 33:9-13 (FCA Supp. SJ Ex. 56)**, and that he did not know what the parties meant by their use of the word "mirror."  Specifically, Mr. Duray testified: "I'm having a problem with the mirroring, because I wasn't present at the negotiations to know what the plan should look like, so I can't form an opinion on those."  ***Id.* at 110:1-5; *see also id.* at 66:3-19** (Q: "So if the JAC guide was consistent with side letter 22 . . . you would have had to be

describing JAC plans which mirrored Bethlehem's, correct?"  A: ***I don't know what they***

***mirrored.***  You're asking me about benefits questions here, John, that – I didn't deal with the

benefits.").  Furthermore, Mr. Duray testified that he did not have any opinion as to whether

FreightCar was required to provide benefits for the retirees' lifetimes.  ***Id.* at 49:3-50:7.**

34.     Mr. Duray likewise testified that FreightCar had all the mirrored Bethlehem Plans
"up and running."  Duray Dep. at 102:23-103-2.  FreightCar continued to provide retiree health
benefits which mirrored those provided in the Bethlehem plan at least through 1999.  Duray Dep.
at 162:2-13.

**RESPONSE:**

FreightCar denies that Paragraph (34) is undisputed.  FreightCar admits that Mr. Duray

testified that FreightCar had "mirrored Bethlehem Plans 'up and running.'"  However, Mr. Duray

also testified that he did not know what the parties meant by their use of the word "mirror."

Specifically, Mr. Duray testified: "I'm having a problem with the mirroring, because I wasn't

present at the negotiations to know what the plan should look like, so I can't form an opinion on

those."  **Duray Dep. at 110:1-5 (FCA Supp. SJ Ex. 56);** *see also id.* **at 66:3-19** (Q: "So if the

JAC guide was consistent with side letter 22 . . . you would have had to be describing JAC plans

which mirrored Bethlehem's, correct?"  A: ***I don't know what they mirrored.***  You're asking me

about benefits questions here, John, that – I didn't deal with the benefits.").

FreightCar denies that it "continued to provide retiree health benefits which mirrored

those provided in the Bethlehem plan at least through 1999."  FreightCar states that the benefits

provided to its retirees under the JAC Guide and through the Steelworkers Health and Welfare

Fund were not identical to the benefits described in the Bethlehem PHMB.  **FCA SUMF ¶¶ 62-**

**67.**

35.     FreightCar "admits that it fulfilled its obligation under the Mirroring Agreement
to create and provide welfare plans which mirrored Bethlehem's."  FreightCar's Answer (Dkt.
#76) ¶ 47.

**RESPONSE:**

FreightCar admits that Paragraph (35) is undisputed.

36.     USW negotiator Andrew Palm testified consistent with Mr. Duray's testimony and FreightCar's admission that mirrored plans were in place as of 1991.  Excerpts from the Deposition Testimony of Andrew Palm ("Palm Dep.") (Ewing Decl. Ex. U) at 31:17–32:7.

**RESPONSE:**

FreightCar admits that Paragraph (36) is undisputed.  However, FreightCar does not admit that Mr. Palm testified consistent with Mr. Duray's testimony and FreightCar's position in this action regarding what terms comprised the "mirrored plans."  Specifically, Mr. Duray testified: "I'm having a problem with the mirroring, because I wasn't present at the negotiations to know what the plan should look like, so I can't form an opinion on those."  **Duray Dep. at 110:1-5 (FCA Supp. SJ Ex. 56); *see also id.* at 66:3-19** (Q: "So if the JAC guide was consistent with side letter 22 . . . you would have had to be describing JAC plans which mirrored Bethlehem's, correct?"  A: ***I don't know what they mirrored.***  You're asking me about benefits questions here, John, that – I didn't deal with the benefits.").  FreightCar denies that the "mirrored plans" created by FreightCar and approved by the USW included the Continuation of Coverage provisions found in the Pensioners' Insurance Agreement between the USW and Bethlehem.

37.     Mr. Duray's testimony and FreightCar's admission are consistent with the Mirroring Agreement provision requiring that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing [of the sale]."  Mirroring Agreement at 2 (emphasis added).

**RESPONSE:**

FreightCar admits that Paragraph (37) is undisputed.

38.     While FreightCar "fulfilled its obligation under the Mirroring Agreement to create and provide welfare plans which mirrored Bethlehem's," it did not do so by drafting a plan document, as none existed as of 2002.  See letter dated March 1, 2002 from FreightCar's Human Resource Manager to Raymond Jastrzab (Palm Aff. Ex. D) (Ewing Decl. Ex. V).

**RESPONSE:**

FreightCar denies that Paragraph (38) is undisputed.  FreightCar states that it drafted the summary plan descriptions in JAC's Employee Guide, which along with the plans' associated insurance contracts, served as the plan documents.  **FCA SUMF ¶ 53.**  FreightCar further states that the USW reviewed and approved the summary plan descriptions in JAC's Employee Guide which contained the language identifying the plan documents.  **FCA SUMF ¶ 40.**

39.     FreightCar advised as follows on this point on March 1, 2002:

I am writing in response to your request for plan documents for represented employees of Johnstown America Corporation. . . . Plan documents do not exist for the welfare plans i.e., health care, and sickness and accident plans, etc.  The Summary Plan Description is all that exists for these plans.

Id.

**RESPONSE:**

FreightCar denies that Paragraph (39) is undisputed.  FreightCar states that the letter referenced by the plaintiffs in Paragraph (39) was not written to advise on the accuracy of the plaintiffs' statement in Paragraph (38).  FreightCar states that the summary plan descriptions in the JAC Guide, along with their underlying insurance contracts, were the "plan documents." **FCA SUMF ¶ 53.**  FreightCar notes that several courts have held that a summary plan description can serve as a "plan document" for ERISA purposes.  *See Wise v. IBM Benefits Plan for Retired Employees*, Civ. No. 13-cv-1591, 2014 WL 3849975 (D. Conn. Aug. 5, 2014) (collecting post-*Amara* cases and finding that SPD can serve as the plan document and an employer has no obligation to create a "formal" plan document).

40.     The Bethlehem PHMB describes in detail the health and life insurance benefits provided thereunder.  *See* Bethlehem PHMB at 8-54.

**RESPONSE:**

FreightCar denies that Paragraph (40) is undisputed.  FreightCar admits that the

Bethlehem PHMB is a summary plan description, and accordingly, it described the health and

life insurance benefits provided thereunder.

41.     In 1993, while the 1991 CBA was still in effect, FreightCar distributed a summary plan description titled "JAC's Employee Guide" ("1993 SPD").  *See* Ewing Decl. Exs. W, X, and Y.  The first sentence of the "retiree insert" states: "We know that comprehensive, high-quality medical coverage is extremely important to you in your retirement years."  1993 SPD (Ewing Decl. Ex. X) at FCA000459.

**RESPONSE:**

FreightCar admits that Paragraph (41) is undisputed.  However, FreightCar states that the

"retiree insert" also states that benefits could be lost or delayed and the plan could be modified to

reduce or eliminate benefits.  **Christenson Decl. Ex. N, p. 33 (FCA SJ Ex. 15).**

42.     The 1993 SPD includes a May 1993 letter addressed to "Dear Employee" that states that "this handbook serves as the summary plan description required by the Employee Retirement Income Security Act of 1974, as amended."  1993 SPD (Ewing Decl. Ex. W) at FCA000215.

**RESPONSE:**

FreightCar admits that Paragraph (42) is undisputed.

43.     The 1993 SPD first came out in 1993 or close to that year.  Duray Dep. at 62:11-13.

**RESPONSE:**

FreightCar admits that Paragraph (43) is undisputed.  FreightCar states that the JAC

Guide was distributed to employees in May 1993.  **FCA SUMF ¶ 51.**

44.     Mr. Duray testified that the Mirroring Agreement was still in effect when the 1993 SPD came out in 1993.  Duray Dep. at 63:13-17.

**RESPONSE:**

FreightCar denies that Paragraph (44) is undisputed.  The plaintiffs' use of the phrase

"still in effect" is vague and ambiguous.  Mr. Duray's counsel objected to the plaintiffs' use of

this phrase during Mr. Duray's deposition. **Duray Dep. at 62:14-21 (FCA Supp. SJ Ex. 56).**

FreightCar states that the "mirroring agreement" was a side letter to the 1991 CBA, which did

not expire until 1994. FreightCar further states that by distributing the JAC Guide in 1993, it

fulfilled its obligation under Side Letter 22 to "create" bargaining unit employee benefit plans

that "replaced" the Bethlehem plans.

45.     Mr. Duray testified that the 1993 SPD "described what went into effect in 1991,"
*i.e.*, the Bethlehem PHMB.  Duray Dep. at 68:5-17.

