IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY J. ZANGHI, KENNETH J. SOWERS, DOMINIC MCCUCH, JAMES HOHMAN, and DARRELL SHETLER,** *on behalf of themselves and others similarly situated*; **UNITED STEEL, PAPER AND FORESTRY, RUBBER MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO/CLC,** | ) ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION NO. 3:13-146**<br><br>**JUDGE KIM R. GIBSON** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **FREIGHTCAR AMERICA, INC.; JOHNSTOWN AMERICA CORPORATION; and JOHNSTOWN AMERICA CORPORATION USWA HEALTH & WELFARE PLAN,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

<u>MEMORANDUM OPINION AND ORDER OF COURT</u>

**I.   INTRODUCTION**

This matter comes before the Court on Defendant FreightCar America's first motion for summary judgment (ECF No. 118) and Plaintiffs' third motion for summary judgment as to liability (ECF No. 123). Plaintiffs Anthony J. Zanghi, Kenneth J. Sowers, Dominic McCuch, James Hohman, and Darrell Shetler ("Class Representatives"), on behalf of themselves and all other persons in the proposed class described in their complaint, by their attorneys, and Plaintiff United Steel, Paper and Forestry, Rubber,

1

Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW"), by its attorneys, brought a complaint against Defendants FreightCar America and Johnstown America Corporation USWA Health & Welfare Plan. (ECF No. 1 at 1).

The parties agree that this case is related to the underlying *Deemer* litigation. *United Steelworkers of America, AFL-CIO-CLC, Geraldine Deemer, and Darrell Shetler v. Johnstown America Corporation, et al.*, No. 02-CV-806 (W.D.Pa.). (ECF No. 136 at 1). Plaintiffs' complaint asserts that FreightCar's reduction of retiree welfare benefits violated collectively bargained obligations owed to Class Members, and is actionable under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). (ECF No. 1 at 24). Plaintiffs also assert that FreightCar's violation of the employee welfare benefit plan is actionable under § 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), which allows a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (*Id.* at 25).

Plaintiffs now ask the Court to enter summary judgment in their favor on the basis of additional evidence adduced during the *Deemer* discovery, which they assert confirms that FreightCar and the Union never "agreed otherwise" to allow FreightCar to unilaterally terminate retirees' health and life insurance benefits. (ECF No. 124 at 3). In the alternative, Plaintiffs argue that FreightCar failed to terminate retirees' healthcare benefits

through the collective bargaining process, and that it terminated life insurance benefits in violation of the parties' settlement agreement. (*Id.* at 3–4).

Defendants also move for summary judgment, asking the Court to find that the undisputed material facts clearly demonstrate a lack of any clear and express agreement by FreightCar to provide vested medical and life insurance benefits to the Retirees. (ECF No. 120-1 at 1). Further, Defendants argue that FreightCar's termination of Retirees' benefits was entirely consistent and expressly authorized by the governing documents because none of them provided for vested benefits. (*Id.* at 2).

Also pending before this Court is Plaintiffs' motion to strike certain denials of fact included in Defendants' response to Plaintiffs' statement of undisputed facts. (ECF No. 142).

For the reasons given below, this Court will deny Plaintiffs' and Defendant's motions for summary judgment. Plaintiffs' motion to strike is also denied.

## II. JURISDICTION AND VENUE

This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as both counts of Plaintiffs' complaint raise federal questions. This Court also has jurisdiction over Count I pursuant to § 301 of the LMRA, 29 U.S.C. § 185, and over Count II pursuant to §§ 502(e)(1) and (f) of ERISA, 29 U.S.C. § 1132(e)(1). Venue in this judicial district is proper pursuant to § 301 of LMRA, 29 U.S.C. § 185, and § 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2).

### III. BACKGROUND

##### a.  Factual background

This Court previously ruled on FreightCar's motion to dismiss, transfer, or stay proceedings, in which a lengthy description of the factual background was given. (ECF No. 73 at 2–7). FreightCar's response to Plaintiffs' concise statement of undisputed material facts asserts that the Court's summary did not contain all of the materially relevant facts. (ECF No. 136 at 1). The Court now sets out the undisputed facts as set out by the parties in their respective statements of undisputed material fact. (ECF Nos. 119 and 129).

##### i.   The 1991 Collective Bargaining Agreement

Bethlehem Steel Corporation owned and operated a facility producing railroad freight cars in Johnstown, Pennsylvania, from 1923 to 1991. (Compl. ¶ 3). In 1991, Bethlehem Steel sold the assets of the freight car division to Johnstown America Corporation ("JAC"), FreightCar's predecessor. (ECF No. 129 at 11, ¶ 8).

Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("Union" or "USW"), was the collective bargaining representative for hourly employees at the Johnstown Facility. (Id. at ¶ 3).  The USW negotiated the collective bargaining agreements with FreightCar relating to the retiree health and life insurance benefits at issue in this case. (Id.).

The 1991 purchase agreement between FreightCar and Bethlehem, to which the USW was not a party, provided that Bethlehem would reimburse FreightCar for retiree insurance costs for those FreightCar employees who were 43 at the time of the October 28, 1991 sale and who subsequently retired with eligibility for retiree insurance benefits from FreightCar. (*Id.* at ¶ 9). FreightCar recognized the USW as the collective bargaining representative of the Johnstown Facility bargaining unit employees in connection with the 1991 sale. (*Id.* at ¶ 10).

During the summer and fall of 1991, FreightCar engaged in negotiations with the USW in an effort to reach a collective bargaining agreement that would govern the terms and conditions of employment at the Johnstown Plant following the closing of the sale. (ECF No. 119 at ¶ 9). In October 1991, the parties discussed the benefit plans that JAC would create for the represented employees if FreightCar closed on the Johnstown Plant. (*Id.* at ¶ 10). In mid-October, FreightCar and the USW reached an agreement which they memorialized in a main collective bargaining agreement ("the 1991 CBA") and twenty-seven "side letters" to the CBA. (*Id.* at ¶ 16). This agreement was tentative and would only become effective in the event that FreightCar closed on its purchase of the Johnstown Plant. (*Id.*). One of the 27 side letters to the 1991 CBA was the "Mirroring Agreement," which was also known as "Side Letter 22." (ECF No. 129 at 11, ¶¶ 11–12). Side Letter 22 provided that:

> Johnstown America Corporation will create mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace. Within 60 days after closing of the Johnstown America Corporation/Bethlehem sale, Johnstown America Corporation will forward

> to the Union for review and comment draft copies of such plans, and
> Johnstown America Corporation and the Union agree to use their best
> efforts to finalize such plans, subject to IRS approval if appropriate, within
> 120 days of closing.

(ECF No. 119 at ¶ 20).

### ii.   The 1993 Summary Plan Description

In 1993, while the 1991 CBA was still in effect, FreightCar distributed a summary plan description titled "JAC's Employee Guide" ("1993 SPD"), which included a letter informing employees that the handbook served as the summary plan description required by the Employee Retirement Income Security Act of 1974, as amended. (ECF No. 129 at 17, ¶¶ 41–42). The 1993 SPD stated as follows with respect to health benefits:

> Note: This plan is subject to the rights and obligations of collective
> bargaining. The company may amend or terminate the plan only through
> this process. This booklet is intended as a general summary of your
> benefits under the plan. The specific details of this plan are in the actual
> plan document, which controls your benefits.

(Id. at ¶ 48). In addition, the 1993 SPD provided that "[t]he plans are subject to the collective bargaining process." (Id. at ¶ 49). Another notice provided that:

> This guide attempts to provide a simple explanation of the provisions of
> your benefit. Complete technical information on the plans can be found in
> formal legal documents available in the human resources department. If
> there's any omission, if this guide is unclear, or if this guide and the plans
> differ, the plans as stated in the legal documents must take precedence.

(Id. at ¶ 50).

The first page of the 1993 SPD included a letter dated May 1993 addressed to "Employee" stating that the handbook contained only "summaries of the benefit plans;" and that:

> Each benefit plan has legal documents that may be referred to whenever a question concerning your coverage arises. In the event of a difference between the summary and the legal documents, the legal documents shall control.

(*Id.* at ¶ 51). The 1993 SPD was drafted by Hewitt, an outside benefits administrator. (*Id.* at ¶ 52). Mr. Grove, the FreightCar Benefit Administrator, reviewed the 1993 SPD to ensure that the benefits in it matched the Bethlehem benefits. (*Id.* at ¶ 53).  Regarding eligibility upon retirement, the 1993 SPD provided that:

> If you retire under Johnstown America's pension plan for represented employees and have worked continuously at Johnstown America for 15 or more years, you and your eligible dependents will be enrolled for retiree medical coverage under the medical plan, unless you choose not to be. If you're the spouse of a former employee who's eligible to receive a surviving spouse's benefit under the pension plan, you'll also be eligible for our retiree medical coverage.

(*Id.* at ¶ 55). With respect to retiree coverage, the 1993 SPD stated that "[t]he company pays the cost of hospital and physicians' coverage for you and your dependents." (*Id.* at ¶ 56). Regarding life insurance, the 1993 SPD stated: "If you retire at or after age 62, your basic life insurance will be reduced to $5,000. If you retire before you turn age 62 . . . you'll keep the same coverage as other active employees until you turn 62. Then your coverage will be reduced to $5,000." (*Id.* at ¶ 57).

The 1993 SPD further provided the following regarding termination:

> Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part. This means the plans may be discontinued in part or in their entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented. If any changes are made, you'll be notified.

7

(*Id.* at ¶ 58). Another provision of the 1993 SPD provided the following regarding situations that could affect benefits:

> Situations That May Affect Your Benefits
> You and your family's medical benefits could be lost or delayed if:
> * * *
> Subject to the collective bargaining agreement, the plan is modified to reduce or eliminate certain benefits or it ends.

