**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY J. ZANGHI et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:13-146 |
| | ) | JUDGE KIM R. GIBSON |
| FREIGHTCAR AMERICA, INC. et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum Opinion and Order**

**I.     Introduction**

Presently before this Court is the Joint Motion for Final Approval of Class Action Settlement. ECF No. 287. The Parties submitted a Memorandum of Law in Support of Joint Motion for Final Approval of Class Action Settlement. ECF No. 288. A substantial number of Class Members object to the proposed Settlement. *See* ECF Nos. 241-246, 249-275. Counsel for the Plaintiffs and for the Defendants submitted separate responses to the objections. ECF Nos. 286, 289. Counsel for the Parties and members of the Class appeared before the Court for a Hearing on the Joint Motion for Final Approval of Class Action Settlement (**Fairness Hearing**) on January 5, 2016.

Having considered the arguments in support of the proposed settlement agreement, and the objections thereto, and for the reasons that follow, the Court holds that the proposed settlement, memorialized at ECF No. 238, meets the requirements for settlement approval under applicable law, and therefore grants the Joint Motion for Final Approval of Class Action Settlement. ECF No. 238.

## II.     Jurisdiction and Venue

The Court exercises jurisdiction under 28 U.S.C. § 1331, 29 U.S.C. § 185, and 29 U.S.C. § 1132(e)(1) and (f). Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Johnstown, Pennsylvania. Venue is also proper under 29 U.S.C. § 185 and 29 U.S.C. § 1132(e)(2).

## III.     Factual Background

This case stems from ten years of litigation concerning the rights to continued medical coverage and life insurance benefits ("welfare benefits")[1] under an employee benefit plan. To put the current matter in context, the Court will first discuss the underlying facts and extensive procedural history in this case.

### a.   The 1991 Collective Bargaining Agreement

Bethlehem Steel Corporation owned and operated a facility producing railroad freight cars in Johnstown, Pennsylvania, from 1923 to 1991. ECF No. 1 at ¶ 3. In 1991, Bethlehem Steel sold the assets of the freight car division to Johnstown America Industries, Inc. In 1999, Johnstown America Industries, Inc. renamed itself Transportation Technologies Industries, Inc., selling its railcar business to newly formed Johnstown America Corporation (**JAC**). In 2004, JAC changed its name to FreightCar America, Inc.[2] *Id*. at ¶ 4.

Plaintiff United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (**Union** or **USW**), was the collective bargaining representative for hourly employees at the Johnstown Facility. ECF No.

---

[1] The parties refer to these medical coverage and life insurance benefits as "welfare benefits." ECF No. 1. The Court will continue using this terminology for clarity purposes.

[2] Although JAC was the defendant entity for part of the time period described herein, the Court will refer to this entity as FreightCar throughout this section.

[129 at ¶ 3](#). The USW negotiated the collective bargaining agreements with FreightCar relating to the retiree health and life insurance benefits at issue in this case. *Id*.

The 1991 purchase agreement between FreightCar and Bethlehem, to which USW was not a party, provided that Bethlehem would reimburse FreightCar for retiree insurance costs for those FreightCar employees who were 43 at the time of the October 28, 1991 sale and who subsequently retired with eligibility for retiree insurance benefits from FreightCar. *[Id. at ¶ 9](#)*. FreightCar recognized the USW as the collective bargaining representative of the Johnstown Facility bargaining unit employees in connection with the 1991 sale. *[Id. at ¶ 10](#)*.

During the summer and fall of 1991, FreightCar engaged in negotiations with the USW in an effort to reach a collective bargaining agreement that would govern the terms and conditions of employment at the Johnstown Plant following the closing of the sale. [ECF No. 119 at ¶ 9](#). In October 1991, the parties discussed the benefit plans that JAC would create for the represented employees if FreightCar closed on the Johnstown Plant. *[Id. at ¶ 10](#)*. In mid-October, FreightCar and the USW reached an agreement which they memorialized in a main collective bargaining agreement (**the 1991 CBA**) and twenty-seven "side letters" to the CBA. *[Id. at ¶ 16](#)*. This agreement was tentative and would only become effective in the event that FreightCar closed on its purchase of the Johnstown Plant. *[Id](#)*. One of the 27 side letters to the 1991 CBA was the "Mirroring Agreement," which was also known as "Side Letter 22." [ECF No. 129 at 11, ¶¶ 11-12](#). Side Letter 22 provided that:

> Johnstown America Corporation will create mirror bargaining unit employee benefit plans identical in all material respects to the Bethlehem plans they replace. Within 60 days after closing of the Johnstown America Corporation/Bethlehem sale, Johnstown America Corporation will forward to the Union for review and comment draft copies of such plans, and Johnstown

America Corporation and the Union agree to use their best efforts to finalize such plans, subject to IRS approval if appropriate, within 120 days of closing.

ECF No. 119 at ¶ 20.

### b. The 1993 Summary Plan Description

In 1993, while the 1991 CBA was still in effect, FreightCar distributed a summary plan description titled "JAC's Employee Guide" (**1993 SPD**), which included a letter informing employees that the handbook served as the summary plan description required by the Employee Retirement Income Security Act of 1974, as amended. ECF No. 129 at 17, ¶¶ 41-42. The 1993 SPD stated as follows with respect to health benefits:

Note: This plan is subject to the rights and obligations of collective bargaining. The company may amend or terminate the plan only through this process. This booklet is intended as a general summary of your benefits under the plan. The specific details of this plan are in the actual plan document, which controls your benefits.

*Id*. at ¶ 48. In addition, the 1993 SPD provided that "[t]he plans are subject to the collective bargaining process." *Id*. at ¶ 49. Another notice provided that:

This guide attempts to provide a simple explanation of the provisions of your benefit. Complete technical information of the plans can be found in formal legal documents available in the human resources department. If there's any omission, if this guide is unclear, or if this guide and the plans differ, the plans as stated in the legal documents must take precedence.

*Id*. at ¶ 50. The first page of the 1993 SPD included a letter dated May 1993 addressed to "Employee" stating that the handbook contained only "summaries of the benefit plans;" and that:

> Each benefit plan has legal documents that may be referred to whenever a question concerning your coverage arises. In the event of a difference between the summary and the legal documents, the legal documents shall control.

*Id*. at ¶ 51. The 1993 SPD was drafted by Hewitt, an outside benefits administrator. *Id*. at ¶ 52. Mr. Grove, the FreightCar Benefit Administrator, reviewed the 1993 SPD to ensure that the benefits in it matched the Bethlehem benefits. *Id*. at ¶ 53. Regarding eligibility upon retirement, the 1993 SPD provided that:

> If you retire under Johnstown America's pension plan for represented employees and have worked continuously at Johnstown America for 15 or more years, you and your eligible dependents will be enrolled for retiree medical coverage under the medical plan, unless you choose not to be. If you're the spouse of a former employee who's eligible to receive a surviving spouse's benefit under the pension plan, you'll also be eligible for our retiree medical coverage.

*Id*. at ¶ 55. With respect to retiree coverage, the 1993 SPD stated that "[t]he company pays the cost of hospital and physicians' coverage for you and your dependents." *Id*. at ¶ 56. Regarding life insurance, the 1993 SPD stated: "If you retire at or after age 62, your basic life insurance will be reduced to $5,000. If you retire before you turn age 62…you'll keep the same coverage as other active employees until you turn 62. Then your coverage will be reduced to $5,000." *Id*. at ¶ 57.

The 1993 SPD further provided the following regarding termination:

> Subject to collective bargaining, the company reserves the right to end, suspend, or amend the plans at any time, in whole or in part. This means the plans may be discontinued in part or in their entirety or modified to provide different benefits or different levels of benefits, the price of coverage may be changed, or any other modifications may be implemented. If any changes are made, you'll be notified.

*Id.* at ¶ 58. Another provision of the 1993 SPD provided the following regarding situations that could affect benefits:

> Situations That May Affect Your Benefits
> You and your family's medical benefits could be lost or delayed if:
> * * *
> Subject to the collective bargaining agreement, the plan is modified to reduce or eliminate certain benefits or it ends.

*Id.* at ¶ 59. FreightCar construed the JAC Employee Guide to mean that it had "expressly reserve[d] to JAC the right to terminate any benefit, including company paid retiree benefits, subject to collective bargaining." *Id.* at ¶ 60.

The USW, through Jerry Sokolow, its Technician in the USW's Pension, Insurance & Research Department, had sought and obtained the 1993 SPD condition that the right to amend or terminate the plan should be "subject to collective bargaining" and "subject to the collective bargaining agreement." *Id.* at ¶ 61. With regard to the purported reservation of right provisions as to dental, vision, and medical benefits, the USW had advised FreightCar: "delete or subject to collective bargaining agreement." *Id.*

The JAC Guide was distributed to the represented employees in May 1993, and was given an effective date of October 28, 1991, as agreed by FreightCar and the USW. ECF No. 119 at ¶ 51.

### c. The 1994 Collective Bargaining Agreement

In 1994, FreightCar and the Union engaged in collective bargaining, resulting in the 1994 CBA. ECF No. 129 at ¶ 65. Mr. Joseph S. Canini, Jr., who worked in FreightCar's Human Resources Department from November 15, 1993 through August 21, 2000, stated the following regarding the 1994 bargaining:

It was during the 1994 round of bargaining that JAC management first proposed removing a number of side letters from the 1991 CBA, including Side Letter 22 (the Mirroring Agreement). The Union negotiators asked JAC negotiators why they wanted the side letters removed. Tex McIver stated that these side letters were no longer needed, because they dealt with issues related to the 1991 sale. McIver also assured the Union's negotiators that the removal of the side letters would not affect anybody's rights under the CBA. Mark Duray, a JAC executive and a member of management's negotiating committee, affirmed McIver's statement. McIver and Duray said that removing these letters was "housecleaning" and would merely make the CBA shorter without changing its meaning. (I specifically remember Duray using the term "housecleaning.")

*Id*. at ¶¶ 68-69.