**RESPONSE:**

FreightCar denies that Paragraph (45) is undisputed.  Mr. Duray only stated that the JAC

Guide "described what went into effect in 1991." **Duray Dep. at 68:5-17 (FCA Supp. SJ**

**Ex. 56).**  Mr. Duray did not state that the Bethlehem PHMB went into effect in 1991. *Id.* **at**

**66:3-19.**

46.     As testified to by Glenn Grove, FreightCar's benefit administrator at the time, the
1993 SPD encompassed the Mirroring Agreement.  Excerpts from the December 10, 2003
Deposition Transcript of Glenn Grove ("Grove Dep.") (Ewing Decl. Ex. Z) at 13:16-22; 22:2-16.

**RESPONSE:**

FreightCar denies that Paragraph (46) is undisputed.  FreightCar admits that Grove stated

he believed that the JAC Guide "encompassed the mirroring agreement." Grove testified that this

belief was based on the fact that the benefits in the Bethlehem Program of Insurance Benefits

("the Bethlehem PIB") which was the Bethlehem summary plan description that described ***active***

employees' benefits, matched the benefits in the JAC Guide. **Grove Dep. at 22:3-22 (FCA SJ**

**Ex. 40).**  Grove did not testify that he reviewed the JAC Guide to ensure that the Continuation of

Coverage language found in the Bethlehem PHMB, or any other terms or benefits in the

Bethlehem PHMB, were included in the JAC Guide. *Id.* **at 22:3-22.**  Furthermore, Mr. Grove's

testimony that he only reviewed "the benefit part" of the Bethlehem PIB, *id.* **at 22:17-23:2,**

reflects the fact that the parties did not believe they were mirroring the separate collectively

bargained insurance agreements which required Bethlehem to create, but were not a part of, the

Bethlehem PHMB and PIB.

47.     Mr. Duray testified as follows with respect to the 1993 SPD's status as such:

Q. And would it be fair to state that the JAC guide was a summary plan description of the various benefit plans that JAC had, including retiree health?

A. Yes

Duray Dep. at 63:18-23.  He also testified that he knows how to read and understand summary plan descriptions.  Id. at 162:21-163:4.

**RESPONSE:**

FreightCar admits that Paragraph (47) is undisputed.

48.     The 1993 SPD states as follows with respect to health benefits:

Note: **This plan is subject to the rights and obligations of collective bargaining.  The company may amend or terminate the plan only through this process.**  This booklet is intended as a general summary of your benefits under the plan.  The specific details of this plan are in the actual plan document, which controls your benefits.

1993 SPD (Ewing Decl. Ex. Y) at handwritten page number 6 (emphasis added).

**RESPONSE:**

FreightCar admits that Paragraph (48) is undisputed.  However, FreightCar states that the

above quoted language is only applicable to the ***represented active employees'*** medical benefit

plan.  While this same language is found in ***each of the represented active employees'*** summary

plan descriptions, it was not included in from the ***retired employees'*** medical benefit plan SPD.

The retiree medical plan SPD simply provides:

This guide attempts to provide a simple explanation of the provisions of your benefit.  Complete technical information on the plans can be found in formal legal documents available in the human resources department.  If there's any omission, or if this guide is unclear, or if this guide and the plans differ, the plans as stated in the legal documents must take precedence.  If you have any questions, call the human resources department.

**Christenson Decl. Ex. N, p. 2 (FCA SJ Ex. 15).**

49.     The 1993 SPD also states that "[t]he plans are subject to the collective bargaining process."  1993 SPD (Ewing Decl. Ex. W) at FCA000445.

**RESPONSE:**

FreightCar admits that Paragraph (49) is undisputed.  However, FreightCar states that "the collective bargaining process" does not include bargaining on behalf of and with respect to retirees.  *See Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971) ("Th[e] obligation [to collectively bargain] ***extends only to the 'terms and conditions of employment' of the employer's 'employees'*** in the unit appropriate for such purposes that the union represents.").  Retirees are no longer members of the bargaining unit, are no longer represented by a union, and therefore, do not participate in the collective bargaining process.  *Id.* ("[I]n addition to holding that pensioners are not 'employees' within the meaning of the collective bargaining obligations of the Act, we hold that they were not and could not be 'employees' included in the bargaining unit.").

50.     Another notice similarly provides:

This guide attempts to provide a simple explanation of the provisions of your benefit.  Complete technical information on the plans can be found in formal legal documents available in the human resources department.

**If there's any omission, if this guide is unclear, or if this guide and the plans differ, the plans as stated in the legal documents must take precedence.**

1993 SPD (Ewing Decl. Ex. W) at FCA 000437 (emphasis added).

**RESPONSE:**

FreightCar admits that Paragraph (50) is undisputed.  However, FreightCar states that the controlling "legal documents" for both the active and retiree medical plans were the summary plan descriptions in the JAC Guide, *see Wise v. IBM Benefits Plan for Retired Employees*, Civ. No. 13-cv-1591, 2014 WL 3849975 (D. Conn. Aug. 5, 2014)  (collecting post-*Amara* cases and

finding that SPD can serve as the plan document and an employer has no obligation to create a "formal" plan document), along with the plans' underlying insurance contracts.  **FCA SUMF ¶ 53.**

51.     On the first page of the 1993 SPD, a letter dated May 1993 addressed to "Employee" similarly states that the handbook contained only "summaries of the benefit plans;" and that:

> Each benefit plan has legal documents that may be referred to whenever a question concerning your coverage arises.  **In the event of a difference between the summary and the legal documents, the legal documents shall control.**

1993 SPD (Ewing Decl. Ex. W) at FCA000215 (emphasis added).

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (51) is undisputed.  However, FreightCar states that the controlling "legal documents" for both the active and retiree medical plans were the summary plan descriptions in the JAC Guide, *see Wise v. IBM Benefits Plan for Retired Employees*, Civ. No. 13-cv-1591, 2014 WL 3849975 (D. Conn. Aug. 5, 2014) (collecting post-*Amara* cases and finding that SPD can serve as the plan document and an employer has no obligation to create a "formal" plan document), along with the plans' underlying insurance contracts.  **FCA SUMF ¶ 53.**

52.     The 1993 SPD was drafted by Hewitt, an outside benefits administrator.  Grove Dep. at 20:8-9; Duray Dep. at 68:19-24.  FreightCar Benefit Administrator Glenn Grove provided Hewitt with the information it needed to draft the 1993 SPD by sending Hewitt Bethlehem's Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Bethlehem Steel Corporation and Subsidiary Companies ("PIB").  Grove Dep. at 20:10-14.

**<u>RESPONSE:</u>**

FreightCar denies that Paragraph (52) is undisputed.  FreightCar admits that the JAC Guide was primarily drafted by Hewitt.  FreightCar denies the plaintiffs' statement that "Grove provided Hewitt with the information it needed to draft the 1993 SPD by sending Hewitt

Bethlehem's Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving

Spouses of Bethlehem Steel Corporation and Subsidiary Companies ("PIB")."  To the contrary,

Grove sent Hewitt the "Bethlehem Program of Insurance Benefits" ("the Bethlehem PIB"),

which was the summary plan description book Bethlehem created to describe the benefits

provided to *active* employees.  **Grove Dep. at 20:12-16 (FCA SJ Ex. 40).**  The Bethlehem PIB

does not contain any language similar to the Continuation of Coverage language found in the

Bethlehem PHMB.  **FCA SUMF ¶ 31.**

53.     Mr. Grove reviewed the 1993 SPD to ensure that the benefits in it matched the
Bethlehem benefits.  Grove Dep. at 22:11-22 ("I made sure that if the benefit was in this book
[the Bethlehem PIB], it was covered in our book [the 1993 SPD]").

**RESPONSE:**

FreightCar admits that Paragraph (53) is undisputed.  FreightCar notes that Grove

testified that he only compared the Bethlehem PIB to the JAC Guide to ensure that the *benefits*

matched.  **Grove Dep. at 22:6-23:2 (SJ Ex. 40)** ("When I proofread my part, *which was only*

*the medical part*, I made sure *benefit matched benefit*.  That was all I did.  And I made sure that

the benefits in this book w[ere] covered in our book.") (emphasis added).  Grove did not testify

that he reviewed either the Bethlehem PHMB or the collectively-bargained Pensioner's

Insurance Agreement attached thereto.

54.     The 1993 SPD list of "Official Plan Names and Plan Numbers" includes the
"Johnstown America Corporation Hourly Employees Medical Plan."  1993 SPD (Ewing Decl.
Ex. W) at FCA000446.  As shown, FreightCar admitted in 2002 that it never prepared an actual
medical plan document (whether named "Johnstown America Corporation Hourly Employees
Medical Plan" or otherwise).  *See* Ewing Decl. Ex. V.  Accordingly, the controlling medical plan
document repeatedly referenced in the 1993 SPD can only be the Bethlehem PHMB.