(*Id.* at ¶ 59). FreightCar construed the JAC Employee Guide to mean that it had "expressly reserve[d] to JAC the right to terminate any benefit, including company paid retiree benefits, subject to collective bargaining." (*Id.* at ¶ 60).

The USW, through Jerry Sokolow, its Technician in the USW's Pension, Insurance & Research Department, had sought and obtained the 1993 SPD condition that the right to amend or terminate the plan should be "subject to collective bargaining" and "subject to the collective bargaining agreement." (*Id.* at ¶ 61). With regard to the purported reservation of right provisions as to dental, vision and medical benefits, the USW had advised FreightCar: "delete or subject to collective bargaining agreement." (*Id.*).

The JAC Guide was distributed to the represented employees in May 1993, and was given an effective date of October 28, 1991, as agreed by FreightCar and the USW. (ECF No. 119 at ¶ 51).

### iii.    The 1994 Collective Bargaining Agreement

In 1994 FreightCar and the Union engaged in collective bargaining, resulting in the 1994 CBA. (ECF No. 129 at ¶ 65). Mr. Joseph S. Canini, Jr., who worked in FreightCar's

Human Resources Department from November 15, 1993 through August 21, 2000, stated the following regarding the 1994 bargaining:

> It was during the 1994 round of bargaining that JAC management first proposed removing of a number of side letters from the 1991 CBA, including Side Letter 22 (the Mirroring Agreement). The Union negotiators asked JAC negotiators why they wanted the side letters removed. Tex McIver stated that these side letters were no longer needed, because they dealt with issues related to the 1991 sale. McIver also assured the Union's negotiators that the removal of the side letters would not affect anybody's rights under CBA. Mark Duray, a JAC executive and a member of management's negotiating committee, affirmed McIver's statement. McIver and Duray said that removing these letters was "housecleaning" and would merely make the CBA shorter without changing its meaning. (I specifically remember Duray using the term "housecleaning.")

(*Id.* at ¶¶ 68–69).

### iv.    The 1997 Collective Bargaining Agreement

FreightCar and the Union engaged in collective bargaining again in 1997, which resulted in the 1997 CBA. (*Id.* at ¶ 72). Prior to these negotiations, the active employee and retiree medical benefits described in the JAC Guide were administered by Blue Cross Blue Shield pursuant to an insurance contract and indemnity agreement with FreightCar ("the BCBS Insurance Agreement"). (ECF No. 119 at ¶ 62). During the 1997 negotiations, the USW proposed that FreightCar provide employee and retiree medical benefits through the Steelworkers Health and Welfare Fund Point-of-Service Plan ("the SHWF Plan"), to which FreightCar agreed. (*Id.* at ¶¶ 63, 67). The SHWF Summary Plan Description was distributed to the employees and retirees. (*Id.* at ¶ 71).

The 1997 CBA included a "zipper clause," which stated:

> This Agreement and the documents expressly referred to herein are the only documents by which the parties intend to be contractually or statutorily bound. Any document not expressly referred to herein that may be brought forth by either the Company or the Union after ratification of this Agreement may be included as part of this Agreement, provided both parties agree to its inclusion.

(*Id.* at ¶ 58).

In a letter to FreightCar employees dated November 7, 1997, FreightCar President James D. Cirar advised that FreightCar had made its last and final offer to the Union, and that "[t]his offer provides major benefits to you and your family, including… an improved healthcare, life insurance and benefit package." (ECF No. 129 at ¶ 83). The 1997 CBA included a "Successorship" provision, stating that:

> (1) In the event of a permanent shutdown of the Plant prior to five years following the date of sale, the Company will guarantee that each former Johnstown America Corporation Employee at the Plant will receive from the owner of the Plant, from the Pension Benefit Guaranty Corporation (the "PBGC") and/or from the Johnstown America Corporation Pension Plan . . . the same retiree health and life insurance coverage, and the same severance pay that he would have received had the Plant shutdown as of the date of sale.

(*Id.* at 104). In the deposition taken of Mr. Duray, FreightCar's Vice President of Human Resources, he testified that the retiree health benefits provided by FreightCar in 1999 mirrored those provided in the Bethlehem Plan. (*Id.* at ¶ 106). The President of FreightCar sent a letter to employees dated June 3, 1999, which reassured employees that their benefits would continue just as they had under Bethlehem: "You will be eligible for the same retiree health and life insurance coverage through Johnstown America Corporation as you were through Bethlehem Steel and the current plan." (*Id.* at ¶ 107).

10

### v.   The 2001 negotiations

Beginning around June of 2001, Bethlehem fell behind in its reimbursements to FreightCar for the cost of retiree benefits for retirees who were age 43 or older at the time of the 1991 sale. (ECF No. 129 at ¶ 108). Bethlehem went into Chapter 11 bankruptcy in October 2001. (*Id.* at ¶ 109). The 1997 CBA expired on October 31, 2001. (*Id.* at ¶ 110). In September 2001, FreightCar and the USW began negotiations to reach a successor agreement to the 1997 CBA. (ECF No. 119 at ¶ 73).

FreightCar explained to the USW that retiree welfare benefits had become particularly burdensome because Bethlehem's unanticipated bankruptcy filing in 2001 had prevented it from fulfilling its obligations under the 1991 purchase and sale agreement to reimburse FreightCar for the cost of certain retirees' ("the reimbursable retirees") welfare benefits. (*Id.* at ¶ 75). FreightCar proposed that retiree insurance benefits be terminated to the extent that they were supported by reimbursement from Bethlehem but Bethlehem failed or refused to reimburse FreightCar for the cost of those benefits. (ECF No. 129 at ¶ 111). Bethlehem informed FreightCar by letter dated January 24, 2002, that it would no longer provide reimbursements for FreightCar retiree insurance. (*Id.* at ¶ 116).

During the 2001 negotiations between FreightCar and the USW the issue arose whether the USW could represent past retirees. (ECF No. 119 at ¶¶ 82–83). The USW informed FreightCar during its October 25, 2001 meeting that it would discuss whether it represented the retirees with its legal department. (*Id.* at ¶ 84). During the November 14,

11

2001 negotiations, the USW informed FreightCar that it did not represent retired individuals. (*Id.* at ¶ 86).

After the USW was provided with numerous proposals regarding retirees' benefits, the bargaining unit voted on and rejected the Fifth and Final Proposal on January 10, 2001. (*Id.* at ¶ 103). FreightCar informed the USW that it believed the parties were at an impasse. (*Id.* at ¶ 101). FreightCar subsequently informed the USW that it intended to implement its Final Proposal effective January 21, 2002. (*Id.* at ¶ 104).

The USW responded by filing a charge with the National Labor Relations Board, alleging that FreightCar had violated Section 8(a)(5) of the National Labor Relations Act by failing to bargain in good faith with the USW during the 2001 negotiations. (*Id.* at ¶ 105).

After the *Deemer* class members had already retired, FreightCar announced by letters dated February 1, 2002 and March 6, 2002 that effective in May 1, 2002, it would cease paying for these retirees' medical coverage, citing Bethlehem's failure to provide reimbursement. (ECF No. 129 at ¶¶ 117–118).

    vi.    The *Deemer* litigation

On April 26, 2002, the USW and a putative class consisting of reimbursable retirees and their dependents filed suit challenging FreightCar's decision to terminate their welfare benefits, *Deemer v. Johnstown America Industries, Inc.*, Civ. No. 02-cv-806 (W.D. Pa. 2002). (ECF No. 119 at ¶ 107). On June 28, 2002, the *Deemer* plaintiffs filed a Motion for Summary Judgment and Permanent Injunction, or in the Alternative, Motion for

Preliminary Injunction. (*Id.* at ¶ 108). On August 9, 2002, FreightCar filed its response to the *Deemer* plaintiffs' alternative motions, and also filed its own cross-motion for summary judgment. (*Id.* at ¶ 110). Magistrate Judge Robert C. Mitchell recommended that FreightCar's motion for summary judgment be granted and that the *Deemer* plaintiffs' motions for summary judgment be denied, to which Plaintiffs objected. (*Id.* at ¶¶ 111–112). Judge Cindrich exercised his discretion pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) to "accept new evidence as part of [his] *de novo* review of [Magistrate Judge Mitchell's R&R.]" (*Id.* at ¶ 113). Following Judge Cindrich's order of an evidentiary hearing, the parties filed a joint motion to continue the hearing to allow for discovery, which Judge Cindrich granted. (*Id.* at ¶¶ 114–116). Judge Cindrich also denied their respective motions for summary judgment without prejudice to be asserted at the close of discovery. (*Id.* at ¶ 116).

### vii.   The *Britt* litigation

In 2002, in addition to amending the JAC Guide's medical plan to eliminate retiree medical benefits for the reimbursable retirees, FreightCar eliminated the monthly pension supplement and the health and life insurance benefits it had previously provided to represented employees that retired under certain special pension formulas. (*Id.* at ¶ 117). In August 2003, a putative class of current and former FreightCar employees who "applied or will apply for 70/80 or Rule of 65 retirement benefits" filed a lawsuit in which they alleged that the unilateral elimination of these benefits violated the parties' collective

bargaining agreements and the terms of FreightCar's pension and retiree medical plans.

(*Id.* at ¶ 118).

### viii.   The *Britt* and *Deemer* Settlements

The parties engaged in negotiations to settle the *Deemer* and *Britt* litigation from September through November 2004, ultimately resulting in the "Britt-Deemer Settlement Agreement," which the Court approved. (ECF No. 129 at 6, ¶ 12).