### d. The 1997 Collective Bargaining Agreement

FreightCar and the Union engaged in collective bargaining again in 1997, which resulted in the 1997 CBA. *Id*. at ¶ 72. Prior to these negotiations, the active employee and retiree medical benefits described in the JAC Guide were administered by Blue Cross Blue Shield pursuant to an insurance contract and indemnity agreement with FreightCar ("the BCBS Insurance Agreement"). ECF No. 119 at ¶ 62. During the 1997 negotiations, the USW proposed that FreightCar provide employee and retiree medical benefits through the Steelworkers Health and Welfare Fund Point-of-Service Plan (**SHWF Plan**), to which FreightCar agreed. *Id*. at ¶¶ 63, 67. The SHWF Summary Plan Description was distributed to the employees and retirees. *Id*. at ¶ 71.

The 1997 CBA included a "zipper clause," which stated:

This Agreement and the documents expressly referred to herein are the only documents by which the parties intend to be contractually or statutorily bound. Any document not expressly referred to herein that may be brought forth by either the Company or the Union after ratification of this Agreement may be included as part of this Agreement, provided both parties agree to its inclusion.

*Id*. at ¶ 58.

In a letter to FreightCar employees dated November 7, 1997, FreightCar President James D. Cirar advised that FreightCar had made its last and final offer to the Union, and that "[t]his offer provides major benefits to you and your family, including…an improved healthcare, life insurance and benefit package." ECF No. 129 at ¶ 83. The 1997 CBA included a "Successorship" provision, which stated:

> (1) In the event of a permanent shutdown of the Plant prior to five years following the date of sale, the Company will guarantee that each former Johnstown America Corporation Employee at the Plant will receive from the owner of the Plant, from the Pension Benefit Guaranty Corporation (the "PBGC") and/or from the Johnstown America Corporation Pension Plan…the same retiree health and life insurance coverage, and the same severance pay that he would have received had the Plant shutdown as of the date of sale.

Id. at 104. In the deposition taken of Mr. Duray, FreightCar's Vice President of Human Resources, he testified that the retiree health benefits provided by FreightCar in 1999 mirrored those provided in the Bethlehem Plan. Id. at ¶ 106. The President of FreightCar sent a letter to employees dated June 3, 1999, which reassured employees that their benefits would continue just as they had under Bethlehem: "You will be eligible for the same retiree health and life insurance coverage through Johnstown America Corporation as you were through Bethlehem Steel and the current plan." Id. at v 107.

e. **The 2001 Negotiations**

Beginning around June of 2001, Bethlehem fell behind in its reimbursements to FreightCar for the cost of retiree benefits for retirees who were 43 or older at the time of the 1991 sale. Id. at ¶ 108. Bethlehem went into Chapter 11 bankruptcy in October 2001. Id. at ¶ 109. The

1997 CBA expired on October 31, 2001. *Id*. at ¶ 110. In September 2001, FreightCar and the USW

began negotiations to reach a successor agreement to the 1997 CBA. ECF No. 119 at ¶ 73.

FreightCar explained to the USW that retiree welfare benefits had become particularly

burdensome because Bethlehem's unanticipated bankruptcy filing in 2001 had prevented it

from fulfilling its obligations under the 1991 purchase and sale agreement to reimburse

FreightCar for the cost of certain retirees' (the **Reimbursable Retirees**) welfare benefits. *Id*. at ¶

75. FreightCar proposed that retiree insurance benefits be terminated to the extent that they

were supported by reimbursement from Bethlehem but Bethlehem failed or refused to

reimburse FreightCar for the cost of those benefits. ECF No. 129 at ¶ 111. Bethlehem informed

FreightCar by letter dated January 24, 2002, that it would no longer provide reimbursements for

Freightcar retiree insurance. *Id*. at ¶ 116.

During the 2001 negotiations between FreightCar and the USW, the issue arose whether

USW could represent past retirees. ECF No. 119 at ¶¶ 82-83. The USW informed FreightCar

during its October 25, 2001, meeting that it would discuss whether it represented the retirees

with its legal department. *Id*. at ¶ 84. During the November 14, 2001, negotiations, the USW

informed FreightCar that it did not represent retired individuals. *Id*. at ¶ 86.

After the USW was provided with numerous proposals regarding retirees' benefits, the

bargaining unit voted on and rejected the Fifth and Final proposal on January 10, 2001. *Id*. at ¶

103. FreightCar informed the USW that it believed the parties were at an impasse. FreightCar

subsequently informed the USW that it intended to implement its Final Proposal effective

January 21, 2002. *Id*. at ¶ 104.

The USW responded by filing a charge with the National Labor Relations Board, alleging that FreightCar had violated Section 8(a)(5) of the National Labor Relations Act by failing to bargain in good faith with the USW during the 2001 negotiations. *Id*. at ¶ 105.

After the *Deemer* class members had already retired, FreightCar announced by letters dated February 1, 2002, and March 6, 2002, that effective May 1, 2002, it would cease paying for these retirees' medical coverage, citing Bethlehem's failure to provide reimbursement. ECF No. 129 at ¶¶ 117-18.

### f. The *Deemer* Litigation

On April 26, 2002, the USW and a putative class consisting of reimbursable retirees and their dependents filed suit challenging FreightCar's decision to terminate their welfare benefits, *Deemer v. Johnstown America Industries, Inc.*, Civ. No. 02-cv-806 (W.D.Pa. 2002). ECF No. 119 at ¶ 107. On June 28, 2002, the *Deemer* plaintiffs filed a Motion for Summary Judgment and Permanent Injunction, or in the Alternative, Motion for Preliminary Injunction. *Id*. at ¶ 108. On August 9, 2002, FreightCar filed its response to the *Deemer* plaintiffs' alternative motions, and also filed its own cross-motion for summary judgment. *Id*. at ¶ 110. Magistrate Judge Robert C. Mitchell recommended that FreightCar's motion for summary judgment be granted and that the *Deemer* plaintiffs' motions for summary judgment be denied, to which Plaintiffs objected. *Id*. at ¶¶ 111-112. Judge Cindrich exercised his discretion pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) to "accept new evidence as part of [his] *de novo* review of [Magistrate Judge Mitchell's R & R.]" *Id*. at ¶ 113. Following Judge Cindrich's order of an evidentiary hearing, the parties filed a joint motion to continue the hearing to allow for discovery, which Judge Cindrich

granted. *Id.* at ¶¶ 114-16. Judge Cindrich also denied their respective motions for summary judgment without prejudice to be asserted at the close of discovery. *Id.* at ¶ 116.

### g. The *Britt* Litigation

In 2002, in addition to amending the JAC Guide's medical plan to eliminate retiree medical benefits for the reimbursable retirees, FreightCar eliminated the monthly pension supplement and the health and life insurance benefits it had previously provided to represented employees that retired under special pension formulas. *Id.* at ¶ 117. In August 2003, a putative class of current and former FreightCar employees who "applied or will apply for 70/80 or Rule of 65 retirement benefits" filed a lawsuit in which they alleged that the unilateral elimination of these benefits violated the parties' collective bargaining agreements and the terms of FreightCar's pension and retiree medical plans. *Id.* at ¶ 118.

### h. The *Britt* and *Deemer* Settlements

The parties engaged in negotiations to settle the *Deemer* and *Britt* litigation from September through November 2004, ultimately resulting in the "Britt-Deemer Settlement Agreement," which the Court approved. ECF No. 129 at 6, ¶ 12.

### i. The 2005 CBA

In 2005, FreightCar and the USW entered a collective bargaining agreement. ECF No. 119 at ¶ 120. Active employees' and retirees' medical benefits were addressed in Article XIX of the 2005 CBA and a side letter relating to the parties' settlement of the *Deemer* and *Britt* litigation. *Id.* at ¶ 121. The 2005 CBA incorporated the *Deemer* and *Britt* settlements and provided that FreightCar would contribute $700 per month for each household with at least one non-Medicare eligible retiree and $450 per month for each Medicare-eligible retiree. *Id.* at ¶ 124.

In addition, the agreement provided that "[i]n any event, the Company's contributions for retiree and/or surviving spouse coverage as described above will remain unchanged until the later of November 30, 2012 or the expiration of a successor Agreement to this CBA." *Id*. The contributions were to last at least through November 2012, and if FreightCar were to cease contributions at any point after that, Retirees could then re-file their lawsuits in this Court. ECF No. 125 at 4, ¶ 13. The Settlement Agreement further provided that in re-filed lawsuits, the parties would "retain their legal positions that they asserted in the *Britt* and *Deemer* litigations," so that the "Plaintiffs [could] continue to assert both that alteration of benefits is unlawful and that obligations under collectively bargained agreements require the continuation of the negotiated level of benefits provided under the 1997 collective bargaining agreement (*e.g.* no deductibles, contributions, etc.)". *Id*. at ¶ 14. As for life insurance benefits, the Settlement Agreement provided that "Defendant JAC will reinstate the retiree life insurance program and will provide future benefits consistent with that Program." *Id*. at ¶ 15.

### j.  The Plant Shutdown

In 2007, after FreightCar announced that it was closing the Johnstown Facility, the *Sowers* plaintiffs filed their lawsuit. *Id*. at ¶ 17.

Before FreightCar and the USW began effects bargaining, a putative class of FreightCar employees filed a lawsuit in the Western District of Pennsylvania, challenging FreightCar's decision to close the Johnstown Plant. *Hayden v. FreightCar America, Inc.*, Civ. No. 07-cv-00201 (W.D.Pa. 2007); ECF No. 119 at ¶ 126. After this Court granted the *Hayden* plaintiffs' motion for a preliminary injunction and ordered that the class be reinstated to allow them to accrue the years of service they required, FreightCar, the USW, and the *Sowers* plaintiffs negotiated a

combined settlement/shutdown agreement. *Id*. at ¶ 128. Under their "FCA/Union Settlement Agreement (the **Shutdown Agreement**), the parties acknowledged that the 2005 CBA terminated May 15, 2008, and that FreightCar "closed the [Johnstown Plant] effective May 16, 2008, after affording the Union a full and fair opportunity to engage in decisional and effects bargaining in accordance with the National Labor Relations Act." *Id*. at ¶ 129. With respect to retiree medical benefits, the parties agreed that then-current retirees' benefits would continue to be provided as set forth in the 2005 CBA and pursuant to the applicable terms and conditions of the *Deemer* and *Britt* settlements. *Id*. at ¶ 130. The Shutdown Agreement also provided that the *Sowers* plaintiffs would similarly be entitled to retiree medical benefits under the 2005 CBA and the *Deemer* and *Britt* settlements. *Id*. at ¶ 131.