**RESPONSE:**

FreightCar denies that Paragraph (54) is undisputed.  FreightCar admits that the JAC

Guide list of "Official Plan Names and Plan Numbers" includes the "Johnstown America

Corporation Hourly Employees Medical Plan." FreightCar states that in 2002 a human resources employee informed the USW that JAC Guide's summary plan descriptions were all that existed for the welfare plans. FreightCar states that the "controlling" documents for the active and retiree medical and life insurance plans were the summary plan descriptions for those plans, along with the underlying insurance contracts. **FCA SUMF ¶ 53.**

FreightCar denies that "the controlling medical plan document repeatedly referenced in the 1993 SPD can only be the Bethlehem PHMB." The retiree section of the JAC Guide references controlling "legal documents," which include documents such as the underlying insurance contracts. **Christenson Decl. Ex. N, p 2 (FCA SJ Ex. 15).** Second, the JAC Guide itself defines the term "plan documents" to include "insurance contracts and copies of documents filed by the plan with the Internal Revenue Service or U.S. Department of Labor, like annual reports and plan descriptions." **FCA SUMF ¶ 53.** Third, a summary plan description can serve as the controlling plan document. *See Wise v. IBM Benefits Plan for Retired Employees*, Civ. No. 13-cv-1591, 2014 WL 3849975 (D. Conn. Aug. 5, 2014) (collecting post-*Amara* cases and finding that SPD can serve as the plan document and an employer has no obligation to create a "formal" plan document).

55.    The 1993 SPD provides:

If you retire under Johnstown America's pension plan for represented employees and have worked continuously at Johnstown America for 15 or more years, you and your eligible dependents will be enrolled for retiree medical coverage under the medical plan, unless you choose not to be. If you're the spouse of a former employee who's eligible to receive a surviving spouse's benefit under the pension plan, you'll also be eligible for our retiree medical coverage.

1993 SPD (Ewing Decl. Ex. X) at FCA000256.

**RESPONSE:**

FreightCar admits that Paragraph (55) is undisputed.

56.     The 1993 SPD states as follows with respect to retiree coverage: "The company pays the cost of hospital and physicians' coverage for you and your dependents."  199  SPD (Ewing Decl. Ex. X) at FCA000463.

**RESPONSE:**

FreightCar admits that Paragraph (56) is undisputed.  However, FreightCar states that the

JAC Guide also provides that if retirees "choose major medical coverage, [they will] need to pay

part of the cost of this coverage."  **Christenson Decl. Ex. N, p. 7 (FCA SJ Ex. 15).**

57.     With respect to life insurance, the 1993 SPD provides: "If you retire at or after age 62, your basic life insurance will be reduced to $5,000.  If you retire before you turn age 62 . . . you'll keep the same coverage as other active employees until you turn 62.  Then your coverage will be reduced to $5,000."  1993 SPD (Ewing Decl. Ex. W) at FCA000309.

**RESPONSE:**

FreightCar admits that Paragraph (57) is undisputed.

58.     FreightCar relies in this litigation on the following:

*If Coverage Ends or Is Modified*

**Subject to collective bargaining**, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part.  This means the plans may be discontinued in part or in their entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented. If any changes are made, you'll be notified.

1993 SPD (Ewing Decl. Ex. W) at FCA000450 (emphasis added).

**RESPONSE:**

FreightCar denies that Paragraph (58) is undisputed.  FreightCar states that it does not

rely on any particular provision or language in any of the documents relevant to this litigation.

Rather, FreightCar relies on the fact that none of the relevant documents evidence a clear and

express agreement by FreightCar to limit its right to unilaterally modify or terminate retiree

medical or life insurance benefits.  In addition to relying on the absence of evidence that

FreightCar agreed to limit its rights to unilaterally modify or terminate these benefits, FreightCar

states that the express reservation of rights quoted by the plaintiffs in Paragraph (58) is

affirmative evidence of the parties' mutual understanding that there was no such agreement.

59.     Another 1993 SPD provision, similarly relied upon by FreightCar and similarly
consistent with the "Note" from the 1993 SPD cited above, states:

Situations That May Affect Your Benefits

You and your family's medical benefits could be lost or delayed if:

* * *

**Subject to the collective bargaining agreement**, the plan is modified to reduce
or eliminate certain benefits or it ends.

1993 SPD (Ewing Decl. Ex. W) at FCA000257 (emphasis added).

**<u>RESPONSE:</u>**

FreightCar denies that Paragraph (59) is undisputed.  FreightCar states that it does not

rely on any particular provision or language in any of the documents relevant to this litigation.

FreightCar relies on the fact that none of the relevant documents evidence a clear and express

agreement by to limit its right to unilaterally modify or terminate retiree medical or life insurance

benefits.  In addition to relying on the absence of evidence that FreightCar agreed to limit its

right to unilaterally modify or terminate these benefits, FreightCar cites the JAC Guide provision

quoted by the plaintiffs in Paragraph (59) as affirmative evidence of the parties' mutual

understanding that there was no such agreement.

60.     As construed by FreightCar, "the general provisions of JAC's Employee Guide
expressly reserve to JAC the right to terminate any benefit, including company paid retiree
benefits, **subject to collective bargaining**."  Duray Aff. ¶ 20 (emphasis added).

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (60) is undisputed.  However, FreightCar states that its

obligation to engage in collective bargaining only extends to the "terms and conditions of

employment" of active represented employees.  *See Allied Chemical and Alkali Workers v.*

*Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971) ("Th[e] obligation [to collectively bargain]

***extends only to the 'terms and conditions of employment' of the employer's 'employees'*** in the

unit appropriate for such purposes that the union represents.").

61.     The USW sought and obtained the 1993 SPD condition that changes to the benefits could only be "subject to collective bargaining" and "subject to the collective bargaining agreement."  By letter dated July 31, 1992, Jerry Sokolow, Technician in the USW's Pension, Insurance & Research Department, advised counsel for FreightCar as follows: "In general, we want effective date of October 28, 1991 for all books, and we want all books to reference collective bargaining agreement as far as company's right to amend and or terminate the plan." Exhibit 1, Tab 7 from the Deposition of Ernie Esposito ("Esposito Dep.") (Ewing Decl. Ex. AA). In particular, the USW advised FreightCar as follows with respect to purported reservation of right provisions as to dental, vision and medical benefits: "delete or subject to collective bargaining agreement."  Id.

**RESPONSE:**

FreightCar admits that Paragraph (61) is undisputed.

62.     The USW followed up by letter dated January 22, 1993 from Mr. Sokolow to FreightCar's counsel advising that "I believe that all of the SPD (Summary Plan Description) books have now been corrected to meet our expectations and specifications."  Esposito Dep. Ex. 1, Tab 8 (Ewing Decl. Ex. BB).

**RESPONSE:**

FreightCar admits that Paragraph (62) is undisputed.

63.     By letter dated March 26, 1993, FreightCar's counsel confirmed that the latest draft of the 1993 SPD "incorporates the changes that the Steelworkers requested."  Esposito Dep. Ex. 1, Tab 9 (Ewing Decl. Ex. CC).

**RESPONSE:**

FreightCar denies that Paragraph (63) is undisputed.  On March 26, 1993, FreightCar's

counsel sent the USW the latest draft of the Retiree Medical Summary Plan Description."  **FCA**

**SUMF ¶ 45.**  FreightCar states that on April 12, 1993, FreightCar's counsel received a phone

call from the USW confirming that the "draft of the Retiree Medical SPD is acceptable to the

Steelworkers."  **FCA SUMF ¶ 46.**

64.     At the time that the 1993 SPD was drafted in 1993 and the parties included the "subject to the collective bargaining agreement" and "subject to collective bargaining" provisions, the collectively bargained Mirroring Agreement (Side Letter 22) was indisputably part of the controlling 1991 collective bargaining agreement.  See 1991 CBA, Side Letter 22.

**RESPONSE:**

FreightCar denies that Paragraph (64) is undisputed.  FreightCar states that Side Letter 22 was not "indisputably part of the controlling 1991 collective bargaining agreement."  Nothing in either Side Letter 22 or the 1991 CBA suggests that the former was ever part of the latter.  ***See* Chirstenson Decl. Ex. B (FCA SJ Ex. 3); Howard Decl. Ex. A (FCA SJ Ex. 18).**

65.     FreightCar and the Union engaged in collective bargaining in 1994, resulting in the 1994 CBA. Duray Aff. ¶ 9.

**RESPONSE:**

FreightCar admits that Paragraph (65) is undisputed.