### ix.   The 2005 CBA

In 2005, FreightCar and the USW entered a collective bargaining agreement. (ECF No. 119 at ¶ 120). Active employees' and retirees' medical benefits were addressed in Article XIX of the 2005 CBA and a side letter relating to the parties' settlement of the *Deemer* and *Britt* litigation. (*Id.* at ¶ 121). The 2005 CBA incorporated the *Deemer* and *Britt* settlements and provided that FreightCar would contribute $700 per month for each household with at least one non-Medicare eligible retiree and $450 per month for each Medicare-eligible retiree. (*Id.* at ¶ 124). In addition, the agreement provided that "[i]n any event, the Company's contributions for retiree and/or surviving spouse coverage as described above will remain unchanged until the later of November 30, 2012 or the expiration of a successor Agreement to this CBA." (*Id.*). The contributions were to last at least through November 2012, and if FreightCar were to cease contributions at any point after that, Retirees could then re-file their lawsuits in this Court. (ECF No. 125 at 4, ¶ 13). The Settlement Agreement further provided that in the re-filed lawsuits, the parties would "retain their legal positions that they asserted in the *Britt* and *Deemer* litigations,"

so that the "Plaintiffs [could] continue to assert both that alteration of benefits is unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated level of benefits provided under the 1997 collective bargaining agreement (*e.g.* no deductibles, contributions, etc.)." (*Id.* at ¶ 14). As for life insurance benefits, the Settlement Agreement provided that "Defendant JAC will reinstate the retiree life insurance program and will provide future benefits consistent with that Program." (*Id.* at ¶ 15).

> **x.    The plant shutdown**

In 2007, after FreightCar announced that it was closing the Johnstown Facility, the *Sowers* plaintiffs filed their lawsuit. (*Id.* at ¶ 17).

Before FreightCar and the USW began effects bargaining, a putative class of FreightCar employees filed a lawsuit in the Western District of Pennsylvania challenging FreightCar's decision to close the Johnstown Plant. *Hayden v. FreightCar America, Inc.*, Civ. No. 07-cv-00201 (W.D. Pa. 2007). (ECF No. 119 at ¶ 126). After this Court granted the *Hayden* plaintiffs' motion for a preliminary injunction and ordered that the class be reinstated to allow them to accrue the years of service they required, FreightCar, the USW, and the *Sowers* plaintiffs negotiated a combined settlement/shutdown agreement. (*Id.* at ¶ 128). Under their "FCA/Union Settlement Agreement" ("the Shutdown Agreement"), the parties acknowledged that the 2005 CBA terminated May 15, 2008 and that FreightCar "closed the [Johnstown Plant] effective May 16, 2008, after affording the Union a full and fair opportunity to engage in decisional and effects bargaining in

accordance with the National Labor Relations Act." (*Id.* at ¶ 129). With respect to retiree medical benefits, the parties agreed that then-current retirees' benefits would continue to be provided as set forth in the 2005 CBA and pursuant to the applicable terms and conditions of the *Deemer* and *Britt* settlements. (*Id.* at ¶ 130). The Shutdown Agreement also provided that the *Sowers* plaintiffs would similarly be entitled to retiree medical benefits under the 2005 CBA and the *Deemer* and *Britt* settlements. (*Id.* at ¶ 131).

###     xi.    FreightCar's Declaratory Judgment Action

FreightCar filed a declaratory judgment action in the United States District Court for the Northern District of Illinois on July 8, 2013. (ECF No. 129 at ¶ 25). The action requested a declaration that FreightCar had the legal right to terminate retiree welfare benefits. (*Id.*). FreightCar sent the USW a copy of the Illinois complaint and a letter informing them that effective October 1, 2013, it would cease all company contributions provided under the 2005 Settlement Agreement for retiree medical coverage. (*Id.* at ¶ 26). The letter also informed the USW that it would no longer provide the life insurance benefit set forth in Section 16(i) of the Settlement Agreement to the *Deemer*, *Britt*, and *Sowers* group of retirees. (*Id.*). Following receipt of this notice, Class Representatives and the USW filed their complaint in this Court on July 9, 2013, asserting that the termination of Retirees' health and life insurance benefits violated § 301 of the LMRA and § 502 of ERISA. (*Id.* at ¶ 27).

FreightCar notified 653 retirees and surviving spouses on July 10, 2013 that FreightCar's contributions for their retiree benefits would end effective October 1, 2013.

(*Id.* at ¶ 28). FreightCar terminated all of its contributions for health and life insurance benefits for Retirees effective November 1, 2013. (*Id.* at ¶ 29).

This Court denied FreightCar's motion to dismiss or transfer by Memorandum and Order of Court on January 14, 2014. (ECF No. 73). Plaintiffs filed a second motion for summary judgment as to liability on February 18, 2014. (ECF No. 82). The Court held an Initial Rule 16 Status Conference on March 25, 2014, in which it did the following:

> (1) consolidated FreightCar's now-transferred Illinois action with the pending case filed by Plaintiffs; (2) ordered that the case be bifurcated in two stages, with the issue of liability to be determined before the issue of damages; (3) allowed three months of additional discovery; (4) ordered the withdrawal of Plaintiffs' Second Motion for Summary Judgment, with the parties to file summary judgment motions on July 17, 2014.

(ECF No. 100). FreightCar certified the following class as to liability by Order entered April 17, 2014:

> (1) former FreightCar employees that were represented by the USW at the time of their retirement from FreightCar, and who upon retirement received or were eligible to receive medical and life insurance benefits under the JAC-USWA Health and Welfare Plan (the "Plan"); and (2 those individuals who received or were eligible to receive medical and life insurance benefits under the Plan as a spouse, surviving spouse, or dependent of an aforementioned former FreightCar employee.

(ECF No. 107 at ¶ 12).

FreightCar filed a motion for summary judgment on July 17, 2014. (ECF No. 118). Plaintiffs filed a third motion for summary judgment on July 18, 2014. (ECF No. 123).

## IV. STANDARD OF REVIEW

### a.  The summary judgment standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact. . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.,* 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a).[1]  Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005).  Material facts are those that will affect the outcome of the trial under governing law.  *Anderson,* 477 U.S. at 248.  The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009).  "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'"  *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.  If the moving party meets this burden, the

---

[1] Rule 56 was revised in 2010.  The standard previously set forth in subsection (c) is now codified as subsection (a).  The language of this subsection is unchanged, except for "one word—genuine 'issue' bec[ame] genuine 'dispute.'" FED. R. CIV. P. 56 advisory committee's note, 2010 amend.

party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

   b.   **Welfare and pension benefits under ERISA**

   The LMRA grants federal courts jurisdiction to resolve disputes between employers and labor unions about collective-bargaining agreements. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015), citing 29 U.S.C. § 185. ERISA governs collective-bargaining agreements that create pension or welfare benefit plans. *Id.* Under ERISA, a pension plan is a plan, fund, or program that provides retirement income to employees or that results in a deferral of income. 29 U.S.C. § 1002(2)(A). A welfare benefit plan is a plan, fund, or program established or maintained to provide participants with additional benefits, such as life insurance and disability coverage. 29 U.S.C. § 1002(1). Welfare plans provide "medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment…" 29 U.S.C. § 1002(1)(A). Pension plans and welfare benefit plans are treated differently under ERISA. *Tackett*, 135 S. Ct. at 933. While ERISA imposes elaborate minimum funding and vesting standards for

pension plans under 29 U.S.C. §§ 1053, 1082, 1083, 1084, it explicitly exempts welfare benefits plans from those rules under 29 U.S.C. §§ 1051(1), 1081(a)(1). *Id*. Welfare benefits plans must be "established and maintained pursuant to a written instrument," §1102(a)(1), but "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans," *Id.*, citing *Curtiss-Wright Corp. v. Shoonejongen*, 514 U.S. 73, 78 (1995). Employers have large leeway to design disability and other welfare plans as they see fit. *Id.*, citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). The "rule that 'contractual provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA [welfare benefits] plan.'" *Id.* at 933, citing *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 134 S. Ct. 604, 611–612 (2013).

Collective bargaining agreements, including those establishing ERISA plans, are to be interpreted according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy. *Id.*, citing *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–457 (1957).

c.   **The vesting of welfare benefits**

The Third Circuit has noted that "to vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language." *UAW v. Skinner*, 188 F. 3d 130, 139 (3d

Cir. 1999), citing *In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 58 F.3d 896, 902 (3d Cir. 1995) ("*Unisys II*").

While ERISA has elaborate vesting requirements for pension plans, it does not require automatic vesting of welfare benefit plans. *Id.* at 137–138, citing *Unisys II*, 58 F.3d at 901. Congress has rejected the automatic vesting of welfare plans because of its recognition of the need for flexibility with respect to an employer's right to change medical plans. *Id.* at 138. Employers are "generally free ... for any reason at any time, to adopt, modify or terminate welfare plans." *Id.*, quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). Employers may relinquish their right to unilaterally terminate and provide for lifetime vesting. *Id.* Furthermore, the "plan participant bears the burden of proving, by a preponderance of the evidence, that the employer intended the welfare benefits to be vested." *Id.*, citing *Unisys II*, 58 F.3d at 902. Words such as "shall remain" and "will continue" in the collective bargaining agreement are not sufficient to unambiguously indicate that benefits will continue *ad infinitum*. *Id.* at 141.

## V. ANALYSIS

### a. Plaintiffs' motion to strike

Plaintiffs have filed a motion to strike certain denials of fact made by FreightCar in response to their Statement of Undisputed Material Fact. (ECF No. 142). After the 2010 amendments to Federal Rule of Civil Procedure ("Rule") 56, it is no longer appropriate to attack the admissibility of summary judgment evidence by way of a motion to strike.