### k. Procedural History Relevant to This Proposed Settlement

FreightCar filed a declaratory judgment action in the United States District Court for the Northern District of Illinois on July 8, 2013. ECF No. 129 at ¶ 25. The action requested a declaration that FreightCar had the legal right to terminate retiree welfare benefits. *Id*. FreightCar sent the USW a copy of the Illinois complaint and a letter informing them that effective October 1, 2013, it would cease all company contributions provided under the 2005 Settlement Agreement for retiree medical coverage. *Id*. at ¶ 26. The letter also informed the USW that it would no longer provide the life insurance benefit set forth in Section 16(i) of the Settlement Agreement to the *Deemer*, *Britt*, and *Sowers* group of retirees. *Id*. Following receipt of this notice, Class Representatives and the USW filed their complaint in this Court on July 9, 2013, asserting that the termination of Retirees' health and insurance benefits violated § 301 of the LMRA and § 502 of ERISA. *Id*. at ¶ 27.

FreightCar notified 653 retirees and surviving spouses on July 10, 2013, that FreightCar's contributions for their retiree benefits would end effective October 1, 2013. *Id*. at ¶ 28. FreightCar terminated all of its contributions for health and life insurance benefits for Retirees effective November 1, 2013. *Id*. at ¶ 29.

This Court denied FreightCar's motion to dismiss or transfer by Memorandum and Order of Court on January 14, 2014. ECF No. 73. Plaintiffs filed a second motion for summary judgment as to liability on February 18, 2014. ECF No. 82. The Court held an Intial Rule 16 Status Conference on March 25, 2013, in which it did the following:

> (1) consolidated FreightCar's now-transferred Illinois action with the pending case filed by Plaintiffs; (2) ordered that the case be bifurcated in two stages, with the issue of liability to be determined before the issue of damages; (3) allowed three months of additional discovery; (4) ordered the withdrawal of Plaintiffs' Second Motion for Summary Judgment, with the parties to refile summary judgment motions on July 17, 2014.

ECF No. 100. The Court certified the following class as to liability by Order entered April 17, 2014 as follows:

> (1) former FreightCar employees that were represented by the USW at the time of their retirement from FreightCar, and who upon retirement received or were eligible to receive medical and life insurance benefits under the Plan; and (2) those individuals who received or were eligible to receive medical and life insurance benefits under the Plan as a spouse, surviving spouse, or dependent of an aforementioned former FreightCar employee.

ECF No. 107 at ¶ 12.

FreightCar filed a motion for summary judgment on July 17, 2014. ECF No. 118. Plaintiffs filed a third motion for summary judgment on July 18, 2014. ECF No. 123. This Court denied both motions by Memorandum and Order of Court dated March 30, 2015. ECF No. 161.

Trial in this matter was scheduled to begin on August 25, 2015. ECF No. 172. On August 20, 2015, the parties filed a Joint Motion to Cancel the Trial, having reached an agreement on a signed term sheet and thus obviating the need for trial. ECF No. 233. The Court granted the Joint Motion to Cancel the Trial, and ordered that the parties file a motion for preliminary approval of their settlement no later than September 19, 2015. ECF No. 234. After a conference to discuss preliminary approval of the settlement agreement, the Court granted preliminary approval on September 28, 2015. ECF No. 240. By that Order, the Court certified the Class for settlement purposes to include:

> (a) former FreightCar employees that were represented by the USW at the time of their retirement from FreightCar, and who upon retirement received or were eligible to receive medical and life insurance benefits under the JAC USWA Health and Welfare Plan (the "Plan"); and (b) those individuals who received or were eligible to receive medical and life insurance benefits under the Plan as a spouse, surviving spouse, or dependent of an aforementioned former FreightCar employee.

ECF No. 240 ¶ 2.

Pursuant to Paragraph Five of the Court's order granting preliminary approval of the Settlement Agreement, members of the class filed objections to the Settlement Agreement with the Court. *See* ECF Nos. 249-275, 280, 283-285, 296, 297. The parties filed responses to these objections on December 22, 2015. ECF Nos. 286, 289.

The parties filed the Joint Motion for Final Approval of Class Action Settlement, and the accompanying brief in support, on December 22, 2015. ECF Nos. 287, 288. Lastly, the Court held the Fairness Hearing on January 5, 2016. At the hearing, counsel were permitted to present the proposed settlement agreement and arguments in support of final approval. Members of the

class were then given the opportunity to make objections to the proposed settlement agreement. Counsel then responded to the objections made during the hearing.

## IV. Standard for Final Approval of Class Action Settlement

The Third Circuit "recognizes a strong public policy favoring settlements of disputes, the finality of judgments and the termination of litigation." *In re Nazi Era Cases Against German Defendants Litig.*, 236 F.R.D. 231, 241-42 (D.N.J. 2006). This policy in favor of settlement is particularly strong in "class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. ("In re GMC")*, 55 F.3d 768, 784 (3d Cir. 1995). In these cases, "a settlement may represent the best method of distributing damage awards to injured plaintiffs, especially where litigation would delay and consume the available resources." *Id*.

Federal Rule of Civil Procedure 23(e) sets out the procedure for class action settlements. Fed.R. Civ.P. 23(e). Pursuant to this rule, the court may approve a class action settlement that would bind class members "only after a hearing and on finding that it is fair, reasonable, and adequate." *Id*. This inquiry is within the district court's sound discretion and "requires the court's independent and objective analysis of 'the evidence and circumstances before it to determine whether the settlement is in the best interest of those whose claims will be extinguished.'" *In re Cmty. Bank. Of N. Va.*, 2008 U.S. Dist. LEXIS 62787, at *22 (W.D.Pa. Aug. 14, 2008) (quoting *In re GMC*, 55 F.3d at 785).

The Third Circuit has adopted a non-exhaustive nine-factor test around which district courts should structure their final decisions to approve class action settlements as fair, reasonable, and adequate as Rule 23(e) requires. *Id*. (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d

Cir. 1975)). These so-called *Girsh* factors are: (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of the litigation. *Colella v. University of Pittsburgh*, 569 F.Supp.2d 525, 534-35 (W.D.Pa. 2008) (citing *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)).

For the reasons explained below, and having considered the *Girsh* factors as applied in this matter, the Court finds that the proposed Settlement Agreement is fair, reasonable, and adequate.

## V.      Discussion

In this Part, the Court first summarizes the terms of the proposed settlement agreement. The Court will then discusses the parties' arguments in support of the proposed settlement agreement, and the objections thereto. Lastly, the Court analyzes whether the settlement complies with applicable law, including FRCP 23(e), the Class Action Fairness Act of 2005, and due process. For the reasons explained, below, the Court concludes that the settlement agreement complies with all applicable requirements, and therefore grants final approval of the proposed settlement agreement.

### a. Terms of the Proposed Settlement Agreement

The terms of the proposed Settlement Agreement are summarized generally as follows.

In exchange for the dismissal of the Released Claims,[3] Defendants will make a one-time payment of $32,750,000, the balance of which after attorneys' fees and costs will be contributed to a Voluntary Employee Beneficiary Association (**VEBA**). *See* ECF No. 238 at ¶¶ 1.11, 2.1-2.2. The VEBA will thereafter be managed by a committee of independent trustees. *See id.* at ¶¶ 1.28, 3.2-3.5.

With the settlement funds, the VEBA will provide various categories of benefits, which include reimbursement for past healthcare expenses, a death benefit, and continuing healthcare benefits. *See* ECF No. 288-1 at ¶¶ 15-16, 18-23, 25-28.

The reimbursement for past healthcare expenses is available to both class member retirees and surviving spouses. The maximum amount of reimbursement that retirees and surviving spouses can receive depends on whether they were eligible for Medicare during the 29-month period beginning November 1, 2013, and ending March 31, 2016. Those who were not eligible during that time can receive reimbursement up to $6,728. Retirees who were eligible during that time can receive up to $2,349. *See* ECF No. 288-1 at ¶ 17.

The death benefit will be paid to surviving spouses or the other designated beneficiary at the time of the death of the retiree, and will offer $5,000 for each retiree. The VEBA Committee will establish procedures for enrollment and beneficiary designation. *Id.* at ¶ 19.

The healthcare benefit is structured to provide different benefits depending on whether class members are of Medicare age. There are two programs for class members in each category.

---

[3] To the extent not otherwise expressly defined herein, all capitalized terms have the same meaning as used in the Settlement Agreement.

In the pre-Medicare programs, the VEBA will pay 50% of the class members' monthly premium. After the VEBA subsidy is paid, this will result in an individual premium of $538 per month, and $1074 per month for a family under the first program, and $480 per month for an individual, and $959 for a family under the second program. As for Medicare-eligible retirees, the VEBA will pay 70% of the monthly premium for each program. This will result in approximately $85 per month under the first Medicare plan, and $43 per month under the second Medicare plan. *Id.* at ¶¶ 23-28.

The parties have stated that the VEBA was structured in this manner for various reasons, including to account for the fact that many pre-Medicare class members have other forms of healthcare coverage available to them. That some pre-Medicare class members will not choose VEBA coverage because of their available healthcare alternatives will allow the VEBA funds to last longer. *See id.* at ¶¶ 31-43. Under reasonable assumptions, the VEBA is expected to provide benefits for 18 years. *See* ECF No.290 at ¶¶ 18-19.