66.     Side Letter 22—the Mirroring Agreement—was carried forward in the 1994 CBA.  Duray Aff. ¶ 9.

**RESPONSE:**

FreightCar denies that Paragraph (66) is undisputed.  FreightCar states that during the 1994 collective bargaining negotiations the parties agreed that Side Letter 22 would not be carried forward.  **FCA SUMF ¶ 56.**

67.     There were no changes in the 1994 CBA that are pertinent to this case.  Duray Aff. ¶ 7.

**RESPONSE:**

FreightCar admits that Paragraph (67) is undisputed.  However, while the 1994 CBA was not changed, FreightCar states that in the JAC Guide was approved and distributed in 1993. **FCA SUMF ¶¶ 40, 46, 51.**  FreightCar also states the parties agreed during the 1994 negotiations that Side Letter 22 would not be carried forward.  **FCA SUMF ¶ 56.**

68.     Manager Joseph S. Canini, Jr. worked in FreightCar's Human Resources Department from November 15, 1993 through August 21, 2000.  April 30, 2003 Affidavit of Joseph S. Canini, Jr. ("Canini Aff.") (Ewing Decl. Ex. DD).

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (68) is undisputed.

69.     Mr. Canini was a member of FreightCar's bargaining team during 1994 bargaining.  He averred as follows with respect to 1994 bargaining:

> It was during the 1994 round of bargaining that JAC management first proposed removing of a number of side letters from the 1991 CBA, including Side Letter 22 (the Mirroring Agreement).  The Union negotiators asked JAC negotiators why they wanted the side letters removed.  Tex McIver stated that these side letters were no longer needed, because they dealt with issues related to the 1991 sale.  McIver also assured the Union's negotiators that the removal of the side letters would not affect anybody's rights under CBA.  Mark Duray, a JAC executive and a member of management's negotiating committee, affirmed McIver's statement.  McIver and Duray said that removing these letters was "housecleaning" and would merely make the CBA shorter without changing its meaning.  (I specifically remember Duray using the term "housecleaning.")

<u>Id.</u> ¶ 6.

**<u>RESPONSE:</u>**

FreightCar admits that Paragraph (69) is undisputed.

70.     Mr. McIver testified as follows about his effort in 1994 to eliminate various side letters, including the Mirroring Agreement:

> Q. Okay.  And then once the medical plan was implemented, pursuant to the mirroring agreement or Side Letter 22, was there any purpose to be served by retaining that Side Letter in subsequent collective bargaining agreements?
>
> A. No.  In fact, in 1994 I sought to have it removed, along with many others that I thought had sunsetted.  My term.
>
> Q. Did you express that position across the bargaining table; that it had sunsetted?
>
> A. Among other letters, yes.
>
> Q. Okay.  Did you see a problem with retaining Side Letters where – what did you mean by sunsetted, so that we have that clear?
>
> A. That the obligations created for the Company in the letter itself had been met.

Q. Okay.

A. And there was no purpose in having the letter retained.  Simply a clean-up effort to be frank.  It's just trying to get a big book into a little book.

February 25, 2004 Deposition Transcript of Claud McIver (Ewing Decl. Ex. EE) at 38:12-39:5.

**RESPONSE:**

FreightCar admits that Paragraph (70) is undisputed.

71.     FreightCar admits that it was bound by the Mirroring Agreement through 1997. *See* FreightCar Preliminary Injunction Brief at 25 (citing "the undisputed fact that before its abrogation in 1997, FreightCar had continuing obligations under Side Letter 22").

**RESPONSE:**

FreightCar denies that Paragraph (71) is undisputed.  FreightCar denies that the statement

quoted by the plaintiffs constitutes a judicial admission that it was bound by the Mirroring

Agreement through 1997.  FreightCar states that its response to the plaintiffs' motion for a

preliminary injunction was filed at the outset of the case and without the benefit of discovery.

FreightCar further states that it was not "bound" by Side Letter 22 through 1997.

FreightCar's obligations under Side Letter 22 were satisfied after the employee benefit plans and

the JAC Guide were approved by the USW and distributed to the represented employees by

FreightCar in 1993.  **FCA SUMF ¶¶ 51, 56.**  FreightCar further states that the parties agreed

during the 1994 negotiations that Side Letter 22 would not be carried forward.  ***Id.* at ¶ 56.**

72.     FreightCar and the Union engaged in collective bargaining in 1997, resulting in the 1997 CBA.  Duray Aff. ¶ 8.

**RESPONSE:**

FreightCar admits that Paragraph (72) is undisputed.

73.     Glenn Grove, who was FreightCar's Benefits Administrator, has no recollection of anyone discussing the Mirroring Agreement or telling him there had been any change with regard to that Agreement around the time of the 1997 bargaining.  Grove Dep. at 17:22-18:7.

**RESPONSE:**

FreightCar admits that Paragraph (73) is undisputed.

74.    It is FreightCar's position in this litigation that during the 1997 negotiations, it set out to eliminate from the 1997 CBA side letters which had accompanied the 1991 CBA and had been carried forward in the 1994 CBA. Duray Aff. ¶ 9.

**RESPONSE:**

FreightCar denies that Paragraph (74) is undisputed.  FreightCar states that its position

and arguments are set forth in its motion for summary judgment and brief in support thereof, as

well as in its brief in opposition to the plaintiffs' cross-motion for summary judgment.

FreightCar further states that the parties agreed during the 1994 negotiations that they would not

carry forward the side letters to the 1991 CBA that had become obsolete, including Side

Letter 22.  **FCA SUMF ¶ 56.**

75.    In his Summary Judgment Ruling, Judge Cindrich concluded that the <u>Deemer</u> plaintiffs had presented a "plausible explanation" that the Mirroring Agreement was not retained after 1997 because it had already achieved its purpose, *i.e.*, the creation of an employee benefit plan that mirrored the Bethlehem PHMB.  *See* <u>Deemer</u> SJ Ruling at 3.  Mr. Duray's testimony is to the same effect:

> Q. And if Johnstown America did create a retiree healthcare plan, if it mirrored Bethlehem's, once it did so, and if it did discharge its obligations then there would be no need for this side letter [the Mirroring Agreement] in 1997, correct?
>
> * * *
>
> A. Yes.

Duray Dep. at 114:21-115:6.

**RESPONSE:**

FreightCar denies that Paragraph (75) is undisputed.  FreightCar admits that Judge

Cindrich had reached the conclusion described by the plaintiffs in Paragraph (75).  However,

FreightCar states that the parties had in fact agreed during their negotiations in 1994 that Side

Letter 22 would not be carried forward because FreightCar had fulfilled its obligations set forth

therein by creating, adopting, and distributing the JAC Guide that had been approved by the USW. **FCA SUMF ¶ 56.** FreightCar further states that Judge Cindrich's opinion was issued based on his review of Judge Mitchell's R&R, which was in turn based on arguments presented by the parties at the outset of litigation and prior to any discovery. ***Id.* at ¶¶ 108-15.**

FreightCar also states that the plaintiffs improperly characterize Judge Cindrich's opinion as a "Summary Judgment Ruling." Judge Cindrich's July 14, 2003 Memorandum Opinion and Order was merely a ruling on the plaintiffs' objections to the Magistrate Mitchell's R&R. **Cindrich Memorandum Opinion, p. 5 (FCA SJ Ex. 50).** Judge Cindrich never ruled on the parties' motions for summary judgment, which were dismissed without prejudice to allow for discovery to take place. **FCA SUMF ¶ 116.**

76.    Also on this point, Mr. Duray testified as follows with regard to statements of Tex McIver, one of the two leaders of 1997 negotiations for FreightCar (Duray Dep. at 134:24-135:135:3):

> Q. Would you agree that Tex McIver gave, as the reason for removing the side letters, that these things were no longer needed, they were obsolete, that all obligations under the side letters were all removed, had already been taken care of?
>
> A. Yes.

Duray Dep. at 135:13-21.

**<u>RESPONSE:</u>**

FreightCar denies that Paragraph (76) is undisputed. FreightCar states that the parties agreed during their negotiations in ***1994*** that Side Letter 22 would not be carried forward because FreightCar had fulfilled its obligations set forth therein by creating, adopting, and distributing the JAC Guide that had been approved by the USW. **FCA SUMF ¶ 56.**

77.    John Plunkard was deposed during <u>Deemer</u> discovery. Mr. Plunkard was FreightCar's Chief Financial Officer from 1991 through 1993, and again from 1998 to 1999. Excerpts from May 27, 2004 Deposition Transcript of John Plunkard ("Plunkard Dep.") at 14:21-15:7, 15:19-16:10 (Ewing Decl. Ex. FF) Mr. Plunkard was the person on FreightCar's

management committee in 1997 who was most knowledgeable about health care negotiations. Plunkard Dep. at 49:3-15.