*Ankney v. Wakefield,* 2012 WL 1633803, at *1 (W.D. Pa. May 8, 2012). The motion to strike will therefore be treated by the Court as objections under Rule 56(c)(2). *Id.*

Plaintiffs assert that FreightCar's responses to their statement of undisputed material facts should be stricken because they are contrary to prior judicial admissions made by FreightCar. (ECF No. 145 at 1). FreightCar responds that it should not be bound by earlier pleadings and briefs, primarily from the decade-old *Deemer* litigation. (ECF No. 158 at 4).

"A fact asserted in a pleading, which is both unequivocal and which would normally require evidentiary proof, constitutes a judicial admission." *Judon v. Travelers Prop. Cas. Co. of Am.,* 773 F.3d 495, 503 n. 6 (3d Cir. 2014) (citations omitted). Judicial admissions are restricted to matters of fact which otherwise would require evidentiary proof, and do not include counsel's statement of his conception of the legal theory of a case. *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir. 1972), citing *New Amsterdam Casualty Co. v. Waller,* 323 F.2d 20 (4th Cir. 1963), cert. denied, 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1964). A judicial admission binds for the purpose of the case in which the admission is made, including appeals. *Id.,* citing *State Farm Mutual Auto Ins. Co. v. Worthington,* 405 F.2d 683 (8th Cir. 1968). However, judicial admissions may be superseded by amendment. *W. Run Student Hous. Associates, LLC v. Huntington Nat. Bank,* 712 F.3d 165, 171 (3d Cir. 2013), citing *Giannone v. U.S. Steel Corp.,* 238 F.2d 544, 547 (3d Cir. 1956).

Plaintiffs argue that FreightCar's proffered facts contradict its prior admissions made in pleadings (notably FreightCar's March 1, 2014 First Amended Complaint in the consolidated Illinois case, and its Answer in *Deemer*), its briefing (including its preliminary injunction opposition in the present case and its summary judgment briefing in *Deemer*), and representations made in sworn statements FreightCar has proffered to the Court to prove facts asserted therein (particularly the Affidavit of FreightCar's former Vice President for Human Resources, Mr. Duray). (ECF No. 145 at 23).

The *Britt-Deemer* Settlement Agreement gave Plaintiffs "the right to re-file with the Court the Britt and Deemer litigations against all Defendants, and in such re-filed lawsuits, the parties shall be able to make full use of depositions, documents and other materials thus far produced during discovery." (ECF No. 126-6 at 16(f)).

While Defendants argued in the *Deemer* litigation that the parties had "agreed otherwise" to terminate welfare benefits in the 1997 discussions leading to the 1997 CBA (ECF No. 145 at 5, , citing FreightCar's Deemer SJ brief at 4, 5, 16, 16 n. 2), Defendants now assert that they never agreed to adopt the Continuation of Coverage language of the Bethlehem PHMB in the first place (*see* ECF No. 120-1 at 18, stating that "[Side Letter 22] notably did not make any representation as to the duration of the retiree medical and life insurance benefits that would be provided under these newly created plans.").

In addition to the Duray Affidavit produced in the *Deemer* litigation, Plaintiffs rely on FreightCar's First Amended Complaint, filed in the Illinois case which has since been consolidated with the current case, at Case Number 14-cv-00017 (FreightCar America,

Inc., v. Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO, CLC ("USW") and Anthony J. Zanghi, Kenneth Sowers, Dominic McCuch, James Hohman, and Darrell Shetler, as individuals and on behalf of others similarly situated ("the Retirees" or "the Defendant Class")). (ECF No. 145 at 23). In particular, Plaintiffs note that Defendant's Amended Complaint stated that the Bethlehem Plans that were to be mirrored included the Continuation of Coverage language. (Id. at 24, citing 14-cv-00017, ECF No. 122 at ¶ 26). Plaintiffs further rely on Defendant's statement that "[p]ursuant to Side Letter 22, from 1991 until 1997 Johnstown America provided medical and life insurance benefits which mirrored the benefits provided by the Bethlehem plans." (Id. at 25, citing Case No. 14-cv-00017, ECF No. 122 at ¶ 27). FreightCar also stated that "Johnstown America and the USW Renegotiated the Agreement to Mirror Benefits in 1997…" and that FreightCar admitted that "the parties agreed in the 1997 CBA to eliminate the mirroring agreement in Side Letter 22." (Id., citing Case No. 14-cv-00017, ECF No. 122 at 8, ¶ 33).

Plaintiffs further note that while FreightCar seeks to argue that the Duray Affidavit was produced in an earlier case, it also proffered the Affidavit in the present case, most recently in its September 18, 2013 response in opposition to Plaintiffs' motion for preliminary injunction. (Id. at 27). The excerpts relied on by FreightCar stated that "…JAC was obligated to mirror the Bethlehem benefit plans…" (Id., citing FreightCar's Preliminary Injunction Opposition at 6). Further, FreightCar cited Paragraph 9 of the Duray Affidavit, which averred that "[g]oing into the 1997 negotiations, JAC set as a goal

to eliminate the side letters which had accompanied the 1991 CBA (and been carried forward in the 1994 CBA)…" (*Id.*, citing FreightCar's Preliminary Injunction Opposition at 6–7).

By order dated April 3, 2014, this Court consolidated Case No. 14-cv-00017 (W.D. Pa.) with the present case. (ECF No. 100). The Court finds that the statements made by FreightCar in its First Amended Complaint and the statements in the Duray Affidavit relied on in FreightCar's objection to Plaintiffs' preliminary injunction motion are unequivocal regarding their obligations under Side Letter 22. They are not in the nature of legal theories, but rather concede that the Bethlehem plans that FreightCar agreed to mirror included the Continuation of Coverage language. The statements to which Plaintiffs draw the Court's attention were made in pleadings and briefs in a case that was subsequently consolidated with the present case. Though the Court will not grant Plaintiffs' motion to strike on the grounds that a motion to strike is no longer proper after the 2010 amendments to the Federal Rules of Civil Procedure, the Court will consider FreightCar judicially bound by its earlier admissions in pleadings and briefs before this Court. The Court will give due consideration to these admissions in determining whether or not there is a genuine dispute of material fact in this case.

### b.  The governing plan documents

The Court analyzes this case by applying ordinary principles of contract law. As the Supreme Court recently noted in *Tackett*, collective-bargaining agreements, including those establishing ERISA plans, are to be interpreted according to ordinary principles of

contract law, at least when those principles are not inconsistent with federal labor policy. *Tackett*, 135 S.Ct. at 933 (citation omitted). The issue for the court to determine in *Tackett* was whether an expired collective-bargaining agreement had created a right to lifetime contribution-free health care benefits for retirees, their surviving spouses, and their dependents. *Id.* at 930. "'Where the words of the contract are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'" *Id.* at 933, citing 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)(Williston) (internal quotation marks omitted). The concurrence in *Tackett* added that "when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties." *Id.* at 938, citing Williston § 30:7, at 116–124.

The first issue to be decided is whether there is any genuine dispute of material fact as to whether or not FreightCar agreed to be bound by the Bethlehem PHMB. FreightCar asserts that the 1991 CBA did not address FreightCar's employee benefit obligations, and that nothing in either Side Letter 22 or the 1991 CBA suggests that the former was incorporated into the latter. (ECF No. 119 at ¶ 17, citing McIver Decl., ¶ 8; ECF No. 136 at 14, citing Christenson Decl. Ex. B. (FCA SJ Ex. 3); Howard Decl. Ex. A. (FCA SJ Ex. 18)). Plaintiffs counter that Defendants stated in the *Deemer* litigation that the Mirroring Agreement was incorporated in and made a part of the 1991 collective bargaining agreement by and between Johnstown America Corporation and the USW. (ECF No. 133 at 13, citing FreightCar's Answer in *Deemer*, ECF No. 126-16 at ¶ 44; Affidavit of FreightCar declarant Mark Duray, ECF No. 126-12 at ¶¶ 5, 9). Plaintiffs assert

that FreightCar agreed under the Mirroring Agreement to create benefit plans that included the Bethlehem PHMB Continuation of Coverage language. (ECF No. 124 at 14). They rely on Judge Cindrich's opinion in which he stated that it appeared to be undisputed that Johnstown America continued to adhere to the Bethlehem PHMB until early 2002. (*Id.*). FreightCar counters that the indisputable evidence establishes that the later implemented JAC Guide, the corresponding insurance contracts, and FreightCar's own CBAs with the USW are the only documents governing the retirees' benefits. (ECF No. 138 at 9). FreightCar also argues that in purchasing the plant, it did not assume or adopt Bethlehem's existing employee and retiree benefit plans. (ECF No.120-1 at 3).

The Court finds it material that the parties agreed to execute Side Letter 22 in conjunction with the 1991 CBA negotiations. Side Letter 22 provides the following:

> Johnstown America Corporation will create mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace. Within 60 days after closing of the Johnstown America Corporation/Bethlehem sale, Johnstown America Corporation will forward to the Union for review and comment draft copies of such plans, and Johnstown America Corporation and the Union agree to use their best efforts to finalize such plans, subject to IRS approval if appropriate, within 120 days of closing.

(ECF No. 126-15 at 3). Side Letter 22 further provides that "Johnstown America Corporation bargaining unit welfare benefit plans will mirror existing Bethlehem plans and shall be effective immediately after closing." (*Id.* at 4). Side Letter 22 also states that "Johnstown America Corporation shall be responsible for all benefits payable to its employees or its retirees which arise or are based on events which occurred after closing." (*Id.* at 4). Finally, Side Letter 22 provides that "[n]otwithstanding the foregoing, there shall

27

be no requirement for Johnstown America Corporation to establish a mirror 'Employee Investment Program,' including an annual EIP Profit Sharing Pool, an Employee Stock Ownership Plan, and a Special Profit Sharing Plan (the 'Shortfall Plan.')" (*Id.* at 3).