**b. Summary of arguments in support of the Proposed Settlement Agreement**

The parties urge the Court to grant final approval of the proposed settlement agreement, arguing that it satisfies all applicable criteria for approval. In support of the motion for final approval, the parties argue that consideration of the *Girsh* factors supports a finding that the proposed settlement agreement is fair, reasonable, and adequate. ECF No. 288 at 6-7. The parties' arguments with respect to the *Girsh* factors are set out in more detail in the analysis section below.

c. **Summary of Objections to the Proposed Settlement Agreement and the Parties' Responses Thereto**

A number of class members object to the proposed settlement agreement. Thirty-three written objections were filed prior to the Fairness Hearing. *See* ECF Nos. 241-246, 249-275. One written objection includes a petition that is signed by approximately 409 class members (the **Lump Sum Objectors**), including all five of the class representatives, requesting an "equal cash distribution instead of the USWA proposal" (the **Lump Sum Proposal**). ECF No. 242. In addition to the written objections, nine individuals raised objections during the Fairness Hearing held on January 5, 2016. Lastly, two written objections were filed with the Court after the Fairness Hearing. *See* ECF Nos. 296, 297.

Approximately 430 of the objectors, including the Lump Sum Objectors, support the Lump Sum Proposal. *See* ECF Nos. 242, 245-246, 249, 251, 253, 255-256, 258, 260, 262-264, 266-270, 272-275. Many of these objections indicate that the class members would like to receive such cash distribution tax-free. *See, e.g.*, ECF Nos. 246, 253, 255. In response to this objection, and in opposition to the Lump Sum Proposal, the parties make several arguments. First, the parties note that any such pure cash settlement would be subject to extensive taxation. *See* ECF No. 288-1 at ¶¶ 52-54; ECF No. 288-3 at 3-4. In addition, the parties emphasize that the settlement in this case must remedy an alleged breach of an employer's obligation to provide retiree health insurance benefits, and that it is the nature of health insurance that some people need it more than others and that the need for the benefit changes over time. *See* ECF No. 288-1 at ¶¶ 52-54. The parties note that the pure cash settlement would not include a health insurance component. *Id*. at ¶ 52; ECF No. 286 at 8; ECF No. 289 at 2-4. Lastly, the parties point out that those in favor

of the Lump Sum Proposal do not object to the proposed settlement amount, but rather urge the court to impose a different structure on that settlement amount. ECF No. 286 at 4.

Twelve class members object on the ground that the benefit described in the class notice is too expensive. *See* ECF Nos. 244, 245, 246, 254, 256, 259, 260, 262, 264, 265, 267, 275. In response, the parties note that many of the class members who make this objection are not yet eligible for Medicare, and that when structuring the VEBA, counsel had to identify an optimal premium amount for both pre-Medicare and Medicare-eligible coverage that would allow the best benefits for the longest amount of time. ECF No. 286 at 14-15. The parties note that most pre-Medicare class members, particularly those on limited incomes, have other health insurance options available to them. *Id*. at 15; ECF No. 289 at 5.

Seven class members object on the ground that the settlement amount is inadequate. *See* ECF Nos. 244, 246, 254, 255, 257, 262, 272. The parties argue in support of the proposed settlement amount and believe that it is fair and reasonable under the circumstances and given the risks associated with proceeding to trial. ECF No. 286 at 16; ECF No. 289 at 8.

Six class members object on the basis that they are entitled to nothing less than full lifetime benefits. *See* ECF Nos. 241, 250, 254, 255, 257, 261. In response to this objection, the parties argue that this result could not be achieved absent a trial and a full victory on the merits for Plaintiffs and further victory on appeal. ECF No. 286 at 16. The parties note that Plaintiffs may not have prevailed, and argue that the settlement amount is fair and reasonable under the circumstances. *Id*.

Four class members object to paying the proposed VEBA administration fees. *See* ECF Nos. 246, 256, 264, 274. In response, the parties note that each of these objections cites this point

as supporting the Lump Sum Proposal. The parties argue that the administrative fees are only a small portion of the total settlement fund, capped at three-hundredths of a percent, and will allow the VEBA to invest the funds as a common pool, thereby prolonging the availability of subsidized care and reducing investment costs. ECF No. 286 at 18; ECF No. 289 at 6.

Three class members object that the proposed settlement is not fair in its treatment of pre-Medicare class members. *See* ECF Nos. 256, 259, 265. In response, the parties argue that the pre-Medicare coverage under the proposed settlement is robust when compared to unsubsidized alternatives. ECF No. 288-1 at ¶ 45. In addition, the parties argue that many pre-Medicare retirees have opportunities for subsidized coverage, and therefore do not have the same need for VEBA coverage as Medicare-eligible retirees. The parties also note that pre-Medicare retirees will be able to take advantage of the Medicare-eligible coverage once they reach Medicare age, and that the VEBA funds will last longer given that some pre-Medicare class members will opt out of VEBA coverage. *See* ECF No. 288-1 at ¶ 45. Lastly, the parties note that pre-Medicare retirees and spouses are entitled to greater cost reimbursement under the proposed settlement than Medicare-eligible retirees. *Id*. at ¶ 48.

Three objectors argue that the class members, rather than the USW, should decide the terms of the settlement. *See* ECF Nos. 254, 262, 264. In response, the parties argue that the objection that class members were unable to vote on the settlement does not constitute a proper objection and indicates a misunderstanding of the requirements of FRCP 23. ECF No. 286 at 18-19.

Two class members object on the ground that the proposed settlement would create problems with their current form of insurance. *See* ECF Nos. 244, 256. Similarly, two class

members object that the proposed settlement is unfair to members of the class who already have health insurance. *See* ECF Nos. 274, 260. To these objections, the parties respond that the VEBA has no control over whether its benefits interfere with other insurance, but the parties note that there is no evidence that any particular class member would lose coverage and further note that any such retiree would continue to be eligible for coverage under the VEBA. ECF No. 288-1 at ¶ 61; ECF No. 289 at 7.

One class member objected that class counsel is ineffective for agreeing to the settlement. *See* ECF No. 241. The parties respond that class counsel believes the certainty of settlement is in the best interests of the class as a whole when considering the risks that would be involved in litigating this case to its conclusion. ECF No. 286 at 20.

One class member objected that he believes the settlement is unfair. *See* ECF No. 252. In response, the parties argue that general objections carry little weight in the Court's determination of whether the settlement is fair, adequate, and reasonable. ECF No. 286 at 20-21 (citing 2 NEWBERG ON CLASS ACTIONS (3d) § 11.58).

One class member objected to the payment of class counsel's fees and expenses. *See* ECF No. 256. In response, the parties note that this objection does not explain why class counsel should be denied the reimbursement other than general objections to the unfairness of the settlement. ECF No. 286 at 19. The parties argue that class counsel's requested fee and cost request is significantly below the lodestar and is reasonable and appropriate.[4] *Id.* at 19-20.

---

[4] Analysis and approval of class counsel's requested fee and costs is set forth in Paragraph 26 of the Final Order and Judgment. This approval in the Final Order and Judgment also constitutes approval of class counsel's Motion for an Order Approving Attorneys' Fees and Expenses. ECF No. 247.

One class member objected that the settlement is not fair because ex-spouses are included while current spouses are not. *See* ECF No. 275. The parties respond that this approach has historically been applied throughout the USW-represented steel industry, and that the retiree is free to change the designated beneficiary as to the death benefit. ECF No. 288-1 at ¶ 63; ECF No. 289 at 7.

One class member objected that the settlement should not include a release for Defendants. ECF No. 251. In response, the parties state that the settlement would not be possible without such release. ECF No. 286 at 21.

One class member objected that the Class Notice and the materials provided at the meetings were unclear. *See* ECF No. 275. In response, the parties state that the Notice was approved by the Court on September 28, 2015, and Plaintiffs' counsel provided a phone number for class members to call if they required additional information or explanation of the benefits. ECF No. 286 at 22.

One class member objected that VEBA Committee member Jeanette Stump has a conflict of interest. *See* ECF No. 275. In response, the parties state that Ms. Stump and the other committee members are bound by fiduciary obligations and must discharge her duties solely in the interest of participants and for the exclusive purpose of providing benefits to participants and paying the reasonable expenses of administering the VEBA and the health and welfare plans that provide benefits to participants. ECF No. 286 at 22.

One class member objected that deceased retirees should receive the same benefits as living class members. *See* ECF No. 246. In response, the parties note that this objection supports the Lump Sum Proposal and argues that all class members, living and deceased should share in

the same "tax free" equal payment. The parties state that the proposed settlement provides full benefits for surviving spouses. ECF No. 286 at 22.

One class member objected that the cost reimbursement provision could result in a loss of ACA subsidies or higher taxes. *See* ECF No. 275. In response, the parties acknowledge that this is a possibility, but state the class members were informed at a meeting on October 14, 2015, that those who desire to retain subsidized ACA coverage should not immediately seek reimbursement and should delay receipt of this benefit until they are no longer eligible for an ACA subsidy. *See* ECF No. 288-1 at ¶ 58. The parties also note that payment in cash under the Lump Sum Proposal would face a similar challenge with respect to ACA subsidy eligibility. *Id.* at ¶ 59.

One class member objected to the possibility that premiums could increase in 2019. *See* ECF No. 256. In response, the parties state that this design is necessary to ensure that the VEBA funds are available for as long as possible. ECF No. 286 at 24.

One class member objected that class members should be able to choose between a lump sum payment and VEBA benefits. *See* ECF No. 256. In response, the parties state that such an option would adversely impact the VEBA by diluting the fund and would prevent the VEBA from providing the healthcare benefit to those class members who need it most. ECF No. 286 at 24.

One class member objected that pre-Medicare class members eligible for coverage pursuant to the ACA or HCTC, or because of a spouse's employment, should not be precluded from selecting VEBA coverage. ECF No. 275. In response, the parties state that this requirement

has been eliminated upon consideration, and that pre-Medicare coverage under the VEBA will be available to anyone who selects it. ECF No. 288-1 at ¶ 60; ECF No. 286 at 24.

Certain of the objections demonstrate a misunderstanding of the settlement proposal.

One class member objected that failure to obtain pre-Medicare health insurance coverage from the VEBA would result in loss of the cost reimbursement benefit and loss of the death benefit. *See* ECF No. 264. In response, the parties state that there is no such requirement. ECF No. 288-1 at ¶ 64.