**RESPONSE:**

FreightCar admits that Paragraph (77) is undisputed.

78.     Mr. Plunkard confirmed the point made by Mr. Duray, testifying that at the time that the Mirroring Agreement (Side Letter 22) was removed, the mirroring requirement had already been accomplished:

> Q. Well, you testified that in 1991, or shortly after the closing of the sale, that the Bethlehem benefit plans for the bargaining units, the welfare benefit plans had been mirrored.  So my question is, in 1997, there was no—that purpose had already been—or that requirement had already been accomplished?
>
> A. I would say there was no need, in my opinion, for that letter, once we had accomplished the requirement, yes.

Plunkard Dep. at 43:22-44:8.

**RESPONSE:**

FreightCar denies that Paragraph (78) is undisputed.  FreightCar admits that the plaintiffs have quoted Mr. Plunkard's testimony.  However, Mr. Plunkard did not, and could not, testify to what the "mirroring requirement" entailed.  Mr. Plunkard stated that in 1991, he did not participate in discussions involving health insurance, he did not participate in the creation of the benefit plans, and did not participate in the negotiation of the 1991 collective bargaining agreement other than to provide financial information.  **Plunkard Dep. at 24:11-25:15 (FCA Supp. SJ Ex. 57).**  Furthermore, FreightCar  states that Mr. Duray expressly stated that he did not know what the parties had meant by their use of the word "mirror."  **Duray Dep. at 66:3-19, 110:1-5 (FCA Supp. SJ Ex. 56).**

79.     Mr. Palm's testimony is consistent with Mr. McIver's, Mr. Duray's and Mr. Plunkard's on this point: the Mirroring Agreement was no longer needed by 1997 because its purpose had already been accomplished, *i.e.*, the Bethlehem plan had already been mirrored:

Q. Now, in the 1997 round that resulted in the collective bargaining agreement that spanned 1997 to 2001, do you recall that the union agreed to delete that Exhibit 11 which is the mirroring agreement?

A. Yes; because the purpose of that mirroring agreement – this letter was finished, it was done because the language was already in the contract, Nancy, that we maintained our health care benefits that we had at Bethlehem . . .

Palm Dep. at 44:2-15.

**RESPONSE:**

FreightCar denies that Paragraph (79) is undisputed.  First, at a minimum Mr. Palm's testimony is not consistent with Mr. McIver's, Mr. Duray's or Mr. Plunkard's.  Mr. Palm's testimony that he had various private one-on-one conversations with Mr. McIver in which he "renegotiated" retirees' benefits is uncorroborated hearsay.  **USW-International Dep. at 182:16-185:5 (FCA SJ Ex. 44).**  Second, FreightCar denies that Mr. Palm testified that the "Bethlehem plan" had been mirrored.  Rather, Mr. Palm testified that they had "maintained *our health care benefits* that we had at Bethlehem." ***Id.* at 184:24-185:2.**

80.     Most of the 1991 Side Letters, including Side Letter 22—the Mirroring Agreement—were removed from the 1997 CBA.  Duray Aff. ¶ 9; *see also* FreightCar Preliminary Injunction Brief (Dkt. #58-1) at 7 ("The parties only retained four side letters from the 1991 CBA").

**RESPONSE:**

FreightCar denies that Paragraph (80) is undisputed.  FreightCar states that there was no need to "remove" Side Letter 22 from the 1997 CBA.  The parties agreed during the 1994 negotiations that Side Letter 22 would not be carried forward with the 1994 CBA, and that Side Letter 22 could be removed or withdrawn because FreightCar had fulfilled its obligations set forth therein by creating, adopting, and distributing the JAC Guide in 1993 that had been approved by the USW.  **McIver Decl. ¶ 14 (FCA SJ Ex. 31); McIver Decl. Ex. C (FCA SJ Ex. 34).**  Article XXI of the 1997 CBA did not "remove" any prior agreements.  Instead,

Article XXI clarified which documents comprised their collective bargaining agreement.

**Howard Decl. Ex. C, p. 73 (FCA SJ Ex 20).**

81.     As to the removal of other side letters, Mr. Duray averred that during 1997 negotiations, FreightCar "achieved the Union's agreement to abrogate all of the 1991 side letters except numbers 4, 5, 13 and 26." Duray Aff. ¶ 9.  Mr. Duray testified that numerous side letters besides Side Letter 22 (the Mirroring Agreement) were removed because they had already achieved their purpose.  *See* Duray Dep. at 85:5-86:9 (Side Letter 1 removed because the obligation it addressed had been discharged and there was no need to keep it in the CBA); id. at 86:10-87:4 (obligations in Side Letter 2 discharged in 1991); id. at 87:5-87:24 (FreightCar had nothing further to do under Side Letter 3 – it had already done what the letter obligated it to do); id. at 87:4-88:4 (Side Letters 4 and 5 were not removed from the contract); id. at 88:4-89:12 (witness did not know whether FreightCar discharged its obligations under Side Letter 6); id. at 89:13-20 (FreightCar discharged its obligations under Side Letter 7); id. at 90:6-20 (witness did not know whether FreightCar discharged its obligations under Side Letter 8); id. at 90:22-91:11 (Side Letter 9 concerned language that was to be included in 1991 contract); id. at 91:12-92:4) (obligations under Side Letter 10 discharged); id. at 92:6-93:3 (witness did not know whether FreightCar discharged its obligations under Side Letter 11); id. at 94:11-13 (Side Letter 13 stayed in the contract); id. at 94:19-95:9 (FreightCar discharged its obligations under Side Letter 14); id. at 97:5-97:19 (no longer any need for Side Letter 17); id. at 97:20-98:5 (no longer any need for Side Letter 18); id. at 98:15-99:5 (no further need for Side Letter 19 because FreightCar discharged its obligations); id. at 99:6-11 (witness did not know whether FreightCar discharged its obligations under Side Letter 20).

## RESPONSE:

FreightCar denies Paragraph (81) is undisputed.  While FreightCar does not dispute that

the plaintiffs have accurately quoted Mr. Duray's testimony, FreightCar states that it was not

necessary to "abrogate" Side Letter 22 or to "remove" it from the 1997 CBA.  The parties had

agreed during the 1994 negotiations that Side Letter 22 would not be carried forward with the

1994 CBA, and that it could be "delete[d]" or "withdraw[n]," because FreightCar had fulfilled its

obligations set forth therein by creating, adopting, and distributing the JAC Guide in 1993 that

had been approved by the USW.  **McIver Decl. ¶ 14 (FCA SJ Ex. 31); McIver Decl. Ex. C**

**(FCA SJ Ex 34).**  Article XXI of the 1997 CBA did not "remove" any prior agreements.

Instead, Article XXI clarified which documents comprised the parties' collective bargaining

agreement.  **FCA SUMF ¶ 58.**

82.     In additional testimony with regard to the 1997 negotiations, Mr. Duray testified that health benefits were actually **improved** during these negotiations.  Duray Dep. at 135:22-136:4; id. at 144:18-145:2.

**RESPONSE:**

FreightCar denies that Paragraph (82) is undisputed.  FreightCar does not dispute that the plaintiffs have accurately characterized Mr. Duray's testimony.  FreightCar states that the active employees' and the retirees' medical plans were changed in 1997.  **FCA SUMF ¶¶ 62-72.** FreightCar further states that the USW asked that the JAC Guide be amended to reflect these changes.  **USW-International Dep. at 135:20-136:12 (FCA SJ Ex. 44).**

83.     By letter dated November 7, 1997 to FreightCar employees, FreightCar President James D. Cirar advised that FreightCar had made it last and final offer to the Union, and represented that "[t]his offer provides major benefits to you and your family, including . . . an improved healthcare, life insurance and benefit package."  Ewing Decl. Ex. GG.

**RESPONSE:**

FreightCar admits that Paragraph (83) is undisputed.  FreightCar does not dispute that the plaintiffs have accurately quoted language from the November 7, 1997 letter referenced. FreightCar states that the active employees' and the retirees' medical plans were changed in 1997.  **FCA SUMF ¶¶ 62-72.**  FreightCar further states that the USW asked that the *JAC Guide* be amended to reflect these changes.  **USW-International Dep. at 135:20-136:12(FCA SJ Ex. 44).**

84.     Mr. Duray testified that a written description of FreightCar's priorities for 1997 bargaining stating that the Company was not asking employees to give up any covered benefits was consistent with his understanding of FreightCar's position in the 1997 negotiations.  Duray Dep. at 138:3-140:16; see "1997 Labor Contract Required Changes" ("FreightCar 1997 Bargaining Priorities") (Ewing Decl. Ex. HH).