Claims for benefits under ERISA are contractual in nature and are governed by federal common law contract principles. *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011), citing *Burstein v. Ret. Account Plan for Emps. Of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 381 (3d Cir. 2003). Determining the meaning of an agreement to create benefit plans identical to the Bethlehem plans "in all material respects" is a question of law for the Court to decide. The Court must determine as a matter of contractual interpretation whether or not an agreement to mirror the Bethlehem plan "in all material respects" included an agreement to adopt the Bethlehem Continuation of Coverage language.

FreightCar's witnesses purport never to have been sent the contents of the Bethlehem PHMB. (ECF No. 119 at ¶¶ 15, 30). FreightCar asserts that Robert Christenson from Fisher & Phillips and consultants at Hewitt Associates, who drafted the welfare plans, were only provided with copies of the Bethlehem Steel Program of Insurance Benefits ("the Bethlehem PIB"), which was a summary plan description of the life insurance, sickness and accident, medical, dental, and vision care benefits for Bethlehem's active represented employees. (*Id.* at ¶¶ 28, 30).

The mere fact that FreightCar may not have been sent the Bethlehem PHMB does not establish that FreightCar was unaware of its contents or was not bound to mirror its

material aspects. FreightCar agreed in Side Letter 22 to create benefits plans "identical in all material respects" to the Bethlehem plans they replaced (ECF No. 126-15 at 3), and was therefore under an obligation to mirror the material aspects of the Bethlehem PHMB, regardless of whether or not FreightCar was in possession of the document at the time of drafting. In addition, FreightCar by its own admission had the Bethlehem PIB, which contained the Continuation of Coverage provision for life insurance for retirees. (ECF No. 134 at 6). The PIB contained the following statement regarding "Life Insurance after Retirement:"

> Any Employee who shall have retired and who shall have become entitled to life insurance after retirement pursuant to the provisions of the insurance agreement and booklet applicable to such Employee at the time of retirement shall not have such life insurance terminated or reduced (except as provided in such booklet) so long as he or she remains retired from the Company, notwithstanding the expiration of such agreement or booklet or of this Agreement, except as the Company and the Union may agree otherwise.

(ECF No. 121-5 at 51). Thus, FreightCar was undeniably familiar with the Continuation of Coverage language in the Bethlehem PIB.  The Court finds that FreightCar's assertion that it was not in possession of the Bethlehem PHMB does not relieve it of its obligation to create mirror benefit plans identical in all material respects to the Bethlehem plans.

FreightCar further denies that the Continuation of Coverage provision was part of the Bethlehem PHMB, arguing instead that the provision was part of the separate Pensioner's Insurance Agreement, which was a collectively bargained agreement that required Bethlehem to create the retiree medical and life insurance plans described by the

Bethlehem PHMB. (ECF No. 136 at 21, citing Christenson Decl. Ex. E., pp. 55–56 (FCA SJ Ex. 6)).

This Court finds that the Bethlehem PHMB and Pensioners' Insurance Agreement are to be construed as one document, and that an agreement to mirror the Bethlehem PHMB also included an agreement to mirror the material aspects of the Pensioners' Insurance Agreement. A primary indication that the two agreements were one and the same document is the fact that the pagination is consecutive, thus indicating that the document was to be taken as a whole. (ECF No. 126-18). In addition, the Court notes that there was no allegation in prior litigation that these documents were to be considered separate. In its First Amended Complaint in the consolidated case, FreightCar admitted as follows:

> As part of the purchase of the Johnstown Facilities, Johnstown America entered into a collective bargaining agreement with the USW and agreed in a side letter to the collective bargaining agreement ("Side Letter 22") to "create mirror bargaining unit employee benefit plans material in all respects to the Bethlehem plans they replace." The Bethlehem plans in question provided for medical benefits to retirees or surviving spouses and life insurance benefits to retirees "so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of [the Bethlehem plans], except as the Company and the Union may otherwise agree."

(14-cv-00017, ECF No. 122 at ¶ 26). Further, FreightCar made the following argument in opposing Plaintiffs' preliminary injunction motion on September 19, 2013:

> The Bethlehem welfare benefit plan FreightCar agreed to mirror…expressly allowed the parties to change its terms at any time: Any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by [the Bethlehem PHMB] shall not have such coverage terminated or reduced (except as provided in this Program) so long as the

individual remains retired from the Company or receives a Surviving
Spouse's 5 benefit, notwithstanding the expiration of this Agreement,
except as the Company and the Union may agree otherwise.

(ECF No. 63 at 6, quoting Bethlehem PHMB).

In light of FreightCar's prior representations to the Court that the Continuation of
Coverage language was a part of the Bethlehem PHMB FreightCar agreed to mirror, the
Court will not entertain the argument that the Pensioners' Insurance Agreement
containing the Continuation of Coverage language was separate from the Bethlehem
PHMB. In agreeing to mirror the Bethlehem PHMB, FreightCar agreed to mirror the
material aspects of the entire booklet, including the section entitled "Pensioners'
Insurance Agreement."

The Court finds that the Continuation of Coverage language of the Bethlehem
PHMB was a material part of the Bethlehem PHMB. There is no genuine dispute of
material fact as to whether or not FreightCar agreed to be governed by the terms of the
Bethlehem PHMB when it executed the side letter during the 1991 sale. FreightCar agreed
to create new benefit plans that would be identical to the Bethlehem plans "in all material
respects." (ECF No. 126-15 at 3).

Applying ordinary principles of contract law to this case, the Court finds that in
agreeing to create benefit plans identical "in all material respects" to the Bethlehem plans
they replaced, FreightCar also undertook to incorporate the Continuation of Coverage
language that was clearly a part of the Bethlehem PHMB.

### c. Vesting

FreightCar asserts that even if the Court were to find that FreightCar had agreed to mirror the Continuation of Coverage language in the Bethlehem Plans, the language still would not avail Plaintiffs as it does not provide for vested benefits. (ECF No. 120-1 at 17). Plaintiffs respond that the retiree benefits were "vested" in the sense that FreightCar could not unilaterally terminate them, but that the USW could expressly agree in collective bargaining to reduce or terminate them. (ECF No. 133 at 28). They rely heavily on Judge Cindrich's opinion at the outset of the *Deemer* litigation, which held that welfare benefits under the Bethlehem PHMB were vested in the sense that they were protected from unilateral employer alteration. (ECF No. 124 at 7, n. 4). Judge Cindrich found that Johnstown America had continued to adhere to the Bethlehem PHMB until early 2002, long after the Mirroring Agreement was supposedly rejected under FreightCar's theory. (*Id.* at 8, citing *Deemer* SJ Ruling at 3). Judge Cindrich also found that Plaintiffs had provided the Court with the "plausible explanation" that the Mirroring Agreement was not retained after 1997 because it had already achieved its purpose, namely the creation of an employee benefit plan mirroring the Bethlehem PHMB. (*Id.*, citing *Deemer* SJ Ruling at 3). Judge Cindrich further held that the term "subject to collective bargaining," as used in the 1993 SPD, was not irreconcilable with the term "as the company and union may otherwise agree," which was used in the Bethlehem PHMB. (*Id.*, citing *Deemer* SJ Ruling at 4). The Court found further support for this conclusion in the fact that the SPD was drafted in 1993, when the Bethlehem PHMB and its Continuation of Coverage clause were

indisputably in effect, and was not changed after the 1997 negotiations. (*Id.*).  FreightCar argues in response to Plaintiffs' argument that Judge Cindrich's earlier ruling in this case was contrary to Third Circuit law and issued without the benefit of the full evidentiary record, and that the Bethlehem welfare plans that FreightCar agreed to mirror in Side Letter 22 themselves did not provide Bethlehem's retirees with vested benefits. (ECF No. 120-1 at 19).

The Bethlehem PHMB provided that pensioners "shall not have such coverage terminated or reduced... so long as the individual remains retired from the Company... notwithstanding the expiration of this agreement, except as the company and union may agree otherwise." (ECF No. 121-5 at 51). The Third Circuit recently considered similar language in *Lewis v. Allegheny Ludlum Corp.*, a case involving an agreement which provided that "any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Plan established by this Agreement shall not have such coverage terminated or reduced (except as provided in the Plan) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, *except as the Company and the Union may agree otherwise.*" *Lewis v. Allegheny Ludlum Corp.*, 579 F. App'x 116, 118 (3d Cir. 2014) (emphasis in original). The Third Circuit held that the plaintiffs had not identified any "clear and express language" in the PHMBs that conferred unalterable, vested lifetime health benefits. *Id.* at 119. The court further noted that the promise between the parties in the collective bargaining agreement was not illusory because it did not allow for

33

modification solely by Allegheny Ludlum. *Id.* at 120. Rather, it allowed for modification only upon the agreement of both parties. *Id.* While the plaintiffs in the case had asserted that the promise in the collective bargaining agreement was an illusory one, the court noted that "Plaintiffs' argument ignores the fact that USW is a party to the contract that must agree to any modification." *Id.*

FreightCar asserts that the underlying District Court opinion in *Lewis* is the "death knell" for Plaintiffs' argument, as it recognizes that language stating "subject to agreement otherwise" does not provide for vested benefits. (ECF No. 120-1 at 19, citing *Lewis v. Allegheny Ludlum Corp.*, 2013 WL 3989448, at *6 (W.D. Pa. Aug. 2, 2013) ("Lewis II"); *Lewis v. Allegheny Ludlum Corp.*, 2012 WL 1328360, at *4 (W.D. Pa. Apr. 17, 2012) ("Lewis I")). FreightCar also argues that the Third Circuit's opinion in that case "confirms the familiar principle that under ERISA, employers may 'for any reason at any time, . . . adopt, modify, or terminate welfare plans.'" (ECF No. 141 at 1).