One class member objected that coverage could end in 2019. *See* ECF No. 267. In response, the parties state that this class member may have misunderstood the class notice, which indicated that the VEBA Committee cannot increase premiums before January 1, 2019. *See* ECF No. 288-5 at 7. The parties note that VEBA coverage is expected to last until 2034. ECF No. 286 at 20; ECF No. 289 at 6-7.

Two class members objected that life insurance is not included in the proposed settlement. *See* ECF Nos. 254, 256. In response, the parties state that the proposed settlement includes a $5000 benefit to be paid to the surviving spouse or other beneficiary of any retiree who has died since November 1, 2013, and is also included for those who die in the future. ECF No. 286 at 23.

Two objections were filed on January 8, 2016. *See* ECF Nos. 296, 297. These objections were filed outside of the time period for objections set out in the Court's order granting preliminary approval of the settlement. *See* ECF No. 240 at ¶ 5. These objections are therefore waived pursuant to that order. The Court notes that each of the two class members who filed these objections previously filed an objection within the time frame set out in the order granting

preliminary approval, and also spoke at the Fairness Hearing held on January 5, 2016. *See* [ECF Nos. 255](#), [271](#). These two class members were therefore given an opportunity to be heard both prior to and during the Fairness Hearing.

As noted above, the Court held a settlement Fairness Hearing on January 5, 2016, during which all who so requested were given a full and fair opportunity to be heard. Nine members of the Class voiced objections at this hearing.

Thomas Brawley, a Medicare-eligible individual, spoke on behalf of those who support the Lump Sum Proposal. Mr. Brawley explained that he accepts the settlement amount but does not agree with the VEBA structure and would prefer a cash settlement. He stated that he believed a cash settlement would be better for the class than the VEBA structure. He also stated that he had been told that a cash settlement could be distributed in such a way that it was not subject to federal taxes.

Donald Osborn also spoke in support of the Lump Sum Proposal. He argued that FreightCar retirees should have control over the manner in which the settlement money is paid and that the parties should research whether it would be possible to distribute the cash settlement tax free.

Samuel Pollak, a pre-Medicare individual, also spoke in support of the Lump Sum Proposal. Mr. Pollak expressed that he had not received answers to his questions at meetings held to explain the proposed Settlement Agreement, and stated that he believed the settlement money should be divided evenly among the class members.

Diane Robinson is a pre-Medicare individual who is married to Joseph Robinson, a Medicare-eligible individual. Ms. Robinson stated that she did not believe that the settlement

amount is adequate. Ms. Robinson proposed two alternate solutions: (1) an adequately-funded VEBA; and (2) a Health Reimbursement Account (**HRA**). Ms. Robinson also raised questions as to how certain provisions of the Affordable Care Act would affect the VEBA, and whether premiums under the VEBA were likely to increase in the future. In response, a witness for the plaintiffs noted that the dollar amounts of premiums were likely to increase in the future, but that the percentages would not increase. The witness also indicated that the VEBA Committee would have to take ACA provisions into account as they became effective to optimize the use of funds under the VEBA.

Daniel Sojak, a pre-Medicare individual, stated that the premiums under the VEBA are not affordable. Mr. Sojak also questioned whether he and other class members would be able to navigate the proposed settlement without adverse impact on their current healthcare. A witness for the plaintiffs stated that the VEBA Committee would send a letter to class members explaining the nature of the benefits and the ways to draw on those benefits without having an adverse impact on current healthcare eligibility.

David Waltimire expressed his support for the Lump Sum Proposal and stated that he believed this money should not be subject to taxes.

Karen Shaw, a pre-Medicare individual who is married to a pre-Medicare individual, expressed her belief that the proposed VEBA settlement is not fair and also noted that the settlement does not provide reimbursement for life insurance premiums that class members have already paid.

Stan Rok objected to the settlement on the ground that it is not fair that some members of the class received higher percentages of their past healthcare expenses than others.

Lastly, Thomas Shulte stated that he disagreed with the VEBA structure and expressed his support for the Lump Sum Proposal.

### d. Analysis

This section first addresses the sufficiency of the class notice under the requirements of FRCP 23(e), the Class Action Fairness Act of 2005 (**CAFA**), and due process considerations. Second, this section addresses the fairness of the proposed settlement using the *Girsh* factors to guide the analysis. The Court finds, as set out below, that the class notice meets the requirements under applicable law and finds further that the proposed settlement is fair, adequate, and reasonable.

### i. Class Notice

FRCP 23(e) requires the court to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed.R.Civ.P. 23(e). CAFA requires that defendants serve upon certain State and Federal officials a notice of any proposed class action settlement within ten days of it being filed in court. *See* 28 U.S.C. § 1715. Due process considerations require that notice to class members be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

In its Preliminary Approval Order, the Court found that the proposed notice "clearly explain[ed] the nature of the claims at issue, the history of the litigation, the risks inherent at trial, the amount of the settlement, and the basic parameters of the benefits class members would receive from the VEBA if the settlement were approved." ECF No. 240 at 2. Further, the

Court found that "direct mailings of the proposed class notice [were] appropriate" and that "the parties' proposed notice method and notice documents provide the best notice practicable under the circumstances." *Id*. at 2-3. The Court therefore ordered as follows:

> The Court orders that Plaintiffs' counsel mail the proposed notice to the last known address of each member of the settlement class within seven (7) days after the entry of this order. If notice to any member of the settlement class is returned as undeliverable, the parties shall attempt to deliver the notice or otherwise notify the subject class member in the manner set forth in the proposed settlement agreement.

*Id*. at 4.

The Court notes that one class member objected that the class notice materials were unclear. *See* ECF No. 275. Upon further review of this objection, however, the Court finds that it takes issue with the benefits under the settlement proposal, but does not provide a basis for the Court to find that the class notice materials failed to satisfy the requirements of FRCP 23(e) or due process considerations.

Along with the joint brief in support of final settlement approval, the parties submitted the Declaration of Pamina Ewing, wherein she stated that class counsel caused the class notice to be mailed by First Class Mail to class members' last known addresses. *See* ECF No. 288-4 at ¶¶ 5-6. The parties also submitted the Declaration of Brian D. Netter, counsel for Defendants in this action, wherein he stated that individuals acting under his direction served notice of the settlement on certain identified Federal and State officials as directed in 28 U.S.C. § 1715(a). *See* ECF No 291.

The Court finds that the class notice, in plain English, described the terms and benefits to be provided to the class and the binding effect of the settlement, including releases given to

Defendants, gave notice of the time and place of the Fairness Hearing, described how an objection could be made to entry of the final approval order and the deadline for filing such an objection, and described how class counsel would apply to the Court for an award of attorneys' fees and expenses and the deadline for the filing of such an application.

The Court therefore finds that the notice sent to class members here complied with the requirements of FRCP 23(e) and CAFA, and satisfied due process considerations.

### ii. Fairness of the Proposed Settlement Agreement

Federal Rule of Civil Procedure 23(e) requires that a class action settlement be fair, reasonable, and adequate. In this Circuit, the nine-factor *Girsh* test guides this analysis. *See Girsh*, 521 F.2d at 157. The *Girsh* test directs the court to conduct a "substantive inquiry into the terms of the settlement relative to the likely rewards of litigation," and "a procedural inquiry into the negotiation process." *General Motors*, 55 F.3d at 796. The Court cannot substitute its own view of what an "ideal" settlement would be for the one proposed by the parties, and "[s]ignificant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class." *Lake v. First Nationwide Bank*, 900 F.Supp. 726, 732 (E.D.Pa. 1995) (internal quotations omitted). The issue is therefore "whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement." *In re PrudentialentailCo of America Sales Practices Litig.*, 962 F.Supp 450, 534 (D.N.J. 1997).

The Court will address each of the nine *Girsh* factors below, taking into account the arguments supporting and objecting to the proposed settlement agreement. For the reasons discussed below, the Court finds that these factors, when considered together, support final approval of the proposed settlement agreement.

As a preliminary matter, the Court finds that the settlement agreement was negotiated vigorously, in good faith, and at arm's length, and notes that class counsel has endorsed the settlement.

### 1. The Complexity, Expense, and Likely Duration of the Litigation

With regard to the first factor, the complexity and duration of the litigation, the parties argue that "a continuation of this litigation would be costly and time consuming." ECF No. 288 at 8. The parties note that this dispute dates back to 2002 with the original *Britt* and *Deemer* cases, and that but for the proposed Settlement Agreement, trial and inevitable appeals would result in further delay in the resolution of this matter. *Id*. The parties argue that such delay would be harmful to class members, many of whom are already over the age of 65 and are in need of healthcare benefits now. *Id*.

Continuing litigation in this matter would result in a complicated trial with inevitable post-trial motions and appeals that would prolong the litigation, reduce the value of any recovery to the class, and deprive healthcare coverage from class members who need it immediately. The Court therefore agrees with the parties that this factor weighs in favor of final approval of the proposed settlement agreement.

### 2. The Reaction of the Class to the Settlement

The second factor, the reaction of the class to the settlement, "attempts to gauge whether members of the class support the settlement." *In re Cmty. Bank of N. Va.*, 2008 U.S. Dist. LEXIS 62787, at *27 (W.D.Pa. Aug. 14, 2008) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004)).

As described above, a substantial number of class members object to the proposed settlement agreement. Taking the thirty-three written objections, the 409 Lump Sum Objectors, and the nine objections heard during the Fairness Hearing, there are approximately 451 total objections[5] to the settlement out of the 1,085 member class. The Court takes note that this is a large proportion of the class, and the Court has fully considered each objection that was filed.

The Court notes, however, that while the number of objections relative to class size is one factor for the Court to consider in assessing fairness, it is not determinative. The Third Circuit has explained, "a settlement is not unfair or unreasonable simply because a large number of class members oppose it. The drafters of Rule 23…did not require rejection of a settlement on objection of a given part of the class." *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974). Indeed, courts regularly conclude that a strong objection to a settlement, including where the class representatives are among the objectors, cannot serve as an automatic bar to approval when the district judge determines, having considered the settlement, objections, and risks of litigation, that the proposed settlement is reasonable in light of these factors. *See, e.g.*, *Walsh v. Great Atlantic & Pacific Tea Co.*, 96 F.R.D. 632, 643 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3d Cir. 1983) (noting that even when named plaintiffs join a substantial number of class members in objecting to a class action settlement, the court may still deem that settlement fair and adequate); *Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) (affirming final approval of settlement where all class representatives objected to the settlement and noting that "assent of class representatives is not essential…as long as the Rule requirements are met"); *TBK Partners,*

---

[5] The Court notes that there is some overlap between those who signed the Lump Sum Proposal petition and those who submitted written and oral objections to the Court.