**RESPONSE:**

FreightCar admits that Paragraph (84) is undisputed.

85.     Mr. Duray testified with regard to the 1997 negotiations as follows:

**Q. You agree there was no intent to reduce retiree health benefits, correct?**

**A. Correct.**

Duray Dep. at 145:8-12, 145:19-22 (emphasis added).

**RESPONSE:**

      FreightCar admits that Paragraph (85) is undisputed.

      86.     Mr. Plunkard was not even aware of the existence of the Continuation of Coverage provision at the time of the 1997 negotiations.  Plunkard Dep. at 39:23-40:19.

**RESPONSE:**

      FreightCar admits that Paragraph (86) is undisputed.

      87.     Mr. Plunkard testified that during 1997 bargaining (Plunkard Dep. at 44:15-18), he authored a document titled "1997 Labor Contract Required Changes" ("FreightCar 1997 Bargaining Priorities") which identified what he felt were the critical issues on health care, to establish talking points for FreightCar's strategy sessions.  Plunkard Dep. at 47:10-48:21.

**RESPONSE:**

      FreightCar admits that Paragraph (87) is undisputed.

      88.     The FreightCar 1997 Bargaining Priorities contained FreightCar's negotiating goals with respect to healthcare.  Plunkard Dep. at 49:16-20.  Other than the listed goals, there were no other health care goals.  Id. at 50:2-6.

**RESPONSE:**

      FreightCar admits that Paragraph (88) is undisputed.

      89.     The FreightCar 1997 Bargaining Priorities stated with respect to health care goals that "the main issue here is the provider."  FreightCar 1997 Bargaining Priorities at 1; *see also* Plunkard Dep. at 50:7-14.  This was Mr. Plunkard's view of the problem or issue with health care in 1997.  Id.

**RESPONSE:**

      FreightCar admits that Paragraph (89) is undisputed.

      90.     The FreightCar 1997 Bargaining Priorities proceeded to address FreightCar's ability to shop for the best value and states: "**the company is not asking the employee to give up any of the covered benefits**."  FreightCar 1997 Bargaining Priorities at 1 (emphasis added); *see also* Plunkard Dep. at 50:15-24.

**RESPONSE:**

      FreightCar admits that Paragraph (90) is undisputed.

      91.     The second health care goal identified by Mr. Plunkard in the FreightCar 1997 Bargaining Priorities concerned the cost of continuing coverage for laid off employees. FreightCar 1997 Bargaining Priorities at 2; *see also* Plunkard Dep. at 51:4-10.

**RESPONSE:**

      FreightCar admits that Paragraph (91) is undisputed.

      92.     Mr. Plunkard also authored a second document that identified "three critical issues" concerning health care insurance for 1997 bargaining, referred to herein as the "Critical Issues Memo" (Ewing Decl. Ex. II). This document stated, and Mr. Plunkard testified, that the three critical health care issues for 1997 bargaining were the provider, *i.e.*, the Company's ability to shop for insurance to get the best price; coverage for laid off employees; and the complicated nature of the sickness and accident benefit. Critical Issues Memo; Plunkard Dep. at 52:9-54:II.

**RESPONSE:**

      FreightCar admits that Paragraph (92) is undisputed.

      93.     Mr. Plunkard testified that at the time of the 1997 negotiations, there was no indication that Bethlehem would not continue paying for retiree health and life insurance benefits. Plunkard Dep. at 63:7-11.

**RESPONSE:**

      FreightCar admits that Paragraph (93) is undisputed.

      94.     Mr. Plunkard further testified that at the time of the 1997 negotiations, it was his belief and FreightCar's belief that Bethlehem would continue paying for retiree health and life insurance benefits. Plunkard Dep. at 63:12-18.

**RESPONSE:**

      FreightCar admits that Paragraph (94) is undisputed.

      95.     It was Mr. Plunkard's view at the time of the 1997 negotiations that Bethlehem, and not FreightCar, was responsible for these benefits. Id. at 63:19-64:7. This was also the view of James Cirar, FreightCar's President and CEO at the time. Excerpts from the May 25, 2005 Deposition Transcript of James Cirar ("Cirar Dep.") (Ewing Decl. Ex. JJ) at 12:2-5; 54:16-55:2 ("Q. Okay. Did you have an understanding as to whether [FreightCar] had any obligation independent of Bethlehem Steel's obligation, to provide retiree healthcare benefits? A. It was always my understand that the company did not.").

**RESPONSE:**

FreightCar denies that Paragraph (95) is undisputed.  FreightCar states that Mr. Plunkard

testified that at the time of the 1997 negotiations, Bethlehem was responsible for the "Bethlehem

retirees'" benefits.  **Plunkard Dep. at 63:19-64:7 (FCA Supp. SJ Ex. 57).**  Mr. Plunkard did

not testify that he believed that Bethlehem was responsible for all FreightCar retirees' benefits.

96.     Mr. Duray testified that other than improvements to pension calculations, there
were no changes to the 1993 SPD as a result of 1994 or 1997 negotiations.  Duray Dep. at 69:12-
25.

**RESPONSE:**

FreightCar denies that Paragraph (96) is undisputed.  FreightCar states that when the

parties discussed changes to the employee benefit plans, the parties discussed changes to the

terms of the JAC Guide.  *See, e.g.*, **McIver Decl. ¶ 12 (FCA SJ Ex. 31); Local Dep. at 63:8-24**

**(FCA SJ Ex. 45).**

97.     Mr. Duray also testified that the only reason he gave to the Union before May
2002 for continuation of retiree health payments being an issue was the fact that Bethlehem had
stopped reimbursing the company.  Duray Dep. at 131:7-14.

**RESPONSE:**

FreightCar admits that Paragraph (97) is undisputed.  However, FreightCar denies that

the plaintiffs' statement in Paragraph (97) is material.

98.     FreightCar's benefit administrator at the time, Glenn Grove, testified as follows:

Q. And, did you have an understanding prior to the 1997 bargaining that one of
JAC's purposes was to change anything that had to do with the Bethlehem
agreement?

A. No.

Q. After the 1997 bargaining, after the contract was completed, did anything
change with regard to how Bethlehem retirees were treated with regard to the
medical benefits?

A. No.

Grove Dep. at 13:16-22; 23:4-14.

**RESPONSE:**

FreightCar admits that Paragraph (98) is undisputed.

99.     In his detailed 27-paragraph Affidavit proffered by FreightCar in opposing summary judgment in <u>Deemer</u> and in opposing a preliminary injunction in the instant case, FreightCar 1997 negotiator Mark Duray addressed FreightCar's "goal" in 1997 negotiations. Duray Decl. ¶ 8 (discussing goal of eliminating side letters and negotiating a zipper clause). However, Mr. Duray does **not** aver that retiree medical benefits, the Bethlehem PHMB, or the Mirroring Agreement were ever discussed in 1997 negotiations, let alone that bargainers agreed to modify any of these.  *See* Duray Aff.

**RESPONSE:**

FreightCar admits that Paragraph (99) is undisputed.

100.     No documentary or testimonial evidence suggests that the parties sought or agreed to alter health or life insurance benefits for retirees.

**RESPONSE:**

FreightCar denies that Paragraph (100) is undisputed.  FreightCar states that in 1997 the

parties agreed that retirees' health benefits would be provided through the Steelworkers Health

and Welfare Fund, instead of under the indemnity plan that FreightCar had previously sponsored.

**FCA SUMF ¶¶ 62-72.**  Furthermore, FreightCar states that during the 2001-2002 negotiations,

FreightCar informed the USW of its intention to terminate certain retirees' medical benefits and

place premium contribution limits on other retirees' medical benefits.  ***Id.* at ¶¶ 78-81, 89-92,**

**95-96.**  FreightCar also proposed changes to the retirees' benefits during the 2005 bargaining.

*Id.* **at ¶¶ 122-24.**  The parties also negotiated changes to the retirees' health and life insurance

benefits between 2011 and 2013.  ***Id.* at ¶¶ 132-37.**

101.     Mr. Palm, the USW's chief negotiator in 1997, testified as follows as to whether he would have ever agreed to alter retiree benefits:

Q. . . . if the mirroring agreement had been deleted from the 1997 to 2001 agreement how could it have been violated when the retirees lost their benefits? That's –

A. Because we never gave up the retiree coverage.  Nancy, over my dead body would I ever do an agreement where Johnstown America would give up the retiree health care.  That's just not going to happen.  We don't do that.  We're all they got.  They have nobody else but us.

Palm Dep. at 45:13-23.