The facts in *Lewis* are not entirely identical with the facts in the present case. In *Lewis* there was clear evidence that the Union and the employer had agreed to change the terms of the coverage provision, and that the plaintiffs had then been notified of that change. *Lewis*, 579 Fed.App'x. at 118. In the present case, the disputed issue is not whether or not the Union had the power to agree to change or terminate benefits, but rather whether the Union and FreightCar had agreed to eliminate the retirees' right to welfare benefits terminable only upon agreement by both FreightCar and the Union. *Lewis* recognizes that an agreement with Continuation of Coverage language providing for

benefits "subject to agreement otherwise" requires the Court to apply principles of contract law to determine whether such an agreement to terminate or alter benefits has been entered into. The Court finds that the Continuation of Coverage language that FreightCar agreed to mirror requires the Court to find evidence of an agreement to terminate retirees' right to welfare benefits terminable only upon agreement by the parties.

In *Unisys,* the Third Circuit found that the employer had reserved the right to terminate the plan under which medical benefits were provided. *In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 58 F.3d 896, 904 (3d Cir. 1995). There, the SPD booklet distributed to all employees contained the clause that "[t]he Company expects to continue the Plans, but reserves the right to change or end them at any time." *Id.* at 900.

Unlike in *Unisys,* FreightCar here did not reserve to itself the right to unilaterally terminate the benefit plans. Rather, the Continuation of Coverage language in the Bethlehem PHMB that FreightCar agreed to mirror provided that the benefits would continue "notwithstanding expiration of this agreement . . . except as the Company and the Union may otherwise agree." (ECF No. 126-19 at 57). This language explicitly requires that the parties agree to termination, and does not give the company the right to unilaterally terminate benefits. Thus, the language at issue here can be distinguished from the language allowing unilateral benefit termination in *Unisys.*

The Court finds that the Bethlehem PHMB did not provide for vested welfare benefits in the sense of being "forever unalterable" as understood by the Third Circuit in

*Skinner*. The language of the Continuation of Coverage provision is not sufficiently clear and unambiguous to provide for lifetime vested benefits. *See Skinner*, 188 F.3d at 139. As the Third Circuit noted in that case, "[v]esting requirements were not established for employee welfare plans because Congress determined that '[t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income.'" *Id.* at 138, citing *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir. 1990). The language of the Bethlehem PHMB providing that the employees "shall not have [benefits] terminated or reduced . . . except as the Company and the Union may otherwise agree" (ECF No. 126-18 at 60) does not unambiguously indicate that the benefits will continue indefinitely. *See Skinner*, 188 F.3d at 141.

Though the Continuation of Coverage language in the Bethlehem PHMB was not sufficiently clear to create vested benefits in the sense of being forever unalterable, the Court finds that the language in the Bethlehem PHMB that FreightCar agreed to mirror through Side Letter 22 required agreement between the Union and the company before such benefits could be terminated or altered. As a matter of contractual interpretation, this Court finds that in adopting Side Letter 22 FreightCar agreed to mirror the Bethlehem PHMB provision that provided that benefits would not be terminated unless the parties reached an agreement to terminate them. Thus, the question the Court must decide is whether FreightCar and the Union agreed that FreightCar had satisfied its mirroring obligation under Side Letter 22.

36

### d.  The 1993 CBA

FreightCar asserts that its adoption of the  JAC Guide in 1993, the absence of any durational language in the Bethlehem PHMB and the "subject to" language insisted upon by the USW in negotiations over the new plan documents establish that the USW was wrong to assert that its consent to termination of benefits was required. (ECF No. 129-1 at 24). FreightCar argues that none of the relevant documents evidence a clear and express agreement to limit its right to unilaterally modify or terminate retiree medical or life insurance benefits. (ECF No. 136 at 36). FreightCar further asserts that the express reservation of rights in the 1993 SPD is evidence of the parties' mutual understanding that there was no agreement to limit its right to unilaterally modify or terminate these benefits. (*Id.*).

Under "Situations That May Affect Your Benefits" the 1993 SPD states that "You and your family's medical benefits could be lost or delayed if: . . . subject to the collective bargaining agreement, the plan is modified to reduce or eliminate certain benefits or it ends." (ECF No. 126-23 at 40). Regarding life insurance coverage, the 1993 SPD states that "Your coverage could be lost or a payment to your beneficiary could be delayed if: . . . Subject to collective bargaining, the plan, or part of the plan, ends (benefits under that part will end)." (*Id.* at 97). The SPD provides the same for sickness and accident benefits. (*Id.* at 113). For retiree benefits, the 1993 SPD provides the following:

> *If Coverage Ends or Is Modified*
> Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part. This means the plans may be discontinued in part or in their entirety or modified to

provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented. If any changes are made, you'll be notified.

(ECF No. 126-24 at 94).

Plaintiffs argue in response to FreightCar's statement of undisputed material facts that the USW had no need to "insist" on Continuation of Coverage language identical to the language in the 1993 Bethlehem PHMB in the 1993 SPD because that provision was already part of the parties' collectively bargained agreement pursuant to the Mirroring Agreement, namely Side Letter 22 to the 1991 and 1994 CBAs. (ECF No. 133 at 29). Plaintiffs also assert that the participants who addressed the drafts in 1993 did not see themselves as participating in negotiations, as the parties had already negotiated the benefit terms in the form of the pre-closing Mirroring Agreement, Side Letter 22 to the 1991 CBA. (*Id.* at 29–30). Plaintiffs state that the purpose of the review was to "develop booklets that would be simple enough for bargaining unit members to understand." (*Id.* at 29). They assert that no contract was being negotiated in connection with the benefit books, and that the bargaining committee was not authorized to change any of the mirrored benefits. (*Id.* at 30). Thus, Plaintiffs conclude that the 1993 SPD provided the same benefits, including protection for retiree coverage, as the Bethlehem benefits. (*Id.*). In addition, Plaintiffs state that creation and distribution of the 1993 SPD does not establish that FreightCar satisfied its obligations under the Mirroring Agreement. (*Id.* at 36).

The question whether the creation and adoption of the 1993 SPD satisfied FreightCar's obligation under the Mirroring Agreement should be addressed as a matter

38

of contract law. The only evidence that FreightCar cites in support of its assertion that it had satisfied its obligation in 1993 is the fact that the Union agreed to the 1993 SPD without insisting on durational language. The Court finds that the Union's agreement to the 1993 SPD does not establish that FreightCar had satisfied its obligation to create mirror benefit plans replacing the Bethlehem plans. Though the Union did not insist on vesting language at the time of reviewing the 1993 SPD, the Court finds no evidence that the Union explicitly agreed to give up the retirees' right not to have benefits terminated without agreement between FreightCar and the Union, which was the protection they had been given under the Bethlehem plans that FreightCar had agreed to mirror.

### e.  The 1994 CBA

The Court finds a dispute of fact regarding when the parties agreed to remove Side Letter 22 from their agreement. Contrary to its assertions earlier in this litigation, FreightCar now states that the parties agreed as early as 1994 no longer to be bound by Side Letter 22. (ECF No. 136 at 24). FreightCar states that the parties agreed in 1994 "that Side Letter 22 would not be carried forward because FreightCar had fulfilled its obligations set forth therein by creating, adopting, and distributing the JAC Guide that had been approved by the USW." (*Id.* at 43). Thus, FreightCar argues that there was no need to "remove" Side Letter 22 in 1997 because FreightCar had already fulfilled its obligations under the Side Letter by creating the JAC Guide that had been approved by the USW. (*Id.* at 45). Rather than "removing" any prior agreements, FreightCar states that Article XXI of the 1997 CBA clarified which documents comprised the parties' collective

bargaining agreement. (*Id.* at 45, 46). In support of that assertion, FreightCar repeatedly relies on the declaration made by Claud McIver, who served as the lead attorney for JAC during labor negotiations relating to its Johnstown Pennsylvania rail car manufacturing facilities. (ECF No. 136 at 24, citing McIver Declaration, ECF No. 121-31 at ¶¶ 3, 14). The McIver Declaration states as follows:

> By the time the 1994 negotiations began, the JAC Guide had been drafted, approved by the USW, and distributed to the represented employees. Accordingly, the parties agreed during the 1994 negotiations that Side Letter 22 was no longer necessary because JAC had satisfied its obligations provided therein. Contract proposals exchanged by the parties which evidence their agreement to delete Side Letter 22 are attached as McIver Declaration Exhibit C.

(ECF No. 121-31 at ¶ 14). The contract proposals cited by McIver state the following: "Side Letter 22 of 27 – Parties agree to delete. Out." (ECF No. 121-34 at 5). Plaintiffs counter that these contract proposals contain "no description of their use, meaning or outcome." (ECF No. 133 at 37).

There is a genuine dispute of material fact as to whether or not the parties agreed in 1994 that FreightCar had satisfied its obligation in Side Letter 22. While FreightCar relies on the McIver declaration and the contract proposals exchanged between the parties, Plaintiffs rely on statements made by Mark Duray in the *Deemer* litigation, FreightCar's Illinois Complaint, and FreightCar's Preliminary Injunction brief to establish that FreightCar's assertion contradicts prior statements made in this litigation. (*Id.* at 36).