*LTD v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982) (approving settlement where class members who held over 50% of the shares of stock at issue objected to the settlement); *League of Martin v. City of Milwaukee*, 588 F.Supp. 1004 (E.D.Wisc. 1984) (approving settlement over objections of more than half of the class).

Having determined that the number of objectors is not determinative in this case, the Court now turns to the substance of the objections.

Given the number of class members that support it, the Court takes seriously the Lump Sum Proposal, and understands the view that this structure may seem more equitable on its face than the VEBA proposal. The Court finds, however, that the Lump Sum Proposal does not support a finding that the proposed settlement is not fair, reasonable, and adequate for three main reasons.

First, the Court recognizes that its role at this stage is not to determine whether another form of settlement may be preferable, but rather to determine whether the settlement as proposed is fair, adequate, and reasonable, as FRCP 23(e) requires. Courts recognize a difference between objections to the form of settlement, like the Lump Sum Proposal, and objections to the amount of settlement. With respect to the former, the Court's role is more limited, as it "does not have the authority to impose a preferred payment structure upon the settling parties." *Casey v. Citibank, N.A.*, 2014 WL 4120599, at *2 (N.D.N.Y. Aug. 21, 2014). Therefore, when class members object to the manner in which settlement funds are allocated, rather than the amount of settlement, courts are unlikely to allow objectors, even where they represent a majority of the class, to impose their will on the other class members. *See Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1217 (5th Cir. 1978); *accord TBK Partners, Ltd. V.*

*Western Union Corp.*, 675 F.2d 456, 462-63 (2d Cir. 1982). Here, the Lump Sum Objectors do not argue that the settlement amount is inadequate. Rather, the Lump Sum Objectors take issue with the manner in which those funds will be distributed to class members over time. The Lump Sum Proposal therefore does not convince the Court that the proposed settlement should not be granted final approval unless it otherwise demonstrates that the proposed settlement is unfair.

Second, the Court finds that the Lump Sum Proposal is not a viable alternative to the proposed settlement. The Court notes that many Lump Sum Objectors have indicated that they would prefer a lump sum payment of the settlement funds tax free. The Court finds, based on testimony presented at the Fairness Hearing, and affidavits submitted to the Court, including the affidavit of Douglas Greenfield, who prepared an independent memorandum comparing the tax consequences of the proposed settlement to those of the lump sum cash payment proposal, that any such cash disbursement of settlement funds would be subject to significant federal and state taxes. Such taxes would substantially reduce the total amount of the settlement before it reached the class members. *See* ECF No. 288-3 at 2-5. The benefits under the proposed settlement agreement, in contrast, with the exception of the death benefit payment, would avoid taxation. *Id*.

Third, the Court notes that the case at hand concerns a dispute over an employer's alleged obligation to provide health insurance benefits to retirees. Therefore, although an evenly distributed cash settlement may be more attractive to members of the class that already have viable healthcare options, such a structure would not remedy the alleged harm in this case, because it would not include a healthcare component. *See* ECF No. 288-1 at ¶¶ 56-57. The fact

that some members of the class may choose to opt out of the VEBA coverage does not, therefore, support a finding that the proposed settlement agreement is unfair, as the benefit under the VEBA will continue to exist for those members should they choose to use it in the future.

The Lump Sum Proposal therefore does not convince the Court that the proposed settlement fails to meet FRCP 23(e)'s requirements. The remaining objections similarly do not support a finding that the settlement is unfair, inadequate, or unreasonable.

The Court pays particular attention to those objections that indicate a belief that the settlement amount is inadequate, because, as noted above, such objections are afforded more weight in the Court's analysis. *See Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987). The Court notes that only seven objections argue that the settlement amount is inadequate. *See* ECF Nos. 244, 246, 254, 255, 257, 262, 272. In consideration of this relatively small number of objections to the settlement amount, and taking into account the fact that the settlement was negotiated at arm's length by counsel who had prepared up to the brink of trial, the Court finds that these objections do not weigh against final approval of the proposed settlement.

The remaining objections are limited in number and do not indicate to the Court that the proposed settlement is unfair, inadequate, or unreasonable. Although some objectors are understandably frustrated that they will not benefit from the settlement immediately, or that the settlement may benefit some class members differently than others, the Court must view the settlement in light of the benefits it will provide to the Class as a whole and over time. This analysis indicates that the objections do not weigh against granting final approval to the proposed settlement.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

The third factor takes into account the stage of the proceedings and the amount of discovery completed. This factor assesses "the degree of case development that class counsel have accomplished prior to settlement…[to] determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Corp.*, 55 F.3d at 813.

The parties filed the joint motion to cancel trial just five days before trial was set to begin. *See* ECF No. 233. Given that the parties in this case negotiated settlement after having prepared extensively for trial, including preparing witness lists, filing motions in limine, and filing trial briefs with the court, there can be little doubt that the parties understood the merits and weaknesses of their respective positions. This factor weighs in favor of granting final approval of the proposed settlement agreement.

### 4. The Risks of Establishing Liability and Damages

*Girsh* factors four and five assess the risks of establishing liability and the risks of establishing damages. The fourth factor assesses "what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 322 (3d Cir. 2011). Similarly, the fifth factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Id.* (internal quotations omitted). The Court notes that one class member expressed a preference that the case go to trial rather than settle *See* ECF No. 257 at 1. Nevertheless, the Court finds that the complexity of this case and uncertainty on both sides with respect to both liability and damages weigh in favor of granting final approval of the settlement.

As the parties note, Plaintiffs and Defendants filed cross motions for summary judgment in this case, which the Court denied. *See* [ECF No. 161](). The Court continues to view the issues of liability and damages in this case as complex and concludes that litigation would have presented substantial risks for all parties.

Moreover, even if Plaintiffs could secure a judgment in their favor and in the amount requested, there are risks associated with the amount of time it would require to arrive at a final judgment in this case. No matter the result at the trial level, post-trial motions and appeals would have been likely and would have resulted in further expense to the parties. Given these factors, and the strong public policy in favor of settlement of class actions, *see In re General Motors*, 55 F.3d at 784, the Court finds that factors four and five weigh in favor of final approval of the proposed settlement.

### 5. The Risks of Maintaining the Class Action Through Trial

The sixth *Girsh* factor addresses the risks of maintaining the class action through trial. This factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial in light of the fact that the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." *Sullivan*, 667 F.3d at 322 (internal quotations omitted).

The court finds that the risk of decertification in this case is very small, given that trial was imminent when the settlement was reached and the class was still intact at that point. The Third Circuit has indicated, however, that this factor may carry little weight in the overall analysis of whether to grant final approval to a class action settlement: "Because the district court always possesses the authority to decertify or modify a class that proves unmanageable,

examination of this factor in the standard class action would appear to be perfunctory." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 321 (3d Cir. 1998).

Moreover, the settlement in this case is reasonable not because of the risks associated with decertification of the class, but because of the risks associated with establishing liability and damages and securing a judgment within a reasonable time frame. The Court therefore finds that this favor weighs neither in favor of nor against granting final approval to the proposed settlement at hand.

### 6. The Ability of the Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor "considers whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537-38 (3d Cir. 2004) (internal quotations omitted). At least one class member objected to the proposed settlement on the ground that FreightCar can afford to pay a larger settlement. *See* ECF No. 257. The Court takes this objection into account, but finds that there is no evidence before it to support a finding about FreightCar's ability to pay a greater judgment. Moreover, "the fact that [a defendant] could afford to pay more does not mean that it is obligated to pay more than what the…class members are entitled to under the theories of liability that existed at the time the settlement was reached." *In re Warfarin*, 391 F.3d at 538. The Court therefore concludes that this factor does not weigh either in favor of or against granting final approval of the settlement.

7. **The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of All the Attendant Risks of Litigation**

"The last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. These factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id*.

The parties argue that the proposed settlement covers a large portion of plaintiffs' best possible outcome. The parties note that under the previous agreement, FreightCar paid between $4 million and $4.5 million annually to fund the class's premiums, compared to this settlement, where the VEBA will receive at least $31.45 million from the settlement amount that FreightCar pays. *See* ECF No. 288 at 18. The parties also argue that the VEBA proposal reasonably approximates the benefits the class previously enjoyed, and that it also provides management by the independent VEBA trustees who owe fiduciary obligations to the beneficiaries, independence from FreightCar's future success, independence from collective bargaining, and upfront funding by FreightCar. *Id*. at 18-21. At the Fairness Hearing, the Court heard from Chris Birch, an independent actuary that FreightCar called to discuss the healthcare benefits under the VEBA proposal. Mr. Birch compared the VEBA plans to the 2013 plan, and concluded that although there are items that differ, generally the healthcare plans offered under the VEBA are comparable to those offered in 2013. The Court finds that the settlement is reasonable in light of the plaintiffs' best possible recovery.

The Court also finds that the settlement is reasonable in light of the attendant risks of litigation. As noted above, the plaintiffs' best possible outcome was not certain in this case, as

the theories of liability and damages are complex on both sides. Many legal and factual questions could have prevented a full recovery at trial, and these risks would have continued at the post-trial and appellate stages. The Court therefore finds that *Girsh* factors eight and nine weigh in favor of granting final approval of the settlement.

## VI. Conclusion

For the foregoing reasons, the Court holds that the proposed settlement agreement is fair, reasonable, and adequate, and meets the requirements for settlement approval under applicable law. The Court therefore grants final approval of the settlement agreement.