**RESPONSE:**

FreightCar denies that Paragraph (101) is undisputed.  FreightCar does not dispute that the plaintiffs have accurately quoted an excerpt from Mr. Palm's deposition.  However, FreightCar disputes Mr. Palm's testimony to the extent that it is premised on the incorrect assumption that his agreement to modify retirees' health care was ever required.  *See* **FCA Sum. J. Resp. Brief, at pp. 16-22.**

102.    Article XXI of the 1997 CBA, which FreightCar terms the "zipper clause" and on which it relies, in pertinent part provides:

EXTENT OF AGREEMENT

This Agreement and the documents expressly referred to herein are the only documents by which the parties intend to be contractually or statutorily bound. Any document, not expressly referred to herein that may be brought forth by either the Company or the Union after ratification of this Agreement may be included as part of this Agreement, provided both parties agree to its inclusion. All Appendices from previous agreements have either been consolidated into Articles of this Agreement or in any event, are no longer part of this Agreement.

Ewing Decl. Ex. KK at Art. XXI.

**RESPONSE:**

FreightCar denies that Paragraph (102) is undisputed.  FreightCar states that the plaintiffs' excerpt of Article XXI of the 1997 CBA fails to include its explicit reference to "summary plan descriptions," such as the JAC Guide, which are thereby incorporated into the 1997 agreement.  **Howard Decl. Ex. C, p. 73 (FCA SJ Ex. 20).**

103.    It is FreightCar's position in this litigation that the 1997 CBA "abrogated" the Mirroring Agreement and replaced it with the 1993 SPD.  Duray Aff. ¶ 14.  As shown, the 1993 SPD in fact "encompassed" the Mirroring Agreement; stated that it was "subject to the collective bargaining agreement."  At the time that the 1993 SPD was adopted the applicable contract was the 1991 CBA which expressly included the Mirroring Agreement as Side Letter 22, and the 1993 SPD explicitly stated that in the event of any conflict with the governing plan, the plan controlled.

**<u>RESPONSE:</u>**

FreightCar denies that Paragraph (103) is undisputed.  It is not FreightCar's position that "the 1997 CBA 'abrogated' the Mirroring Agreement and replaced it with the 1993 SPD." FreightCar states that its position and arguments are set forth in its motion for summary judgment and brief in support thereof, as well as in its brief in opposition to the plaintiffs' cross-motion for summary judgment.

FreightCar also denies the plaintiffs' apparent legal argument regarding the relationship between the JAC Guide, Side Letter 22, and the 1991 CBA.  This argument is not a "statement of fact" to which a response is required.  Furthermore, this argument is not supported by any citations to the record or admissible evidence.

104.    The 1997 CBA included a "Successorship" provision which stated that the Johnstown plant could not be sold unless the buyer assumed the Collective Bargaining Agreement and the Insurance Agreement applicable to the Employees at the Plant. 1997 CBA at Article XIX and p. 70.  The provision further stated:

> (1) **In the event of a permanent shutdown of the Plant prior to five years following the date of sale, the Company will guarantee that each former Johnstown America Corporation Employee at the Plant will receive** from the owner of the Plant, from the Pension Benefit Guaranty Corporation (the "PBGC") and/or from the Johnstown America Corporation Pension Plan . . . **the same retiree health and life insurance coverage**, and the same severance pay **that he would have received had the Plant shutdown as of the date of sale.**

<u>Id.</u> (emphasis added).  The 1991 CBA also included this same provision.  *See* 1991 CBA (Ewing Decl. Ex. LL) at Article XIX and p. 84.

**RESPONSE:**

FreightCar denies that Paragraph (104) is undisputed.  First, the Successorship article did not provide that the Johnstown Plant could not be sold unless the buyer assumed the Collective Bargaining Agreement and the Insurance Agreement.  The Successorship article expressly states that as an alternative to assuming the Collective Bargaining Agreement and the Insurance Agreement, the buyer may "enter into [its own] agreement with the Union establishing the terms and conditions of employment to be effective as of the date of the sale."  **Howard Decl. Ex. C, p. 70 (FCA SJ Ex. 20).**

105.    After 1997 bargaining, nothing changed with regard to how retirees were treated with regard to medical benefits.  Grove Dep. at 23:15-20.

**RESPONSE:**

FreightCar denies that Paragraph (105) is undisputed.  Without attempting to provide an exhaustive list of changes to the Retirees' benefits, FreightCar states that after the 1997 negotiations, retirees' medical benefits were provided and administered through the Steelworkers Health and Welfare Fund, which was a managed care plan with a different plan administrator.  **FCA SUMF ¶¶ 62-72.**  Furthermore, in 2002, the "reimbursable retirees'" benefits were terminated.  **Id. at ¶ 106.**  In 2002, FreightCar also imposed a cap on its premium contributions for the "non-reimbursable retirees."  **Howard Decl. Ex. M, p. 3 (FCA SJ Ex. 30).** FreightCar also states that retiree benefits were reinstated or modified in connection with the 2005 collective bargaining.  **FCA SUMF ¶¶ 120-124.**  And in 2013, FreightCar terminated the retiree medical and life insurance benefits.  **Id. at ¶ 137.**

106.    Mr. Duray testified that the retiree health benefits provided by FreightCar in 1999 mirrored those provided in the Bethlehem plan.  Duray Dep. at 162:2-13.

**RESPONSE:**

FreightCar admits that Paragraph (107) is undisputed.

107.     In a letter from FreightCar's President dated June 3, 1999 addressing a change in corporate ownership, FreightCar provided union employees "with information about how your benefits will be handled following the acquisition, particularly . . . retiree health care and life insurance programs."  *See* Palm Aff. Ex. C (Ewing Decl. Ex. MM).  As to these health and life insurance programs, FreightCar's President reassured employees that their benefits would continue just as they had under Bethlehem:

> **You will be eligible for the same retiree health and life insurance coverage through Johnstown America Corporation as you were through Bethlehem Steel and the current plan.**

Id.

**RESPONSE:**

FreightCar admits that Paragraph (107) is undisputed.

108.     Beginning around June of 2001, Bethlehem fell behind in its reimbursements to FreightCar for the cost of retiree benefits for retirees who were age 43 or older at the time of the 1991 sale.  Duray Aff. ¶ 22.

**RESPONSE:**

FreightCar admits that Paragraph (108) is undisputed.

109.     In October 2001, Bethlehem went into Chapter 11 bankruptcy.  Duray Aff. ¶ 23.

**RESPONSE:**

FreightCar admits that Paragraph (109) is undisputed.

110.     The 1997 CBA expired on October 31, 2001.  Duray Aff. ¶ 24.

**RESPONSE:**

FreightCar admits that Paragraph (110) is undisputed.

111.     In 2001 negotiations for a new CBA, FreightCar proposed that retiree insurance benefits be terminated to the extent that they were supported by reimbursement from Bethlehem but Bethlehem failed or refused to reimburse FreightCar for the cost of those benefits.  Duray Aff. ¶ 24.  According to Mr. Duray, the Union told FreightCar to take this proposal off the table. Id.  As FreightCar states, "[i]n 2001, upon expiration of the 1997 collective bargaining agreement, FreightCar attempted to bargain over the retiree medical benefits, as required, and upon impasse, terminated these benefits."  FreightCar Preliminary Injunction Brief (Dkt. #58-1) at 3.

**RESPONSE:**

FreightCar admits that Paragraph (111) is undisputed.  FreightCar admits that during the 2001 negotiations, FreightCar proposed that retiree insurance benefits for the reimbursable retirees be terminated to the extent that they were supported by reimbursement from Bethlehem. **FCA SUMF ¶¶ 79-81, 90-91.**  However, FreightCar further states that it proposed that its premium contributions toward retiree benefits for the "non-reimbursable" retirees be capped.  *Id.*

FreightCar further admits that according to Mr. Duray, the USW told FreightCar to take this proposal off the table.  However, FreightCar states that the USW asked FreightCar to take this proposal off the table because they were not agreeing to represent the retirees and they believed that past retirees' benefits were an inappropriate subject of collective bargaining.  *Id.* **at ¶¶ 82-83, 88, 93-96.**

FreightCar admits that the plaintiffs have quoted from its response brief to the plaintiffs' motion for a preliminary injunction.  However, FreightCar denies that it had any obligation to bargain, to impasse or otherwise, over retiree medical or life insurance benefits prior to modifying or terminating those benefits.  *See Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971) ("Th[e] obligation [to collectively bargain] ***extends only to the 'terms and conditions of employment' of the employer's 'employees'*** in the unit appropriate for such purposes that the union represents.")  Retirees are no longer members of the bargaining unit, are no longer represented by a union, and therefore, do not participate in the collective bargaining process.  *Id.*

112.    In his 55-page decision concerning 2001 bargaining, National Labor Relations Board Administrative Law Judge David Evans thoroughly reviewed the bargaining, both as to retiree healthcare and other issues, and concluded, among other things, that FreightCar engaged "in a course of overall bad faith bargaining with the Union during contract negotiations."  In re Johnstown America Corp., 2003 WL 1831898, at *54 (NLRB Div. of Judges, April 4, 2003).