The Court notes that FreightCar made statements in its Illinois Complaint, which was subsequently consolidated with this case, which contradict its present assertion that

the parties agreed in 1994 no longer to be bound by Side Letter 22. Notably, FreightCar stated that "Johnstown America and the USW Renegotiated the Agreement to Mirror Benefits in 1997 and Established that Retiree Medical and Life Insurance Benefits Would Be Provided Pursuant to Johnstown America's Employee Guide." (ECF No. 126-10 at 13) Further, FreightCar asserted that "[t]he 1997 CBA expressly referred to a number of side letters from earlier collective bargaining agreements…The 1997 CBA did not incorporate Side Letter 22 by reference, resulting in the abrogation of that agreement by the parties." (*Id*. at ¶ 24). FreightCar also stated that "[i]n short, the parties agreed in the 1997 CBA to eliminate the mirroring agreement in Side Letter 22 and to instead provide that the provisions of the Johnstown America Employee Guide would govern retiree medical and life insurance benefits." (*Id*. at ¶ 27). In its Preliminary Injunction Brief, FreightCar cited "the undisputed fact that before its abrogation in 1997, FreightCar had continuing obligations under Side Letter 22. The plain language of Side Letter 22 included this continuing obligation: 'Johnstown America Corporation bargaining unit welfare plans *will mirror* existing Bethlehem plans and shall be effective immediately after closing . . . . Johnstown America Corporation *shall be responsible* for all benefits payable to its employees or retirees which arise or are based on events which occurred after closing." (ECF No. 63 at 25, citing Side Letter 22) (emphasis in original). These statements contradict FreightCar's present assertions that FreightCar had already agreed with the Union in 1994 that it would no longer be bound by the Mirroring Agreement in Side Letter 22.

Plaintiffs argue that the 1994 CBA included Side Letter 22 as part of the parties' collectively bargained agreement, and rely on Mark Duray's affidavit proffered by FreightCar's current counsel in this case on September 19, 2013. (ECF No. 133 at 36, citing ECF No. 60-2 at ¶ 9). The affidavit states that "[g]oing into the 1997 negotiations, JAC set as a goal to eliminate the side letters which had accompanied the 1991 CBA (and been carried forward in the 1994 CBA) and to negotiate a 'zipper clause.'" (ECF No. 60-2 at ¶ 9). Mr. Duray also stated that "[t]here was no change in the 1994 CBA that is pertinent to this case." (*Id.* at ¶ 7). He noted that the parties' "[a]brogation of the Mirroring Agreement" occurred "in the 1997 negotiations . . ." (*Id.* at ¶ 11).

The Court finds it material to determine whether or not the parties agreed in 1994 that they had satisfied their obligation under Side Letter 22 by adopting and distributing the 1993 JAC Guide. By asserting that the parties had agreed in 1994 that FreightCar had fulfilled its obligations under Side Letter 22, FreightCar is stating that it had no remaining obligations under Side Letter 22 going into the 1997 negotiations, and that formal removal of Side Letter 22 was therefore unnecessary. As the Court noted above, FreightCar entered into a contractual obligation to create mirror benefit plans identical in all material respects to the Bethlehem plans under Side Letter 22. The Court also found that the Continuation of Coverage language was a material aspect of the Bethlehem PHMB. Thus, FreightCar was under an obligation to create mirror benefit plans that incorporated the Continuation of Coverage language.

The factual evidence regarding the parties' alleged 1994 agreement is ambiguous. The contract proposal cited by FreightCar's Claud McIver is insufficient evidence of an agreement between the parties regarding satisfaction of FreightCar's obligation under Side Letter 22. Furthermore, that evidence contradicts FreightCar's prior assertions that they remained bound by the Side Letter until 1994. If the parties had agreed that the protection of the Continuation of Coverage language in the Bethlehem PHMB should be replaced by a weaker protection allowing FreightCar's termination of benefits subject only to collective bargaining, then it would be necessary to find evidence of consideration given by FreightCar in exchange for this agreement.

In examining the record evidence, the Court finds a genuine dispute of material fact regarding the parties' agreement with regard to Side Letter 22 during the 1994 negotiations, which must be resolved at trial by the finder of fact.

### f. The 1997 CBA

The Court also finds a dispute of fact regarding the parties' negotiations surrounding the 1997 CBA. FreightCar asserts that while the 1991 and 1994 CBAs between FreightCar and the USW were silent with regard to retiree benefits, the 1997 CBA made clear that the insurance and other benefits provided to employees would be governed by the JAC Guide. (ECF No. 120-1 at 10). The 1997 CBA contained a zipper clause that provided that "this Agreement and the documents expressly referred to herein are the only documents by which the parties intend to be contractually or statutorily bound." (*Id.*). Among the documents expressly referred to were the summary plan descriptions in

the JAC Guide, and 1991 Side Letters 4, 5, 13, 26. (ECF No. 126-39 at 10). Side Letter 22 is

not listed. FreightCar notes that the 1997 CBA did not make any reference to the

Bethlehem PIB, PHMB, or any other benefit program. (ECF No. 120-1 at 10).

Plaintiffs assert that the mere removal of the side letters in the 1997 CBA did not

amount to an abolition of FreightCar's obligation under Side Letter 22 to create benefit

plans mirroring the Bethlehem plans. (ECF No. 124 at 21).

The Court finds that resolution of the 1994 factual dispute also has an impact on

the Court's interpretation of the parties' 1997 negotiations. FreightCar asserted earlier in

this litigation that it had continuing obligations under Side Letter 22 that remained until

1997. (ECF No. 63 at 25). FreightCar now states that it had fulfilled those obligations by

1994. The Continuation of Coverage language in the Bethlehem PHMB that FreightCar

agreed to mirror in all material respects provided Plaintiffs with a strong protection of

their entitlement to welfare benefits. An agreement to afford retirees a weaker protection

allowing FreightCar to unilaterally terminate benefits should not be inferred lightly. The

Court does not find that consideration of the 1997 CBA itself sheds light on the parties'

agreement regarding Side Letter 22. Furthermore, the record evidence is ambiguous

regarding FreightCar's obligations entering into the 1997 negotiations. The Court

therefore finds that there is a dispute of fact that must be resolved at trial by the finder of

fact.

g.  **FreightCar's continuing obligation under Side Letter 22**

Plaintiffs state that "[a]t no time during the 1991 negotiations or during any other negotiations preceding 2001 did FreightCar ever suggest to any Union negotiators that retiree welfare benefits were terminable simply because the pending labor agreement expired." (ECF No. 133 at 64, citing Affidavit of Andrew Palm (ECF No. 126-14 at ¶ 13)). In light of the fact that Side Letter 22 was not listed in the 1997 CBA, the Court will consider whether or not FreightCar remained obligated under Side Letter 22 after expiration of the 1994 CBA.

The traditional principle is that "'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 937 (2015), citing *Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 207 (1991). The Supreme Court noted that "we have already recognized that 'a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration.'" *Id.*, quoting *Litton*, 501 U.S. at 207. The concurrence in *Tackett* noted that "[t]o determine what the contracting parties intended, a court must examine the entire agreement in light of relevant industry-specific 'customs, practices, usages, and terminology.'" *Id.* at 937–38, citing 11 R. Lord, Williston on Contracts § 30:4, at 55–58 (4th ed. 2012) (Williston). The concurrence further noted that "[w]hen the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." *Id.*, citing Williston § 30:6, at 98–104. However, "when the contract is ambiguous, a court may

consider extrinsic evidence to determine the intentions of the parties." *Id.*, citing Williston § 30:7, at 116–124.

As the Court noted above, this case must be decided as a matter of contract law. The parties' 1994 and 1997 agreements are ambiguous on the question of whether the parties agreed that FreightCar had satisfied its mirroring obligation. Thus, as the concurrence noted in *Tackett*, the Court may look at extrinsic evidence to determine the intentions of the parties. The extrinsic evidence regarding the 1994 and 1997 negotiations is also inconclusive and presents a genuine dispute of material fact as to whether the parties agreed that the obligations under Side Letter 22 had been fulfilled and whether FreightCar had provided the Union with consideration in return for giving up this benefit. As FreightCar stated earlier in this litigation, it had continuing obligations through 1997. (ECF No. 63 at 25). Furthermore, FreightCar continued to provide welfare benefits through 2002, when Bethlehem ceased reimbursing FreightCar for paying retiree welfare benefits. (ECF No. 129 at ¶ 116).

The extrinsic evidence is ambiguous on whether the parties intended the mirroring obligation under Side Letter 22 to continue past expiration of the CBAs. FreightCar Manager Joseph Canini, who worked in FreightCar's Human Resources Department from November 15, 1993, through August 21, 2000, and who was a member of FreightCar's bargaining team during 1994 negotiations, attested to the fact that the parties wanted to clean up the contract during the 1994 negotiations. With regard to Side Letter 22, he noted the following:

> They said it wasn't necessary to continue it. They just wanted to house clean the contract to make the contract as small -- as compact as they could. I was totally against removing any letters. I was guaranteed, and now I'm a management employee, I was guaranteed by Tex McIver that it was strictly house cleaning. Mark Duray said, who was my boss now, told me there's no problem removing that letter. Everything is guaranteed.

(ECF No. 133 at 35). Upon being asked what he believed was meant by the words "everything is guaranteed," he stated "[t]hat the employees would not lose anything on their benefit package." (*Id.*).   In contrast, FreightCar states that the parties agreed as early as 1994 that Side Letter 22 would not be carried forward because the USW had approved, and FreightCar had distributed, the JAC Guide in 1993. (ECF No. 136 at 24, citing McIver Decl. (ECF No. 121-31 at ¶ 14)). These two statements present conflicting views of what was agreed to by the parties in 1994. While Joseph Canini's statement suggests that the parties remained bound by Side Letter 22 even after the 1994 negotiations, but simply sought to make the contract more compact, Tex McIver's declaration suggests that the Union had implicitly agreed in 1993 that FreightCar had fulfilled its obligation under Side Letter 22.