This memorandum of law is filed in support of the Final Order and Judgment that follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION

| | |
|---|---|
| ANTHONY J. ZANGHI, *et al.*, | No. 3:13-CV-00146 |
| Plaintiffs, | Hon. Kim R. Gibson |
| v. | |
| FREIGHTCAR AMERICA, INC., *et al.*, | |
| Defendants. | |

### ~~[PROPOSED]~~ FINAL ORDER AND JUDGMENT

Based on the Court's review of the pertinent files, records, and proceedings in this matter, including the evidence and testimony offered at the hearing held January 5, 2016, the Court enters the following Order and Final Judgment pursuant to the terms of a Class Action Settlement Agreement dated September 22, 2015, which is binding upon and inures to the benefit of Plaintiffs Anthony J. Zanghi, Kenneth J. Sowers, Dominic McCuch, James Hohman, and Darrell Shetler, individually and as representatives of the Plaintiff Class (collectively, "Class Representatives"), Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("Union"), each of the Defendants (collectively, "FCA"), and the Class described below. To the extent not otherwise expressly defined herein, all capitalized terms shall have the same meaning as used in the Settlement Agreement.

IT IS HEREBY ORDERED AND ADJUDGED:

1.    The underlying dispute in this matter began in 2002, when FCA ceased paying for healthcare and life insurance benefits for some former employees. Three previous lawsuits were

1

filed, with each reaching a settlement agreement, before Plaintiffs brought this action in 2013. Plaintiffs claim that FCA's conduct violated Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1973, 29 U.S.C.§ 1132(a)(1)(B), and Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. Plaintiffs have alleged that a continuation of coverage provision in a benefits plan provided by a predecessor to FCA created vested lifetime benefits. Defendants deny this, claiming that the continuation of coverage provision was insufficiently clear to vest lifetime benefits.

2.      On September 28, 2015, this Court certified the Class for settlement purposes to include:

> (a) former FreightCar employees that were represented by the USW at the time of their retirement from FreightCar, and who upon retirement received or were eligible to receive medical and life insurance benefits under the JAC USWA Health and Welfare Plan (the "Plan"); and (b) those individuals who received or were eligible to receive medical and life insurance benefits under the Plan as a spouse, surviving spouse, or dependent of an aforementioned former FreightCar employee.

3.      The Court has jurisdiction over the subject matter of this action and over all parties to the action and the Settlement Agreement, including all members of the Class.

4.      On September 28, 2015, this Court entered an order granting preliminary approval (the "Preliminary Approval Order") of the settlement memorialized in the parties' proposed Settlement Agreement dated September 22, 2015 ("Settlement Agreement"), and approving the form of Class Notice and directing the manner of delivery. See Dkt. #240.

5.      The Court finds that in accordance with the Preliminary Approval Order, Class Notice was timely distributed by first-class mail to all members of the Class who could be identified with reasonable effort. In addition, pursuant to the Class Action Fairness Act, 29 U.S.C. § 1711, et seq., notice was provided to the Attorneys General for each of the states in

2

which a Settlement Class Member resides, the Attorney General of the United States, and the United States Secretary of Labor.

6.      The Court determines that the Class Notice transmitted to the Class Members pursuant to the Preliminary Approval Order and the Settlement Agreement constituted the best notice practicable under the circumstances and provided individual notice to all members of the Class who could be identified through reasonable efforts. The Class Notice provides valid, adequate, and sufficient notice of, among other things, these proceedings, and the settlement to all persons entitled to such notice. Such notice has fully satisfied the prerequisites and requirements of Fed. R. Civ. P. 23, due process, and any other applicable law. In addition, all requirements of the Class Action Fairness Act, 29 U.S.C. § 1711, *et seq.*, have been met.

7.      Under the proposed settlement and as described in the Class Notice, three types of benefit will be provided to Class Members through a voluntary employees' beneficiary association, or VEBA. The VEBA will provide reimbursement up to certain amounts for expended healthcare costs (available to class member retirees and surviving spouses); a death benefit (paid to surviving spouses or other designated beneficiary upon the death of retiree); and health insurance (available to all class members).

8.      The maximum amount of reimbursement that retirees and surviving spouses can receive depends on whether they were eligible for Medicare during the 29-month period beginning November 1, 2013 and ending March 31, 2016. Retirees and surviving spouses who were not eligible for Medicare before March 31, 2016 can receive reimbursement of up to $6,728. Retirees and surviving spouses who were eligible for Medicare during the entire 29-month period beginning November 1, 2013 and ending March 31, 2016 can receive up to $2,349 in reimbursement. Retirees and surviving spouses who were eligible for Medicare for part but

3

not all of the 29-month period beginning November 1, 2013 and ending March 31, 2016 will receive reimbursement of $81 per month for each month that they were eligible for Medicare (with proof of their Medicare Part B payments), and up to $232 for each month that they were not yet eligible for Medicare.

9.     As to the death benefit, the VEBA will pay a $5,000 cash death benefit as to any retiree who died after November 1, 2013.

10.    As to the VEBA health insurance benefit, the VEBA will offer two benefit programs for class members not yet eligible for Medicare and two benefit programs for class members eligible for Medicare.

11.    The VEBA will pay 50% of class members' monthly premium for both of the pre-Medicare programs. Under the first such program, after the VEBA subsidy is paid, the individual premium is $538 per month and $1074 per family. Under the second pre-Medicare program, pre-Medicare class members are responsible for monthly premiums of approximately $480 per individual and $959 per family. Further details concerning the programs are described in the December 21, 2015 Declaration of Jeanette Stump ("Stump Declaration") (Dkt. #288-1). As explained in the Stump Declaration, given publicly available plan options, these programs of coverage offer substantial savings to pre-Medicare retirees. Id. ¶ 25.

12.    As to Medicare-eligible retirees, the VEBA will pay 70% of the monthly premium for each program. Under the first program for Medicare-eligible retirees, class members will pay approximately $85 a month for a comprehensive Medicare Advantage plan. Under the second program for Medicare-eligible retirees, each class member's share of the premium will be $43.20 per month. Further details concerning the programs are described in the Stump Declaration. Id. ¶¶ 27-28.

4

13.     Members of the Class have had an opportunity to be heard on all issues regarding the resolution and release of their claims by submitting objections to the Settlement Agreement to the Court and by testifying at the final approval hearing.

14.     On January 5, 2016, 2016, the Court held a settlement fairness hearing (the "Fairness Hearing"), for which members of the Class had been given appropriate notice. A full and fair opportunity to be heard was given to all persons who requested to be heard in accordance with the Preliminary Approval Order and Class Notice.

15.     This Court has considered each of the objections and overrules each with prejudice.

16.     Approximately 409 class numbers, including the five class representatives, signed a petition indicating that instead of the benefits provided by the proposed settlement, they would prefer that each retiree and surviving spouse receive a tax-free lump sum cash payment. Approximately twenty-six class members, almost all of whom also signed the petition, also filed individual objections to similar effect. This objection does not impugn the fairness, adequacy, or reasonableness of the settlement. First, this objection does not take issue with the fact of settlement, or the amount of settlement, but simply objects to the form of the settlement. Second, the Court finds that the lump sum remedy proposed by these Class Members is not in the best interest of the Class a whole because it does not include any health insurance benefit, which the Court finds based on the evidence presented is needed by many Class Members and will be needed by additional Class Members in the future. Third, any cash payment to the Class would be treated as taxable income, thereby reducing the overall recovery of the Class by up to between 35% and 45%, and potentially making some Class Members ineligible for other subsidies, notably under the Affordable Care Act.

5

17.     Approximately five Class Members have objected that the Settlement will not reimburse them for past medical expenses, or that the proposed reimbursement is too low. In fact, the proposed Settlement will reimburse for previously incurred expenses, although those reimbursements are indeed capped. The Court finds that the amount provided for in the Settlement is reasonable, fair, and adequate in light of the risks and delay of further litigation.

18.     Approximately eighteen Class Members have objected that the premiums for the proposed VEBA plans are too expensive. This Court first notes that a majority of the Class is currently eligible for Medicare while many more will soon become eligible (see Appendix B to the Declaration of Chris Birch (Dkt. #290)), and that, as discussed, the available Medicare plans are very affordable, at $85 or $43.20 per month. While the premiums for pre-Medicare plans are more expensive, these Class Members will also receive a much higher dollar subsidy from the VEBA, until they become eligible for the cheaper Medicare Advantage plans. This Court finds that the proposed settlement provides a fair and equitable manner of providing for healthcare benefits for the Class.

19.     Approximately six Class Members have objected to the VEBA's proposed management fees. The Court finds that the VEBA fees are very reasonable, and that this structure will enable economies of scale in managing and investing the Net Settlement Amount. See Stump Decl. ¶¶ 13-14.

20.     Approximately Six Class Members have objected that the VEBA will run out of funds in the near future. These objections appear to stem from a misunderstanding of a statement in the Class Notice. While the Class Notice states that the VEBA may alter the subsidy scheme in 2019, actuary Chris Birch estimated, using reasonable assumptions, that the VEBA will likely be able to offer comparable benefits until approximately 2034. While this is

6

not the equivalent of lifetime healthcare, the Court finds that it is fair, adequate, and reasonable given the risks of continuing the litigation.

21.     Approximately one Class Member has objected that the VEBA will make Class Members ineligible for cheaper insurance plans available from other employers. Without detail concerning these other plans, which the objection has not provided, the Court cannot assess whether these concerns are founded. The Court notes, however, that the VEBA is expected to be available to the Class for approximately eighteen years, providing a safety net to any Class Member who may lose health insurance during that time. That is a fair, adequate, and reasonable resolution of this dispute for the Class.

22.     Approximately one Class Member has objected that newly married spouses will be ineligible for health insurance under the VEBA while ex-spouses will be eligible.  The Court rejects this objection because the Class certified by this Court in the Preliminary Approval Order includes spouses who were previously eligible for benefits under the Plan.  In addition, and as attested to by Ms. Stump, this is the historical approach to coverage in the Union-represented steel industry.  Stump Decl. ¶ 63.