**RESPONSE:**

FreightCar denies that Paragraph (112) is undisputed.  FreightCar denies that Judge

Evans' decision was based on his review of bargaining with respect to past retirees' healthcare.

The parties' bargaining with respect to past retirees' medical benefits was not at issue in the

NLRB charge addressed by Judge Evans.  There was no charge that FreightCar violated the

NLRA by failing to bargain in good faith with respect to the past retirees' benefits before

terminating them, nor could there have been such a charge.  *See Allied Chemical and Alkali*

*Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 188 (1971) (finding that there is no

obligation to collectively bargain with respect to retirees' benefits, and accordingly, a failure to

do so cannot give rise to an unfair labor practice action).  To the extent that Judge Evans did

touch on the negotiations with respect to past retirees' benefits, he noted that the USW did not

object to the termination of past retirees' benefits because it did not feel that it represented those

retirees.  **FCA SUMF ¶ 88.**

113.    The NLRB judge ruled that during bargaining in 2001 and 2002, FreightCar failed
and refused to bargain in good faith and that its conduct, including insistence on proposals
related to retiree health insurance and other benefits for laid-off and retired employees, violated
§§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5).  2003 WL
1831898, at *53.  In particular, the judge ruled:

> I accordingly find and conclude that, because the Respondent had engaged in an
> attempt to secure a contract only on its own terms, because its take-it-or-leave-it
> proposals included non-mandatory subjects of bargaining, because the
> Respondent knew that the Union had misunderstood its proposals, and because
> the parties did not believe that they were at impasse, a good faith impasse under
> *Taft Broadcasting* did not exist on December 18.  I therefore find and conclude
> that the Respondent violated Section 8(a)(5) by terminating bargaining on that
> date.

2003 WL 1831898.

**RESPONSE:**

FreightCar denies that the plaintiffs' statement in Paragraph (113) is undisputed. Judge Evans did not find that FreightCar's decision to terminate the benefits provided to past retirees, or its negotiations with the USW regarding these benefits, violated §§ 8(a)(1) and (5) of the National Labor Relations Act. The NLRA places no obligation on either an employer or a union to collectively bargain over benefits offered to past retirees. *See Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 188 (1971) (finding that there is no obligation to collectively bargain with respect to retirees' benefits, and accordingly, a failure to do so cannot give rise to an unfair labor practice action). Judge Evans did not address any issues relating to FreightCar's obligation to provide past retirees benefits.

114.    In its ruling in the underlying case of <u>Sowers</u>, this Court relied on Judge Evans' conclusion, finding as follows:

> A 2003 National Labor Relations Board administrative law judge ("ALJ") ruling recounts the FCA's efforts to eliminate special pensions, also termed shutdown pensions, and the benefits associated with them. The ALJ concluded that . . . the Company violated the Act by "unilaterally implementing changes in the unit employees' terms and conditions of employment in the areas of employees Rule-of-65 and 70/80 pensions," specifically by "unilaterally eliminating the $400 supplement and the health and life insurance benefits of employees retiring under the Rule-of-65 and 70/80 pensions."

<u>Hayden v. FreightCar America, Inc.</u>, 2008 WL 375762, at *33 (W.D. Pa. Jan. 11, 2008) (citations omitted).

**RESPONSE:**

FreightCar denies that Paragraph (114) is undisputed. FreightCar admits that the plaintiffs have accurately quoted an excerpt from this Court's opinion in *Hayden v. FreightCar America, Inc.* However, FreightCar denies that the excerpt or the issues discussed therein are material to this case. As this Court noted, Judge Evans ruled that FreightCar had improperly implemented changes to the "unit employees' terms and conditions of employment" by

"unilaterally eliminating the $400 supplement and health and life insurance benefits of employees retiring under the Rule of 65 and 70/80 pensions."  Judge Evans' ruling with respect to "the unit employees' terms and conditions of employment" was unrelated to FreightCar's ability to terminate benefits that it provided to past retirees.

115.    At no time during the initial 1991 labor negotiations or during any subsequent round of bargaining before 2002 did FreightCar ever suggest to the Union that retiree welfare benefits were terminable simply because the current labor agreement had expired.  *See*, *e.g.*, Palm Aff. ¶ 13; Supp. Palm Decl. ¶ 2.

**RESPONSE:**

FreightCar denies that Paragraph (115) is undisputed.  First, the plaintiffs mischaracterize FreightCar's argument. FreightCar has never claimed that past retirees' welfare benefits can only be terminated when a current labor agreement has expired.  To the contrary, FreightCar is free to terminate past retirees' welfare benefits at any time and for any reason.  Furthermore, FreightCar denies that it never suggested to the USW that retiree welfare benefits were terminable because FreightCar and the USW drafted and agreed to the reservation of rights set forth in the JAC Guide.  Accordingly, the USW was on notice that FreightCar could terminate past retirees' benefits at any time and for any reason.

116.    By letter dated January 24, 2002, Bethlehem informed FreightCar that it would no longer provide reimbursements for FreightCar retiree insurance.  Duray Aff. ¶ 26; Ewing Decl. Ex. NN.

**RESPONSE:**

FreightCar admits that Paragraph (116) is undisputed.

117.    After the Deemer class members had already retired, FreightCar by letters dated February 1, 2002 and March 6, 2002 announced that effective in May 1, 2002, it would cease paying for these retirees' medical coverage.  *See* Letters from JAC dated February 1, 2002 and March 6, 2002, which appear in the record as Exhibits E and F to the Palm Aff. (Ewing Decl. Exs. OO and PP); *see also* McCarthy Decl. ¶ 6.

**RESPONSE:**

FreightCar admits that Paragraph (117) is undisputed.

118.    In particular, by letter dated February 1, 2002 signed by Mark Duray, FreightCar advised retirees that: (1) at the time of its acquisition of Bethlehem's Freight Car Division, Bethlehem had agreed to reimburse FreightCar for the cost of retiree health and life insurance benefits; (2) Bethlehem had filed a bankruptcy petition and ceased reimbursing FreightCar for these benefits; and (3) FreightCar would not continue to pay retiree insurance premiums unless Bethlehem provided reimbursement.  Palm Aff. Ex. E (Ewing Decl. Ex. OO) at 1.  FreightCar did not cite the 1993 SPD or provide any rationale for terminating benefits other than Bethlehem's failure to provide reimbursement.  *See* id.

**RESPONSE:**

FreightCar admits that Paragraph (118) is undisputed.

119.    By letter dated March 6, 2002 signed by Mark Duray, FreightCar advised retirees as follows:

> Since Bethlehem Steel will not honor its contractual obligation to reimburse Johnstown America for your post-retirement health and life insurance coverage, we concede that we can no longer continue to absorb the cost of your post-retirement health and life insurance coverage.  Johnstown America Corporation will discontinue paying these costs as of May 1, 2002.

Palm Aff. Ex. F (Ewing Decl. Ex. PP) at 1.  Once again, FreightCar did not cite the 1993 SPD or provide any rationale for terminating benefits other than Bethlehem's failure to provide reimbursement.  *See* id.

**RESPONSE:**

FreightCar admits that Paragraph (119) is undisputed.

Dated: August 22, 2014

Respectfully Submitted,

/s/ *Sam P. Myler*

| | |
|---|---|
| James Clark Munro II | Nancy G. Ross (*pro hac vice*) |
| Michael J. Parrish, Jr. | Sam P. Myler (*pro hac vice*) |
| Ronald P. Carnevali, Jr. | Prashant Kolluri (*pro hac vice*) |
| SPENCE, CUSTER, SAYLOR, WOLFE & ROSE, LLC | Kirk Watkins (*pro hac vice*) |
| | MCDERMOTT WILL & EMERY LLP |
| AmeriServ Financial Building | 227 West Monroe Street |
| P.O. Box 280 | Chicago, Illinois 60606 |
| Johnstown, Pennsylvania 15907 | (312) 372-2000 |
| (814) 536-0735 | (312) 984-7700 (facsimile) |
| (814) 539-1423 (facsimile) | |

**ATTORNEYS FOR DEFENDANTS FREIGHTCAR AMERICA, INC., JOHNSTOWN AMERICA, LLC, AND JOHNSTOWN AMERICA CORPORATION USWA HEALTH & WELFARE PLAN**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system this 22nd day of August, 2014.  Any other counsel of record will be served by facsimile transmission and/or first class mail.

/s/ *Sam P. Myler*_____

Sam P. Myler

DM_US 53714426-3.082260.0018