The Court found above that FreightCar was under an obligation to create mirror benefit plans that included the Bethlehem PHMB Continuation of Coverage language. The Court further finds that there is a dispute of fact as to the parties' intention with regard to the continuing force of Side Letter 22. FreightCar was clearly under a contractual obligation to create mirror benefit plans pursuant to Side Letter 22, which was part of the 1991 sale agreement. The conflicting evidence presented by the parties regarding the 1994 and 1997 negotiations creates a dispute of fact as to whether the parties agreed that

FreightCar's obligation under Side Letter 22 had been satisfied, or whether the parties intended the obligation under Side Letter 22 to continue to govern past 1997. The Court makes particular note of the fact that FreightCar continued to pay welfare benefits until 2002, when Bethlehem ceased to reimburse FreightCar for retiree welfare benefits. The Union did not agree to termination of welfare benefits, which would have been required pursuant to the Bethlehem PHMB Continuation of Coverage language. FreightCar's assertion that it was entitled to unilaterally terminate retiree welfare benefits is therefore premised on the fact that the parties had agreed to give FreightCar a right to unilateral termination, and that FreightCar had no remaining obligations under Side Letter 22.

The Court finds that the factual evidence is ambiguous regarding FreightCar's continuing obligations under Side Letter 22. As the Court found above, these questions of fact should be determined by the finder of fact at trial.

### h. Subject to collective bargaining

Plaintiffs argue that in the event the Court should find a dispute of fact clouding the first point, namely whether or not the company and the Union "agreed otherwise," FreightCar still cannot avoid summary judgment unless the Court also finds disputed facts as to whether FreightCar complied with the 1993 SPD mandate that any benefit termination must be "subject to collective bargaining." (ECF No. 124 at 13). Plaintiffs argue that the phrase "subject to collective bargaining" and "subject to the collective bargaining agreement" should be given the same meaning as the Continuation of Coverage clause (i.e. that the union must affirmatively agree) because the parties never

discussed the duration of retiree benefits in 1997, and FreightCar continued to inform retirees in 1999 that they were eligible for "the same" coverage as under Bethlehem Steel. (*Id.*). Plaintiffs further assert that there was no need for the USW to "insist" on inclusion of a Continuation of Coverage provision identical to the one in the Bethlehem PHMB because that provision was already part of the parties' collectively bargained agreement pursuant to the Mirroring Agreement, namely in the form of Side Letter 22 to the 1991 and 1994 CBAs. (*Id.*).

FreightCar argues that under the language of the JAC Employee Guide, as incorporated into the 1997 and 2005 CBAs, it could terminate retiree medical benefits, because neither CBA promised lifetime or vested medical and life insurance benefits. (ECF No. 120-1 at 21). FreightCar further states that it attempted to collectively bargain over benefits for past retirees during the 2001 CBA negotiations, but that the USW refused to do so. (*Id.* at 28). After they had repeatedly raised the issue of past retirees' benefits during negotiations, FreightCar claims that the USW had told FreightCar to remove all references to past retirees from draft agreements. (*Id.*). Thus, FreightCar concludes that after bargaining to impasse, it properly exercised its right under the terms of the JAC Guide to terminate the retirees' medical and life insurance benefits. (*Id.*). Since the retirees whose benefits were in question were no longer active employees at the time that the USW engaged in collective bargaining, FreightCar asserts that they were not required to bargain, to impasse or otherwise, over their benefits. (ECF No. 136 at 56).

The labor disputes that the National Labor Relations Act ("NLRA") orders to be subject to collective bargaining are those of employers and their active employees. *Allied Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division,* 404 U.S. 157, 166 (1971). Section 8(d) of the NLRA defines to "bargain collectively" as meeting and conferring "with respect to wages, hours, and other terms and conditions of employment." *Id.* at 183. Retirees are not properly included in a bargaining unit because "interests extend only to retirement benefits, to the exclusion of wage rates, hours, working conditions, and all other terms of active employment." *Id.* at 173. "[A] 'modification' is a prohibited unfair labor practice only when it changes a term that is a mandatory rather than a permissive subject of bargaining." *Id.* at 184. Retirees' benefits are a permissive term of collective bargaining, and therefore their unilateral mid-term modification does not violate s. 8(d) of the NLRA. *Id.* at 188.

The Court finds that the parties' obligations under the 1997 CBA are governed by the determination of the issue whether FreightCar and the Union had agreed that FreightCar had satisfied its obligations under Side Letter 22. FreightCar's argument that it was not required to bargain to impasse with the Union over retiree benefits is premised on the notion that they had agreed with Plaintiffs no longer to be bound by Side Letter 22 and the Continuation of Coverage language in the Bethlehem PHMB, and were thus free to terminate the benefits only subject to collective bargaining or subject to any contrary provision in the collective bargaining agreement. In light of the Court's finding that there is a genuine dispute of material fact regarding whether the parties agreed no longer to be

bound by the obligations in Side Letter 22, the Court does not find it dispositive that FreightCar asserts it was not required to bargain to impasse over retiree benefits.

### i. The 2005 Agreement

The Court will now address FreightCar's final argument in support of summary judgment, namely that the 2005 settlement between the parties disposes of this case. The parties returned to the bargaining table in 2005, and reached an agreement over the benefits in dispute. (ECF No. 119 at ¶ 120). The parties entered into the settlement of the *Deemer* and *Britt* lawsuits at that time, and they agreed that "current and future eligible retirees" would receive benefits as set forth in the JAC Guide until the later of November 30, 2012 or the expiration of a successor CBA to the 2005 CBA. (ECF No. 120-1 at 39). FreightCar asserts that neither the 2005 CBA, nor the *Deemer* or *Britt* settlements incorporated therein gave Plaintiffs a right to lifetime medical and life insurance benefits. (*Id.*). FreightCar argues that when it terminated retiree benefits after expiration of its obligations under the final 2005 CBA, it did so in full compliance with the last CBA between the parties and the negotiated terms in the JAC Guide. (*Id.*). Plaintiffs counter that the 2005 CBA merely reiterated the date from the *Britt* and *Deemer* settlement when FreightCar could cease its mandated contributions and the parties would revert to their prior positions. They assert that no term in the 2005 CBA could have any bearing on the current outcome, since the parties expressly retained their legal positions as asserted in *Britt* and *Deemer*. (ECF No. 134 at 23).

The Court agrees with Plaintiffs that they were entitled to reinstate litigation pursuant to the *Britt* and *Deemer* settlements and that they were not precluded from doing so by virtue of the settlement agreement. The 2005 CBA expressly allowed the parties to retain their legal positions as asserted in *Britt* and *Deemer*. (ECF No. 121-21 at 48). It provided the following:

> Both parties retain their legal positions that they asserted in the Britt and Deemer litigation. For example, the Company continues to assert that it can reduce or eliminate retiree medical benefits after expiration of the Agreement, and the Union and retirees continue to assert both that alteration of benefits was unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated level of benefits provided under the 1997 collective bargaining agreement (no deductibles, contributions, etc.). Accordingly, neither the Union nor the retirees are waiving any right to reactivate the Britt and Deemer litigations against all defendants) if in the future the company breaches its obligations to make the contributions specified herein.

(*Id.*).  The terms of the agreement expressly provide that both parties retain their legal positions as asserted in *Britt* and *Deemer*. By FreightCar's own admission, the settlement reached by the parties was an "interim settlement agreement," which resolved the dispute until November 30, 2012, "at which time FreightCar was entitled to cease paying the benefit costs under the 2005 settlement agreement and the parties would revert back their prior legal positions." (ECF No. 120-1 at 2, n. 4)  The Court finds that the Plaintiffs did not preclude their ability to reinstate litigation by signing the settlement agreement.

### III. CONCLUSION

For the above reasons, this Court will deny the parties' cross-motions for summary judgment and Plaintiffs' motion to strike certain denials of fact. The Court finds a genuine

dispute of material fact as to whether the parties agreed that FreightCar had satisfied its obligation under Side Letter 22 to create mirror benefit plans identical in all material respects to the Bethlehem plans they replaced.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY J. ZANGHI, KENNETH J.              )
SOWERS, DOMINIC MCCUCH,                     )
JAMES HOHMAN, and DARRELL                   )        CIVIL ACTION NO. 3:13-146
SHETLER, *on behalf of themselves and*     )
*others similarly situated;* UNITED         )        JUDGE KIM R. GIBSON
STEEL, PAPER AND FORESTRY,                  )
RUBBER MANUFACTURING,                       )
ENERGY, ALLIED INDUSTRIAL AND               )
SERVICE WORKERS                             )
INTERNATIONAL UNION, AFL-                    )
CIO/CLC,                                     )
                                            )
                        Plaintiffs,          )
                                            )
            v.                              )
                                            )
FREIGHTCAR AMERICA, INC.;                   )
JOHNSTOWN AMERICA                           )
CORPORATION; and JOHNSTOWN                   )
AMERICA CORPORATION USWA                    )
HEALTH & WELFARE PLAN,                       )
                                            )
                        Defendants.          )

ORDER OF COURT

AND NOW, this ___30th___ day of March, 2015, upon consideration of

Defendant's first motion for summary judgment (ECF No. 118) and Plaintiffs' third

motion for summary judgment (ECF No. 123), as well as Plaintiffs' motion to strike certain

denials of fact included in Defendants' response to Plaintiffs' Statement of Undisputed

Facts (ECF No. 142), it is **HEREBY ORDERED AS FOLLOWS:**

1.        Defendant's motion for summary judgment is **DENIED.**

2.      Plaintiffs' motion for summary judgment is **DENIED.**

3.      Plaintiffs' motion to strike certain denials of fact is **DENIED.**

**BY THE COURT:**

**KIM R. GIBSON**