23.     Approximately eight Class Members have objected that the FreightCar Payment is too low.  This objection merits careful consideration, as the Settlement Agreement offers less to the Class than they could have received if they had prevailed at trial or on appeal.  Nevertheless, this Court finds that Class Counsel, after bringing this case to the brink of trial, have made a fair and informed decision to exchange the uncertainty of litigation for the certainty of a settlement, and that the FreightCar Payment is a fair, adequate, and reasonable sum given the factual and legal disputes in this litigation.

24.     Approximately one Class Member has objected that she would prefer to go to trial.  Different people have different tolerances for risk, and this Court notes that many Class Members, including one who so wrote to this Court, need subsidized healthcare now.  It is fair and reasonable for Class Counsel to settle this case now, so that the Class may receive benefits sooner and have certainty of receiving some benefits.

25.     Approximately eight Class Members have objected that Class Members not yet eligible for Medicare should receive more from the settlement and that the proposed settlement treats Medicare-eligible class members more favorably than pre-Medicare class members.  The Court rejects this objection for several reasons.  First, and as explained by Ms. Stump, pre-Medicare coverage, when compared to unsubsidized alternatives, will cost a couple approximately $750 less per month.  Stump Decl. ¶ 45.  The VEBA subsidy to Medicare-eligible class members is a lower dollar amount.  Second, pre-Medicare retirees often have other opportunities for subsidized coverage available to them, such as under the Affordable Care Act.  Third, pre-Medicare retirees will be able to take advantage of subsidized Medicare-eligible coverage upon reaching Medicare age. Conservation of VEBA funds will enable the VEBA to fund benefits for a longer period of time, thus preserving benefits for most pre-Medicare retirees once they reach Medicare age. By structuring the available coverage to encourage pre-Medicare class members to take advantage of other subsidized benefits, VEBA funds will be preserved and VEBA benefits will be available to all retiree class members long into the future. See id.  While many pre-Medicare class members thus will have one or more relatively affordable healthcare options, Medicare-eligible class members will not be able to obtain comprehensive coverage on an individual basis, except to the extent that they or their spouse have access to employer-

8

provided group health insurance. Id. ¶ 46. The Court finds that the proposed distribution of benefits from the VEBA is fair, adequate, and reasonable.

26.     Approximately two Class Members have objected that the attorneys' fees in this case are too high. The Settlement Agreement provides that FreightCar will pay $32.75 million to settle the claims of the Plaintiffs. The Court finds that the requested $1.3 million fee and expense award is justified under ERISA, which provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Settlement Agreement clearly represents "some degree of success on the merits" within the meaning of Hardt v. Reliance Standard Life Insurance Co., 560 U.S. 242, 245 (2010). Templin v. Independence Blue Cross, 785 F.3d 861, 866 (3d Cir. 2015). The Court has considered the five factors identified in Ursic v. Bethlehem Mines, 719 F.2d 670, 673 (3d Cir.1983), and finds that they support an award of fees and costs to Plaintiffs since the lawsuit was brought to benefit a class, and the Settlement will result in retiree medical and life insurance benefits to over 1000 Class members. Attorney fee and expense awards under ERISA are generally determined under the "lodestar" approach. Hahnemann University Hospital v. All Shore, Inc., 514 F.3d 300, 310 (3d Cir. 2008). The Court has reviewed the declarations of Counsel and attached exhibits and finds that they represent reasonable hourly rates and a reasonable number of hours in the prosecution of this case. The requested fee is also reasonable when cross-checked under the "common fund doctrine." Where a common fund is created for the benefit of the Class, class counsel is entitled to recover a "percentage-of-the-fund." See Brytus v. Spang & Co., 203 F.3d 238, 243 (3d Cir. 2000). The requested award of $1.3 million represents less than 4% of common fund, which is well-below the range of awards in similar class actions. See e.g., In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 822 (3d Cir.

9

1995).   Thus, the Court concludes that either under a "lodestar" analysis under ERISA, a "percentage-of-the-recovery" analysis under the common fund doctrine, or a blended approach whereby one analysis is used to "cross-check" the other, see In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions, 148 F.3d 283, 333 (3d Cir. 1998), the fees requested by Class Counsel are fair and reasonable, and the Court overrules the objection as to Class Counsel's fees.

27.   Approximately two Class Members have objected that Class Counsel have been ineffective, or that they have a conflict of interest. This Court finds that Class Counsel has been more than adequate. They have persistently prosecuted the claims of the Class and have obtained a settlement for the Class that is fair, adequate, and reasonable.

28.   Approximately four Class Members have objected that they are also owed life insurance. This court dismisses this objection, as the Settlement Agreement provides for a death benefit.

29.   Approximately one Class Member has objected that FreightCar could afford to pay more.  This is immaterial, because the analysis must focus on the reasonableness of the settlement given the factual and legal arguments raised by the parties. In light of those disputes, this Settlement is reasonable.

30.   Approximately two Class Members have objected that they will lose the right to bring suit against FreightCar if the VEBA runs out of funds.  The Court dismisses this objection, as it is a necessary component of what is overall a fair, adequate, and reasonable settlement.

31.   The Court has considered each of the relevant factors considered in this Circuit, see Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), and finds that the Settlement Agreement is fair, adequate, and reasonable.

32.     The <u>Girsh</u> factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

33.     The first <u>Girsh</u> factor weighs in favor of approval. The underlying dispute has produced four separate class actions, and there was no end in sight. A trial in this matter would have been complex and expensive, and a judgment would have been followed with further appeals. This delay would have harmed the Class Members who need health care immediately. Therefore, the complexity, expense and likely duration of this action weighs in favor of approval.

34.     Although the second <u>Girsh</u> factor does not weigh in favor of approval, it also does not compel this Court to reject the Settlement. Many class members have voiced objections. But the objections have not raised any unfair, inadequate, or unreasonable aspects of the Settlement, as discussed above.

35.     The third <u>Girsh</u> factor weighs in favor of approval. The parties brought this case to the brink of trial, after two years of pre-trial preparation, and many more years of proceedings in the three previous class actions. The parties had thoroughly considered the strengths and weaknesses of their respective positions before they entered into the Settlement Agreement, suggesting that it is fair, adequate, and reasonable.

36.     The Court finds that the fourth <u>Girsh</u> factor also counsels approval of the Settlement. If the parties had proceeded to trial, both Plaintiffs and Defendants would have

faced considerable risks. It is not necessary, or appropriate, for the Court to determine what the outcome would have been, but there were substantial legal uncertainties. For example, one of the Supreme Court's recent decisions, *M&G Polymers v. Tackett*, —— U.S. ——, 135 S.Ct. 926, 190 L.Ed.2d 809 (2015), suggests that changes to vested benefits may be permissible so long as they are "reasonable."

37.     The fifth <u>Girsh</u> factor weighs in favor of approval. Even if they had continued this litigation and prevailed, Plaintiffs' recovery was uncertain. Benefits would not have been reinstated until this Court entered a final judgment, which may have taken years.

38.     The Court finds that there was not a significant risk that the Class would have been decertified during trial. However, the Court finds that this, the sixth <u>Girsh</u> factor, does not affect the analysis in this case because the parties were motivated to settle by other, significant legal risks.

39.     This Court finds that the seventh <u>Girsh</u> factor is also immaterial in this case. The parties were not motivated to settle this case by the Defendants' inability to withstand a greater judgment. Rather, the parties were motivated by the risks associated with trial and appeal.

40.     Lastly, the Court finds that the eighth and ninth <u>Girsh</u> factors weigh in favor of approval. The Settlement is less than Plaintiffs' best possible recovery. But, it is still a significant benefit to the class, providing for subsidized health care until 2034, given reasonable assumptions. And the disparity between Plaintiffs' best possible recovery and this Settlement is reasonable given the risks associated with further litigation. Therefore, the eighth and ninth <u>Girsh</u> factors suggest that this Settlement is fair, adequate, and reasonable.

41.     Furthermore, the Court determines that the Settlement Agreement has been negotiated vigorously, in good faith, and at arms' length.

42.     The motion for final approval of the Settlement Agreement (ECF No. 287) is hereby **GRANTED**, the Settlement of the Class Action is **APPROVED** as fair, reasonable and adequate to the Class, and the Parties are hereby directed to take the necessary steps to effectuate the terms of the settlement.  Pursuant to Fed. R. Civ. P. 41(a)(2), the Court hereby dismisses the operative complaint, and all claims asserted therein are hereby dismissed with prejudice and without costs to any of the settling parties other than as provided for in the Settlement Agreement.

43.     Consistent with the release included in the Settlement Agreement, and with all terms defined in the Settlement Agreement with respect to the release having the same definitions herein, the Court hereby orders that "Upon the Effective Date, the Union, the Class Representatives and each of the Class Members shall have fully, finally and forever released, dismissed with prejudice, relinquished and discharged all Released Claims. This Release does not release claims by the Union or Class Members to enforce the Settlement Agreement or Judgment."  Further, "[w]ith respect to any and all Released Claims," the Court orders that upon the Effective Date, the Union, Class Representatives , and the Class Members "will be releasing all Released Claims, whether known or unknown, suspected or unsuspected, contingent or non-contingent." Without affecting the finality of this Final Order and Judgment, and consistent with the parties' agreement in the Settlement Agreement, the Court orders that it "shall retain jurisdiction with respect to implementation and enforcement of the terms of the Settlement Agreement."

44.     Upon entry of this Order, all Class Members shall be bound by the Settlement Agreement as amended and by this Final Order.

45. Class Counsel's requested fee and expense award of $1.3 million is hereby approved. The Court awards to Class Counsel reimbursement of their litigation expenses in the total amount of $27,931.23, including $25,621 for Feinstein Doyle Payne and Kravec, LLC, $142.81 for Brian Zimmerman of B. Zimmerman Law, and $2,167.42 for attorneys from Cornfield and Feldman, LLP. The Court awards $1,272,068.77 to Class Counsel as a reasonable attorneys' fee. Defendants shall make a payment in the total amount of $1.3 million to the law firm of Feinstein Doyle Payne & Kravec LLC within ten days of the Effective Date, as that term is defined in the Settlement Agreement.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

So ordered,

Dated: January 19, 2016    Entered: _____

The Honorable Kim. R. Gibson